IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. 14-603 |
| | : | CIVIL ACTION NO. 17-5243 |
| BRENT S. GALLETTA | : | |

## <u>MEMORANDUM OPINION</u>

Smith, J.                                                                July 17, 2023

     Currently before the court is an amended motion under 28 U.S.C. § 2255 filed by a movant who was sentenced to an aggregate term of imprisonment of 50 years after a jury convicted him of attempting to entice or coerce a minor, transporting child pornography, and possessing child pornography. The underlying facts relating to the three charges started with the movant posting a Craigslist advertisement looking for other "pervy dads" who like doing "taboo stuff." News of this advertisement eventually reached a special agent of the Pennsylvania Office of Attorney General, who was also a member of an FBI task force on child predators. The special agent, posing as a father with a six-year-old son and seven-year-old daughter, responded to the advertisement, and he and the movant engaged in text and email communication over a two-day period in July 2014 during which the movant increasingly expressed his sexual interest in the seven-year-old daughter, including explicitly expressing the unlawful sexual activity he wanted to engage in with her. Eventually, the movant and the special agent agreed to meet at a location and then travel to the special agent's residence, where the seven-year-old daughter would be present and wearing a bikini at the movant's request. The movant traveled in his car to the meeting location and was arrested upon his arrival. At the time of his arrest, the movant had a cellular phone in his car.

     Shortly after the movant's arrest, law enforcement obtained search warrants to search the cellular phone found in the car and an email address the movant had provided to the special agent

during their communications. During the search of the cellular phone, law enforcement recovered three thumbnail images of child pornography that had been deleted from the phone. During the search of the email account, law enforcement discovered that the movant had also shared child pornography while communicating with another individual. They also discovered additional communications the movant had with other individuals where he openly expressed his interest in minor girls.

Unfortunately, the events giving rise to the charges in this case were not the movant's only involvement with minor girls that resulted in criminal convictions. In 2001, he pleaded guilty in a Pennsylvania state court to two counts of corruption of minors relating to his unlawful communications with a 14-year-old girl. Then, approximately a year later, and while on parole on that charge, the movant was arrested on several charges relating to a 13-year-old girl and her 15-year-old sister. The undersigned, while serving as a Pennsylvania state trial judge, presided over this trial, which concluded with a jury finding the movant, who was 29 years old at the time of the offense, guilty of corruption of minors, graded as a first-degree misdemeanor, for meeting the 15-year-old girl in a movie theater and kissing her there. At sentencing, the movant was sentenced to the maximum allowable sentence for the offense, which was a minimum sentence of imprisonment for two-and-a-half years to a maximum of five years. The movant's parole on his first corruption of minors convictions was also revoked, and he was directed to be recommitted to serve the balance of his sentence. The movant challenged both sentences on appeal, but they were affirmed in a published opinion by a Pennsylvania intermediate appellate court.

Perhaps unsurprisingly, the movant was unhappy upon learning that the undersigned would be presiding over his federal trial after having sentenced him approximately ten-and-a-half years ago. Since the undersigned remembered the movant's name, a hearing was scheduled to allow

counsel the opportunity to ask the court questions about the prior trial. The court answered questions from the movant's counsel, two attorneys from the Office of the Federal Community Defender, the Assistant United States Attorney prosecuting the case, and the movant himself. The undersigned's answers revealed that the undersigned had no knowledge of the prior trial other than the information gained from reading the Pennsylvania appellate court's published decision. Although the undersigned indicated that there was neither bias against the defendant nor the appearance of bias, the undersigned gave defense counsel the opportunity to move for recusal, and they declined to so move.

Angered by his counsel's decision not to move for the undersigned's recusal, the movant directed an ex parte letter to the undersigned's chambers in which he expressed dissatisfaction with his counsel not moving for recusal and his belief that the undersigned should recuse himself from this case. This letter was forwarded to defense counsel, and soon thereafter, they sought to withdraw from the case due in large part to disagreements over who would direct the strategy in the case, them or the movant. The court granted the motion to withdraw, without objection by the movant, and appointed Criminal Justice Act ("CJA") counsel to represent him. Despite having new counsel, who ultimately represented the movant at trial and on direct appeal, the theme of the movant wanting to direct more of the strategy for his case permeated through the trial, the direct appeal, and certainly throughout these section 2255 proceedings to the point where the movant is currently proceeding *pro se* but with standby counsel. In addition, he is currently pursuing 16 claims, most of which were raised by the movant in his original *pro se* section 2255 submissions and not those raised by counsel appointed to represent him in these section 2255 proceedings.

Regarding those claims, most of them are ineffective assistance of counsel claims, including claims that (1) CJA counsel was ineffective for failing to obtain a report from an expert

psychologist who had evaluated the movant or otherwise obtaining an expert who would testify about the taboo sexual fantasy culture as the movant asserts that his communications with the special agent were fantasy-only, (2) all defense counsel were ineffective for failing to pursue the affirmative defense available under 18 U.S.C. § 2252(c) to the charge of possession of child pornography, (3) all defense counsel were ineffective for failing to challenge the sufficiency of each count of the operative indictment before trial or on appeal, (4) all defense counsel were ineffective for failing to challenge the search warrant for the cell phone, (5) all defense counsel were ineffective for failing to challenge the search warrant for the email account,[1] (6) CJA counsel was ineffective for failing to notify the movant that under *Anders v. California*, 386 U.S. 738 (1967), he had a right to file his own supplemental appellate brief to raise any nonfrivolous claims he wanted to raise on appeal, (7) CJA counsel was ineffective for failing to challenge the imposition of a $10,000 fine, (8) all defense counsel were ineffective for failing to object to the court abusing its discretion when informing the movant about hybrid representation, (9) all defense counsel were ineffective for failing to seek the undersigned's recusal, (10) CJA counsel was ineffective for failing to object to a constructive amendment and prejudicial variance of the attempting to entice or coerce a minor count in the operative indictment at trial or on appeal, (11) all defense counsel were ineffective for failing to file a motion to dismiss for lack of subject-matter jurisdiction because the government lacked "criminal standing" to bring the charges against him in federal court, (12) ineffective assistance of counsel for failing to object to a constructive amendment to the possession of child pornography count of the operative indictment, and (13) ineffective assistance of counsel for failing to challenge the sufficiency of the evidence as to the possession of child pornography count of the operative indictment. The movant also asserts that

---

[1] There are two separate claims relating to the search of the email account.

the court violated his due process rights by allegedly failing to consider recusal and that the trial was fundamentally unfair due to cumulative error.

In addition to these claims, the movant has also filed motions (1) seeking free copies of transcripts of an evidentiary hearing and oral argument in this matter, (2) seeking to have the court direct his current standby counsel to turn over his entire case file to him, (3) requesting that the court take judicial notice of the presence of two statutes in the judgment, (4) requesting that the court allow him to supplement his amended motion with a claim that the court improperly applied a five-level enhancement under section 2G2.2(b)(5) of the United States Sentencing Guidelines, and (5) requesting that the court take judicial notice of one page of a transcript prepared from the original grand jury proceedings because he contends that it supports his claim that the transportation of child pornography count of the operative indictment was constructively amended.

As explained in more detail below, the movant is not entitled to relief under section 2255 on any of his claims, although the court points out that some of those claims were much more developed and nuanced than how the government treated them when filing its responses. In fact, one of his claims, relating to the section 2252(c) affirmative defense, touches a matter of first impression in this circuit. The movant also was able to identify a defect in the possession of child pornography count of the operative indictment, even if it ultimately did not provide him with a sufficient ground for relief from his conviction or sentence.

Concerning his separately filed motions, the court will grant the motion for transcripts, but will deny his other motions. The court also will decline to issue a certificate of appealability.

## I.    RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On November 6, 2014, a grand jury returned an indictment charging the defendant, Brent S. Galletta ("Galletta"), with three offenses: (1) attempted enticement or coercion of a minor in

violation 18 U.S.C. § 2422(b); (2) transportation of child pornography in violation 18 U.S.C. § 2252(a)(1); and (3) possession of child pornography in violation of 18 U.S.C. § 2252(a)(4).[2] *See* Indictment at 1–3, Doc. No. 1. Galletta had his initial appearance and arraignment before United States Magistrate Judge Henry S. Perkin, now retired, on November 20, 2014. *See* Doc. No. 8. Shortly after his arraignment, Assistant Federal Defender Catherine Henry entered her appearance on Galletta's behalf, *see* Doc. No. 11, and Assistant Federal Defender Maranna J. Meehan entered her appearance on his behalf on February 18, 2015. *See* Doc. No. 24.

On April 10, 2015, the court held an on-the-record status conference to provide counsel the opportunity to address the undersigned having presided over a prior criminal trial involving Galletta while the undersigned was a Judge on the Court of Common Pleas of Northampton County.[3] *See* Doc. No. 87. At a status hearing held on May 6, 2015, Attorneys Henry and Meehan orally moved to have the court permit them to withdraw as counsel, representing that they were unable to effectively represent Galletta due to his numerous challenges and attacks on their method of representation. *See* Tr. of May 6, 2015 Hrg. on Mot. to Withdraw ("Withdrawal Hrg. Tr.") at 5, Doc. No. 86.[4] Galletta did not oppose the motion. *See id.* at 10, 11, 19, 20, 24. The court granted their unopposed motions to withdraw as counsel, and appointed Robert E. Sletvold, Esquire, as CJA counsel, to represent Galletta. *See id.* at 24–25; May 6, 2015 Order at 1, Doc. No. 32.

---

[2] As will be referenced at various points later in this opinion, Galletta was originally facing charges in a Pennsylvania state court before those charges were dropped to allow this federal prosecution to occur.

[3] As explained in much more detail *infra*, counsel (and Galletta himself) were permitted to ask questions to the undersigned about the prior criminal case and the undersigned answered those questions. Defense counsel did not move, orally or in writing, for the undersigned's recusal from this case. And the undersigned did not find that recusal was appropriate under the applicable statutes.

[4] Prior to this status hearing, Attorneys Meehan and Henry had forwarded a letter to the undersigned's chambers in which they indicated that Galletta was displeased with their representation of him and had alleged that they were ineffective as his defense counsel. *See* Tr. of May 5, 2015 Status Conf. at 4. Based on, *inter alia*, Galletta's representations of their alleged ineffectiveness as his counsel, Attorneys Meehan and Henry asked to be permitted to withdraw from this case and have the court appoint new counsel to represent Galletta. *See id.*

On July 13, 2015, Galletta, through Attorney Sletvold, filed pretrial motions to (1) suppress statements he made to law enforcement after being placed in custody and (2) dismiss the attempted enticing or coercing a minor charge in count one of the indictment. *See* Def.'s Pretrial Mots. at ECF pp. 2–4, Doc. No. 40. The government filed a response in opposition to these pretrial motions on July 29, 2015. *See* Doc. No. 49. The following day, the grand jury returned a superseding indictment that revised the averments in the attempted enticing or coercing a minor charge and otherwise did not alter the other language used in the original indictment. *Compare* Indictment at 1–4, *with* Superseding Indictment at 1–4, Doc. No. 46.

The court held an evidentiary hearing on Galletta's pretrial motions on August 13, 2015. After the hearing, and at the court's request, both the government and Galletta filed proposed findings of fact and conclusions of law with respect to their contentions on Galleta's motion to suppress and motion to dismiss on August 21, 2015. *See* Doc. Nos. 63, 64. On August 26, 2015, the court held a final pretrial conference during which the court discussed, *inter alia*, the motions to suppress and dismiss, and two motions *in limine* filed by the government. *See* Doc. No. 88.

Regarding the two motions *in limine*, the first motion was a motion *in limine* to admit evidence under Federal Rule of Evidence 404(b) that it claimed was relevant to Galletta's intent and knowledge. *See* Gov't's Mot. in Limine for Admission of Fed. R. Evid. 404(b) Evidence at 1–2, Doc. No. 54. The proposed evidence included approximately 25 images of child erotica, consisting of girls, approximately seven years old, wearing bathing suits or underwear, found on Galletta's cell phone at the time of his arrest, email communications with other individuals, a video where Galletta video/audio recorded his discussions with a pool lifeguard regarding class time for children's swim classes, and a video where Galletta video/audio recorded girls, approximately 12-years-old, trying on shoes in a department store. *See id.* As for the second motion *in limine*, the

7

government sought to have the court admit Galletta's two prior Pennsylvania convictions, one in 2001 and the other in 2004, for corruption of minors as evidence relevant to his intent and knowledge under Federal Rules of Evidence 404(b) and 609. *See* Gov't's Mot. in Limine for Admission of Def.'s Prior Convictions at 1–4, Doc. No. 65. Galletta opposed both motions. *See* Aug. 26, 2015 Tr. of Final Pretrial Conf. at 4, 13–20, 21–22, 32, Doc. No. 88.

As for the resolution of these four motions, the court informed the parties during the conference that the court would be denying Galletta's motion to suppress and motion to dismiss via a memorandum opinion and order that would be filed later.[5] *See id.* at 4. For the government's two motions *in limine*, the court preliminarily ruled that both motions would be granted but (1) indicated that an appropriate limiting/cautionary instruction would be provided so the jury understood the limited purpose of the evidence and (2) directed counsel to discuss how the evidence would be admitted to minimize the potential prejudice to Galletta. *See id.* at 24.

Jury selection occurred on August 31, 2015, and then this matter then proceeded to a two-day jury trial starting on September 1, 2015.[6] During the trial, the government presented the following evidence as to Galletta's guilt:

Several days prior to July 22, 2014, an individual indicating they were 34 years old and "fit" posted a personal advertisement on Craigslist, titled "Pervy Dads-M for M-34 Mall."[7] *See*

---

[5] On August 28, 2015, the court entered a memorandum opinion and order denying Galletta's motion to suppress his statements to law enforcement and denying as moot his motion to dismiss due to the issuance of the superseding indictment. *See* Doc. Nos. 68, 69.

[6] Prior to the start of trial, the court and counsel once again discussed the government's proposed Rule 404(b) evidence. *See* Tr. of Jury Tr. Day – 1 ("Day One Tr.") at 3–6, Doc. No. 89. The parties indicated that they had reached an agreement regarding some of that evidence, which provided that the government would only admit Galletta's 2001 conviction for corruption of minors and not the 2004 conviction, the government would still introduce the two videos identified in its motion, the government would limit the additional email communications it would admit, and the government would also limit the number of pictures of child erotica it would introduce. *See id.* Attorney Sletvold also indicated that based on this agreement, he did not have new objections. *See id.* at 5.

[7] Craigslist is a "company that offers online classified advertisement services incorporating Internet e-mail relay services." Day One Tr at 50. Advertisements posted on Craigslist "can be anything from housing, rentals of apartments, for sale items[,] . . . personal ads, casual encounters, misconnections, [and] different kind[s] of personal ads." *Id.* at 45. "M for M" means "male for a male." Day One Tr. at 45.

Day One Tr. at 45, 47, 48, 55. This advertisement was available for viewing on July 22, 2014, at which time it stated:

> I'm looking for another pervy dad to hang out with. One who is pervy and likes taboo stuff. I want to hang out and talk at the mall or pool. Better yet if you have a pool. I am 34, good looking and I know that there are other dads who are pervy like me.

See id. at 48.[8] A concerned citizen reported the advertisement to local law enforcement, who then reported it to Justin Leri, a Special Agent with the Pennsylvania Office of Attorney General and a Task Force Officer with the Federal Bureau of Investigation.[9] See id. at 44. Agent Leri then began his investigation into the concerned citizen's report. See id. at 44–45.

This investigation started with Agent Leri searching for, locating, and then taking a screenshot of the advertisement on Craigslist. See id. at 45. The advertisement contained a unique identifying number, which Agent Leri used to obtain additional information from Craigslist about the advertisement and the individual who posted it. See id. at 49–53. According to Craigslist's business records:[10] (1) the email address connected to the advertisement was ChrisDouglas775@gmail.com; (2) the posting contained a unique IP address, the phone number associated with the advertisement was 484-222-8487; (3) the advertisement was posted in the Lehigh Valley region; and (4) the poster chose to use an "anonymized email address," meaning that the poster used "the anonymous relay service of Craigslist to . . . communicat[e]" and "the actual email addresses of the users are not provided . . . ."[11] See id. at 52–53.

---

[8] A screenshot of this advertisement was admitted as Government's Exhibit 1. See Day One Tr. at 46–47.

[9] Agent Leri was assigned to the Bureau of Special Investigations, which encompasses the Child Predator Unit and the Computer Forensic Unit. See Day One Tr. at 41–42. Agent Leri was admitted without objection as an expert in computer forensic analysis. See id. at 43.

[10] The business records from Craigslist were admitted as Government's Exhibit 2. See Day One Tr. at 50–51.

[11] Agent Leri described the anonymous relay service as follows:

> [I]t's a service that's provided by Craigslist. Often times if users are posting sex ads or for sale ads or wanted ads or housing ads they don't want to provide their actual e-mail address. So[,] Craigslist provides a service that you can still receive the communications, but you're not providing your

As part of his investigation, Agent Leri also responded to the advertisement while using an undercover email account. *See id.* at 49, 56.[12] He initially responded by indicating that he was interested in the ad. *See id.* at 54, 56, 57. Agent Leri received a response by someone identifying himself as "Chris," who stated: "Tell me more, are you a dad? Do you appreciate pretty younger girls? Do you have a pool?" *Id.* at 57–58. Agent Leri responded that he was a dad, he appreciated pretty younger girls, and he had a pool. *See id.* at 58. Agent Leri also asked Chris, "What about you?" *See id.* Chris responded to Agent Leri by stating:

> I love younger girls. I love their tight bodies and I love to hangout and befriend them. I love pools, but do not have one. I have a step daughter who is nine now, but her mother and I split and they moved to Texas and that is why I'm having withdraw [sic]. I need to find someone who appreciates them as much as I do and will let me spend time with them and get pervy together.

*Id.* at 58–59. This email was signed "Chris," and showed an email address of ChrisDouglas775@gmail.com. *See id.* at 59.

Agent Leri responded to Chris's email by sending an email to the ChrisDouglas775@gmail.com email address. *See id.* The two men exchanged the following messages:

> [Agent Leri:] I am so sorry to hear that!! I [totally] . . . get the withdraw [sic] . . . . [M]y ex[] is . . . a really making my life a mess and for my two kids. I have a [six-year-old son and a seven-year-old daughter[.] [S]ound exactly like me [and] know the importance of love. I'm in the area a few days w[ith] my kids trying to get something straighten out. What type of things are you into[]?

> [Chris:] I am sorry [to] hear about your situation also. I am into young. I am bi-curious, but I know that I like young girls. I have . . . dated women with young daughters just to spend time with their daughters. I was at the park today with a woman and her daughter who was nine and gorgeous. I just like flirting with her and playing with her. Tomorrow we are supposed to go to the movies and swim. I

---

actual e-mail address[. I]t's a way to sometimes hide your identity or sometimes protect your identity unless you feel like you want to give that person additional information.

Day One Tr. at 57.

[12] Agent Leri and the poster's online correspondence was admitted as Government's Exhibit 3.

> hope this doesn't offend you, but I am being honest. I am attracted to younger. So
> if there is a dad who feels the same and is not threatened by it then I want to hang
> out. Do stuff together and be friends. What do you think? What are you looking for
> too[]?

*Id.* at 59–60. This latter message was again signed "Chris," and it also stated, "[T]ext me if you

want, 484-222-8487." *Id.* at 60.

After this email exchange, Agent Leri (who was using his undercover cellphone) and Chris

started communicating via text messages, with Agent Leri texting Chris at 484-222-8487, which

was the same number associated with the original advertisement.[13] *See id.* at 60–61. At one point

in the text message exchange, Chris texts: "I hope I didn't offend you in my email." *Id.* at 64.

Agent Leri responded by stating that he was not offended and added: "[I]t's hard to find others

who think alike. You are very lucky to find a woman to date with such a young beautiful girl.

Wow." *Id.* Chris replied, "That's the easy part[,] trying to get close and flirt and touch . . .

incidentally is the hard part." *Id.* at 64–65. Chris later added: "The woman was hot, but after I

fucked her long and hard she would go to sleep and I would go in and peek while her[] 7 year [old]

slept." *Id.* at 65; Gov't Ex. 4.

Later in this text conversation, Agent Leri stated, "It's fine as long as it's done with love

and respect. That's the most important part with my little ones." Day One Tr. at 65. Chris

responded and wrote, "That's how I am. I am not a molester who hurts them, just one who connects

and encourages them to explore and learn about their bodies and enjoy it." *Id.* Agent Leri replied,

"That's so good to hear honestly, it truly is." *Id.* at 65–66. He later added: "It makes me very

comfortable chatting with you [and] I'm certain my kids also." *Id.* at 66.

Approximately 15 minutes after this last message, Chris reached out to Agent Leri, asked

to see pictures of him and his kids, and inquired when Agent Leri was "free to hang out." *Id.* Agent

---

[13] The text messages were admitted as Government's Exhibit 4. *See* Day One Tr. at 61–62.

Leri informed Chris that he wanted to be able to trust him, but he had been "burned b[efore]." *Id.* Agent Leri then explained to Chris how he had been previously "burned," and Chris responded, "Damn. I am not an asshole. Trust me. Once we meet you will know I am serious." *Id.* at 67.

Agent Leri informed Chris that he might be able to get his daughter out of the house later that night or the following day. *See id.* He then asked Chris what Chris would be interested in doing, but he cautioned that he would have the final say over anything relating to his daughter. *See id.* Chris indicated that he was available later that night, and he would only do what Agent Leri was comfortable with him doing. *See id.* Agent Leri then asked for Chris's "thoughts," and Chris responded by writing: "Hopefully touching, kisses and tickling and peeking up skirt. Oh, I love feet too[.]" *Id.*

After Chris confirmed that Agent Leri did not feel that his articulated desires went too far, Chris indicated that he "want[ed] to do more if you want that too." *Id.* at 67–68. Chris explained that he "wanted to go down on [Agent's Leri's fictitious daughter and] taste her sweet pussy." *Id.* at 68. Agent Leri responded by texting, "That gets me excited, I'll tell her, I have a new friend to meet lol." *Id.* Chris later stated to Agent Leri that he wanted to "play with [his] daughter" and "enjoy her body, her lips, her [feet], her laugh, her everything." *Id.* at 69.

After further correspondence, Chris and Agent Leri agreed to meet in the afternoon on the following day at Agent Leri's residence, where he was living with his parents, and they would discuss the plan in the morning. *See id.* at 69–70. At approximately 9:45 the next morning, Chris and Agent Leri started chatting again. *See id.* at 70. In these communications, Agent Leri asked Chris, "Are you planning on taking any pics? My only rule is I don't want them all over the Internet." *Id.* Chris responded, "Sure, and okay." *Id.* Agent Leri also informed Chris that his parents would not be home, but he did not want Chris parking in front of the house. *See id.* at 70.

12

They agreed that Chris would park at a parking lot near Agent Leri's purported residence, meet Agent Leri there, and then walk to the house. *See id.* In addition, Galletta and Agent Leri discussed certain aspects of their plan for the day, such as when Galletta asked whether he should "bring swim trunks" and "a laptop." *Id.* Agent Leri also asked Galletta whether he would like to see the daughter "in anything," to which Galletta replied, "Bikini [smiley face image]." *Id.*

As it got closer to the meeting time, Chris and Agent Leri exchanged texts messages as Chris was traveling toward the meeting location. *See id.* at 71. Chris also texted Agent Leri and informed him that he would be driving a "four-door grayish Saab." *Id.* Agent Leri had other officers providing surveillance at the meeting location, and soon after Chris identified the car he was driving, surveillance officers informed Agent Leri that they observed a vehicle matching that description pulling into the agreed-upon parking lot. *See id.* at 72. Agent Leri then saw the vehicle approaching, and he observed that Galletta was the individual driving it. *See id.* at 72, 83. Agent Leri recognized Galletta from a picture of himself that he had sent Agent Leri during their communications. *See id.* at 72–73, 81–82, 84.[14]

Galletta saw Agent Leri, who was wearing clothing matching clothing he said he would be wearing for the meeting in their correspondence, traveled to the part of the parking lot where he was standing. *Id.* at 83. Agent Leri then directed Galletta to park in a particular parking spot. *See id.* Once Galletta parked, Agent Leri walked up to his vehicle in conjunction with several other members of law enforcement. *See id.* They pointed their guns at Galletta and told him that he was under arrest. *See id.* at 84–85. Galletta was then removed from his vehicle and placed in handcuffs. *See id.* at 85.

---

[14] The picture of Galletta that Agent Leri received during their text communications was admitted as Government's Exhibit 6. *See* Day One Tr. at 81–82.

Once Galletta was in handcuffs, Agent Leri identified himself and verbally read Galletta his *Miranda* rights. *See id.* Agent Leri then asked Galletta what he was doing there, and Galletta responded by stating, "To meet with a father and hang out." *Id.* Galletta next indicated that he did not want to speak further about the investigation. *See id.*

Agent Leri then prepared to have Galletta transported to the police department in his marked patrol vehicle. *See id.* Agent Leri asked Galletta if he had been arrested before, and Galletta responded that he had been previously arrested for the same thing. *See id.* Galletta was then led to the police vehicle and, as officers were placing him inside, he "blurted and yelled out, 'Oh my God, my fuck [sic] life is over.'" *Id.*

With Galletta in custody, and with Agent Leri having observed a cellular device in Galletta's vehicle, law enforcement turned their attention to his vehicle. *See id.* at 86. They took photographs of the vehicle and secured it. *See id.* Agent Leri then applied for and obtained a search warrant for the vehicle and the cellular device. *See id.* Later that evening, he executed the search warrant on the vehicle and seized the cellular device and a few other items from the vehicle. *See id.* at 86, 88.

Agent Leri performed an analysis of the cellular device, which he determined to be a Samsung Galaxy smart phone (the "Phone").[15] *See id.* at 86–89, 133; Gov't's Ex. 7. The Phone

---

[15] Agent Leri explained that his analysis of the Phone started with him placing the phone in airplane mode so that it would not communicate with any wireless communication service. *See* Day One Tr. at 86–87. He then connected the Phone to UFED software made by Cellebrite. *See id.* at 87. This software takes a "forensic image" of the device; in other words, it takes "the memory of the device from the beginning to the end . . . and puts it into a file on [his] computer." *Id.* The software does not place any additional items on the device. *See id.* Once the forensic image is created, the device does not need to be powered on anymore, as any examination of the data obtained from the device is conducted through the forensic image. *See id.* at 87–88.

Agent Leri also explained that there are circumstances where the device is powered on and examined through a "scroll analysis." *Id.* at 88. This type of analysis involves "scrolling through the device and taking pictures of items of interest that [they] weren't able to get or to see through the forensic image." *Id.* at 88.

was manufactured in China and transported to the United States for sale.[16] *See* Day One Tr. at 90–91.

During Agent Leri's forensic examination of the Phone, he located the text communications between him (while he was using his undercover cell number) and Galletta, which matched the messages extracted from Agent Leri's undercover mobile device.[17] *See id.* at 91–92, 94, 95–102, Gov't's Ex. 8. Included with these text communications was a picture Galletta sent Agent Leri of Galletta performing a sexual act with a female. *See id.* at 69, 78, 82, 99; Gov't's Ex. 5. In addition, there were three thumbnail images of child pornography, which Galletta had at one time saved to the Phone but had subsequently been deleted. *See* Day One Tr. at 103–09, 146–47; Gov't's Exs. 9–11.[18] Agent Leri sent the three images to the National Center for Missing and Exploited Children ("NCMEC") for analysis as part of its Child Victim Identification Program. *See* Day One Tr. at 109. The NCMEC was able to confirm that the children in the thumbnail images were real children. *See id.* at 110.

Agent Leri also recovered 25 additional thumbnail images that had been saved or viewed on the Phone. *See id.* Five of these images were of young girls in bathing suits/undergarments, and the remaining images were of a similar nature.[19] *See id.* at 121–26; Gov't's Exs. 12–16.

---

[16] The parties stipulated to the following facts: (1) the Internet and telephone mobile services are facilities of interstate commerce; (2) data transmitted via the Internet, or a telephone mobile device, travels through interstate commerce; and (3) a user who transmits data via the Internet or a mobile device uses a facility of interstate commerce. Day Two Tr. at 87.

[17] Agent Leri noted that although the Phone was passcode protected, he was able to bypass the passcode via the software he was using. *See* Day One Tr. at 88. The Phone contained an application named Pinger, "which is used for communications, text-based communications or to make phone calls," and when doing so, uses a different number than the phone's number. *See id.* at 92. Agent Leri pointed out that Galletta had installed an additional application, which provided a passcode for accessing Pinger. *See id.* at 92–93. Agent Leri was also able to bypass that passcode, and then take screen shots and pictures of text messages as Galletta would have seen them. *See id.* at 93.

[18] The government described the content of these explicit images in its pretrial memorandum. *See* Trial Mem. at ECF p. 5, Doc. No. 61. Agent Leri did not have any data that the Phone was used to take the images. *See* Day One Tr. at 145–46. Agent Leri also could not tell how the images arrived on the Phone, only that at one point they had been saved to it. *See id.* at 146, 147.

[19] These additional thumbnail images were admitted under Rule 404(b)(2) for the limited purpose of determining whether Galletta had the requisite state of mind, knowledge, or intent necessary to commit the crimes charged, and

In addition to the thumbnail images, Agent Leri recovered videos that were made by and saved to the Phone.[20] *See* Day One Tr. at 126, 136; Gov't's Exs. 17, 18. One of the videos depicts the torso, legs, and feet of a female lifeguard in a red bathing suit, and the audio includes Galletta asking the lifeguard questions about swim class times for younger children. *See* Day One Tr. at 126–28; Gov't's Ex. 17. Another video extracted from the Phone shows approximately twelve-year-old girls in a shoe department. *See* Day One Tr. at 128–31; Gov't's Ex. 18.

Along with the search of Galletta's vehicle and the Phone, the FBI, through Agent William G. Smith, obtained and executed a search warrant on all records and email content associated with the ChrisDouglas775@gmail.com email address. Tr. of Jury Tr. Day – 2 ("Day Two Tr.") at 14, 16, Doc. No. 90. During the FBI's search of this email address, they located the email communications between Galletta and Agent Leri. *See id.* at 17–18; Gov't's Ex. 19. In addition, they obtained four email chains between Galletta and other individuals.[21] *See* Day Two Tr. at 20.

The first of these email chains was a series of emails between Galletta (who was going by his alias, Chris Douglas), and an individual identified as Rick Smith ("RS") from mid-March 2014. *Id.* at 20–37, 41–42; Gov't's Exs. 20A, 20B. In this email chain, Galletta and RS engage in sexually explicit correspondence, where Galletta writes that, *inter alia*, he:

- "like[s] little girl panties";

---

the court gave the jury a cautionary instruction to clarify the limited purpose of this evidence. *See* Day One Tr. at 111–13, 120–21.

[20] As with the additional thumbnail images, the videos were admitted under Rule 404(b)(2) for the limited purpose of determining whether Galletta had the requisite state of mind, knowledge, or intent necessary to commit the crimes charged, and the court gave a cautionary instruction to the jury to clarify the limited purpose of this evidence. *See* Day One Tr. at 111–13, 120–21, 129–30.

[21] With exception of one image of child pornography (which related to the transportation of child pornography charge), the four email chains and images exchanged during those chains were admitted under Rule 404(b)(2) for the limited purpose of determining whether Galletta had the requisite state of mind, knowledge, or intent necessary to commit the crimes charged, and the court gave numerous cautionary instructions to the jury to clarify the limited purpose of this evidence. *See* Day Two Tr. at 37–41, 50–52, 82–84. The court also notes that the government also introduced, for the same purpose, Galletta's December 2001 convictions (via guilty pleas in the Court of Common Pleas of Northampton County) of two counts of corruption of minors, relating to his communications with a fourteen-year-old girl in June 2001. *See* Day Two Tr. at 76–82; Gov't's Exs. 24, 25.

- gets sexually aroused by little girl panties;

- "like[s] hot girls from 6 to 16";

- thought a ten-year-old girl (R.S.'s purported niece) was "hot" and mentioned that he "love[d her] age and [her] size";[22]

- "like[s girls aged] 6 to 12 . . . [and] all teen girls";

- "ha[s] had younger" girls;

- wanted to know if RS had "any other sexy pics of [his] daughter, niece, or other girls";

- loved Christmas and Easter because "the little girls get dressed up [in s]hort skirts and stockings…delicious";

- "like[d] young pussy [and] want[ed] 6 to 11";

- was curious if R.S. had "any young neighbor girls or any that would hangout . . . and not know that [they] were fantasizing about them"; and

- had ejaculated to an image of an approximately seven-year-old wearing a bra and panties, while laying on a bed.

Day Two Tr. at 24–37, 41–42; Gov't's Ex. 20B. In addition to these messages, Galletta sent R.S. a picture of himself, *see* Day Two Tr. at 25; Gov't's Ex. 20C, an image of child pornography related to the transportation of child pornography charge,[23] *see* Day Two Tr. at 29–31, 36; Gov't's Exs. 20B, 20E, and another image of child pornography that the government introduced as Rule 404(b) evidence, *see* Day Two Tr. at 36–37; Gov't's Exs. 20B, 20F.[24]

The second email chain between Galletta and an individual identifying himself as Mike Quinn ("M.Q."). Day Two Tr. at 42–43, 54–61; Gov't's Exs. 21A, 21B. During this email

---

[22] RS sent Galletta a picture of a woman with a tattoo wearing a bathing suit standing next to a 10-year-old girl, who was also wearing a bathing suit. *See* Day Two Tr. at 28, 29; Gov't's Exs. 20B, 20D. R.S. indicated that the girl was his niece. *See* Day Two Tr. at 28–29; Gov't's Ex. 20B.

[23] As with the other images of child pornography, the government described the image in its trial memorandum. *See* Gov't's Trial Mem. at 7.

[24] The government's introduction of this evidence was followed by a cautionary instruction to the jury about the limited purpose of this evidence. *See* Day Two Tr. at 37–41.

exchange, MQ informs Galletta that he has two step-daughters, ages 14 and 10, and makes sexual comments about both. Day Two Tr. at 54–56; Gov't's Ex. 21B. Galletta responds by stating that M.G. is "blessed and lucky" to have his step-daughters. Day Two Tr. at 55; Gov't's Ex. 21B. Galletta then informed M.Q. that, *inter alia*, he:

- had a seven-year-old step-daughter who was "hot as hell with a tight body";

- loved his step-daughter's "feet and . . . ass;"

- was "torn" about "doing more [with his step-daughter] before [he] lose[s] her for good because her mother (and his ex) was leaving him and wants to "cut [him] out of her life";

- thought that his step-daughter "want[s] more";

- liked spending time with his step-daughter at "the movies because in the dark she will sit on [his] lap and [he] run[s his] hand up her skirt and she just cuddles with [him]";

- "kiss[es] and rub[s]" on his step-daughter;

- ejaculates on his step-daughter's "feet while [they] are under the blanket";

- would "peek alot [sic]" when his stepdaughter slept and would "jerk off";

- had not "penetrated or licked" his step-daughter yet but was "dying to";

- Could get "cp porn" for him and "a dad who is like [him]" for "them to jerk off to";

- "would appreciate seeing [M.Q.] and the youngest";

- thought that he and M.Q. could show trust for each other "if [M.Q.] had [Galletta's] dick in [his] mouth while [Galletta] looked a[t] cp"; and

- reaffirmed for M.Q. that he was "not gay," and just "want[ed] to enjoy [M.Q.'s] step daughters";

Day Two Tr. at 55–56, 57–59, 60–61; Gov't's Ex. 21B. Galletta also sent M.Q. pictures of himself and his step-daughter, who was wearing a bathing suit. Day Two Tr. at 56–57, 58–59; Gov't's Exs. 21C, 21D.

The third email chain was between Galletta and an unknown individual ("U.I.").[25] *See* Day Two Tr. at 63–72; Gov't's Exs. 22A, 22B. In Galletta's emails with U.I., he:

- stated that he "like[d] taboo. Young girls[]";

- inquired if the other individual had "porn or little hotties in [his] neighborhood";

- indicated that he "like[d ages] 6 to 11[, and he] ha[s] always wanted to makeout [sic] and go down on a younger girl";

- stated he loved younger girls' "little bodies" and feet;

- stated that he "love[d] teens, [and] ha[s] fucked a few of them";

- responded to a question about whether he had "ever babys[a]t" by informing U.I. that he had, "but never did anything [except for] incidental touching and peeking";

- asked if UI had "a little sister or niece [they] could babysit and give some nyquil too [sic]";

- thought that dating "a mother with a hot 6 yr old girl would be nice";

- indicating that he thought that "[u]nder 6 would be hot, but [he did not] know about penetration. [He] would love to lick all over them and stick [his] tongue in their mouth";

- "hop[ed U.I.] had some suggestions on how to spend time with a little boy or little girl";

- indicated that if they could "find a girl to babysit and give her nyquill [sic], then she will be sleep [sic] pretty good. [They] can explore her naked."

- told U.I. that there was "a pic that [was] tempting [him];[26]

- asked if U.I. had "noticed the little girls in short shorts and flip flops";

- responded to a comment by U.I. that he knew a "single gay dad" with two two-year-old twins, by stating that "2 is ok[, but he] prefer[red] 5 but . . . could shoot a load 2 yr olds" and asking U.I. to reach out to the dad for them;

---

[25] Agent Smith explained that the only information the FBI had about the other individual was his anonymous Craigslist number. Day Two Tr. at 61.

[26] He also sent U.I. the image, which was of a young girl, approximately nine years old, wearing a tank top and shorts, and sleeping on a chair. *See* Day Two Tr. at 68–69; Gov't's Ex. 22D.

- indicated that he "really wanted [them] both to explore a little girl," but if they could not "find one then a boy";

- stated that he could "find young online" but it was "getting old," so he "[n]eed[ed] real life experiences"; and

- proposed that if they babysat for the dad with the twins they would "[j]ust touch[] and peek[]."

Day Two Tr. at 63–72; Gov't's Exs. 22A, 22B. Galletta also sent U.I. his picture. Day Two Tr. at 64; Gov't's Exs. 22B, 22C.

The fourth, and final, email chain was between Galletta and an individual identifying themselves as Harry. Day Two Tr. at 72–76; Gov't's Exs. 23A, 23B. In this email correspondence, Galletta informed Harry that, *inter alia*, he (1) was "a pervy dude . . . who loves to jerk off looking at young girls," (2) was "hoping there was a dad who liked the idea of a guy finding his daughter attractive," and (3) "like[d ages] 6 to 12 and love[d] public pools because they are in bikinis." Day Two Tr. at 72–76; Gov't's Ex. 23B. He also asked Harry if he had "any access to girls" and whether he "babys[a]t niece or anything?" Day Two Tr. at 76; Gov't's Ex. 23B.

When the government had concluded its case-in-chief, Attorney Sletvold orally moved for a judgment of acquittal on the first two counts in the superseding indictment, attempted enticing or coercing of a minor and transportation of child pornography. *See* Day Two Tr. at 90–91. Regarding the attempted enticement charge, Attorney Sletvold argued that the government had failed to introduce sufficient evidence that Galletta used Agent Leri (who was acting as a parent) to persuade, induce, entice, or coerce the minor to engage in sexual activity. *See id.* As for the transportation of child pornography charge, Attorney Sletvold contended that the image that Galletta allegedly sent to R.S. did not meet the legal definition of child pornography. *See id.* at 90. After hearing the government's arguments in response to the motion, the court denied the motion for judgment of acquittal on both counts. *See id.* at 91–93.

After consulting with Attorney Sletvold, Galletta chose not to testify on his own behalf, and the defense rested without presenting any evidence. *See id.* at 96. Later that day, the jury found Galletta guilty on all counts of the superseding indictment. *See id.* at 178–79; Verdict Sheet, Doc. No. 74.

On December 4, 2015, this court held a sentencing hearing during which the court sentenced Galletta to an aggregate sentence of 600 months' imprisonment, lifetime supervised release, a $300 special assessment, and a $10,000 fine. *See* J. at 2–5, Doc. No. 82.[27] Galletta filed a notice of appeal to the Third Circuit Court of Appeals on December 21, 2015. *See* Doc. No. 83. On November 10, 2016, the Third Circuit upheld Galletta's conviction. *See* Doc. No. 92; *United States v. Galletta*, 662 F. App'x 190 (3d Cir. 2016).[28]

On November 20, 2017, the clerk of court docketed numerous submissions by Galletta, who was proceeding *pro se*. *See* Doc. Nos. 96–102. Of relevance here, one of those submissions was a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255.[29] *See* Doc. No. 96. This motion identified 23 claims, which Galletta presented over 367 pages.[30] *See id.*

---

[27] Regarding each charge, the court sentenced Galletta to 600 months' incarceration for enticing or coercing a minor, 240 months' incarceration for transporting child pornography, and 120 months' incarceration for possessing child pornography, with all sentences to run concurrently. *See* J. at 2.

[28] Galletta raised two issues before the Third Circuit, the insufficiency of the evidence relating to the charge of enticing or coercing a minor and a claim that the court erred in admitting the 404(b) evidence.

[29] The remaining submissions included: (1) a motion to recuse and disqualify, Doc. No. 97; (2) a request to unseal and receive CJA vouchers and all pertaining ex parte communications, Doc. No. 98; (3) a motion requesting discovery at government expense pursuant to Rule 6 of the Rules Governing Section 2255 Motions in Federal District Courts, Doc. No. 99; (4) a motion to stay notice of appeal to denial of movant's motion to recuse and disqualify, Doc. No. 100 (there was also a duplicate filing at Doc. No. 101); and (5) an application for leave to proceed *in forma pauperis*, Doc. No. 102. These additional motions are resolved, and they are not part of this opinion. *See* Nov. 29, 2017 Order at 1, Doc. No. 104 (denying motion to stay notice of appeal, Doc. No. 100, and motion for leave to proceed *in forma pauperis*, Doc. No. 102); Feb. 28, 2018 Order at 1–2, Doc. No. 16 (resolving Doc. Nos. 97–99).

[30] Galletta included the following claims in the original section 2255 motion: (1) ineffective assistance of counsel for failing to obtain a mental health expert; (2) ineffective assistance of counsel for failing to assert an affirmative defense under section 2252(c) relating to Galletta promptly destroying the three visual depictions of child pornography; (3) ineffective assistance of counsel for failing to challenge the sufficiency of the indictment prior to trial and on appeal; (4) ineffective assistance of counsel for failing to challenge the warrant to search the Phone; (5) ineffective assistance of counsel for failing to file a motion to suppress the results of the search of Galletta's email; (6) ineffective assistance of counsel for failing to notify Galletta that under *Anders*, he had a right to file his own supplemental appellate brief to raise any nonfrivolous claims; (7) ineffective assistance of counsel for failing to challenge the imposition of a

On December 15, 2017, Galletta filed a motion in which he requested the assistance of counsel. *See* Doc. No. 106. The court granted Galletta's request and appointed Brian Collins, Esquire, as CJA counsel, to represent him this matter. *See* Dec. 21, 2017 Order at 2, Doc. No. 107. The court also scheduled a hearing on the section 2255 motion for March 14, 2018. *See id.* at 1.

Despite the court having appointed counsel, Galletta attempted to supplement the claims in his section 2255 petition through a *pro se* motion to supplement that the clerk of court docketed on January 9, 2018.[31] *See* Doc. No. 109. On January 26, 2018, the government filed a response in opposition to Galletta's initial *pro se* section 2255 motion and some of his other, separately filed motions. *See* Doc. No. 111.

On February 7, 2018, Attorney Collins filed an amended motion to vacate/set aside/correct sentence under section 2255, which focused on four variations of Galletta's claims in his *pro se*

---

$10,000 fine; (8) ineffective assistance of counsel for failing to object to an abuse of discretion when the court misinformed Galletta regarding hybrid representation; (9) ineffective assistance of counsel for failing to seek recusal of the undersigned; (10) a due process violation for the undersigned refusing to consider his recusal; (11) ineffective assistance by trial counsel for failing to object to the constructive amendment of the enticing or coercing a minor charge in the superseding indictment; (12) ineffective assistance of counsel for failing to object to a variance of the enticing or coercing a minor charge in the superseding indictment during trial; (13) ineffective assistance of counsel for failing to raise claims on direct appeal that the government constructively amended and created a prejudicial variance of the enticing or coercing a minor charge; (14) the trial was fundamentally unfair due to cumulative error; (15) the government lacked "criminal standing" to bring the claim into federal court; thus, this court lacked subject-matter jurisdiction over this action; (16) ineffective assistance of counsel for failing to object to erroneous jury instructions that constructively amended the possession of child pornography charge; (17) ineffective assistance of counsel for failing to suppress evidence obtained from a Google email account (there are two claims related to this general issue); (18) ineffective assistance of counsel for failing to challenge section 2252 as an unconstitutional application under the Commerce Clause; (19) ineffective assistance of counsel for failing to challenge section 2252 for violating the First Amendment; (20) ineffective assistance of counsel for failing to challenge all charged statutes as "a constitutional violation of Federalism"; (21) ineffective assistance of counsel for failing to challenge the charged statutes for "Unequal Application of the law in violation of the Fifth Amendment"; and (22) ineffective assistance of counsel for failing to "Loyally and Adequately perform his or her duties as counsel because of the nature of the allegation and the alleged sexual orientation of" Galletta in violation of the Fifth Amendment. *See* Pro Se Pet'r's Mot. Under 28 U.S.C. § 2255 ("Original Mot.") at ECF pp. 37–53, Doc. No. 96. Galletta's brief in support of the motion contained argument on 16 of the 22 claims raised. *See* Doc. Nos. 96, 96-1, 96-2 (collectively, "Original Br.").

      The court notes that although Galletta broke out at least two claims into subparts, *see* Original Mot. at ECF pp. 44–46 the court has identified them as separate, individual claims here. Thus, the court's numbering for the claims does not match Galletta's numbering in his motion or his supporting brief.

[31] This motion appears to include supplemental arguments relating to claims numbered 1 through 5, 8, 10(b), and 12 in Galletta's original section 2255 motion, and it includes what appears to be the first arguments in support of claims 15 and 16 in the motion. *See* Mot. to Suppl. Original § 2255 ("Suppl.") at ECF pp. 2–89, Doc. No. 109.

section 2255 motion.[32] *See* Doc. No. 112. A few weeks later, on February 27, 2018, Attorney

Collins moved to continue the hearing on the section 2255 motion. *See* Doc. No. 115. The next

_____

[32] In the amended motion, Attorney Collins indicated that Galletta

incorporates the allegations made in his original 2255 motion and supplemental 2255 motion and raises the following additional grounds for relief all of which were not preserved and raised on appeal due to ineffective assistance of counsel and which resulted from counsel's ineffective assistance which was not the product of sound trial strategy and fell below prevailing professional norms of reasonable performance:

(a)     Galletta incorporates, and adopts as if fully pleaded and set forth at length herein, all of the allegations contained in the original 2255 motion and accompanying exhibits and legal memorandum.

(b)     Galletta incorporates, and adopts as if fully pleaded and set forth at length herein, all of the allegations contained in the supplemental 2255 motion and accompanying exhibits and legal memorandum.

(c)     Ineffective assistance of counsel in failing to challenge the <u>sufficiency of the indictment</u> before trial and on appeal where the indictment did not specify, as to Count 3, *the means or facility of interstate commerce which was used to ship or transport or produce child pornography*. Counsel's failure to raise the issue prejudiced Galletta as it resulted in the eventual trial, conviction and sentence on a count in the indictment which otherwise would have been dismissed.

(d)     Ineffective assistance of counsel in failing to challenge the <u>sufficiency of the evidence</u> presented as to Count 3 as the Government failed to establish that the visual depictions contained on a mobile device were produced using material that had been mailed, shipped, and transported in interstate and foreign commerce. Counsel's failure to raise this issue prejudiced Galletta as it resulted in an eventual conviction and sentence on a count in the indictment which otherwise should have been dismissed.

(e)     Ineffective assistance of counsel in failing to challenge at trial and on direct appeal the <u>constructive amendment</u> of the indictment as to Count 3 to wit: whereas the indictment alleged that the mobile device ("matter") contained visual depictions of child pornography which "had been produced using material that had been mailed, shipped, and transported in interstate and foreign commerce," without identifying the "material" and the means and manner of production; at trial, the government alleged that since the mobile device itself had traveled through interstate commerce, the jury could find the interstate commerce "hook" solely on that basis. Counsel's failure to raise this issue prejudiced Galletta as it resulted in an eventual conviction and sentence on a count in the indictment which otherwise should have been dismissed.

(f)     Trial counsel was ineffective for failing to seek suppression of the results of a search of a Samsung Galaxy S 4 Cellular phone seized from Petitioner's vehicle at the time of his arrest. Counsel's failure to raise this issue prejudiced Galletta as it resulted in his eventual conviction and sentence on Counts I, II and III of the indictment, since: the evidence derived from the search, including 404(b) evidence of other crimes, acts or wrongs, was used against Galletta in an inflammatory and prejudicial manner to procure a conviction on all counts of the indictment. Had counsel raised the issue in a timely manner, Count III would have been dismissed or a motion for judgment of acquittal would have been granted for failure to present sufficient evidence to sustain a conviction as a matter of law.

Am. Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence and/or Mot. for Leave to File Am. 2255 Mot. Pursuant to Fed. R. Civ. P. 15 ("Am. Mot.") at ECF pp. 3–5, Doc. No. 112. Attorney Collins briefed the four specific claims identified in the amended section 2255 motion. *See* Mem. of Law in Supp. of Am. Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence and/or Mot. for Leave to File Am. Mot. Pursuant to Fed. R. Civ. P. 15 ("Am. Mem.") at ECF pp. 11–29, Doc. No. 112.

day, the court entered an order which, *inter alia*, (1) granted the continuance request and (2) denied without prejudice (a) Galletta's original *pro se* section 2255 motion, (b) Galletta's *pro se* motion to supplement, and (c) Galletta's other pending *pro se* motions, (3) set a deadline for the government to respond to the amended section 2255 motion, and (4) scheduled an evidentiary hearing on the amended section 2255 motion for May 22, 2018. *See* Feb. 28, 2018 Order at 1–2, Doc. No. 116.[33] The court also explained to Galletta that, with respect to his other *pro se* motions, he was free to resubmit them through his appointed counsel. *See id.* at 1 n.1. Should Galletta have desired to refile the motions, the court set a schedule for refiling them, for the government to respond, and for a hearing on any refiled motions. *See id.* at 2.

On March 20, 2018, Attorney Collins, with Galletta's consent, moved to withdraw as counsel because of a breakdown in effective communication. *See* Doc. No. 119. On March 27, 2018, the court scheduled a hearing on the motion, *see* Doc. No. 120, and on April 4, 2018, the court canceled the evidentiary hearing on the amended section 2255 motion due to Attorney Collins's request to withdraw as counsel, *see* Doc. No. 121.

The court held a hearing on Attorney Collins's motion to withdraw on April 30, 2018. The following day, the court granted the motion to withdraw and appointed Gavin P. Holihan, Esquire, as CJA counsel for Galletta going forward. *See* May 1, 2018 Order at 1, Doc. No. 125. The court also rescheduled the evidentiary hearing on the amended section 2255 motion to July 30, 2018. *Id.* On June 12, 2018, the court entered an order rescheduling the evidentiary hearing to September 18, 2018. *See* Doc. No. 127.

---

[33] The court amended this order the following day, but the amendment was limited to providing that Galletta would remain in federal custody pending the conclusion of the evidentiary hearing on his amended section 2255 motion. *See* Mar. 1, 2018 Order at 1 n.1, Doc. No. 117.

On July 11, 2018, the government filed a motion seeking to have the court find that Galletta had waived the attorney-client privilege with respect to his former attorneys, Attorneys Sletvold, Meehan, and Henry, concerning his claims that they rendered ineffective assistance of counsel. *See* Doc. No. 129. After a conference to discuss this motion on July 31, 2018, the court granted the government's motion. *See* Doc. No. 131.

On September 18, 2018, the court held an evidentiary hearing on the amended section 2255 motion. During the hearing, only Galletta and Attorney Sletvold testified. *See* Tr. of 2255 Hrg. ("2255 Hrg. Tr.") at 6–79, 87–103. At the end of the hearing, the court provided the parties with additional time to submit briefs relative to the evidence presented during the hearing and entered an order to that effect. *See id.* at 104–05. The court gave Galletta until January 16, 2019, to file a brief in further support of his amended section 2255 motion. *See* Sept. 19, 2018 Order at 1, Doc. No. 134.

After the deadline for Galletta to file a supplemental brief passed, the court entered an order on January 24, 2019, requiring Attorney Holihan provide the court with an update regarding the status of the supplemental brief by January 31, 2019. *See* Jan. 24, 2019 Order at 1, Doc. No. 134. When the court again did not receive a response from Attorney Holihan, the court again extended the time to provide a status report on the supplemental brief to February 15, 2019. *See* Feb. 8, 2019 Order at 1, Doc. No. 135. On February 15, 2019, Attorney Holihan filed a status report, which included a request that the court extend the time for him to file the supplemental brief. *See* Doc. No. 136. The court granted Attorney Holihan's request and gave him an additional 30 days to file any supplemental brief. *See* Feb. 22, 2019 Order at 1, Doc. No. 137.

Before the 30-day period expired, Galletta submitted a *pro se* motion to refile his original § 2255 motion and the supplement thereto, and permit hybrid representation. *See* Doc. No. 138.

The court denied this request on March 5, 2019. *See* Doc. No. 139. Attorney Holihan then filed a supplemental brief in support of Galletta's amended section 2255 motion on April 2, 2019, which focused on four of Galletta's original claims.[34] *See* Doc. No. 140. On May 8, 2019, the court ordered the government to provide a status update on its response to Galletta's supplemental brief by May 15, 2019. *See* Doc. No. 141. On May 15, 2019, the government moved for an extension of time to file its responsive brief. *See* Doc. No. 142. The next day, the court granted the government's motion for an extension to file its brief. *See* Doc. No. 143. On June 6, 2019, the government once again moved for an extension of time to respond. *See* Doc. No. 144. The following day, the court once again granted this request. *See* Doc. No. 145. The government then filed its response in opposition to the supplemental brief on July 8, 2019. *See* Doc. No. 147.

On August 7, 2019, the court held an on-the-record telephone conference with Galletta, Attorney Holihan, and counsel for the government, to discuss the status of these section 2255 proceedings in light of five *pro se* submissions the undersigned had received from Galletta that the court had forwarded to Attorney Holihan. The court then entered an order on September 4, 2019, which denied four of the motions Galletta submitted, but granted his remaining motion to have Attorney Holihan withdraw, but act as standby counsel, and permit Galletta to argue on his own behalf at an oral argument scheduled for November 6, 2019.[35] *See* Sept. 4, 2019 Order at 1–2, Doc. No. 151. On November 6, 2019, the court heard oral argument from Galletta in a *pro se* capacity and the government.

---

[34] Those claims were: (1) ineffective assistance of counsel by Attorney Sletvold when he failed to present evidence and argument to support Galletta's claim that he lacked the requisite mens rea to commit the charged offenses; (2) ineffective assistance of counsel for failing to raise an affirmative defense under section 2252(c) to the offense of possession of child pornography; (3) ineffective assistance of counsel for failing to challenge the constitutionality of the search warrant for the Phone; and (4) ineffective assistance of counsel for failing to object to a constructive amendment of the superseding indictment. *See* Pet'r's Br. in Supp. of His Mot. for Post-Conviction Relief Pursuant to 28 U.S.C. § 2255 ("Am. Mot. Suppl.") at 3–20, Doc. No. 140.
[35] Since none of Galletta's *pro se* motions had been docketed, the court attached all five to the order. *See* Sept. 4, 2019 Order at ECF pp. 3–24.

After the argument, Galletta filed a letter with supplemental case references on January 7, 2020, as well as another supplemental case submission on January 22, 2020. *See* Doc. Nos. 155, 156. On June 30, 2020, Galletta filed (1) a *pro se* motion for transcripts from the November 6, 2019 oral argument and September 18, 2018 evidentiary hearing, (2) a *pro se* motion to compel release of the entire case file, and (3) *pro se* motion to have the court take judicial notice of part of his judgment of conviction and grant his request to supplement his amended section 2255 motion. *See* Doc. Nos. 158–160. On October 7, 2020, he submitted another *pro se* motion to have the court take judicial notice of a page from a transcript prepared from the grand jury proceedings leading to the original indictment. *See* Doc. No. 163.

## II.    DISCUSSION

### A.    Section 2255 Claims

Many of Galletta's claims stem from his belief his defense counsel acted ineffectively throughout the various stages of his proceedings in several respects. Galletta believes his counsel was ineffective when it came to trial strategy, for failing to seek to suppress certain pieces of evidence, for failing to challenge various aspects of the charges against him pertaining to their sufficiency, constructive amendments, and variances, for failing to seek recusal of the court, for failing to advise him of his rights to pertaining to a sort of hybrid representation, for failing to challenge the imposed fine, and for failing to challenge subject-matter jurisdiction. He also asserts that this court failed to consider recusal and because of cumulative error, he is entitled to habeas relief. The court will first set forth the applicable legal standards governing this section 2255 proceeding before addressing his claims in turn.

### 1. Applicable Legal Standards

#### a. Section 2255 Motions Generally

Section 2255 allows an individual serving a federal sentence to "move the court which imposed the sentence to vacate, set aside or correct the sentence" based

> upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.

28 U.S.C. § 2255(a). Ultimately,

> [i]f the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

*Id.* § 2255(b).

> In addition, when seeking collateral relief under section 2255,

> a prisoner must clear a significantly higher hurdle than would exist on direct appeal. Because of the great interest in finality of judgments, an error which may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. Indeed, the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas. This is because the concern that unfair procedures may have resulted in the conviction of an innocent defendant is only rarely raised by a petition to set aside a guilty plea.

*United States v. Cleary*, 46 F.3d 307, 310 (3d Cir. 1995) (internal footnote omitted). Moreover,

> a motion pursuant to [section] 2255 is reviewed much less favorably than a direct appeal of the sentence. Indeed, relief under § 2255 is available only when the claimed error of law was a fundamental defect which inherently results in a complete miscarriage of justice, and . . . present[s] exceptional circumstances where the need for the remedy afforded by the writ . . . is apparent.

*United States v. Travillion*, 759 F.3d 281, 288 (3d Cir. 2014) (alteration and omissions in original).

b.    Procedural Default

In general, "[a] collateral challenge may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982) (citations omitted); *see United States v. Cepero*, 224 F.3d 256, 267 (3d Cir. 2000) ("Section 2255 petitions are not substitutes for direct appeals and serve only to protect a defendant from a violation of the constitution or from a statutory defect so fundamental that a complete miscarriage of justice has occurred." (citations omitted)), *abrogated on other grounds by Gonzalez v. Thaler*, 565 U.S. 134 (2012). "Because collateral review under § 2255 is not a substitute for direct review, a movant ordinarily may only raise claims in a 2255 motion that [they] raised on direct review." *Hodge v. United States*, 554 F.3d 372, 378–79 (3d Cir. 2009) (citing *Bousley v. United States*, 523 U.S. 614, 621 (1998)). Thus, "a movant has procedurally defaulted all claims that [they] neglected to raise on direct appeal." *Id.* (citing *Bousley*, 523 U.S. at 621).

"The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro v. United States*, 538 U.S. 500, 504 (2003). Nonetheless, "courts will exempt a movant from [a procedural default if the movant] can prove either that [they are] actually innocent of the crime for which [they were] convicted, or that there is a valid cause for the default, as well as prejudice resulting from the default." *Hodge*, 554 F.3d at 379 (citation omitted); *see Bousley*, 523 U.S. at 622 ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice or that [they are] 'actually innocent.'" (citations and internal quotation marks omitted)); *United States v. De Castro*, 49 F.4th 836, 847 (3d Cir. 2022) ("In the habeas context, we allow a party to overcome their procedural

default if [they] can show either cause and prejudice or actual innocence" (citation and internal quotation marks omitted)).

A court may find cause to excuse a procedural default where the movant demonstrates an "objective impediment to compliance with a procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005) ("To establish 'cause' for procedural default, a defendant must show that 'some objective factor external to the defense impeded [their] efforts to raise the claim.'" (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991), *superseded on other grounds by* 28 U.S.C. §§ 2244(b)(3)(A), 2255)), *as amended* (Mar. 8, 2005). "There is no 'precise content' to the term 'cause,' nor is there 'a comprehensive catalog of the circumstances that would justify a finding of cause.'" *United States v. LaPrade*, 673 F. App'x 198, 202 (3d Cir. 2016) (quoting *Reed v. Ross*, 468 U.S. 1, 13 (1984) and *Smith v. Murray*, 477 U.S. 527, 534 (1986)). Nevertheless, "[o]bjective factors that constitute cause include interference by officials that makes compliance with the . . . procedural rule impracticable, . . . a showing that the factual or legal basis for a claim was not reasonably available to counsel[,]" and "[i]neffective assistance of counsel." *McClesky*, 499 U.S. at 493–94 (fifth alteration in original) (internal quotation marks omitted).

If a movant demonstrates cause, they must then show actual prejudice. *See Frady*, 456 U.S. at 168. Regarding the requirements for a showing of prejudice, a movant can establish prejudice by showing "not merely that the errors at [their] trial created a possibility of prejudice, but that they worked to [their] actual and substantial disadvantage, infecting [their] entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.

If there is no cause and prejudice to excuse the default, the only way for a district court to review a movant's claim is if they "make a threshold showing of 'actual innocence.'" *De Castro*,

49 F.4th at 848 (quoting *Bousley*, 523 U.S. at 622–23). To establish actual innocence, the movant

"must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable

juror would have convicted [them]." *Bousley*, 523 U.S. at 623 (citation and internal quotation

marks omitted). In addition, "'actual innocence' means factual innocence, not mere legal

insufficiency." *Id.* at 623 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

c.    <u>Ineffective Assistance of Counsel</u>

Criminal defendants have

> [t]he right to effective counsel[, which] is derived from the guarantee of a fair trial
> in the Due Process Clause, and the elements of a fair trial are defined through the
> Sixth Amendment. The Sixth Amendment recognizes the right to effective
> assistance because it envisions counsel[ is] playing a role that is critical to the
> ability of the adversarial system to produce just results. Accordingly, [a]n accused
> is entitled to be assisted by an attorney, whether retained or appointed, who plays
> the role necessary to ensure that the trial is fair.

*United States v. Senke*, 986 F.3d 300, 313 (3d Cir. 2021) (last alteration in original) (internal

footnotes and quotation marks omitted), *cert. denied*, 142 S. Ct. 367 (2021).

> When addressing claims for ineffective assistance of counsel, courts

> reference . . . the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).
> To secure relief based on alleged ineffective assistance of counsel, the *Strickland*
> framework requires a defendant to "show that counsel's performance was
> deficient" by proving "that counsel made errors so serious that counsel was not
> functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"
> through a showing that "counsel's representation fell below an objective standard
> of reasonableness." 466 U.S. at 687–88. If a defendant can prove constitutionally
> deficient performance, the defendant must also "show that the deficient
> performance prejudiced the defense" before a court may grant relief. *Id.* at 678.

*United States v. Braddy*, No. 22-1926, 2023 WL 3533649, at *2 (3d Cir. May 18, 2023).

Under the first *Strickland* prong, the movant must show that counsel fell short of

"reasonably effective assistance" by overcoming the presumption that counsel's decision was

"sound trial strategy." *Strickland*, 466 U.S. at 689. Thus, to support their claim of ineffective

31

assistance of counsel, the movant must identify those acts or omissions of counsel that are allegedly not the result of "reasonable professional judgment." *Id.* at 690. Then the court determines whether the identified acts or omissions of counsel fell "outside the wide range of professionally competent assistance," bearing in mind the strong presumption that counsel has "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Under the second *Strickland* prong, commonly referred to as the prejudice prong, the movant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Thus, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

When assessing prejudice,

> a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695–96.

In addition, the most important practical consideration when applying the *Strickland* standard is that

> in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable

because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id.* at 696.

## B.    Analysis of Each Section 2255 Claim

### 1.    Undeveloped/Abandoned Claims

There are five claims from Galletta's original *pro se* section 2255 motion, as incorporated into his amended section 2255 motion, that he has failed to develop during these proceedings. They are: (1) counsel was ineffective or failing to challenge section 2252 as an unconstitutional application under the Commerce Clause of the United States Constitution; (2) counsel was ineffective for failing to challenge section 2252 as violating the First Amendment of the United States Constitution; (3) counsel was ineffective for failing to challenge all charged statutes as "a constitutional violation of Federalism"; (4) counsel was ineffective for failing to challenge the charged statutes for "Unequal Application of the law in violation of the Fifth Amendment" of the United States Constitution; and (5) counsel was ineffective for failing to "[l]oyally and [a]dequately perform his or her duties as counsel because of the nature of the allegation[s] and the alleged sexual orientation of" Galletta in violation of the Fifth Amendment. *See* Original Mot. at ECF pp. 50–52. Although these claims are identified in the original motion, Galletta failed to mention them in his brief in support of the motion, brief in support of his amended motion, or supplemental brief. Moreover, during the evidentiary hearing, Galletta indicated that he was no longer raising these arguments and would not be supporting them. *See* 2255 Hrg. Tr. at 72 ("I referenced in the opening of my 2255 that there would be follow up claims, 17 through I think it

was 22, but I did not submit any supporting arguments. I ran out of the time, so I'm not raising them and I'm not supporting them.").[36]

Through his statements under oath at the evidentiary hearing, Galletta has abandoned and waived these five claims. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (explaining that waiving requires "intentional relinquishment or abandonment" (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938))). Even if he had not expressly abandoned these five claims, the court would deny them because they are conclusory and undeveloped. *See United States v. Dawson*, 857 F.2d 923, 928 (3d Cir. 1988) ("The district court correctly declined to consider the unelaborated statement that Evelyn Davis saw Simons 'manufacturing evidence.' Appellant has yet to indicate what that evidence was, much less how it was being 'manufactured'. The vagueness of this allegation stands in contrast to most of appellant's other allegations, and is too vague to warrant further investigation in a court."); *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000) ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court." (citation omitted)); *United States v. Jackson*, No. 2:13-cr-622, 2023 WL 3229926, at *3 (E.D. Pa. May 3, 2023) ("Mr. Jackson asserts—in conclusory fashion—that counsel was ineffective for failing to pursue a motion for discovery of cell phone evidence from the Government and for failing to pursue a motion to dismiss the indictment as unconstitutionally vague. However, aside from listing these grounds for relief in his motion, Mr. Jackson does not expand upon them in any of his submissions. Mr. Jackson's declaration, his counsel's declaration, and his supplemental brief are all silent on these issues. Where there is no argument or evidence as to these claims of ineffective assistance, Mr. Jackson has not demonstrated that relief is warranted, and I need not investigate further based on his conclusory

---

[36] The court recognizes that Galletta's original motion contained claims numbered 1 through 21. *See* Original Mot. at ECF pp. 37–53. These five claims were numbered 17 through 21.

allegations." (internal footnote and citation omitted)); *United States v. Le*, Crim. A. No. 09-50, Civ. A. No. 18-87, 2020 WL 3830910, at *5 (E.D. Pa. July 8, 2020) (determining section 2255 movant failed to present court "with a claim to review" or "basis for relief" where movant "provide[d] no factual basis for concluding his counsel was deficient for failing to raise a claim"); *see also United States v. Clark*, 24 F.4th 565, 573 n.4 (6th Cir. 2022) ("Although Clark's brief makes passing references to 'an unconstitutional expansion of federal power' and 'a glaring evidentiary hole with constitutional implications' he falls well short of presenting a developed constitutional challenge to § 2252(a)(2). We, therefore, do not consider the constitutionality of § 2252(a)(2) under Congress's Commerce Clause authority." (citation omitted)); *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014) (explaining that appellant abandons argument by failing to "fully develop" it).[37]

---

[37] Even if the court would have addressed these claims, at least two of them wholly lack merit. Regarding his ineffectiveness claims relating to alleged failure to challenge the constitutionality of section 2252, his counsel could not have been ineffective in failing to raise what appear to be meritless arguments. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("[T]here can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."). In the first instance, Galletta has only argued that his counsel was allegedly ineffective for failing to challenge the constitutionality of section 2252, and not any specific portion of that statute, and he would have lacked standing to challenge section 2252 in its entirety as he was only charged with, and convicted of, violating subsections (a)(1) and (a)(4). *See Faustin v. City, Cnty. of Denver, Colo.*, 268 F.3d 942, 948 (10th Cir. 2001) (concluding section 1983 plaintiff lacked standing to challenge constitutionality of Colorado statute that was not applied to plaintiff); *United States v. Wright*, 117 F.3d 1265, 1274 n.18 (11th Cir. 1997) ("[A]s a criminal defendant, Wright has standing to assert a constitutional challenge to the statute he is charged with violating."), *vacated in part on other grounds on reh'g*, 133 F.3d 1412 (11th Cir. 1998); *Brooks v. Briley*, 274 F. Supp. 538, 547 (M.D. Tenn. 1967) ("It is equally apparent that the named plaintiffs, other than the three actually charged, are without standing to maintain the action and that it must be dismissed as to them. This is true because they have sustained no injury."), *aff'd* 391 U.S. 361 (1968); *see also Womens Servs., P.C. v. Douglas*, 653 F.2d 355, 359 (8th Cir. 1981) (determining that district court abstention under *Younger* was improper because, *inter alia*, plaintiffs' constitutional claims to Nebraska statutes could not be raised as part of non-plaintiff's criminal case because non-plaintiff was not charged with violating statute plaintiffs seek to challenge and, as such, "presumably lacks standing to challenge" uncharged statute). Even if Galletta had standing, it appears that section 2252(a)(4) does not violate the Commerce Clause. *See United States v. Rodia*, 194 F.3d 465, 482 (3d Cir. 1999) (holding that "§ 2252(a)(4)(B) was a reasonable exercise of Congress's power under the Commerce Clause"); *United States v. Kallestad*, 236 F.3d 225, 228 (5th Cir. 2000) (concluding that section 2254(a)(4)(B) did not violate Commerce Clause); *United States v. Galo*, 239 F.3d 572, 575–76 (3d Cir. 2001) (concluding that neither sections 2252(a)(4)(B) nor 18 U.S.C. § 2251(a) violated Commerce Clause); *United States v. Bowers*, 594 F.3d 522 (6th Cir. 2010) (concluding that neither section 2251 nor 2252(a)(4)(B) violated Commerce Clause when applied to noncommercial, intrastate production and viewing of child pornography, because intrastate production and possession of child pornography has substantial effect on interstate commerce as Congress determined); *United States v. Wellbeloved-Stone*, No. 17-CR-14, 2018 WL 1973286, at *1–4 (W.D. Va. Apr. 26, 2018) (analyzing motion challenging constitutionality of sections 2251 and 2252 under Commerce Clause

2.      **Ineffective Assistance of Counsel Due to Counsel's Failure to Obtain Expert Mental Health Testimony for Trial or Sentencing**

Galletta claims that Attorney Sletvold was ineffective for failing to call Dr. Frank Dattilio as a mental health expert at trial and that Attorneys Sletvold, Meehan, and Henry failed to conduct any investigation into this testimony. *See* Original Mot. at ECF p. 37; Original Br. at ECF pp. 66, 68; Am. Mot. Suppl. at 3. Galletta also asserts that Attorney Sletvold should have sought an expert, even if it was not Dr. Dattilio, who would have discussed the taboo fantasy culture, as this would have supported Galletta's defense that he was only engaging in fantasy communications with Agent Leri. *See* Original Br. at ECF pp. 77–78; Suppl. at ECF p. 2; Am. Mot. Suppl. at 3. In addressing these two components of this ineffective assistance claim, the court will first summarize the evidence presented on the claim, then reference the parties' allegations and arguments, and finally, resolve the claim.

a.      Evidence Presented

i.      *Galletta's Testimony*

During the evidentiary hearing on September 18, 2018, Galletta testified that when he was originally facing charges in state court, his defense counsel recommended that he meet with Dr. Dattilio. *See* 2255 Hrg. Tr. at 10–11. Once Galletta was facing federal charges, and while Attorneys Meehan and Henry represented him, he met with Dr. Dattilio on two days in April 2015 at the Lehigh County Jail. *See id.* at 8–9. This meeting was to allow Dr. Dattilio to conduct an assessment for the defense. *See id.* at 9. To the best of Galletta's knowledge, Attorneys Henry and Meehan

---

after *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519 (2019), and concluding that these statutes, "as applied to Defendant, do violate the Commerce Clause", *aff'd*, 777 F. App'x 605 (4th Cir. 2019). It also appears unlikely that Galletta would have succeeded on a First Amendment challenge to section 2252. *See, e.g.*, *United States v. Henson*, 705 F. App'x 348, 354 (6th Cir. 2017) (rejecting First Amendment overbreadth argument pertaining to section 2252(a)(4)(B)); *United States v. Bach*, 400 F.3d 622, 629 (8th Cir. 2005) (applying rational basis review to defendant's claim that section 2251 and 2252 convictions violated First Amendment and concluding that "the congressional choice to regulate child pornography by defining minor as an individual under eighteen is rationally related to the government's legitimate interest in enforcing child pornography laws").

never received a report from Dr. Dattilio. *See id.* After Attorney Sletvold was assigned to Galletta's case, Galletta informed him about Dr. Dattilio's evaluation and provided him with Dr. Dattilio's information. *See id.* at 11–12. Although Attorney Sletvold agreed to obtain Dr. Dattilio's report and said that they would not go to trial without it, he never obtained it. *See id.* at 10, 12, 14.

Galletta indicated that if Dr. Dattilio had been called to testify, his testimony would have supported Galletta's "alternate theory defense," namely, that he "was interested in chatting online about various taboo topics with other like-minded adults." *Id.* at 11. Along with not calling Dr. Dattilio, Attorney Sletvold presented no expert mental health testimony at trial or sentencing about Galletta's preference for "discussing taboo topics with like-minded adults without engaging in the actual physical acts." *See id.* at 12. Concerning the trial, Galletta believes that this type of expert testimony would have "put in front of the jury an alternate explanation and understanding of the events" and provided "a reasonable probability that at least one of the jurors would have believed the alternate theory defense" and decide not to convict him. *See id.* at 12–13. Additionally, although Galletta wanted to testify "from the beginning," the lack of supporting testimony, along with Attorney Sletvold not preparing him to testify, made him decide not to testify in his own defense at trial. *See id.* at 13–14.

ii.     *Attorney Sletvold's Testimony*

After Attorney Sletvold was assigned to represent Galletta, he spoke to Dr. Dattilio and Attorneys Meehan and Henry.[38] *See id.* at 89–90. Through those conversations, Attorney Sletvold learned that Galletta wanted Dr. Dattilio to be involved in his case and that Dr. Dattilio had met with Galletta for an evaluation prior to Attorney Sletvold's appointment as Galletta's counsel. *See*

---

[38] Attorney Sletvold testified that he has been practicing law as a licensed attorney in the Commonwealth of Pennsylvania since 1997, with 99% of his work being dedicated to criminal law. *See* 2255 Hrg. Tr. at 87–88. His practice has also included representing clients in criminal cases involving child exploitation. *See id.* at 88.

*id.* Through these discussions, Attorney Sletvold determined that Dr. Dattilio's testimony would have hurt Galletta's case. *See id.* at 90.

Attorney Sletvold indicated that Dr. Dattilio never prepared a report following his evaluation of Galletta. *See id.* at 91. Attorney Sletvold learned that Dr. Dattilio had requested a fee to initially evaluate Galletta, and he would have needed additional fees to write the report and be prepared to testify. *See id.* Attorneys Meehan and Henry, prior to withdrawing from the case, determined that they were not going to pay Dr. Dattilio additional money to write the report. *See id.* If Attorney Sletvold wanted a report, he recognized that he would have had to petition the court for additional fees. *See id.*

Attorney Sletvold did not seek those fees because Dr. Dattilio told him that the report would not be helpful. *See id.* at 91–92. Attorney Sletvold explained that Dr. Dattilio told him that Galletta's "behavior in this case, coupled with his behavior in his prior convictions, and the interviews he did with . . . Galletta," prevented Dr. Dattilio from opining that Galletta "was a harmless person just fantasizing online." *Id.* at 92. Attorney Sletvold indicated that he believes he shared his thoughts about Dr. Dattilio with Galletta. *See id.* at 93.

Regarding his other conversations with Galletta, Attorney Sletvold recalled that Galletta told him that he was someone who just talked with other people about taboo issues, such as child sexual abuse. *See id.* Although he did not recall specific conversations with Galletta, Attorney Sletvold was aware from his legal research that there are people who claim that they are only engaging in fantasies online. *See id.* at 94. However, in Galletta's case, "there were more facts charged, adduced in the investigation . . . that . . . Galletta did [sic] . . . beyond just speaking online in a fantasy-type conversation." *Id.* Those facts included Galletta having sent pictures to other people and that he had gone to meet with a person he thought was another male with young

children. *See id.* at 94–95. Based on those facts, Attorney Sletvold felt that a mental health, fantasy-only defense "could not be the defense," *see id.* at 94, and he never had conversations with any forensic expert about the subset of people who fantasize and talk about taboo subjects such as child sexual abuse. *See id.* at 102.

Attorney Sletvold also noted that when he spoke to Dr. Dattilio, he did not question him about whether there was a subset of people who just fantasize online. *See id.* at 100, 101. Attorney Sletvold also indicated that he would not have called Dr. Dattilio as a witness or even asked Galletta that question because it would have "open[ed] the door to, but those people stay in their house, they stay online, they don't do overt behavior." *Id.* at 100. It would also have brought up again "the laundry list of overt behaviors that . . . Galletta engaged in, both in this case and other instances that [they] had conversations about and in his prior convictions." *Id.*

As for Galletta's positions on the case, Attorney Sletvold pointed out that Galletta took other positions than merely stating that he was part of a subset of people who have fantasies with like-minded adults. *See id.* at 101. Also, although he recognized that Galletta mentioned engaging in online fantasies when interviewed by law enforcement, Attorney Sletvold noted that Galletta said several other things such as he had "been arrested for this before and something to the effect [of] my life is over." *Id.*

b.   Allegations and Summary of Arguments

Galletta alleges that the court provided Attorneys Henry and Meehan with funding totaling $2,500 to hire Dr. Dattilio[39] to examine him and then prepare a report.[40] *See* Original Br. at ECF

---

[39] Galletta notes that Dr. Dattilio "has been recognized by the Third Circuit as an expert and . . . has testified in several cases both for the defense and . . . the government." Original Br. at ECF p. 70.

[40] Galletta is mistaken that Attorneys Meehan and Henry sought and received court approval for money to hire Dr. Dattilio to conduct an evaluation of him. The Federal Community Defender Office for the Eastern District of Pennsylvania does not require court approval for funds to hire experts, as it has its own budget for hiring experts. Only CJA defense attorneys require court approval when seeking to hire experts at an amount exceeding a certain threshold.

p. 68. Galletta claims that although Dr. Dattilio prepared a report, he was unable to view it after the court granted Attorneys Henry and Meehan permission to withdraw from the case. *See id.* Once Attorney Sletvold entered his appearance, Galletta avers that he asked Attorney Sletvold at every meeting they had to procure Dr. Dattilio's testimony, and Attorney Sletvold always told him that he intended to procure the report. *See id.* Attorney Sletvold also told Galletta that they "would not go to trial without" Dr. Dattilio. *See id.* at ECF p. 83. Galletta believes that Attorney Sletvold knew the report was completed, that the report and any testimony would be favorable to the defense, and that Dr. Dattilio was willing and available to testify for the defense. *See id.* at ECF p. 71. In fact, Galletta claims that Dr. Dattilio recommended to him that he direct his counsel to procure an additional $2,500 for Dr. Dattilio's testimony. *See id.* at ECF pp. 71, 86.

As for the substance of the report, Galletta claims he spoke to Dr. Dattilio after they finished a two-day interview at the Lehigh County Jail, and Dr. Dattilio told him that "the final report would be favorable and . . . it would show that even though [he] had an intermittent interest in minors[,] . . . it was unlikely that [he] would have acted on that interest." *Id.* at ECF p. 69; *see id.* at ECF p. 86 (alleging that Dr. Dattilio told Galletta that "[he] 'will be pleased with the findings'"). As such, Galletta believes that "Dr. Dattilio's final report would have shown that [he] also had an interest in having conversations with other adults[,] both men and women[,] about sexual interest in children without acting out on that interest." *Id.* at ECF p. 69.

Galletta asserts that Dr. Dattilio's expert testimony was "important to address the mens rea and [his] credibility." Original Br. at ECF p. 67. Galletta recognizes that Federal Rule of Evidence

Thus, Attorney Sletvold, as CJA counsel, would have required court approval (from the Third Circuit) to receive $2,500 as payment to Dr. Dattilio.

The court notes that at points in this litigation, Galletta has sought CJA information relating to the court approval of funds to pay Dr. Dattilio. *See, e.g.*, Doc. No. 98. There is no such information for Galletta to obtain as no CJA counsel sought funds to pay Dr. Dattilio.

704(b) precludes an expert from expressing an opinion about whether a defendant possessed the mental state or condition constituting an element of a crime charged because the jury must make that determination. *See id.* at ECF p. 70. Nevertheless, Galletta believes that a psychologist "could testify that it was unlikely, given [a] defendant's psychology, that he would act on his intent" to have sex with a child. *See id.* (citing *United States v. Gladish*, 536 F.3d 646, 650–51 (7th Cir. 2008)). In addition, Galletta believes that Dr. Dattilio would have been able to explain to the jury about internet sexual fantasies involving taboo subjects such as sexual activity involving children, which would have bolstered Galletta's fantasy defense. *See id.* at ECF p. 84 (citing *United States v. Laureys*, 866 F.3d 432 (D.C. Cir. 2017)); *id.* at ECF pp. 90, 91; Am. Mot. Suppl. at 3.

Galletta contends that his fantasy-only intent is supported by his answers to 50 minutes of questioning by law enforcement after his arrest in July 2014. *See* Suppl. at ECF p. 3 & Ex. F, Tr. of Galletta Interview from July 23, 2014; Am. Mot. Suppl. at 4 (referencing Galletta's statements to police during interview).[41] He also argues that the government's evidence at trial would have supported Dr. Dattilio's expert testimony. *See id.* at ECF p. 70. In particular, he points out that Agent Smith testified that there was no evidence that Galletta actually met any adult or minor during the 18 months in which the FBI investigated him. *See id.* at ECF p. 71. Also, he claims that the email chains presented by the government "actually confirm that [he] did in fact only have the intent to share graphic sexual fantasies about children with like minded adults." *Id.* at ECF pp. 71–72. Further, he appears to assert that he chose not to testify on his own behalf because he did not have testimony from his expert psychologist to support his testimony. *See id.* at ECF p. 72. Without that corroborating expert testimony, Galletta's "own testimony would have sounded irrational and

---

[41] The transcript begins on ECF p. 92 of Doc. No. 109.

unexplainable." *Id.* at ECF p. 73. It also "left the jury without any legitimate framework upon which to view [Galletta's] conduct." Am. Mot. Suppl. at 4.

Although Galletta mostly focuses on counsel's failure to call Dr. Dattilio as a witness, he reiterates that his claim of ineffectiveness is not "necessarily specific to Dr. Dattilio." Am. Mot. Suppl. at 4. He points out that it is unnecessary that he identify a particular expert; rather, he need only show that counsel failed to present the expert's testimony despite knowing that such evidence was available, that it supports Galletta's claim of innocence, and that the evidence was likely to sway the jury in Galletta's favor. *See id.*

In response to Galletta's arguments, the government points out that despite alleging what Dr. Dattilio's report would have said and how it would have helped him, he has not proven that any report or testimony from Dr. Dattilio, or any other expert, would have been helpful. *See* Gov't's Resp. to Pet'r's Mot. to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 ("Gov't's 2d Br..") at 12, 15, Doc. No. 147. As such, the government contends that Galletta is purely speculating as to what any report or testimony would have provided. *See id.* In addition, the government indicates that Galletta cannot show prejudice because Attorney Sletvold testified at the evidentiary hearing that Dr. Dattilio's opinion would not have been favorable to Galletta. *See id.* at 14.

c.     Resolution of Claim

Galletta has failed to demonstrate that any of his prior counsel were ineffective for deciding not to call Dr. Dattilio or any other mental health expert at trial or at sentencing. As already indicated, Galletta's claim appears to have two components. The first component relates to Dr. Dattilio and counsel's alleged failure to secure a report from him and call him as a witness at trial or at sentencing. The second component relates to counsel's failure to investigate into obtaining

42

any mental health expert testimony to assist Galletta's case at trial. The court addresses each component in turn.

i.      *Dr. Dattilio*

As for the issues relating to Dr. Dattilio failing to call him as a witness,

> "[t]he decision of whether to interview and call a particular witness is generally a strategic choice made by counsel and is entitled to a 'heavy measure of deference.'" *U.S. v. Brown*, No. 04-532, 2011 WL 4835846, at *4 (E.D. Pa. Oct. 12, 2011) (quoting *Strickland*, 466 U.S. at 690–91). An evaluation of the failure on the part of defense counsel to call a witness at trial under the first prong of *Strickland* requires the Court to decide whether the decision not to call the witness was "in the exercise of reasonably professional judgment." *Strickland*, 466 U.S. at 690; *see also Duncan v. Morton*, 256 F.3d 189, 201 (3d Cir. 2001). Given professional reasonableness as a touchstone, "[t]he Constitution does not oblige counsel to present each and every witness that is suggested to [them]." *United States v. Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990). Accordingly, when challenging the failure to interview a potential witness, "there must be a clear showing that the testimony would have been material and favorable." *Brown*, 2011 WL 4835846 at *4.

*United States v. Claude*, Crim. A. No. 12-33-1, 2020 WL 5083890, at *9 (E.D. Pa. Aug. 14, 2020) (second alteration in original); *see also Lema v. United States*, 987 F.2d 48, 54 (1st Cir. 1993) ("The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony."). Concerning experts, "courts have found ineffective assistance arising from counsel's failure to offer expert mental health testimony where it was necessary to an adequate defense." *Laureys*, 866 F.3d at 437–38 (citations omitted).

Here, Galletta has failed to show that any of his trial counsel acted unreasonably in either declining to pay to obtain Dr. Dattilio's report or call him as a witness during trial or sentencing. There are two preliminary matters the court must mention. First, because Dr. Dattilio did not prepare a report and was not called as a witness during the evidentiary hearing, the court does not know the results of Dr. Dattilio's examination of Galletta to be able to definitively ascertain whether any report would have been favorable or hurtful to Galletta's case. Second, the court is

43

unable to fully assess the reasonableness of Attorneys Meehan and Henry's decision not to pay the additional fee to obtain a report from Dr. Dattilio because they were not called to testify at the evidentiary hearing.

Nevertheless, the court does have the benefit of Attorney Sletvold's testimony, and he unequivocally testified that he spoke to Dr. Dattilio about his evaluation of Galletta and concluded that Dr. Dattilio's testimony would be hurtful to Galletta's case.[42] Attorney Sletvold explained that Dr. Dattilio told him that Galletta's "behavior in this case, coupled with his behavior in his prior convictions, and the interviews he did with . . . Galletta," prevented Dr. Dattilio from opining that Galletta "was a harmless person just fantasizing online." 2255 Hrg. Tr. at 92. As such, he determined that he would neither seek to have Dr. Dattilio prepare a report of his evaluation of Galletta nor call Dr. Dattilio as a witness at trial. This court cannot conclude that this strategic decision not to call an expert witness whom Attorney Sletvold, using his professional judgment, determined would have harmful testimony was unreasonable.

Additionally, the court finds that Galletta's testimony that Attorney Sletvold told him that they would not go to trial without Dr. Dattilio's report and testimony, that Dr. Dattilio told Galletta

---

[42] During oral argument on Galletta's motion on November 6, 2019 (which has not yet been transcribed), Galletta represented that he possessed a letter from Dr. Dattilio which contradicted Attorney Sletvold's statement that he had contacted Dr. Dattilio. The court explained to Galletta that since the evidentiary portion of the case was closed, Galletta would have to move to reopen the record to supplement it with this letter. Galletta indicated that he did not want to submit the letter to the court because he did not want the government to be able to use it against him in a subsequent trial.

Galletta also stated that his prior section 2255 counsel, Attorney Collins, and his current standby counsel, Attorney Holihan, had viewed the letter and could substantiate what it said. He also sought to have Attorney Holihan verify the letter's contents, which the court did not allow him to do as a backdoor way to have the letter admitted. In the end, Galletta has not introduced this letter into evidence.

Even if Galletta had introduced the letter into evidence and the court found it contradicted Attorney Sletvold's statement about having spoken to Dr. Dattilio, it would not change the court's decision because Galletta has still failed to show prejudice insofar as he has not shown by a preponderance of the evidence that Dr. Dattilio's report would have been favorable to him in any respect. He could have called Dr. Dattilio as a witness, but he did not. As such, any belief as to what his report would have said is pure speculation. Moreover, Galletta's statement during oral argument about not wanting to allow the government to access the letter should the court grant him a new trial creates a reasonable inference that the remainder of the letter did not contain information that would benefit Galletta.

that his report would be favorable to Galletta, or that Dr. Dattilio's testimony would have supported his fantasy/no-overt-act defense, to lack credibility. Regarding the two latter contentions, they are both based on the premise that Dr. Dattilio would have concluded that Galletta only desired to talk with other-like minded adults about taboo subjects such as sexual activity with children and would have never acted on it. For Dr. Dattilio to have reached such a conclusion after his six-hour interview with Galletta appears very unlikely because of the facts of the case and Galletta's criminal history, both of which Dr. Dattilio, who as Galletta notes has provided testimony in numerous state and federal courts throughout Pennsylvania, would have surely reviewed before reaching any conclusions. *See, e.g.*, *Laureys*, 866 F.3d at 435 (describing situation where expert with whom defense counsel had consulted to prepare report and testify at trial "refused to offer a preliminary medical opinion about [the defendant] in time for the status conference, explaining that professional ethics forbade him from formulating any opinion about [the defendant's] mental condition before he had a chance to review all of [the defendant's] records"). As for Galletta's criminal history, it includes convictions for offenses involving minors where he went well beyond the realm of fantasy to communicate with and ultimately meet minor girls.[43] Moreover, he also went beyond the realm of fantasy in this case, as he sent images of child pornography to email recipients, and he physically appeared to meet with someone, Agent Leri, who he believed to be an adult who would give him access to that adult's young girl for persuading, inducing, or enticing

---

[43] In addition to the two corruption of minors convictions in 2001, which involved a 14-year-old girl, that the government introduced as Rule 404(b) evidence during the trial in this case, Galletta was previously convicted of corruption of minors after a jury trial before the undersigned in 2004, when the undersigned was a judge on the Court of Common Pleas of Northampton County. *See Commonwealth v. Galletta*, CP-48-CR-3296-2002 (Northampton Cnty. Ct. Com. Pl.), available at: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-48-CR-0003296-2002&dnh=8R%2BnSSDkqxwYvtIziBW7Bw%3D%3D. This conviction, which will be discussed in much greater detail later in this opinion, involved conduct with a 15-year-old girl, and Galletta committed this offense while he was on parole from the 2001 corruption of minors convictions.

her to engage in unlawful sexual activity. As such, he was not merely using an online persona to chat with people about taboo subjects, such as having sexual relations with children.

At bottom, Galletta has failed to satisfy either part of the *Strickland* standard regarding any of his trial counsel's failure to obtain a report from Dr. Dattilio or Attorney Sletvold's decision to not call Dr. Dattilio as a witness during Galletta's trial. At a minimum, he has failed to demonstrate that Dr. Dattilio would have testified favorably to him, that Attorney Sletvold acted unreasonably in declining to call a witness whom he determined would provide only hurtful testimony, or that his defense of the case suffered any prejudice by not having Dr. Dattilio as a witness. Further, Galletta has failed to articulate how Dr. Dattilio would have assisted him at sentencing because he provided no evidence about what Dr. Dattilio would have said, and the court cannot conceive how he would be prejudiced by the lack of support of a fantasy/no-over-act defense when the jury clearly convicted him of doing much more than that. Accordingly, the court will not second-guess Attorney Sletvold's decision not to call Dr. Dattilio as a witness at trial or at sentencing as there is no indication that the testimony was necessary to an adequate defense. *See Henderson v. DiGuglielmo*, 138 F. App'x 463, 469 (3d Cir. 2005) ("Counsel's failure to call a witness 'is precisely the sort of strategic trial decision that *Strickland* protects from second-guessing.'") (quoting *Sanders v. Trickey*, 875 F.2d 205, 212 (8th Cir. 1989))).

ii.   *Failure to Obtain Any Mental Health Expert Other Than Dr. Dattilio*

This now leads the court to the second component of Galletta's claim, as fleshed out by Attorney Holihan, where he argues that Attorney Sletvold was ineffective for failing to investigate the possibility of obtaining **any** mental health expert to support a fantasy/no-overt-act alternative defense. In general, the "failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness." *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989).

46

"Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when [they have] not yet obtained the facts on which such a decision could be made." *Id.* (citations omitted).

In this case, Galletta has failed to show that any of his defense counsel, especially Attorney Sletvold, was ineffective for failing to investigate the possibility of other expert testimony to support his alternative fantasy/no-overt-act defense. He cannot show that Attorney Sletvold failed to conduct **any** investigation because he did talk to a mental health expert who had evaluated Galletta, namely Dr. Dattilio. As for Attorneys Meehan and Henry, they paid for Dr. Dattilio's evaluation in the first place.

In addition, Attorney Sletvold explained that in his professional judgment, a fantasy/no-overt-act defense was not the appropriate defense for the case. Even though Attorney Sletvold was aware that there are individuals who claim that they are only engaging in fantasies online, he determined that Galletta's case involved more than just fantasy conversations as he had sent pictures to others and went to meet with a person whom he thought was a male with young children. Attorney Sletvold also pointed out that trying to assert a fantasy/no-overt-act defense would have opened the door to a focus on the differences in behavior of the individuals who engage in fantasies but do not act on them and Galletta's overt actions in his case, and it would also have brought up again "the laundry list of overt behaviors that . . . Galletta engaged in, both in this case and other instances that [they] had conversations about and in his prior convictions." 2255 Hrg. Tr. at 101.

Attorney Sletvold's articulated reasons for not pursuing expert testimony on the fantasy/no-overt-act defense are reasonable. Galletta contends that Attorney Sletvold should have done more

because, for instance, during his interview with police, he consistently mentioned that he was only there to hang out with the dad, was bicurious, and was only engaging in role-playing. However, as Attorney Sletvold testified, Galletta also said other things during the interview and in the case, such as his mentioning prior arrests during the interview and his statement to law enforcement at the time of his arrest in this case that his life was over. *See id.* In addition, the court notes that while Galletta accurately points out that he made several statements to law enforcement during his interview that expressed his intent only to meet the dad, hang out at his pool, and engage in fantasy conversation, *see generally* Suppl., Ex. F, he also made statements such as: (1) he "fights that attraction" to young girls, particularly when his "life is messed up"; (2) he is not interested in toddlers, but is "attracted to teen girls"; (3) he had been previously arrested more than once for "[t]he same thing" and explained that the arrests related to "underage girls" and not another dad. *Id.* at ECF pp. 103–04, 105–06. Also, even though Galletta repeatedly explained that he was bicurious, he told the interviewers that if he had met Agent Leri's undercover dad and found out that he was "really gay, . . . really [did not] have kids, . . . and . . . [did not] have a pool, he "would have said ok, I don't understand what, you know, you were trying to do," and would have left, *id.* at 107–08, which was contrary to him being bicurious (as he would have been ok with the dad being gay) and his statements that he did not care about whether the dad had kids because he was just coming to hang out with the dad. At bottom, Attorney Sletvold did not act unreasonably by not investigating whether there was a potential mental health expert who would opine on the fantasy/no-overt-act defense considering the facts alleged in the case, Galletta's statements to police, and his prior criminal history.

Further, the cases Galletta primarily relies on to support his assertion that expert testimony was necessary in this case are inapplicable and distinguishable.[44] The first of these cases is *United States v. Gladish*, 536 F.3d 646 (7th Cir. 2008). In *Gladish*, the defendant was arrested as part of a sting operation after he had joined an Internet chat room and solicited a purported 14-year-old girl (who was being impersonated by an FBI agent) to have sex with him. *See* 536 F.3d at 648. Although the defendant discussed traveling to meet with the girl, he never did. *See id.* He was nevertheless arrested and charged with attempting to entice a person under 18 to engage in sexual activity in violation of section 2422(b).[45] *See id.* A jury ultimately found him guilty of violating

---

[44] In the government's second response to Galletta's section 2255 motion, it correctly points out that Galletta could not have used expert testimony to show that he lacked the requisite *mens rea* to commit the offenses under Federal Rule of Evidence 704(b). Gov't's 2d Br. at 13. Rule 704(b) states that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). The Rule "applies to all instances in which expert testimony is offered as to mental state or a condition constituting an element of the crime charged or defense thereto." *United States v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) (citing *United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999)). However,

> [e]xpert testimony is admissible if it merely "support[s] an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *United States v. Bennett*, 161 F.3d 171, 183 (3d Cir. 1998) (quoting *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997)). "It is only as to the last step in the inferential process-a conclusion as to the defendant's mental state-that Rule 704(b) commands the expert to be silent." *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988).

> Rule 704(b) may be violated when the prosecutor's question is plainly designed to elicit the expert's testimony about the mental state of the defendant, [*United States v. Boyd*, 55 F.3d 667, 672 (D.C. Cir. 1995)], or when the expert triggers the application of Rule 704(b) by directly referring to the defendant's intent, mental state, or mens rea, *United States v. Lipscomb*, 14 F.3d 1236, 1240 (7th Cir. 1994). Rule 704 prohibits "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." *Bennett*, 161 F.3d at 182 (quoting *Morales*, 108 F.3d at 1037).

*Watson*, 260 F.3d at 309.
        If Galletta sought expert testimony about his ultimate intent in the case, the government is correct that he would be precluded from doing so. Galletta, however, concedes this point. *See* Original Br. at ECF p. 70. As such, the court addresses only the way Galletta claims such testimony could be admitted, by addressing the cases he cites in support of its admissibility.
[45] He was also charged with knowingly transferring or attempting to transfer obscene material to a person under 16 in violation of 18 U.S.C. § 1470. *See Gladish*, 536 F.3d at 647.

section 2422(b), and he appealed from this conviction to the Seventh Circuit Court of Appeals.[46]
*See id.* at 647.

On appeal the Seventh Circuit Court of Appeals addressed the defendant's claim that the
district court erred in applying Federal Rule of Evidence 704(b) to preclude an expert from
testifying that the defendant's statements to the fictitious minor girl about having sex with her were
simply "hot air," and he would not have acted on his expressed desire to have sex with the minor.
*See id.* at 650. The Seventh Circuit concluded that the district court erred in precluding the expert's
testimony about the defendant being unlikely to act on his expressed intent, explaining that while

> the psychologist could not have been permitted to testify that the defendant did not
> intend to have sex with "Abagail," . . . he could have testified that it was unlikely,
> given the defendant's psychology, that he would act on his intent. You can sincerely
> intend to stop smoking, yet a psychologist might conclude that you had such poor
> impulse control that it was exceedingly unlikely that you would stop. That evidence
> would not be barred by Rule 704(b).

*Id.* at 650–51.

In this case, even though *Gladish* identifies a form of admissible testimony an expert can
provide in a section 2422(b) case, it does not benefit Galletta's claim here in one significant way:
Galletta did not, and does not, have an expert who would have said that it was unlikely, given his
psychology, that Galletta would not act on his expressed intent to have sexual contact with a minor.
To the contrary, Dr. Dattilio, the expert Galletta wanted to evaluate him (based on his state-court
counsel's recommendation prior to the grand jury indictment in this court), informed Attorney
Sletvold that Galletta's "behavior in this case, coupled with his behavior in his prior convictions,
and the interviews he did with . . . Galletta," prevented him from opining that Galletta "was a

---

[46] Although the jury also found the defendant guilty of violating section 1470, he did not challenge this conviction on
appeal. *See Gladish*, 536 F.3d at 647.

harmless person just fantasizing online." 2255 Hrg. Tr. at 92. Galletta has also failed to identify any other expert who would testify as such. Therefore, *Gladish* is inapplicable here.

The second case Galletta relies on, and it is the case he primarily relies on, is *United States v. Laureys*, 866 F.3d 432 (D.C. Cir. 2017). *See* Original Br. at ECF p. 84. In *Laureys*, the defendant engaged in somewhat similar behavior to Galletta in this case insofar as the defendant chatted online and spoke on the phone with an undercover police officer posing as an adult male who had a sexual relationship with his girlfriend's nine-year-old daughter. 866 F.3d at 433–34. During their communications, the defendant indicated a desire to engage in sexual activity with the adult and his girlfriend's minor daughter. *See id.* Eventually, the defendant traveled to meet with the undercover officer and, upon his arrival at the officer's location, was arrested. *See id.* at 434. He was later indicted for attempted enticement and coercion of a minor in violation of section 2422(b) and travel with intent to engage in illicit sexual conduct in violation of 18 U.S.C. § 2423(b). *See id.*

While preparing for trial, defense counsel "recognized from his very first meeting with [the defendant] that a mental health expert would be necessary to his defense" and, as such, had consulted with "a specialist in sexual disorders at Johns Hopkins University School of Medicine[] about potentially serving as an expert witness at . . . trial." *Id.* at 434, 438. During defense counsel's sporadic communications with this specialist over several months, counsel focused on "a diminished capacity defense based on [the defendant's] purported inability to form the specific intent to entice a child because he suffered from 'cybersex addiction'" or a diagnosis of "Internet sexual compulsive," despite the trial judge expressing significant doubts about the defense and defense counsel not knowing whether the specialist would be helpful to the defense. *Id.* at 434–35. In the month before trial, the specialist informed counsel "that he agreed with the trial judge's

doubts because it was very unlikely that a successful mental health defense existed in [the] case, and that with enough preparation time, [the specialist] might be able to offer useful information at a sentencing hearing." *Id.* at 435–36.

Now without the specialist's testimony, defense counsel attempted to obtain a new psychiatric expert, but he was unsuccessful. *See id.* at 436. When the case proceeded to trial, defense counsel abandoned a diminished capacity defense and instead argued that the defendant was "merely engaging in fantasy" with the undercover officer. *Id.* The defendant ended up testifying in support of the fantasy defense, which ended up being "the most damning evidence against him." *Id.* The jury found the defendant guilty of both charges, and the trial court later sentenced him to 20 years' imprisonment. *See id.*

On his second appeal from his convictions to the District of Columbia Circuit Court of Appeals ("D.C. Circuit"), the defendant argued that the district court erred in failing to find that defense counsel was ineffective for failing to obtain expert mental health testimony to support a defense that the defendant only desired to meet the undercover officer to "engage in homosexual activity while indulging in [taboo] fantasies."[47] *See id.* at 433, 437 (citation omitted). In addressing this contention, the D.C. Circuit first pointed out that

> trial counsel recognized from his very first meeting with [the defendant] that a mental health expert would be necessary to his defense, and rightly so. [The defendant] has steadfastly maintained his innocence, despite the existence of a chat transcript in which he discussed child sex in graphic detail, because he insists that he was only engaging in fantasy and that his actual intent was to engage in an adult sexual encounter while fantasizing about a child. Such a defense might seem unimaginable to the average juror absent a clinical presentation regarding, for instance, the prevalence of fantasy in internet chat rooms, or the use of fantasy chat

---

[47] The defendant filed an initial appeal from his convictions where he raised claims about the sufficiency of the evidence as to his intent and that his counsel was ineffective for failing to obtain a mental health expert for trial. *See Laureys*, 866 F.3d at 433. The D.C. Circuit affirmed the defendant's convictions but remanded the case for the district court to address the ineffective assistance of counsel claim. *See id.* (citing *United States v. Laureys*, 653 F.3d 27, 35 (D.C. Cir. 2011)). On remand, the district court concluded that defense counsel was not ineffective, and the defendant appealed from that decision. *See id.* at 433, 437–38.

as a coping mechanism to deal with inappropriate or unlawful sexual urges. Therefore, with trial counsel having correctly identified the need for a mental health expert, the question is whether his failure to provide that expert at trial "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 687–88, 104 S. Ct. 2052.

*Laureys*, 866 F.3d at 438.

Regarding the reasonableness of defense counsel's conduct, the D.C. Circuit determined that the conduct was unreasonable insofar as he had "focused [the specialist] on an *invalid* diminished capacity defense *to the exclusion of all other possible defenses*." *Id.* The court explained that the specialist had testified at the district court that

although he could not testify to [the defendant's] inability to form specific intent, he could have provided information for the jury about the prevalence of fantasy in internet chat rooms, how the internet facilitates sexual behaviors for vulnerable persons, [the defendant's] mental health issues and how they affect his behavior, and the meaning of certain internet slang terms used to describe sexual activity. In particular, [the specialist] observed that online fantasizing can seem very real, but a layperson would not necessarily know that, and that a person could be aroused by talking about child sex without then proceeding to seek sex with children.

*Id.* at 436; *see id.* at 438 (explaining that specialist's testimony "would have informed the jury's assessment of the fantasy-only defense"). The court then noted that the specialist's testimony would have "buttressed [the defendant's] own testimony," and "rebutted certain quasi-expert assertions made at trial by [the undercover officer]." *Id.* at 436.

After concluding that defense counsel's conduct was unreasonable,[48] the court addressed whether the defendant demonstrated that he was prejudiced by his counsel's failure to obtain this

---

[48] In addition to finding defense counsel's conduct regarding the specialist to be unreasonable, the D.C. Circuit also determined that defense counsel's failure "to secure a different mental health expert when it became doubtful that [the specialist] would testify" was also unreasonable because he "placed all of his hopes on obtaining expert testimony from [the specialist], despite [the specialist's] continued scheduling conflicts, his persistent refusal to speculate about the requested diminished capacity diagnosis, and the trial judge's repeated skepticism that [the specialist] would come through as trial evidence envisioned." *Laureys*, 866 F.3d at 439. The D.C. Circuit also pointed out that "[j]ust weeks before trial—due to his own apparently exclusive and erroneous focus on expert testimony about [the defendant's] diminished capacity—trial counsel still had no idea whether [the specialist] would be available to testify or what his opinion might turn out to be." *Id.* "In these circumstances, [the court concluded that] a prudent attorney would at a minimum have sought an alternative source." *Id.*

expert's testimony. *See id.* at 440. The court concluded that the defendant had demonstrated prejudice because

> there is no question that [the defendant's] defense, and his own testimony, would have been significantly bolstered by expert testimony regarding fantasy chat and, more specifically, the existence of a subculture of men who meet first online and then offline for sex with one another spurred on by child sex fantasies, such that a "reasonable probability" of a different outcome at trial exists.

*Id.* Additionally, the court found that "[t]he lack of a mental health expert also prejudiced [the defendant] by leaving him unable to rebut dubious, quasi-expert testimony" by the undercover officer. *Id.* at 441. The court also rejected the government's argument that the defendant was not prejudiced

> because he would have offered his own lurid, confused testimony regardless of whether a mental health expert also testified. Although the record does indicate that, according to trial counsel, [the defendant] would have testified either way, that is not the relevant question. Trial counsel conceded that many topics addressed by [the defendant's] testimony would have been better addressed by [the specialist], such as the existence of an online fantasy subculture, phone sex, deviant sex fantasies, and [the defendant's] diagnosis of himself as a sex addict. It is thus reasonable to expect that trial counsel would have limited [the defendant's] damaging testimony to the extent [the specialist] had already testified on those topics. And even if through effective cross-examination the government were able to draw [the defendant] out on those topics, [the specialist's] detached, clinical perspective would have at least framed [the defendant's] testimony in a crucial way, allowing the jury to understand [the defendant's] condition as a doctor would, rather than as the "clearly quite disturbed" defendant understood himself. That difference in perspective might not have been dispositive, but in such a difficult, troubling case in which even the trial judge expressed doubt about [the defendant's] intent in traveling to D.C., the significance of [the defendant's] perspective cannot be underestimated.

*Id.*

Here, it is understandable why Galletta would primarily rely on *Laureys* in support of this ineffectiveness claim. *Laureys* involved a defendant who, unlike the defendant in *Gladish* but like Galletta, traveled to a location to meet an individual he believed to be an adult with a child after engaging in online conversation with the adult about sexual activity with the adult and the child.

Despite this similarity, *Laureys* does not support a finding that counsel's conduct was unreasonable in this case because it is distinguishable in at least four significant ways.

First, defense counsel in *Laureys* knew upon meeting the defendant that a mental health expert would be necessary to the defense. In this case, there is no indication that any of Galletta's counsel in this federal matter believed a mental health expert was necessary for the defense after meeting Galletta. Nevertheless, the court acknowledges that Galletta indicated that his private counsel when the charges were initially brought in the state court suggested he get an expert. *See* Tr. of Apr. 10, 2015 Status Hrg. at 27, Doc. No. 87; 2255 Hrg. Tr. at 10–11. While there is testimony from Attorney Sletvold that Attorneys Meehan and Henry told him that they paid for Dr. Dattilio's evaluation of Galletta because that was what Galletta wanted, *see* 2255 Hrg. Tr. at 91 ("The federal defenders, while somewhat I think reluctant to engage Dr. [Dattilio], did do so because . . . Galletta . . . wanted Dr. [Dattilio]."), there was no evidence presented that they believed that a mental health expert was necessary to the defense. In addition, Attorney Sletvold never testified as such. Nevertheless, even if counsel believed that a mental health expert was necessary, Attorneys Meehan and Henry engaged one when they asked Dr. Dattilio to evaluate Galletta. And, as already stated, there is no evidence indicating Dr. Dattilio's testimony would have been favorable to Galletta's purported fantasy defense.

Second, in *Laureys*, the court had the benefit of the specialist's testimony about what he could have testified to if called as a witness during the trial. While it would not have supported counsel's planned diminished capacity defense, the testimony would have "informed the jury's assessment of the fantasy-only defense and helped buttress [the defendant's] own testimony." *Laureys*, 866 F.3d at 438. Here, Galletta has not provided the court with any evidence that an expert would have testified as the specialist could have testified in *Laureys*. As such, Galletta is

speculating that counsel could have procured such expert testimony for him at trial. The court cannot determine that counsel acted unreasonably in failing to obtain testimony that Galletta has not shown counsel could obtain.

Third, the defendant testified in his own defense in *Laureys*, whereas Galletta did not do so. As such, the D.C. Circuit was aware of exactly what the defendant's fantasy defense was and how the specialist's testimony could "buttress" that defense (and rebut the "quasi-expert" testimony from the undercover officer). *See id.* at 441 (explaining that undercover officer testified "that only three categories of chat participants exist: those who only chat online, those who want to then have phone sex, and those who seek to meet in order to have sex with a child"). Here, the court is unaware of any quasi-expert testimony provided by either Agents Leri or Smith similar to the testimony identified in *Laureys*. Additionally, while Galletta now states that he always wanted to testify and would have testified that his communications were only fantasy, the court cannot assess the reasonableness of counsel's conduct in obtaining testimony Galletta has not shown they could obtain, and the effect of that expert's testimony on Galletta's testimony, because he never testified in his own defense.

Fourth, and finally, as the government points out in its brief, there is no indication that the defendant in *Laureys* brought "the same baggage as Galletta" to trial. Gov't 2d Br. at 14. The government accurately states that Galletta "sent a child sex abuse image to another, []had a prior conviction for having sexual contact with a minor, and surreptitiously recorded girls in public places – demonstrating much more predilection than simply fantasy." *Id.* In addition, there is no reference in *Laureys* to the defendant having admitted to police, as Galletta had here, anything remotely similar to him "fight[ing] that attraction" to young girls, particularly when his "life is messed up"; (2) being disinterested in toddlers, but being "attracted to teen girls"; (3) having been

previously arrested more than once for "[t]he same thing" and explaining that the arrests related to "underage girls" and not another dad. Moreover, the *Laureys* defendant clearly indicated in his chat with the undercover officer a desire to engage in sexual relations with the officer. Here, while some of Galletta's other correspondence introduced as Rule 404(b) evidence also mentioned homosexual activity with the purported male adult, there is not a single mention through Galletta's entire communications with Agent Leri about sexual activity between the two of them. Instead, Galletta's references to sexual activity exclusively related to Galletta doing things to Agent Leri's seven-year-old daughter or Galletta having sexual relations with Galletta's girlfriend.

Overall, Galletta's reliance on *Gladish* and *Laureys*, while understandable, is misplaced and does not support this court finding that counsel acted unreasonably in failing to secure an expert for Galletta's trial. To the contrary, whether pertaining to Dr. Dattilio or the hiring of a mental health expert generally, Galletta has not met his burden to demonstrate that the conduct of Attorneys Meehan, Henry, or Sletvold was unreasonable under prevailing professional norms. Although this finding permits this court to not address the prejudice prong of *Strickland*, *see United States v. Brunson*, No. 20-3587, 2023 WL 3750596, at *2 & n.14 (3d Cir. June 1, 2023) (concluding that because court did not find counsel's conduct unreasonable, court "need not address prejudice" prong of *Strickland*), the court will do so for sake of completeness.

Galletta has failed to show that he was prejudiced by counsel's conduct by demonstrating that there is a reasonable probability that the result of his proceedings would have been different. Regarding Dr. Dattilio, Galletta has not shown that his proposed expert testimony would have been beneficial to the defense. Instead, Attorney Sletvold testified that Dr. Dattilio told him, apparently after conducting more research beyond merely interviewing Galletta at the jail, that his testimony

would not support a fantasy defense. At bottom, Galletta has had an ample opportunity to show that Dr. Dattilio's evaluation of him produced a favorable result, and he has failed to do so.

As for obtaining a mental health expert generally, such as the specialist who could have testified in *Laureys*, Galletta has not shown that there was a reasonable probability that the outcome of his trial would have been different because there is evidence that counsel could have obtained an expert to testify as Galletta believes an expert would have testified. Even if an expert had so testified, Galletta's "baggage" is so much different than the defendant in *Laureys* that this court cannot say that it was reasonably likely to change the outcome in the case. In other words, he has not shown that it was reasonably likely that the jury would have believed his fantasy-only defense.

Furthermore, while Galletta alleges that the lack of a supporting expert compelled him to decide not to testify despite his desire to do so, he cannot ignore the fact that he did not testify in his own defense. In essence, Galletta invites this court to speculate on what an expert could have said if called to testify on his behalf, what Galletta would have testified to, and how the jury would have processed the credibility of Galletta's testimony (in *Laureys*, because the defendant testified, the court was able to determine how the expert testimony could have assisted the defense), to reach a conclusion that he was prejudiced.[49] The court declines this invitation. At bottom, there was

---

[49] In Galletta's submissions, he indicated that one of the reasons why he did not testify in his own defense at trial was due to Attorney Sletvold's failure to properly prepare him. *See, e.g.*, Suppl. at ECF p. 132. In general, Galletta's contention is based on the following:

> . . . I provided 75 questions with their responses to Mr. Sletvold for his review to ensure that no testimony on my behalf would expose me to the government's cross examination. I had asked[] Mr. Sletvold to review these questions and to be prepared to go over them with me at his next visist [sic]. Mr. Sletvold did not bring them with him and he confirmed that he had not reviewed all of them and was not going to.

> . . . I asked Mr. Sletvold to prepare a list of questions for me to answer so that he could review my responses to those questions so as not to expose myself to the government's cross examination. Mr. Sletvold again refused to give me advance questions and also refused to conduct any preparation for me to take the stand.

*Id.* at 132–33.

overwhelming evidence presented at trial to support Galletta's intent to engage in the sexual exploitation of children and his convictions for each of the charged offenses. Galletta has also failed to make any showing that it would be reasonably likely that this court's sentence would have

---

To the extent that Galletta intended to raise an ineffectiveness claim relating to Attorney Sletvold's failure to prepare him to testify at trial, the court finds that he has failed to properly raise the claim. Out of his voluminous filings in this case, Galletta never identified this claim as a standalone ineffective assistance of counsel claim or otherwise provided the court or the government with notice that he was raising such a claim. Nevertheless, even if somehow Galletta preserved such a claim, it would lack merit.

The court recognizes that "the most important witness for the defense in many criminal cases is the defendant [themselves]." *Rock v.* Arkansas, 483 U.S. 44, 52 (1987). Concerning the defendant's right to testify, this right is knowingly and intelligently waived where a defendant is "aware of his right to testify, understood counsel's rationale for not calling him as a witness, and failed to raise with the court his desire to testify." *United States v. Aldea*, 450 F. App'x 151, 153 (3d Cir. 2011) (per curiam). Here, Galletta and Attorney Sletvold discussed whether Galletta would testify during an approximately one-hour lunch break on the last day of trial. *See* Day Two Tr. at 93–94. When court resumed, the undersigned and Attorney Sletvold had the following exchange relating to Galletta's decision not to testify:

> THE COURT: . . . I want to make clear that I have no intention of interfering with the attorney-client relationship or privilege with respect to whether Mr. Galletta does or does not testify and I have no doubt Mr. Sletvold that you've discussed with him his right to testify as well as his right to remain silent and that the decision of whether to testify or not to testify rests solely with him. And of course I know there are issues if he does testify with respect to a prior conviction that has not yet been introduced into evidence, but as far as whatever the consequences are one way or the other the benefits or the disadvantages, I trust that you had the -- an adequate continue [sic] to discuss that with Mr. Galletta.

> MR. SLETVOLD: I believe that I have, Your Honor. I've explained to him that when it comes to trial there are certain decisions that the law permits the attorney to make, but in at least this area of whether or not the defendant can or should testify that's solely his decision. I can neither keep him off the stand or force him to the stand. We've discussed that. I believe he understands that. We've also discussed pros and cons, the evidence that's come in, what other evidence may come in if he does testify and that hadn't come in yet. Based on all of those factors and some others, I believe that it is his decision not to testify, so I will not be calling him.

*Id.* at 95–96. This exchange shows that Galletta was aware of his right to testify, and at no point did Galletta or Attorney Sletvold indicate that Galletta wanted to testify. As such, Attorney Sletvold's conduct did not fall below an objective standard of reasonableness. *See, e.g.*, *Claude*, 2020 WL 5083890, at *8 ("In this case, the record clearly reflects that defendant was informed of his right to testify and elected not to after discussing the matter with [his attorney]. Accordingly, defendant fails to satisfy *Strickland*'s first prong.").

In addition, even if Galletta had shown that Attorney Sletvold's conduct was objectively unreasonable because he did not inform Galletta of the precise questions he would ask him if he testified, Galletta surely has not demonstrated prejudice. Although Galletta has not outlined his proposed testimony in detail, any testimony about him only engaging in fantasy communication with Agent Leri would not have created a reasonable probability that the result of his trial would have been different due to the overwhelming evidence of his guilt. Moreover, regardless of Galletta's belief that Attorney Sletvold could question him in a way that would not expose him to the government's cross-examination, the government would have vigorously cross-examined him, and it is highly likely that his credibility would have been significantly impeached, including being impeached by his other conviction for corruption of minors that involved contact with a minor, which was not introduced as Rule 404(b) evidence during the trial, and his statements to police during his interview, which also was not introduced during the trial.

differed if he had such expert testimony. As such, the court does not find that Galletta was prejudiced at trial or sentencing.

"Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681. Bearing in mind the strong presumption that counsel has rendered adequate assistance, Galletta has not demonstrated that any of his defense counsel was ineffective for not obtaining Dr. Dattilio's report, that Attorney Sletvold was ineffective because he declined call Dr. Dattilio as a witness at trial or sentencing, or that Attorney Sletvold was ineffective for failing to obtain another mental health expert to testify on Galletta's behalf. Accordingly, the court will deny this claim.

### 3.    Ineffective Assistance of Counsel for Failing to Raise an Affirmative Defense Under Section 2252(c)

#### a.    The Parties' Arguments

Galletta contends that Attorneys Meehan, Henry, and Sletvold were ineffective because they did not raise an affirmative defense under section 2252(c) to the possession of child pornography charge under section 2252(a)(4)(B) in the third count of the superseding indictment. *See* Original Mot. at ECF pp. 38–39; Original Br. at ECF pp. 95–104; Am. Mot. Suppl. at 5–10; 2255 Hrg. Tr. at 15–22. Section 2252(c) provides a potential affirmative defense to a defendant charged with violating section 2252(a)(4) if they

> **(1)** possessed less than three matters containing any visual depiction proscribed by that paragraph; and
>
> **(2)** promptly and in good faith, and without retaining or allowing any person, other than a law enforcement agency, to access any visual depiction or copy thereof--
>
>   **(A)** took reasonable steps to destroy each such visual depiction; or

      **(B)** reported the matter to a law enforcement agency and afforded that agency access to each such visual depiction.

18 U.S.C. § 2252(c). Galletta contends that his conduct would have allowed him to assert this affirmative defense. *See* Am. Mot. Suppl. at 5–6.

During the evidentiary hearing, Galletta testified that he expressed his desire to assert the section 2252(c) affirmative defense to Attorneys Henry, Meehan, and Sletvold, but they told him that the defense was unavailable to him because of the quantity of images the government obtained from the Phone. *See* 2255 Hrg. Tr. at 16. Galletta contends that this advice was incorrect, and if counsel had provided him with accurate advice, he could have obtained an expert to evaluate the data from the Phone to confirm that the defense applied to him. *See id.* at 19–20. Once the defense had obtained that information, they could have provided notice of their intent to raise the affirmative defense and potentially received a ruling from this court as to whether it was applicable. *See id.* at 20–21.

As to the accuracy of the advice from counsel he received, Galletta testified (and argued in his *pro se* and counseled submissions) that the advice was incorrect because section 2252(c)'s reference to "matters" pertains to the item containing the images—in this case, the Phone—and not the images themselves. *See id.* at 16–17; Original Br. at ECF pp. 98–101; Am. Mot. Suppl. at 5. Therefore, since the government obtained the images of child pornography from one "matter," the Phone, the section 2252(c) affirmative defense was available to him. *See* 2255 Hrg. Tr. at 16–17; Original Br. at ECF pp. 98–101; Am. Mot. Suppl. at 5.

In addition, Galletta points out that the evidence presented at trial showed that by the time Agent Leri conducted his forensic review of the Phone, the three images comprising the charged child pornography had already been deleted from the Phone and were in an area that was inaccessible to the user. *See* Original Br. at ECF pp. 96–98; Am. Mot. Suppl. at 5–6, 8. He also

claims that the evidence presented by the government showed that the three images were promptly deleted from the Phone, and he alleges that he had promptly deleted them from the Phone. *See* Original Br. at ECF pp. 96–98; Am. Mot. Suppl. at 6–7.[50] He further argues that the government did not introduce any evidence showing that he had retained copies of the child pornography or permitted anyone else to access them. *See* Am. Mot. Suppl. at 6.

In its response to Galletta's arguments, the government initially contended that the section 2252(c) affirmative defense did not apply to Galletta because it presented three images of child pornography at trial. *See* Gov't's Omnibus Response to Pet'r's Post-Conviction Motions ("Gov't's 1st Br.") at 22, Doc. No. 111.[51] In its subsequent submission, the government asserted that "[w]hile Galletta may be correct that the affirmative defense was an option he technically could have pursued, he has failed to establish he was prejudiced in light of the overwhelming evidence of his guilt." Gov't's 2d Resp. at 16. It is unclear whether this statement means that the government is conceding Galletta's claim about "matter" referring only to the Phone and not the images, or if it was just arguing that it did not matter because he could not show prejudice.[52]

b.    <u>Resolution of Claim</u>

As discussed in more detail below, the applicability of the section 2252(c) affirmative defense in the circumstances presented here has apparently never been addressed in this circuit

---

[50] Regarding the government's evidence, Galletta

> contends that image 1384143256268.jpg and image 1384143256406.jpg both have a default created date of 9/21/1970, modified date of 11/11/2013 and accessed date of 11/11/2013. Petitioner contends that both of these images had been destroyed from the mobile device over 8 months prior to the date of the arrest. Petitioner contends that image 1392485986542.jpg which has a default created date of 9/21/1970, modified date of 2/15/2014 and an accessed date of 2/15/2014 was destroyed from the mobile device over 5 months prior to the date of the arrest.

Original Br. at ECF p. 96; *see also* Am. Mot. Suppl. at 6–7 (reasserting argument).

[51] The government did not cite any legal source for this statement.

[52] The government did not try to clarify this argument despite Galletta having astutely identifying the differences between the government's two written submissions during oral argument.

and only occasionally elsewhere. Unfortunately, this court lacks the benefit of any testimony from Attorneys Meehan, Henry, or Sletvold about why they did not raise this affirmative defense. As previously mentioned, Attorneys Meehan and Henry did not testify at the evidentiary hearing and, although Attorney Sletvold testified and was available to answer questions, no questions were posed to him on this issue. Thus, the court's factual record on this issue is limited to Galletta's testimony that his attorneys advised him that the defense was not available to him because he was charged with possessing three images of child pornography, and the court record showing that he never raised the defense before or during trial. Presuming that Galletta's testimony is accurate, the court will address whether counsel's conduct was objectively unreasonable and whether Galletta suffered prejudice.

To determine whether defense counsel's conduct was objectively unreasonable by failing to raise the section 2252(c) affirmative defense on Galletta's behalf, the court must address whether the defense was clearly available to him. As stated above, section 2252(c) provides a potential affirmative defense if a person "possessed less than three **_matters_** containing **_any visual depiction_** proscribed by" section 2252(a)(4). 18 U.S.C. § 2252(c) (emphasis added).[53] Section 2252(a)(4) proscribes a person from possessing visual depictions of "a minor engaging in sexually explicit conduct." 18 U.S.C. § 2252(a)(4)(B)(i)–(ii).

Here, the phrase at issue is section 2252(c)'s "matters containing any visual depiction." 18 U.S.C. § 2252(c). The question relating to that phrase is whether "matters containing" must refer to an item containing images of a minor engaging in sexually explicit conduct or whether "matters containing" can refer to the thumbnail images that Agent Leri recovered from the Phone. The court notes that although Galletta testified at the evidentiary hearing that "the current position of the

---

[53] Section 2252(c) was added as part of the Protection of Children from Sexual Predators Act of 1998. *See* Pub. L. No. 105–314, §§ 202–03, Oct. 30, 1998, 112 Stat. 2974, 2978.

[Third] Circuit [is] that the matter is the phone as charged in the indictment and not the quantity of the images," he has not identified a Third Circuit decision expressing their "current position." This court could find no decision by the United States Supreme Court, the Third Circuit, or any district court in this circuit analyzing the meaning of the word "matter" or the phrase "matter containing" in section 2252(c). This lack of existing precedent alone would support this court concluding that counsel's performances could not have fallen "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, because counsel's failure to pursue an action "not compelled by existing precedent does not constitute 'failure to meet the level of competence required by the Sixth Amendment.'" *Fahy v. Horn*, Civ. A. No. 99-5086, 2014 WL 4209551, at *15 (E.D. Pa. Aug. 26, 2014) (quoting *Buehl v. Vaughn*, 166 F.3d 163, 180 (3d Cir. 1999)); *see also Buehl*, 166 F.3d at 180 ("[A] lawyer's failure to perceive the ground for crafting an argument that might have succeeded is very different from the failure to meet the level of competence required by the Sixth Amendment."); *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999) (explaining that even though "[i]gnorance of well-defined legal principles is nearly inexcusable[,] . . . as an acknowledgment that law is no exact science, the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized."); *Haliym v. Mitchell*, 492 F.3d 680, 696 (6th Cir. 2007) ("Because the law with respect to the necessity of strict compliance with [an Ohio statute] was uncertain, Petitioner's appellate counsel was not constitutionally ineffective for failing to raise the issue on direct appeal.").

Even without any existing precedent, this court could still find the actions of Galletta's counsel objectively unreasonable if the language of section 2252(c) itself compelled them to assert the affirmative defense on his behalf. To interpret the meaning of section 2252(c), the court must "presume that a legislature says in a statute what it means and means in a statute what it says

there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted). As such, the court first reviews the plain meaning of the text itself. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."); *United States v. Williams*, 675 F.3d 275, 277–78 (3d Cir. 2012) ("When interpreting the disputed provisions of a statute, we look first to the language of the statute to determine the law's plain meaning." (citing *United States v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000))). If "the words of [the] statute are unambiguous, then, this first [step] is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank*, 503 U.S. at 254; *see also Gregg*, 226 F.3d at 257 ("If the language of the statute expresses Congress's intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms." (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989))). In addition, the court cannot "look past the plain meaning unless it produces a result 'demonstrably at odds with the intentions of its drafters,' *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 563 [(1994)], or an outcome 'so bizarre that Congress could not have intended it,' *Demarest v. Manspeaker*, 498 U.S. 184, 191 [(1991)]." *Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003).

Unfortunately, unlike the term "visual depiction," the statute providing definitions for some of the terms used in the chapter dealing with offenses for sexual exploitation and other abuse of children, which includes section 2252, does not define the words "matters" or "contain[ing]." *See* 18 U.S.C. § 2256 (providing definitions for offenses in 18 U.S.C. §§ 2251–60A); *see also Noble v. United States*, Nos. 2:10-CR-51, 2:16-CV-38, 2018 WL 4441240, at *9 (E.D. Tenn. Sept. 17, 2018) (pointing out that definition of "any matter" is not included in 18 U.S.C. § 2256).[54]

---

[54] A "'visual depiction' includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format." 18 U.S.C. § 2256(5).

Nevertheless, the lack of definitions does not render those terms ambiguous. *See United States v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) ("[S]tatutory silence does not prove that a term is ambiguous." (citing *Appalachian States Low-Level Radioactive Waste Comm'n v. Pena*, 126 F.3d 193, 197–98 (3d Cir. 1997))). Instead, "[w]hen a [statutory] term is undefined, [the court] give[s] it its ordinary meaning." *United States v. Santos*, 553 U.S. 507, 511 (2008) (citing *Asgrow Seed Co. v. Winterbeer*, 513 U.S. 179, 187 (1995)). To do so, the court "refer[s] to standard reference works such as legal and general dictionaries in order to ascertain the ordinary meaning of words." *Geiser*, 527 F.3d at 294.

After reviewing multiple dictionaries, it appears that (1) the term "matter," while having several definitions (almost all of which are inapplicable), is not ambiguous as used in section 2252(c) and (2) the term "containing" is possibly ambiguous in the context in which it appears in section 2252(c) because it is susceptible to more than one reasonable interpretation. *See Houghton v. Payne*, 194 U.S. 88, 99 (1904) (stating that statute is ambiguous when it is "susceptible of two reasonable interpretations"); *In re Lan Assocs. XI, L.P.*, 192 F.3d 109, 116 (3d Cir. 1999) (concluding that reasonable interpretations of term in statute "render[ed] it ambiguous for purposes" of court's interpretation of statute); *United States v. Kaluza*, 780 F.3d 647, 658 (5th Cir. 2015) (explaining that statutory language is ambiguous if it is "susceptible to more than one reasonable interpretation" (quoting *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 518–19 (5th Cir. 2004)). Regarding the word "matter," dictionaries define it in the following pertinent ways:[55]

- "Any physical or tangible expression of a thought." Matter, Black's Law Dictionary (11th ed. 2019);

---

[55] Since "matter" has several definitions, the court has excluded definitions that could have no possible applicability to interpreting section 2252(c), such as, for example, the most common definitions of "matter" in legal proceedings, i.e., "[a] subject under consideration, esp. involving a dispute or litigation" or "[s]omething that is to be tried or proved; an allegation forming the basis of a claim or defense." Matter, Black's Law Dictionary (11th ed. 2019).

- "[S]omething of an indicated kind or having to do with an indicated field or situation." Matter, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/matter (last visited June 23, 2023); and

- "A thing, affair, concern," "[p]hysical objects vaguely characterized," or, when used as an "indeterminate noun (comparable to *thing*) . . . a thing, affair, subject, etc., in the most general sense." Matter, Oxford English Dictionary, https://www.oed.com/view/Entry/115083?rskey=y1dTaz&result=1#eid (last visited June 23, 2023)

As for the word "contain," dictionaries definite it in the following relevant ways:

- "[T]o have within: HOLD" or "to consist of wholly or in part." Contain, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/contain (last visited June 23, 2023);

- "To have in it, to hold" or "[t]o have as part (or the whole) of its contents or substance; to comprise, include." Contain, Oxford English Dictionary, https://www.oed.com/view/Entry/40041?rskey=fkZr6a&result=1#eid (last visited June 23, 2023); and

- "[T]o hold or include within its volume or area" or "to have as contents or constituent parts; comprise; include." Contain, Dictionary.com, https://dictionary.com/browse/contain (last visited June 23, 2023).

Because of the indeterminate nature of the word "matter," the plain meaning of the word is best described as a "thing." There is no indication from its placement in section 2252(c) that Congress intended that it have a more specific definition; to the contrary, it appears that Congress intentionally left it vague and general so as not to limit its potential application. *See* Antonin Scalia & Bryan A. Gartner, Reading Law 32–33 (2012) ("Vagueness . . . is often intentional, as general terms . . . are adopted to cover a multitude of situations that cannot practicably be spelled out in detail or even foreseen."); *id.* at 101 ("Without some indication to the contrary, general words (like all words, general or not) are to be accorded their full and fair scope. They are not to be arbitrarily limited. This is the general-terms canon, which is based on the reality that it is possible and useful

to formulate categories (e.g., "dangerous weapons") without knowing all the items that may fit—or may later, once invented, come to fit—within those categories.").

Unlike "matter," the plain meaning of the word "contain" could arguably satisfy Galletta's interpretation of the statute or an alternative interpretation. If the court were to define "contain" as "to have in it, to hold," Contain, Oxford English Dictionary, https://www.oed.com/view/Entry/40041?rskey=fkZr6a&result=1#eid (last visited June 23, 2023), while also using the aforementioned definition of "matter" and section 2256's definition of "visual depiction," section 2252(c) would provide an affirmative defense to a defendant who possessed less than three things having any data which is capable of conversion into a visual image prescribed by section 2252(a)(4) in it. This interpretation would lean more toward Galletta's interpretation that the "matter" would be a thing that would hold the visual depictions. On the other hand, if the court were to define "contain" as "to consist wholly or in part," Contain, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/contain (last visited June 23, 2023), while using the same definitions of "matter" and "visual depiction," section 2252(c) would provide an affirmative defense to a defendant who possessed less than three things consisting of wholly or in part any data which is capable of conversion into a visual image prescribed by section 2252(a)(4). This interpretation would seemingly broaden the scope to include the images on the Phone because there would be three things on the Phone with data capable of converting into a visual image of child pornography.

Other federal courts, unfortunately, have rarely addressed section 2252(c) at all, much less interpreted it. Notably, the Third Circuit, albeit in dicta and in a footnote, described section 2252(c) as "providing an affirmative defense to a child pornography possession charge where the defendant **possesses less than three images** and promptly destroyed the images or reported the matter to law

enforcement." *United States v. Perez*, 5 F.4th 390, 400 n.3 (3d Cir. 2021) (emphasis added); *see also United States v. Maurizio*, 701 F. App'x 129, 135 (2017) (concluding that defendant accused of violating section 2252(a)(4) for two images of child pornography found in recycle bin on rectory computer could not assert affirmative defense under section 2252(c) not because images were not "matters," but because evidence did not show defendant took reasonable steps to destroy both images by merely placing them in recycle bin).[56] Other federal courts have, without analysis, seemingly unanimously indicated that section 2252(c) applies to the number of images or files of child pornography and not the number of "things" holding the images of child pornography. *See Quito v. Barr*, 948 F.3d 83, 92 (2d Cir. 2020) (stating that "§ 2252(c) allows an affirmative defense for an individual who possesses less than three prohibited visual depictions and, without allowing anyone else to access them, either promptly destroys them or turns them over to law enforcement"); *United States v. Figueroa-Lugo*, 793 F.3d 179, 193–94 (1st Cir. 2015) (concluding that district court did not err in declining to instruct jury on section 2252(c) affirmative defense where jury would have found that defendant possessed more than two images of child pornography (citing *United States v. White*, 506 F.3d 635, 642 (8th Cir. 2007)); *United States v. Sturm*, 672 F.3d 891, 901 (10th Cir. 2012) (explaining that "a defendant would qualify for the [section 2252(c)] affirmative defense if he reasonably attempts to destroy the one or two visual depictions [he] possessed"); *White*, 506 F.3d at 642 (concluding that defendant was "not entitled to the [section 2252(c) affirmative defense] because, *inter alia*, "he possessed more than three images of child pornography"); *United States v. Groenendal*, No. 11-CR-260, 2020 WL 3046010, at *8 (W.D. Mich. June 8, 2020) (explaining that section 2252(c) would not have been applicable in case where

---

[56] In *Perez*, the Third Circuit referenced section 2252(c) as an example of an affirmative defense in a case where the court addressed "what weight, if any, to give [note 14(B) of the commentary to United States Sentencing Guideline 2K2.1(b)(6)(B)] as an interpretation of the 'in connection with' requirement of § 2K2.1(b)(6)(B)." 5 F.4th at 394.

defendant obtained child pornography on one device, his computer); *United States v. Nguyen*, Civ. No. 12-73, Crim. No. 10-58, 2012 WL 1970938, at *2 (D. Minn. June 1, 2012) (concluding that section 2252(c) affirmative defense was inapplicable to defendant who pleaded guilty to possessing "more than *300* images of child pornography" on his computer); *United States v. Mouton*, No. SA-08-CR-301, 2009 WL 3482610, at *2 (W.D. Tex. Oct. 20, 2009) ("In this case the evidence that was presented to the jury demonstrated that hundreds of photos of child pornography were downloaded to a computer located in the Defendant's home. Defendant misinterprets the applicability of the affirmative defense. Although the image files had been deleted from the Defendant's computer, a computer forensics expert was able to recover many of the files. The evidence admitted in this case clearly established that these images were visual depictions involving the use of a minor engaging in sexually explicit conduct. The three "matters" contemplated by the affirmative defense do not refer to the desktop computer, laptop computer and media card. 'Matters' referenced in 18 U.S.C. § 2252(c) refer to 'books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction.' The 'other matters' in this case were the numerous image files downloaded to the computer." (citations omitted)), *aff'd*, 481 F. App'x 96 (5th Cir. 2011). Interestingly, none of these cases are mentioned in Galletta's submissions.

Instead, Galletta references several cases in which federal courts addressed whether an operative indictment was multiplicitous in violation of the Fifth Amendment's Double Jeopardy Clause when it charged a defendant with multiple possession of child pornography offenses rather than a single violation.[57] *See* Original Br. at ECF pp. 98–101 (citing *United States v. Reedy*, 304

---

[57] "An indictment is multiplicitous, and so violates the Double Jeopardy Clause, if it has two or more counts that charge a defendant for the same conduct. The primary danger of multiplicity is excessive punishment." *United States v. Golden*, No. 21-2618, 2023 WL 2446899, at *3 (3d Cir. Mar. 10, 2023) (internal citation omitted).

F.3d 358 (5th Cir. 2002); *United States v. Buchanan*, 485 F.3d 274 (5th Cir. 2007); *United States v. Planck*, 493 F.3d 501 (5th Cir. 2007); *United States v. Polouizzi*, 564 F.3d 142 (2d Cir. 2009); *United States v. Hinkeldey*, 626 F.3d 1010 (8th Cir. 2010); *United States v. Woerner*, 709 F.3d 527 (5th Cir. 2013); *United States v. Emly*, 747 F.3d 974 (8th Cir. 2014); *Snodgrass v. United States*, Civ. No. 12-cv-50, Crim. No. 09-cr-30039, 2013 WL 6096533 (S.D. Ill. Nov. 20, 2013)). Most of these cases are inapplicable because they did not involve sections 2252(a)(4) or 2252(c) at all. *See United States v. Reedy*, 304 F.3d at 365–68 (addressing whether defendants' convictions on numerous counts for transporting child pornography under section 2252(a)(1) were multiplicitous by, *inter alia*, reviewing language in sections 2252(a)(4) and 2252(c) and stating that "[t]hese references tell us that a 'matter' is larger and inclusive of a 'visual depiction,' but they do not explain the size or inclusiveness of a 'visual depiction'"; determining that review of section 2252 did not answer whether number of counts should be based on total number of images appearing on defendants' websites as district court concluded or the number of websites as defendants argued; concluding that because both interpretations were reasonable, rule of lenity applied, and "district court erred by permitting the prosecution to group the counts by individual image rather than website"); *Buchanan*, 485 F.3d at 278–82 (analyzing whether defendant's convictions of four counts of receiving child pornography under section 2252(a)(2) were multiplicitous, where jury found defendant guilty of having four large images of child pornography on work computer; concluding that four convictions were multiplicitous because "the government did not offer any proof that [the defendant] took more than one action to receive the four images that were the basis of his convictions under § 2252(a)(2)"); *Planck*, 493 F.3d at 505 (explaining that for purposes of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(b), "the *actus reus* is the possession of child pornography; the Government need only prove the defendant possessed the

contraband at a single place and time to establish a single act of possession and, therefore, a single crime"; concluding that possession counts were not multiplicitous because defendant "possessed child pornography in three separate places—a laptop and desktop computer and diskettes—and, therefore, committed three separate crimes");[58] *Hinkeldey*, 626 F.3d at 1013 (analyzing defendant's argument that his convictions on six counts of possession of child pornography in violation of section 2252A(a)(5)(B) were multiplicitous because "simultaneous possession of overlapping, illegal files on separate devices does not constitute distinct possession crimes under" that section; concluding that convictions were not multiplicitous); *Woerner*, 709 F.3d at 540 (addressing defendant's challenge to two convictions for possessing child pornography in violation of section 2252A(a)(5)(B) were multiplicitous; explaining that court has "interpreted the term 'material,' which is not defined in 18 U.S.C. § 2252A(a)(5)(B), to denote a medium containing images of child pornography"; and concluding that charges were not multiplicitous because jury was presented with sufficient evidence that defendant "possessed two or more separate materials and the images contained therein were obtained through separate transactions" (citation omitted)).

In the remaining cases Galletta cites, *United States v. Polouizzi*, *United States v. Emly*, and *Snodgrass v. United States*, the courts addressed multiplicity issues regarding section 2252(a)(4)(B) convictions. In *Polouizzi*, the Second Circuit Court of Appeals addressed a defendant's multiplicity argument where a jury had convicted him of 11 counts of violating section

---

[58] Section 2252A(a)(5)(B) makes it an offense for

[a]ny person who . . . knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer[.]

18 U.S.C. § 2252A(a)(5)(B).

2252(a)(4)(B) based on him "possess[ing,] on a single date, [11] computer files stored on three hard drives housed in two adjacent rooms in a single premises, his detached garage." 564 F.3d at 146, 155 n.5. The government argued that "each 'matter which contain[ed]' a prohibited image is a separate unit of prosecution such that the possession of each such 'matter' is a separate violation of § 2252(a)(4)(B)." *Id.* at 155. The Second Circuit rejected this argument and "conclude[d] that Congress intended to subject a person who simultaneously possesses multiple books, magazines, periodicals, films, video tapes, or other matter containing a visual depiction of child pornography to only one conviction under 18 U.S.C. § 2252(a)(4)(B)." *Id.* at 155.[59]

*Emly* and *Snodgrass* essentially follow *Polouizzi*'s reasoning. In *Emly*, a jury convicted the defendant of three counts of violating section 2252(a)(4)(B) when law enforcement found child pornography on an SD card, CD, and desktop computer tower on the same day. 747 F.3d at 975–76. On appeal, the defendant challenged the three possessions as multiplicitous and the Eighth Circuit Court of Appeals agreed. *See id.* at 977. The Eighth Circuit, finding *Polouizzi* and a decision by the First Circuit Court of Appeals, *United States v. Chiaradio*, 684 F.3d 265 (1st Cir. 2012), persuasive, concluded that the convictions were multiplicitous because (1) the defendant "possessed all of the images found on the separate devices on one medium[, a laptop computer,] prior to copying and transferring them onto [the SD card, CD, and desktop computer tower]"; (2) the devices were all seized from the same location, the defendant's bedroom; and (3) "the act of copying or transferring files onto different devices in itself does not constitute an independent violation of [section 2252(a)(4)(B)]." *Id.* at 977–79.

---

[59] Notably, the Second Circuit noted that the defendant had also argued that "each external hard drive constitute[d] a single 'matter' under [section 2252(a)(4)(B)], regardless of the number of prohibited images stored on each drive." *Polouizzi*, 564 F.3d at 155 n.4. The Second Circuit declined to address whether the external hard drive or "each computer file containing a prohibited image" constituted the "matter" because its "interpretation of § 2252(a)(4)(B) would not permit a defendant in [the defendant's] position to be convicted on multiple possession counts under either interpretation." *Id.*

In *Snodgrass*, a jury found the defendant guilty of two counts of violating section 2252(a)(4)(B) based on evidence showing that he possessed child pornography on a floppy disk and CD found in his residence on a single date. *See* 2013 WL 6096533, at *1, 2. He then unsuccessfully challenged his convictions on direct appeal, and later filed a section 2255 motion raising, *inter alia*, a double jeopardy multiplicity claim. *See id.* at *1. The district court, following *Polouizzi*, concluded that the defendant's "possession of the items serving as the basis for his convictions on Counts 2 and 3, which he possessed at the same time and in the same residence, cannot serve as the basis for two separate convictions." *Id.* at *2–3.

Despite Galletta's arguments to the contrary, none of these cases are dispositive because they do not involve section 2252(c), do not squarely address what "matter consisting" means in section 2252(c), and involve multiplicity issues that are not a part of this case. Nevertheless, Galletta appears to be asserting, albeit without identifying it as a rule of statutory construction, that this court should interpret the word "matter" as the courts seemingly did in those cases, namely as a physical medium holding visual depictions of child pornography.

It is a "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (citation and internal quotation marks omitted); *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 617 (3d Cir. 2015) ("It is '[a] standard principle of statutory construction ... that identical words and phrases within the same statute should normally be given the same meaning.'" (alterations in original) (quoting *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007))). Yet, while *Polouizzi*, *Emly*, and *Snodgrass* appear to treat physical items as the "matters" under section 2252(a)(4)(B), none of those cases attempt to interpret the word "matter." Among Galletta's citations, the case closest to providing a pertinent interpretation is *United States v.*

*Reedy*, when the Fifth Circuit Court of Appeals reviewed sections 2252(a)(4) and 2252(c) as part of its multiplicity analysis of a defendant's convictions under section 2252(a)(2), and stated "[t]hese references [in sections 2252(a)(4) and 2252(c)] tell us that a 'matter' is larger and inclusive of a 'visual depiction,' but they do not explain the size or inclusiveness of a 'visual depiction.'" 304 F.3d at 366. At bottom, the cases Galletta cites are unhelpful to the extent that the court would look to interpretations of the word "matter" in section 2252(a)(4)(B).

The three cases that ***would*** be helpful in guiding this court's interpretation of section 2252(c) have, unfortunately, come to conflicting interpretations of the word "matter" in section 2252(a)(4)(B). In the earliest of those decisions, the Ninth Circuit Court of Appeals, in *United States v. Lacy*, addressed whether "the 'matter' or 'matters' referred to in the statute and instructions are the computer disks and hard drive that contain the GIF files" or "'the computer GIF files which contain the visual depictions of child pornography.'"[60] 119 F.3d 742, 748 (9th Cir. 1997). The Ninth Circuit concluded that section 2252(a)(4)(B)

> indicates that at a minimum, a "matter" must be capable of containing a visual depiction. See 18 U.S.C. § 2252(a)(4)(B). Although both the disks and the GIF files could be viewed as "containing" the visual depiction, we conclude the "matter" is the physical medium that contains the visual depiction—in this case, the hard drive of [the defendant's] computer and the disks found in his apartment.

*Id.* The Ninth Circuit then explained that

> [t]his interpretation is supported by two principles of statutory interpretation, *noscitur a sociis* and *ejusdem generis*. "The first means that a word is understood by the associated words, the second, that a general term following more specific terms means that the things embraced in the general term are of the same kind as those denoted by the specific terms." *United States v. Baird*, 85 F.3d 450, 453 (9th Cir. 1996) (citing 2A Norman J. Singer, Sutherland–Statutory Construction §§ 47.16, 47.17 (5th ed. 1992)). Although canons of construction do not mandate how

---

[60] "Graphics interchange format" or GIF, is digital file format devised in 1987 by the Internet service provider CompuServe as a means of reducing the size of images and short animations. Because GIF is a lossless data compression format, meaning that no information is lost in the compression, it quickly became a popular format for transmitting and storing graphic files." Encyclopedia Britannica, https://www.britannica.com/technology/GIF (last visited June 2, 2023).

> a phrase is to be read, they "describe[ ] what we usually mean by a particular manner of expression." *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992). Here, the word "matter" appears at the end of the list "books, magazines, periodicals, films, [and] video tapes," all of which are physical media capable of containing images. *See Baird*, 85 F.3d at 453 (looking to list's "theme" to determine the meaning of a general term).

*Id.*

The second of the decisions is the Seventh Circuit Court of Appeals' decision in *United States v. Hall*, 142 F.3d 988 (7th Cir. 1998). In *Hall*, the Seventh Circuit considered a defendant's argument that "visual depictions on a computer do not constitute pornographic 'matter' as defined under 18 U.S.C. § 2252(a)(4)(B) and are not considered as 'items' or 'material' for purposes of the sentencing guidelines." 142 F.3d at 993. The Seventh Circuit explained that the defendant

> concede[d] that he possessed more than 10 visual depictions, but maintain[ed] that a visual depiction is not an "item." Rather, he argue[d] that the only "items" he possessed were the three individual disks, which he claim[ed] should not subject him to the sentence enhancement dictated in this provision. Furthermore, under U.S.S.G. § 2G2.4(b)(1), a base level offense can be increased an additional two levels if "the material involved a prepubescent minor or a minor under the age of twelve years ...." (emphasis added). Similar to his argument concerning § 2G2.4(b)(2), [the defendant] contend[ed] that the only "material," as defined under § 2G2.4(b)(1), which he possessed were the three individual disks, and that these did not contain depictions of children under the age of 12. He also argues that his computer cannot be considered to be "matter" in the statute under which he was charged, 18 U.S.C. § 2252(a)(4)(B), but is instead a "container," and that visual depictions are not recognized to be "matter" under that statute.

*Id.* at 997–98 (second alteration in original) (internal footnote omitted).

In addressing the defendant's arguments, the Seventh Circuit noted that "[b]ecause the Internet has only recently been commonly used to transport and transfer visual images," the court had not yet addressed the issue of "whether the files stored within the [defendant's] computer, which contained the depictions, may be considered 'matter,' 'items' or 'material.'" *Id.* at 998. The Seventh Circuit then indicated that it found the United States District Court for the Northern

District of New York's decision in *United States v. Lamb*, 945 F. Supp. 441 (N.D.N.Y. 1996), to

be persuasive. The Seventh Circuit explained that in *Lamb*,

> a defendant similarly charged under 18 U.S.C. § 2252(a)(4)(B) claimed that files transmitted over AOL were not "visual depictions" within the meaning of the statute. To reach its conclusion, the court reviewed the process of computer distribution of child pornography. In order to distribute images by computer, the images are
>
> > scanned or transferred to a computer by a number of technological means, including digital cameras, flatbed scanners, and video capture cards. The images are converted into ... image file formats .... These files can then be transmitted over a modem to other computers. Another program known as a viewer is required to display the image files as actual pictures on the monitor ....
>
> *Id.* Although "visual depiction" is explained in the definition section of the statute as that which includes "undeveloped film and videotape," the *Lamb* court observed that the definition does not exclude other media, specifically photographs. *See id.* The court reasoned that "the explicit reference to media of a type that requires additional steps and equipment before the images they contain can be viewed supports the proposition that Congress intended to sweep the type of transmission at issue here within the ambit of the statute." *Id.* The court acknowledged that computer data stored on disk is not, in and of itself, a "visual depiction," because a computer must first translate the visual image from the computer data. However, a videotape image, similar to a computer image, is recorded magnetically on a reel of plastic tape, and can be viewed only with the aid of a videotape player and television. *See id.* Since 18 U.S.C. § 2252(a)(4)(B) specifically provides that videotape images are "matters," the court ruled that Congress intended computer images to be included within the definition of "matters" as well.

*Id.* (omissions in original). Following the logic espoused in *Lamb*, the Seventh Circuit concluded

that even though section 2252(a)(4) "does not define 'other matter' . . ., plain meaning suggests a

prohibition on three or more of *anything* containing a visual depiction transported in interstate

commerce. In this case, the 'other matter' . . . [is] the 403 individually-named computer files [the

defendant] received in interstate commerce via AOL." *Id.* at 999.

The third case is the Eighth Circuit's decision in *United States v. Vig*, 167 F.3d 443 (8th

Cir. 1999). In *Vig*, the Eighth Circuit framed the main issue as "the appropriate meaning of the

phrase 'other matter' as it is used in [section 2252(a)(4)(B)]. Specifically, whether the defendants can be convicted under section 2252(a)(4)(B) when the visual depictions were saved in three or more computer image files that were located on only a single computer hard drive." 167 F.3d at 446. The defendants argued that "'other matter' refers to the physical medium that contains the physical depictions, in this case, the computer hard drive." *Id.* On the other hand, the government argued that "'other matter' refers to the computer image files." *Id.* at 446−47. The district court had agreed with the government, concluding that "a computer image file constitutes 'other matter' within the meaning of section 2252(a)(4)(B)." *Id.* at 447.

In reviewing the district court's interpretation of section 2252(a)(4)(B), the Eighth Circuit started by examining the plain meaning of the statute. *See id.* The Eighth Circuit determined that the plain meaning "indicates that 'other matter' is simply something which, at a minimum, must be capable of containing a visual depiction[]" and pointed out that "[t]he computer image files all contained one, and some more than one, visual depiction." *Id.* Thus, the Eighth Circuit found that "the plain common sense meaning of 'other matter' encompasses computer image files." *Id.* at 448. In reaching this interpretation, the Eighth Circuit stated that the Seventh Circuit's interpretation of "other matter" in *Hall* "inform[ed its] analysis." *Id.* at 447.

The Eighth Circuit went on to discuss the Ninth Circuit's decision in *Lacy* and noted that the Ninth Circuit had reached its interpretation of "matter" as "refer[ring] to the physical medium that contained the visual depiction—the hard drives and floppy disks[—]" by using two canons of statutory interpretation, *noscitur a sociis* and *ejusdem generis*. *See id.* at 447−48. The Eighth Circuit "decline[d] to adopt the *Lacy* court's reasoning" because the plain meaning of "other matter" was not ambiguous, as such, using those tools of statutory construction was unnecessary. *See id.* at 448 ("We are aware of the cannons of statutory canons of statutory construction *noscitur*

*a sociis* and *ejusdem generis*. When properly applied they are useful tools. However, these cannons

are 'only aids to judicial interpretation, and they will not be applied when there is no ambiguity,

to defeat the legislative intent and purpose, to make general words meaningless, or to reach a

conclusion inconsistent with other rules of construction.'" (quoting *Donovan v. Anheuser-Busch,*

*Inc.*, 666 F.2d 315, 327 (8th Cir. 1981))). Further, the Eighth Circuit explained that

> [e]ven if we were to rely on such statutory tools, we find defendants['] proposed application of them to the statute to be unpersuasive. To conclude, as defendants argue, that a hard drive is the computer equivalent of a book, magazine, periodical, etc., would result in the absurd scenario where an individual who possesses three books with one visual depiction apiece violates the statute, but an individual with hundreds of images on a hard drive does not. We find the Ninth Circuit's reasoning in *United States v.[] Fellows*, 157 F.3d 1197 (9th Cir. 1998), to be more compelling. In *Fellows*, the court stated that: "[a] computer hard drive is much more similar to a library than a book; the hard drive can store literally thousands of documents and visual depictions. Each file within the hard drive is akin to a book or magazine within that library." *Id.* at 1201.

*Id.*

Although the Eighth Circuit concluded that the phrase "other matter" had an unambiguous,

plain meaning, it addressed the defendants' argument that the legislative history of section

2252(a)(4)(B) showed that Congress did not intend that "other matter" would include computer

files:

> [The defendants'] focus is the addition of section 2252A(a)(5)(B) in 1996 which criminalized the knowing possession of "any book, magazine, periodical, film, videotape, computer disk, or any other material that contains 3 or more images of child pornography." 18 U.S.C. § 2252A(a)(5)(B). The district court concluded that the addition of section 2252A(a)(5)(B) did not mean that the conduct at issue was not already criminalized by section 2252(a)(4)(B). Defendants contend, however, that the new amendment cannot simply be read as clarifying the existing law. They argue that the amendment when coupled with the Senate Judiciary Committee's comments that "[s]ince a single computer disk is capable of storing hundreds of child pornographic images, current law effectively permits the possession of substantial collections of child pornography, a loophole that will be closed under this section," conclusively proves that Congress did not intend for the phrase "other matter" in section 2252(a)(4)(B) to include computer image files. S. Rep. No. 104–358 (1996).

We are not persuaded by this argument. We do not think that the Committee's remarks, which go against the plain meaning of the statute and made six years after the passage of section 2252(a)(4)(B), are entitled to much weight. The Supreme Court has stated that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313, 80 S. Ct. 326, 4 L. Ed. 2d 334 (1960). "[S]uch '[l]egislative observations ... are in no sense part of the legislative history.'" *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S. Ct. 2066, 60 L. Ed .2d 609 (1979). Instead, it is the intent of the Congress that enacted the section that controls. *See id.* Moreover, the Supreme Court has observed that "even when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n. 13, 100 S. Ct. 2051, 64 L. Ed. 2d 766 (1980) (noting also that a "mere statement in a conference report ... as to what the Committee believes an earlier statute meant is obviously less weighty").

Section 2252(a)(4)(B) first went into effect on November 29, 1990. See Pub. L. No. 101–647, § 323(a)(2), 104 Stat. 4816, 4818 (1990). Examination of its legislative history prior to this date reveals no insight as to what Congress intended the precise scope of "other matter" to be. *See* 1990 U.S.C.C.A.N. (104 Stat.) 6472 et seq. If anything, the addition of section 2252(a)(4)(B) indicates an expansion of Congress's enforcement authority under the statute, because now, in addition to transportation, sale, and distribution, the mere possession of child pornography was also criminalized. In short, we think that the legislative history contains nothing that would justify our departing from the statute's plain, ordinary meaning. Thus, based on the plain meaning of the statute, and bolstered by the absence of legislative history to the contrary, we hold that computer image files are encompassed within the meaning of "other matter" in section 2252(a)(4)(B).

*Id.* at 448−49.

As these three cases illustrate, the circuit courts have not reached a consensus on the

meaning of "other matter" in section 2252(a)(4)(B). Considering this lack of consensus along with

(1) the lack of existing precedent from the United States Supreme Court or Third Circuit cases on

the meaning of section 2252(c), (2) the reasonable, alternative definitions of "contain[ing]" that

would support and undermine Galletta's argument, (3) the numerous references to section 2252(c)

applying to the number of images appearing in the Third Circuit's and other federal courts'

decisions, and (4) the decisions, such as in *United States v. White*, 506 F.3d 635, 642 (8th Cir.

2007), where courts held that a defendant could not assert the affirmative defense under section 2252(c) because that defendant possessed three or more images of child pornography, this court cannot conclude that Galletta has met his burden to show that his counsel's failure to assert a section 2252(c) affirmative defense on his behalf was objectively unreasonable under *Strickland*. Simply stated, the law on the applicability of section 2252(c) is uncertain concerning whether it would protect someone such as Galletta. Accordingly, Galletta's ineffective assistance of counsel claim relating to the failure to assert an affirmative defense under section 2252(c) fails.[61]

### c.   Galletta's Supplemental *Brady* Claim

In his *pro se* supplemental brief, Galletta argues that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it allegedly provided the defense with only a redacted report from the forensic examination of the Phone. *See* Suppl. Br. at ECF pp. 4–10. As discussed below, this claim fails.[62]

In *Brady*, the Supreme Court held that the Fourteenth Amendment's Due Process Clause requires prosecutors to disclose materially exculpatory evidence in the government's possession to the defense. "A *Brady* violation occurs if: (1) the evidence at issue is favorable to the accused,

---

[61] Since the court has concluded that Galletta failed to show that his counsel's performances were deficient, the court need not address whether he has shown prejudice. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."). Nevertheless, the court finds that Galletta has also failed to show prejudice for at least two reasons, neither of which was argued by the government, as the government's lack of prejudice argument focused significantly on the "overwhelming" evidence presented to convict him on **all** charges, *see* Gov't's 2d Br. at 16–18, and the evidence relating to counts one and two have no applicability whatsoever to the *Strickland* prejudice analysis as to the possession of child pornography conviction. In any event, the first reason Galletta has failed to show prejudice is because it is uncertain whether the section 2252(c) defense would apply to Galletta, he has failed to show that it was reasonably likely that he would not have been convicted on the section 2252(a)(4)(B) possession charge. The second reason is that Galletta has not introduced any evidence to support his self-serving assertion that he "promptly and in good faith . . . took reasonable steps to destroy each such visual depiction." 18 U.S.C. § 2252(c). In this regard, Agent Leri testified at trial that he could not determine when the images of child pornography on the Phone were deleted. *See* Day One Tr. at 151. Yet, Galletta appears to rely on the forensic report attached to his supplemental brief to claim it shows he promptly deleted them. *See* Original Br. at ECF p. 96; Suppl. Br., Ex. G at ECF pp. 109–12. As far as this court can discern, the forensic report contains no information about when the images were deleted. While Galletta asserts that the defense could have performed its own forensic examination of the Phone to show he promptly deleted the images, he does not have a forensic evaluation of the Phone to support this assertion.

[62] The government did not address this claim in either of its briefs.

because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (quoting *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009)). Evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Hollman v. Wilson*, 158 F.3d 177, 181 (3d Cir. 1998). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Here, Galletta is raising a *Brady* violation for the first time as part of this section 2255 proceeding without having first raised it on direct appeal. Thus, he has procedurally defaulted on this claim, unless he alleges and shows cause and prejudice or a fundamental miscarriage of justice to excuse the default. *See Hodge*, 554 F.3d at 378–79 ("Because collateral review under § 2255 is not a substitute for direct review, a movant ordinarily may only raise claims in a 2255 motion that he raised on direct review."); *Sweger v. Chesney*, 294 F.3d 506, 520 (3d Cir. 2002) (indicating that federal courts may raise issue of procedural default *sua sponte*). Galletta has not alleged cause and prejudice or a fundamental miscarriage of justice to excuse his default. *See Sweger*, 294 F.3d at 520 ("[F]ederal courts may not consider the merits of [procedurally defaulted] claims unless the applicant establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse [their] default." (quoting *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999))). In addition, while Galletta asserts numerous ineffective assistance of counsel claims, he does not indicate that Attorney Sletvold was ineffective for failing to raise this claim before trial or on appeal. *See* Suppl. Br. at ECF pp. 4–10.

Even if the claim was not procedurally defaulted, it lacks merit because Galletta has not satisfied two of the requirements for a *Brady* violation. In the first instance, Galletta has not introduced any evidence about the report he attached to his supplemental brief. Although he testified that it was provided to the defense by the government during discovery, *see* 2255 Hrg. Tr. at 17, 21, 22, he introduced no other evidence in support of this allegation. The court is unable to determine whether the government in fact redacted any part of the document. If the government did redact the document as Galletta alleges, he still has not shown that the information redacted would be favorable to him. More specifically, Galletta has not provided any documentation or testimony that states the information, if any, that was redacted. While Galletta contends that this information would be helpful to him in his attempt to show that he could have asserted the section 2252(c) affirmative defense, he is purely speculating. At bottom, without the information allegedly redacted, the court cannot determine that the information would be favorable to him.

Galletta has also failed to show that he suffered prejudice because the information missing from the report was material. Galletta cannot satisfy the materiality requirement because he has not identified the missing information. Even if he did, he could not show that there was a reasonable probability, if the information was disclosed to the defense, that the result of his trial would have been different. The information he was seeking allegedly would have supported an affirmative defense under section 2252(c), which Galletta may not have been able to assert anyway and, which, it is unclear whether a jury would have found him not guilty of possessing child pornography based on that defense. Accordingly, he has failed to show that the result of his trial would have been different.

4.     **Ineffective Assistance of Counsel for Failing to Challenge the Sufficiency of the Superseding Indictment Prior to Trial and on Appeal**

Galletta contends that Attorney Sletvold was ineffective for failing to file a motion to challenge the sufficiency of all charges in the superseding indictment before this court and on direct appeal to the Third Circuit.[63] *See* Original Mot. at ECF pp. 39–40; Original Br. at ECF pp. 105–69; Suppl. at ECF pp. 10–12; Am. Mem. at ECF pp. 11–13; 2255 Hrg. Tr. at 22–30. He generally claims that "the indictment d[id] not include sufficient facts to support the crimes charged and did not properly apprise [him] of the nature and circumstances of the accusations against him." Original Br. at ECF p. 105; *see also* 2255 Hrg. Tr. at 23 ("[T]he indictments do not sufficiently apprise the Defendant of what he is to meet. They do not sufficiently state the facts that the grand jury found probable cause based on, which is my [Fifth] Amendment right. And they are constitutional [sic] insufficient when looked [sic] at them."). In support of this general claim of insufficiency and Attorney Sletvold's ineffectiveness for failing to raise it, Galletta presents numerous challenges to each count of the indictment, although he focuses mostly on the attempted enticing or coercing a minor charge and the possession of child pornography charge. *See id.* at 105–69. The court will address Galletta's challenges by count in the indictment/superseding indictment after first setting forth the applicable law for challenges to the sufficiency of an indictment.

a.     <u>Applicable Law – Sufficiency of Indictment</u>

Under the Sixth Amendment to the United States Constitution, "the accused [in all criminal prosecutions] shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. This means that an indictment must identify the offense "with clearness,

---

[63] The government did not address this claim in any respect in either of its submissions or during oral argument. The court notes that the government mentioned the claim generally in its first brief, *see* Gov't's 1st Br. at 23, it did not include any argument relating to it. *See id.* at 23–25.

and all necessary certainty, to apprise the accused of the crime with which [they] stand charged."

*United States v. Mills*, 32 U.S. 138, 142 (1833).

Concerning the sufficiency of an indictment, Federal Rule of Criminal Procedure 7(c)(1)

provides that

> [t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government. It need not contain a formal introduction or conclusion. A count may incorporate by reference an allegation made in another count. A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

Fed. R. Crim. P. 7(c)(1).

In addition,

> "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits." [*United States v. Huet*, 665 F.3d 588, 594–95 (3d Cir. 2012) (emphasis omitted) (quotation omitted), *cert. denied*, 568 U.S. 941 (2012), *abrogation on other grounds recognized by United States v. Boyd*, 999 F.3d 171, 178 (3d Cir. 2021)]. A facially sufficient indictment "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *Id.* at 595 (quotation omitted). Usually, a recitation of the statutory language satisfies the first requirement, "so long as there is sufficient factual orientation to permit a defendant to prepare his defense and invoke double jeopardy." *Id.* (quotation omitted). And typically, a factual orientation that includes a specification of the time period of the alleged offense is sufficient for the second and third requirements. *Id.* In short, "detailed allegations" are unnecessary. *Id.* at 594.

> Under Rule 12(b)(3)(B), a defendant may contest the sufficiency of an indictment on the basis that it "fails ... to state an offense" in at least two ways. First, a defendant may contend that an indictment is insufficient on the basis that it does not satisfy the first requirement in that it "fails to charge an essential element of the crime." *Huet*, 665 F.3d at 595 (citation omitted). Second, because an indictment that merely "recites in general terms the essential elements of the offense" does not satisfy the second and third requirements, a defendant may also claim that an indictment fails to state an offense on the basis that "the specific facts

> alleged ... fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002).

*United States v. Stock*, 728 F.3d 287, 292 (3d Cir. 2013) (all omissions in original); *see also United States v. Totoro*, Crim. A. No. 15-291, 2017 WL 3189216, at *2 (E.D. Pa. July 27, 2017) ("Rule 12(b)(3)(B) permits a criminal defendant to move for the pre-trial dismissal of an indictment as defective if it, *inter alia*, lacks specificity or fails to state an offense." (citing Fed. R. Crim. P. 12(b)(3)(B)(iii), (v))).

Courts "should uphold [an] indictment 'unless it is so defective that it does not, by any reasonable construction, charge an offense.'" *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (quoting *United States v. Vitillo*, 490 F.3d 314, 324 (3d Cir. 2007), *as amended* (Aug. 10, 2007) (internal quotation marks omitted)). Also, "[w]hen analyzing challenges to the sufficiency of an indictment, courts give the indictment a common[-]sense construction, and its validity is to be determined 'by practical, not technical, considerations.'" *United States v. Gold*, 743 F.2d 800, 812 (11th Cir. 1984) (quoting *United States v. Morano*, 697 F.2d 923, 927 (11th Cir. 1983)). Further, when a defendant attacks the sufficiency of an indictment for the first time on appeal or in a section 2255 motion, "[i]ndictments and informations are construed more liberally . . . and every intendment is then indulged in support of . . . sufficiency." *United States v. Sutton*, 961 F.2d 476, 479 (4th Cir. 1992); *see also United States v. Walker*, 392 F. App'x 919, 929 (3d Cir. 2010) ("'[I]ndictments which are tardily challenged are liberally constructed in favor of validity,' and the indictment will be upheld 'unless it is so defective that it does not, by any reasonable construction, charge an offense.'" (quoting *Vitillo*, 490 F.3d at 324 (alteration in original))).

b. <u>Count One – Attempting to Entice or Coerce a Minor</u>

i. *Language of Charge*[64]

**COUNT ONE**

On or about July 22, 2014 and July 23, 2014, in Lehigh County, in the Eastern District of

Pennsylvania, and elsewhere, defendant

**BRENT S. GALLETTA**

knowingly used a facility and means of interstate commerce, that is, the Internet and a mobile

device, to attempt to knowingly persuade, induce, and entice an individual whom he believed was

7-years-old, to engage in sexual activity for which a person can be criminally charged under

Commonwealth of Pennsylvania law, to wit: 18 Pa.C.S.A[.] 3125(a)(7) (Aggravated Indecent

Assault) and 18 Pa.C.S.A. 3126(a)(7) (Indecent Assault).

In violation of Title 18, United States Code, Section 2422(b).

Superseding Indictment at 1.

---

[64] While arguing that Attorney Sletvold was ineffective for failing to challenge this charge in the indictment/superseding indictment, Galletta recognized that Attorney Sletvold filed a motion to dismiss count one along with his suppression motion. *See* 2255 Hrg. Tr. at 24; *see also* Doc. No. 40. In the motion to dismiss, Attorney Sletvold argued that the court should dismiss count one because it "fail[ed] to identify a separate state or federal crime under which . . . Galletta could be prosecuted," which was a necessary element of section 2422(b). *See* Def.'s Pretrial Mots. at ECF p. 8, Doc. No. 40. Although the government opposed the challenge to the sufficiency of count one, *see* Gov't's Resp. to Def.'s Pretrial Mots. at ECF pp. 10–12, Doc. No. 45, the grand jury returned a superseding indictment that amended count one to remedy the challenge raised in the motion. *See* Doc. No. 46. In light of the superseding indictment, this court denied the motion to dismiss count one as moot. *See* Aug. 28, 2015 Mem. Op. at 7, Doc. No. 68; Aug. 28, 2015 Order at 1, Doc. No. 69.

Additionally, although Galletta never specified in his *pro se* submissions whether he was challenging the original or superseding indictment, he clarified during the evidentiary hearing that he was challenging only the superseding indictment. *See* 2255 Hrg. Tr. at 24. As such, the court will reference the language used in the superseding indictment.

ii.     *Galletta's Arguments*

Regarding the attempted enticing or coercing a minor charge in count one, Galletta argues that that the superseding indictment was defective in several respects including, *inter alia*,

- it "did not contain any facts" describing his conduct "that the government believes constitutes criminal behavior." Original Br. at ECF p. 107.

- it lacked facts as to what his "attempt or intent was." *Id.*

- it lacked sufficient information about "what means the persuasion was carried out and no content or context of the communication between which two parties that factually allege that persuasion was attempted." *Id.* at ECF p. 108.

- it did not include "[t]he actual speech that defines the conduct . . . the government felt constituted the alleged persuasion." *Id.*; *see also* Suppl. at ECF p. 10 ("Count one of the indictment was constitutionally deficient because the alleged criminal activity stems from conduct that is made up of speech, and the specific words whether oral or written should have been included within the indictment.").

- it used the phrase "and elsewhere" in addition to "Lehigh County, in the Eastern District of Pennsylvania," and that phrase "is not specific and [did] not notify [him] of all of the locations the activity is alleged to have occurred." *Id.* at ECF p. 109.

- it lacked the additional elements of an attempt charge because it did not indicate the conduct consisting of the substantial step he took to commit the enticement. *Id.* at ECF pp. 109–10.

- it did not include the facts that "make up the conduct between [him] and the intermediary to show that an attempt had been committed." *Id.* at ECF p. 110.

- it did not allege "any 'objective acts' that were performed so as to corroborate the intent of an attempt." *Id.* at ECF p. 112.

- it used the phrase "the Internet and a mobile device," which, if the government intended to use the phrase as his substantial step is unspecific because the Internet has too many possible uses. *Id.* at ECF pp. 113–14.

- it did not mention text messages, a Craigslist ad, email, or a cellular phone; instead, "it just indicate[d] a 'mobile device'" even though there are "many mobile devices available to people to use for many various [sic] functions." *Id.* at ECF pp. 114, 119.

- it did not mention that the "mobile device" "was manufactured outside of Pennsylvania," and therefore, failed to "satisfy[] the federal nexus." *Id.* at ECF p. 119.

- it lacked any reference to "the nature of the sexual activity that [he] is alleged to have attempted to persuade the minor to engage in." *Id.* at ECF p. 118. In addition, the government's reference to the two Pennsylvania statutes for aggravated indecent assault (18 Pa. C.S. § 3125(a)(7)) and indecent assault (18 Pa. C.S. § 3126(a)(7)) did not "adequately contain the nature of the conduct that constitutes a violation of either of them. *Id.* at ECF pp. 118–19.

- it used the statutory words "entice, persuade[,] and induce" even though they "are terms that are not statutorily defined and are words of common usage that have plain and ordinary meanings . . . ." *Id.* at ECF p. 120.

Due to these alleged deficiencies, Galletta asserts that the government "was able to present an alternate theory under which the alleged conduct occurred." *Id.* at ECF p. 117. More specifically, even though the superseding indictment stated that Galletta attempted to persuade a minor to engage in sexual activity, the government's evidence at trial showed that he attempted to persuade an "adult intermediary to grant [him] access to the minor for sexual activity."[65] *Id.*; *see also* Suppl. at ECF p. 12 ("If [the government was] required to include the words used by [Galletta] that allege the criminal conduct, the government would not have been able to alter the mens rea

---

[65] In addition to his contention that Attorney Sletvold failed to act on these alleged defects, Galletta attempts to blame the court. More specifically, he contends

> that not only was [Attorney] Sletvold disloyal and ineffective for not filing the motion to dismiss the indictment, but also that the Court was responsible for determining the sufficiency of the indictment so as to ensure that [he] was brought before the court with an indictment that contained all of the charged conduct so that [he] would be able to determine if he would plead guilty to the conduct charged or proceed to trial. [The court] abandoned [its] impartial, detached and neutral role when he allowed the indictment to go forward thus violating [his] . . . Due Process rights . . . .

*Id.* at ECF p. 115.

Galletta has identified no case or other legal authority that would give this court, or any district court, the inherent power to dismiss an indictment simply because the court believes it is defective. The court also has been unable to locate such authority. As such, Galletta's claim about the court abandoning its "impartial, detached and neutral role" wholly lacks merit, and it is yet another example of Galletta contorting an aspect of his case in a misguided attempt to show that the court was biased against him.

from enticing someone under 18 to inducing someone older than 18 to grant access and permit the sexual abuse of someone under 18.").

### iii.     *Resolution of Claim*

Galletta has failed to show that Attorney Sletvold was ineffective in not moving to dismiss the superseding indictment as to count one or challenge the sufficiency of count one on appeal because such challenges would have been unsuccessful. Galletta seeks a level of factual specificity in the language of the superseding indictment that is very far beyond what is required. "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.'" *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quoting *United States v. Carll*, 105 U.S. 611, 612 (1881)). Furthermore, while "the language of the statute may be used in the general description of an offence, . . . it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which [they are] charged.'" *Id.* at 117–18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)).

Here, count one of the superseding indictment sets forth all the necessary elements and sufficient facts to inform him of the offense charged, attempting to entice or coerce a minor in violation of section 2422(b). Regarding the elements of the offense, section 2422(b) states that

> [w]hoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b). The elements of this offense are fully reflected in the language used in the superseding indictment, as it alleges that Galletta (1) knowingly, (2) used a facility and  means of

interstate commerce, (3) to knowingly persuade, induce, and entice an individual, (4) who has not attained the age of 18 years, (5) to engage in sexual activity, (6) for which any person can be charged with a criminal offense, (7) or attempts to do so. *See* Superseding Indictment at 1. The superseding indictment also provides a "statement of the facts and circumstances as will inform the accused of the specific offence . . . with which they are charged," *Hamling*, 418 U.S. at 117, insofar as it (1) informed Galletta about the dates of the offense: on or about July 22, 2014, and July 23, 2014; (2) informed Galletta about the location of the offense: In Lehigh County, in the Eastern District of Pennsylvania, and elsewhere;[66] (3) identified his mens rea: knowingly; (4) identified the facility and means of interstate commerce he used: the Internet and a mobile device; (5) informed Galletta of what he was accused of doing: attempting to knowingly persuade, induce, and entice; (6) indicated the age of the person Galletta attempted to knowingly persuade, induce, and entice: an individual whom he believed was seven years old; (7) indicated what Galletta attempted to knowingly persuade, induce, and entice the seven-year-old to do: engage in sexual activity; and (8) informed Galletta of the criminal charges arising from the articulated sexual activity: aggravated indecent assault and indecent assault under Pennsylvania law.

Even though count one is sufficient, two of Galletta's arguments warrant further discussion. First, although Galletta claims that the government should have included that it was alleging that Galletta's attempt to entice a minor occurred through an intermediary in count one, *see* Original Br. at ECF p. 110, he is mistaken. Essentially, he is contending that the operative indictment must indicate how he committed the offense,

> [b]ut that argument misunderstands the nature of an indictment. As the court in *United States v. Verrusio* put it,

---

[66] Although Galletta challenges the use of the phrase "and elsewhere" in the indictment, this phrase does not render count one (or any other count) insufficient. *See, e.g.*, *Hughes v. United States*, No. 1:10-cr-190-01, 2015 WL 463216, at *8 (M.D. Pa. Feb. 4, 2015) (rejecting defendant's claim that indictment was deficient because it used phrase "and elsewhere" as part of location of offense).

> The indictment certainly need not allege precisely how [the defendant committed the alleged offense]. Would he do it by himself or ask someone else to do it? Would that someone else be Colonel Mustard or Professor Plum? With a candlestick or a rope, in the library or the study? Answering those questions is not required at the indictment stage.

> 762 F.3d 1, 14–15 (D.C. Cir. 2014). There is no requirement that the indictment make out the government's case or provide any details as to the logistics of the alleged offense, and thus this criticism falls flat. *See United States v. Sargent*, Case No. 21-cr-00258, (TFH) 2022 WL 1124817, at *4 (D.D.C. April 4, 2022) ("[N]o factual allegations are required when the statutory language itself allows the defendant to prepare a defense to the charge.").

*United States v. McHugh*, Crim. A. No. 21-453, 2023 WL 2384444, at *3 (D.D.C. Mar. 6, 2023). As such, there is no requirement that count one include any reference to the intermediary a defendant was communicating with in their attempt to entice a minor under section 2422(b).

Second, Galletta contends that since he was charged with attempting to entice a minor, the superseding indictment should have included the additional elements for an attempt offense. *See* Original Br. at ECF p. 109. Once again, Galletta is mistaken. "Not only does the word 'attempt' as used in common parlance connote action rather than mere intent, but more importantly, as used in the law for centuries, it encompasses both the overt act and intent elements." *United States v. Resendiz-Ponce*, 549 U.S. 102, 107 (2007). Further, "the 'substantial attempt' requirement is implicit in the word 'attempt,' and . . . adding those four words would [not] . . . give[ the defendant] any greater notice of the charges against [them]." *Id.* at 108 n.4. Since count one tracked the language of section 2422(b), provided the dates of the offense, indicated the statute Galletta was charged with violating, and because section 2422(b) is not an offense requiring a higher level of factual specificity, count one was sufficient. *See id.* ("[I]t was enough for the indictment in this case to point to the relevant criminal statute and allege that '[o]n or about June 1, 2003,' respondent 'attempted to enter the United States of America at or near San Luis in the District of Arizona."

(citing Appendix at 8)); *United States v. Elk-Booth*, 822 F. Supp. 2d 1089, 1093 (D. Mont. 2011) ("[S]ince (1) Count 1 in the original indictment tracked the language of the criminal statute and provided a time and date of the offense alleged and (2) attempted aggravated sexual abuse, like attempted reentry, is not the type of crime that must be pleaded with greater specificity, it was sufficiently alleged in the original indictment." (citing *Resendiz-Ponce*, 549 U.S. at 108, 109–10)), *aff'd* 481 F. App'x 326 (9th Cir. 2012).

In conclusion, Galletta has not demonstrated that Attorney Sletvold's conduct was objectively unreasonable for not filing a motion to dismiss count one of the superseding indictment or challenge count one on appeal. Even if he had demonstrated that Attorney Sletvold's failure to challenge count one pretrial or on appeal was objectively unreasonable, Galletta has not shown that he was prejudiced because any such challenge would have been unsuccessful. At best, while the case was before the undersigned, if Attorney Sletvold had filed a motion to dismiss count one and this court determined that the superseding indictment did not "(1) contain[] the elements of the offense intended to be charged, (2) sufficiently apprise[ Galletta] of what he must be prepared to meet, and (3) allow [Galletta] to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution," *Huet*, 665 F.3d at 595 (quoting *Vitillo*, 490 F.3d at 321), "the trial court has discretion to direct the government to file a bill of particulars." *United States v. Smukler*, 330 F. Supp. 3d 1050, 1066 (E.D. Pa. 2018) (citation omitted); *see* Fed. R. Crim. P. 7(f) ("The court may direct the government to file a bill of particulars."); *United States v. Urban*, 404 F.3d 754, 771–72 (3d Cir. 2005) ("Only where an indictment fails to perform [its required] functions, and thereby 'significantly impairs the defendant's ability to prepare [their] defense or is likely to lead to a prejudicial surprise at trial,' *United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989) (citing [*United States v. Addonizio*, 451

F.2d 49, 62–63 (3d Cir. 1971), as amended Sept. 24, 1971 and Jan. 6, 1972]), will we find that a bill of particulars should have been issued.").[67]

"A bill of particulars is a 'formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor.'" *Urban*, 404 F.3d at 771 (quoting Black's Law Dictionary 177 (8th ed. 2004)). "The purpose of a bill of particulars is a 'to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense.'" *Id.* (quoting *Addonizio*, 451 F.2d at 63–64). "A bill of particulars, however, is not a discovery tool and is not meant, 'to provide the defendant with the fruits of the government's case.'" *Smukler*, 330 F. Supp. 3d at 1066 (quoting *United States v. Knight*, Crim. A. No. 12-367, 2013 WL 3367259, at *2–3 (E.D. Pa. July 3, 2013)).

In his original brief, Galletta appears to recognize the avenue for seeking a bill of particulars, but he contends that Attorney Sletvold requesting such a bill would not have been reasonable "because the indictment was not defective, it was invalid." Original Br. at ECF p. 130. Galletta notes "while a valid indictment can be clarified through a bill of particulars, an invalid indictment cannot be saved by one." *Id.* (citing *United States v. Conlon*, 628 F.2d 150, 155 (D.C. Cir. 1980)).

While Galletta is correct that "a bill of particulars cannot save an invalid indictment," *Russell v. United States*, 369 U.S. 749, 770 (1962) (citations omitted), he is mistaken that count

---

[67] If Galletta believed that the superseding indictment was insufficiently specific, he could have asked Attorney Sletvold to file a bill of particulars. *See* Fed. R. Crim. P. 7(f) ("The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits."). The court's reference here to the defense also having the ability to move for a bill of particulars in no way suggests that Attorney Sletvold should have filed one on Galletta's behalf or was somehow ineffective in not filing such a motion. In terms of the offenses he committed, there is no colorable argument that Galletta was unaware of what he was being charged with and the facts underlying those charges by the time of trial. In other words, he was not surprised by any evidence introduced by the government and had sufficient time to prepare an adequate defense.

one is invalid. As already explained, the superseding indictment is valid because it contained every essential element of each offense charged and informed Galletta of the nature of the accusations against him. *See United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997) ("If the indictment does not contain every essential element of the offense, it is invalid; and, a bill of particulars cannot cure the defect.").[68] Also, "an indictment is valid even if it could have been made more definite." *United States v. Mitchell*, No. 2:21-CR-344, 2022 WL 2720851, at *2 (M.D. Ala. May 27, 2022) (footnote and citations omitted), *report and recommendation adopted*, No. 2:21-CR-344, 2022 WL 2070279 (M.D. Ala. June 8, 2022); *Hagner v. United States*, 285 U.S. 427, 431 (1932) ("The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what [they] must be prepared to meet, and, in case any other proceedings are taken against [them] for a similar offense, whether the record shows with accuracy to what extent [they] may plead a former acquittal or conviction.'" (quoting *Cochran v. United States*, 157 U.S. 286, 290 (1895) and *Rosen v. United States*, 161 U.S. 29, 34 (1896))).

If this court had found count one to be defective, the court unequivocally would not have dismissed count one on the grounds articulated by Galletta without first providing the government with the opportunity to file a bill of particulars. And considering the overwhelming evidence of Galletta's guilt on count one introduced at trial, it is highly unlikely that the government would not have been able to file a bill of particulars that would have informed Galletta of the charges brought against him, allow him to adequately prepare a defense, avoid surprise during the trial,

---

[68] There are certain criminal offenses that "must be charged with greater specificity than an indictment parroting a federal criminal statute's language." *Resendiz-Ponce*, 549 U.S. at 103 (citing *Russell*, 369 U.S. at 758). Galletta has failed to pose any colorable argument or identify any case that would impose such a requirement for section 2422 offenses or for the other two section 2252(a) offenses, especially in the context of this case, and this court does not find that these offenses require greater specificity than the statutes' language so long as they contain the elements of the offenses charged, "sufficiently apprise[] the defendant of what [they] must be prepared to meet," and protect the defendant from double jeopardy. *Huet*, 665 F.3d at 595.

and protect him from double jeopardy. At worst, the government would have returned to the grand jury to obtain a second superseding indictment. As such, he has failed to show that he was prejudiced by Attorney Sletvold not filing another motion to dismiss count one. *See United States v. Swinehart*, 617 F.2d 336, 341 (3d Cir. 1980) ("Effective assistance does not demand that every possible motion be filed, but only those having a solid foundation." (citing *United States v. Hines*, 470 F.2d 225, 232 (3d Cir. 1972))).

In addition, Galletta has not shown that there is a reasonable likelihood that the outcome of his direct appeal would have been different if Attorney Sletvold challenged count one for the first time on appeal. *See, e.g.*, *United States v. Butler*, No. 1:18 CR 38, 2021 WL 5305929, at *8 (N.D. Ohio Nov. 15, 2021) (concluding that section 2255 movant failed to demonstrate prejudice from appellate counsel raising issue on appeal because movant had "not shown a reasonable likelihood that the outcome on appeal would have been different"). However, before proceeding to discuss why Galletta has failed to show prejudice here, the court must address what appears to be a gap in Third Circuit precedent on raising challenges to the sufficiency of indictments for the first time on direct appeal.

In *United States v. Panarella*, the Third Circuit held that Federal Rule of Criminal Procedure 12(b)(2) permitted an appellant "to argue for the first time on appeal that the specific facts alleged in the [operative charging document] do not amount" to the offense charged. 277 F.3d 678, 685 (3d Cir. 2002), *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358, 410 (2010). At the time the *Panarella* court reached this decision, Rule 12(b)(2) "provide[d] that an objection that 'the indictment or information fails … to charge an offense … shall be noticed by the court at any time during the pendency of the proceedings." *Id.* at 682 (quoting prior version of Fed. R. Crim. P. 12(b)(2)).

The Third Circuit continued to uphold an appellant's ability to challenge an indictment for the first time on appeal pursuant to Rule 12(b)(2) despite the United States Supreme Court's decision in *United States v. Cotton*, where the Court held that "defects in an indictment do not deprive a court of its power to adjudicate a case" and, as such, challenges to an indictment for the first time on appeal were subject to a plain error review. 535 U.S. 625, 630, 632–33 (2002). More specifically, in *United States v. Hedaithy*, the Third Circuit rejected an argument by the government that after *Cotton*, "a defendant who fails to challenge the sufficiency of his indictment in the District Court cannot argue for the first time on appeal that the indictment fails to state an offense, unless plain error review is satisfied." 392 F.3d 580, 588 (3d Cir. 2004). Instead, the Third Circuit noted that *Cotton* did not mention Rule 12(b)(2); therefore, the Third Circuit determined that *Panarella* remained good law and allowed an appellant to challenge an indictment for the first time on appeal. *See id.* at 588–89.

Approximately ten years after *Hedaithy*, the Supreme Court amended Rule 12, with those amendments becoming effective on December 1, 2014. *See United States v. Small*, 793 F.3d 350, 352 n.1 (3d Cir. 2015) (referencing amendment to Rule 12 and indicating that "the amendments [took] effect on December 1, 2014" (citing  Order of the United States Supreme Court Amending the Federal Rules of Criminal Procedure (April 25, 2014), *available at* http://www.supremecourt.gov/orders/courtorders/frcr14—khlo.pdf)).  In the amendments, the provision indicating that a "lack of jurisdiction may be raised at any time the case is pending" was relocated from the end of former Rule 12(b)(3)(B), restyled, and revised as Rule 12(b)(2). *See* Fed. R. Crim. P. 12,  advisory committee's note to 2014 amendment. In addition, "Rule 12(b)(3)(B) [was] . . . amended to remove language that allowed the court at any time while the case is pending to hear a claim that the 'indictment or information fails … to state an offense" because "[t]he

Supreme Court abandoned any jurisdictional justification for the exception in" *Cotton. See id.* These amendments have removed the vehicle by which Galletta could have obtained *de novo* review for a first-time challenge of the indictment on appeal under *Panarella* and *Hedaithy*.[69]

To date, it does not appear that the Third Circuit has addressed the standard of review applicable to first-time challenges to indictments on appeal.[70] In the other circuits, several apply plain error review. *See United States v. Dupree*, 870 F.3d 62, 71 (2d Cir. 2017) ("We review a challenge based on a factually deficient indictment and raised for the first time on appeal under the plain error standard." (citing *Cotton*, 535 U.S. at 631)); *United States v. Stanford*, 805 F.3d 557, 565 n.2 (5th Cir. 2015) ("As with a failure to challenge the sufficiency of an indictment, where a defendant alleges a constructive amendment for the first time on appeal, we review for plain error." (citing *United States v. Broadnax*, 601 F.3d 336, 340 (5th Cir. 2010))); *United States v. Peake*, 804 F.3d 81, 85 n.1 (1st Cir. 2015) ("'[J]urisdictional challenges to an indictment may be raised at any time,'" *United States v. Rosa-Ortiz*, 348 F.3d 33, 36 (1st Cir. 2003), but all other motions regarding a defective indictment, such as failure to state an offense, must be made before

---

[69] In its current form (and the form that would have applied to Galletta in December 2015 when he filed his direct appeal in this case), Rule 12(b)(3)(B) states:

> **(b) Pretrial Motions. . . . (3) Motions That Must Be Made Before Trial.** The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits:
>
> . . .
>
>   **(B)** a defect in the indictment or information, including:
>     **(i)** joining two or more offenses in the same count (duplicity);
>     **(ii)** charging the same offense in more than one count (multiplicity);
>     **(iii)** lack of specificity;
>     **(iv)** improper joinder; and
>     **(v)** failure to state an offense[.]

Fed. R. Crim. P. 12(b)(3)(B).

[70] In a case where a defendant challenges an indictment in the district court and then does so again on appeal, the Third Circuit has held that "an indictment that fails to include all essential elements of the charged offense is subject to harmless error review." *United States v. Stevenson*, 832 F.3d 412, 426 (3d Cir. 2016).

trial, Fed. R. Crim. P. 12(b)(3)(B), and thus can only be reviewed for plain error if raised for the first time on appeal, *see United States v. Turner*, 684 F.3d 244, 255 (1st Cir. 2012).”); *United States v. Mendez-Colon*, 417 F. App’x 320, 321 (4th Cir. 2011) (per curiam) (“We review a challenge to the sufficiency of an indictment raised for the first time on appeal for plain error.” (citing *Cotton*, 535 U.S. at 631)); *United States v. Sinks*, 473 F.3d 1315, 1321 (10th Cir. 2007) (concluding that court would review appellant’s claim that indictment failed to charge offense “only for plain error” (citing *Cotton*, 535 U.S. at 631)). Three circuits appear to apply either plain error or a liberal construction standard. *Compare United States v. Pascal*, 817 F. App’x 713, 714 (11th Cir. 2020) (per curiam) (“[C]hallenges to the sufficiency of an indictment or Rule 11 challenges raised for the first time on appeal are reviewed for plain error.” (citing *United States v. Presendieu*, 880 F.3d 1228, 1237 (11th Cir. 2018))); *United States v. Spangler*, 810 F.3d 702, 711 (9th Cir. 2016) (“[I]ndictments which are tardily challenged are liberally construed in favor of validity, and the question becomes whether the indictment is sufficient when read in a common sense, nontechnical fashion.” (internal citations and quotation marks omitted)), *United States v. Olive*, 804 F.3d 747 (6th Cir. 2015) (explaining that “where . . . a challenge to an indictment is brought for the first time after the defendant has been convicted, the indictment is construed liberally in favor of its sufficiency”), *with United States v. Pacchioli*, 718 F.3d 1294, 1307 (11th Cir. 2013) (“When a defendant raises a claim that the indictment fails to state an offense for the first time on appeal, this Court must find the indictment sufficient unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted.” (citation and internal quotation marks omitted)); *United States v. Martines*, 582 F. App’x 768, 768 (9th Cir. 2014) (“We . . . review the indictment for plain error, since [the appellant] challenges it for the first time on appeal.” (citing *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir.

2004))); *United States v. Howard*, 947 F.3d 936, 942 (6th Cir. 2020) ("If there was no indictment-sufficiency objection raised below, then unless the indictment cannot within reason be construed to charge a crime, a defendant must demonstrate prejudice to prevail, and this court reviews only for plain error." (internal quotation marks and citation omitted)). And two circuits appear to only apply the liberal construction standard. *See United States v. Jones*, 754 F. App'x 452, 455 (7th Cir. 2018) ("Because Jones challenges his indictment for the first time on appeal, 'it is immune from attack unless it is so obviously defective as to not charge the offense by any reasonable construction.'" (quoting *United States v. Sandoval*, 347 F.3d 627, 633 (7th Cir. 2003))); *United States v. Jenkins-Watts*, 574 F.3d 950, 968 (8th Cir. 2009) (indicating that when appellant challenges indictment for first time on appeal, circuit court "appl[ies] a deferential standard of review, upholding the indictment unless it is so defective that by no reasonable construction can it be said to charge the offense for which the defendants were convicted." (citation and internal quotation marks omitted)).

Even though it is unclear which standard of review the Third Circuit would have applied to Galletta's challenge to count one if Attorney Sletvold had raised it on direct appeal, it is not reasonably likely that the Third Circuit would have reached a favorable decision under either standard. Concerning plain error,[71]

> it is an unforgiving standard of review:
>
>> there must be (1) error, (2) that is plain, and (3) that affects substantial rights. In the ordinary case, an error affects substantial rights when it affected the outcome of the lower court proceedings. If these conditions are met, [the appellate court] may exercise [its]

---

[71] This court believes the Third Circuit would adopt plain error review given *Cotton* and the Third Circuit's application of plain error review in other contexts where a challenge is raised for the first time on appeal. *See, e.g.*, *United States v. Perez-Colon*, 62 F.4th 805, 818 (3d Cir. 2023) (applying plain error review to claim that district court erred in accepting plea to violating section 2252(a)(2) for first time on appeal); *United States v. Cannon*, 36 F.4th 496, 502 (3d Cir. 2022) ("Cannon raises two arguments on appeal for the first time, which we review for plain error." (citing *Olano*, 507 U.S. at 734)).

discretion to remedy the error, but only if the error seriously affects
the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Parker*, No. 21-3078, 2023 WL 4117474, at *2 (3d Cir. June 22, 2023) (quoting

*Gov't of the Virgin Islands v. Mills*, 821 F.3d 448, 456 (3d Cir. 2016)).

Here, as already indicated, count one does not contain any error; instead, it includes all the

necessary elements of an attempted enticement charge under section 2422(b) and sufficient facts

to allow Galletta to prepare his defense. Even if the Third Circuit were to find an error, Galletta is

woefully short on demonstrating that it affected the outcome of the trial or seriously affected the

fairness, integrity, or public reputation of judicial proceedings. *See United States v. Marcus*, 560

U.S. 258, 262 (2010) (explaining that Federal Rule of Appellate Procedure 52(b) "permits an

appellate court to recognize a plain error that affects substantial rights, even if the claim of error

was not brought to the district court's attention," and indicating that under plain error review an

appellant must "demonstrate[] that (1) there is an error; (2) the error is clear or obvious, rather than

subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the

ordinary case means it affected the outcome of the district court proceedings; and (4) the error

seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" (citations

and internal quotation marks omitted)). Therefore, Galletta has not demonstrated that it was

reasonably likely that the outcome of his appeal would have been different if the Third Circuit

applied plain error review.

If the Third Circuit were to follow the reasonable/liberal-construction line of cases, the

result would be the same. "Indictments which are tardily challenged are liberally construed in favor

of validity." *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979) (citing *United States v.*

*Pheaster*, 544 F.2d 353, 361 (9th Cir. 1976)). Under this liberal construction, the Third Circuit

will "uphold the indictment against [the defendant] 'unless it is so defective that it does not, by

any reasonable construction, charge an offense'" under the applicable criminal statute. *Vitillo*, 490 F.3d at 324 (quoting *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995)); *see also Resendiz-Ponce*, 549 U.S. at 107–08 (pointing out that indictment does not need to specifically allege each element if it is stated implicitly).

Galletta has failed to show that count one was "so defective that it [did] not, by any reasonable construction, charge an offense" under section 2422(b). To the contrary, it contained all the necessary elements, informed Galletta that he used the Internet and a mobile device to attempt to entice a child he believed was seven years old, to engage in sexual activity for which he could have been charged for two criminal offenses in Pennsylvania (and identified those offenses), informed him when and where the offense occurred, and stated the federal criminal statute he violated.[72] Accordingly, under both plain error and liberal construction review, it is not reasonably likely that the outcome of Galletta's appeal to the Third Circuit would have been different if Attorney Sletvold had challenged count one on appeal.

    c.    <u>Count Two – Transportation of Child Pornography</u>

    i.    *Language of Charge*

<u>**COUNT TWO**</u>

On or about March 17, 2014, in Lehigh County, in the Eastern District of Pennsylvania, and elsewhere, defendant

**BRENT S. GALLETTA**

knowingly transported a visual depiction using a facility of interstate and foreign commerce, that is, the Internet, which visual depiction showed a minor engaged in sexually explicit conduct and

---

[72] Even if, implausible as it might be, the Third Circuit were to find that count one was defective after liberally construing it, Galletta has not shown that the outcome of his appeal would have been different because the Third Circuit would have found that the error was harmless. *See Stevenson*, 832 F.3d at 427–28 (detailing "test for harmless error").

the producing of the visual depictions involved the use of minors engaged in sexually explicit conduct.

In violation of Title 18, United States Code, Section 2252(a)(1).

Superseding Indictment at 2.

### ii.      *Galletta's Arguments*

Concerning the transportation of child pornography charge in count two, Galletta contends that it was insufficient in five ways. First, he argues that that the superseding indictment was defective because it did "not contain the nature of the character of the visual depiction" and, as such, "it [did] not satisfy the knowledge element of the offense." Original Br. at ECF p. 122 (citing *United States v. Knox*, 32 F.3d 733 (3d Cir. 1994)). Instead, because count two "simply follow[ed] or track[ed] the statutory language, specifically 'sexually explicit conduct[,]' . . . it [did] not meet the constitutional requirements to remain valid." *Id.* Second, Galletta asserts that the language was deficient because it did not identify the form of the visual depiction, "such as a digital image," so as to "fairly inform [him] of what visual depiction was presented to the [grand] jury." *Id.* at ECF p. 123. Third, Galletta points out that count two did not identify "the means" by which he transported the visual depiction, such as via a file-sharing program or email. *See id.* Fourth, he asserts that count two did not identify to whom he transported the visual depiction. *See id.* Fifth, he again challenges the use of the phrase "and elsewhere," as being insufficiently specific. *See id.* at ECF p. 124.

### iii.      *Resolution of Claim*

As with his claim as to count one, Galletta has failed to show that Attorney Sletvold was ineffective in not moving to dismiss the superseding indictment as to count two or challenge count two on appeal because any such challenge would have been unsuccessful. In this regard, Galletta

yet again seeks a level of factual specificity in the language of the superseding indictment that the government is not required to provide.

Count two of the superseding indictment sets forth all the necessary elements and sufficient facts to inform Galletta of the offense charged, transportation of child pornography in violation of section 2252(a)(1). Regarding the elements of the offense, section 2252(a)(1) states that

> **(a)** Any person who--
>
> > **(1)** knowingly transports or ships using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mails, any visual depiction, if--
> >
> > > **(A)** the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
> > >
> > > **(B)** such visual depiction is of such conduct[.]

18 U.S.C. § 2252(a)(1).

The elements of this offense are fully reflected in the language used in the superseding indictment, as it alleges that Galletta (1) knowingly, (2) transported or shipped, (3) by using a means or facility of interstate or foreign commerce, (4) a visual depiction, (5) showing a minor engaged in sexually explicit conduct, and (6) the producing of the visual depiction involved the use of minors engaged in sexually explicit conduct. *See* Superseding Indictment at 2. It also informed Galletta (1) how he transported the visual depiction: the Internet; (2) when he committed the offense: March 17, 2014; and (3) where he committed the offense: in Lehigh County, in the Eastern District of Pennsylvania, and elsewhere. *See id.* At bottom, the language used in count two provided Galletta with a "statement of the facts and circumstances" and "informed [him] of the specific offense . . . with which [he] was charged." *Hamling*, 418 U.S. at 117.

Galletta has failed to identify any case or statute requiring the government to include more specificity in an indictment. While he once again has mentioned an element of a section 2252(a)(1)

charge that the government must prove at trial by introducing evidence sufficient to prove his guilt beyond a reasonable doubt, *see* Original Br. at ECF pp. 122–23 (citing *United States v. Long*, 831 F. Supp. 582, 586 (W.D. Ky. 1993) for proposition as to government's requirement to prove defendant "knew of the nature and content of the materials received or possessed"), there is no such requirement for the language in an indictment and, thus, it would not be a proper basis for a motion to dismiss that indictment. *See United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000) ("[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." (citations omitted)). Therefore, Galletta has not shown that Attorney Sletvold's conduct was objectively unreasonable for not filing a motion to dismiss count two of the superseding indictment. Galletta also has not demonstrated that he was prejudiced because any such motion would have been unsuccessful and even if such a motion raised a doubt with this court about the language used in count two, the court would have exercised its discretion to require the government to file a bill of particulars. Further, at worst, the government would have returned to the grand jury for a second superseding indictment. Therefore, Galletta cannot show that there is a reasonable likelihood that the outcome of his criminal case would have been different had Attorney Sletvold filed a motion to dismiss count two of the superseding indictment.

Galletta also has failed to prove by a preponderance of the evidence that the outcome of his direct appeal to the Third Circuit would have been different if Attorney Sletvold challenged the sufficiency of count two for the first time on appeal. If the Third Circuit reviewed count two for plain error, there is no likelihood that the Third Circuit would have found an error because count two contained all the necessary elements for a charge under section 2252(a)(1). Moreover, Galletta has failed to show that any error in count two affected any aspect of the proceedings before

the undersigned and that it "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Parker*, 2023 WL 4117474, at *2. If the Third Circuit were to follow the reasonable/liberal-construction line of cases, the result would be the same because count two undeniably, "by any reasonable construction, charge[s] an offense" under section 2252(a)(1).[73] *Vitillo*, 490 F.3d at 324. Therefore, Galletta has not demonstrated prejudice under *Strickland* because Attorney Sletvold did not challenge count two of the superseding indictment for the first time on direct appeal.

        d.     <u>Count Three – Possession of Child Pornography</u>

            i.     *Language of Charge*

**<u>COUNT THREE</u>**

On or about August 2013 to or on or about July 23, 2014, in Lehigh County, in the Eastern District of Pennsylvania, and elsewhere, defendant

**BRENT S. GALLETTA**

knowingly possessed a mobile device which contained a video depictions [sic] that had been produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce. The production of these visual depictions involved the use of minors engaged in sexually explicit conduct and the visual depictions were of minors engaging in sexually explicit conduct.

In violation of Title 18, United States Code, Section 2252(a)(4)(B).

Superseding Indictment at 3.

---

[73] As with Galletta's challenge to count one, even were the Third Circuit to identify an issue with count two, Galletta has not shown by a preponderance of the evidence that the Third Circuit was reasonably likely to not find the error harmless.

### ii.     *Galletta's Arguments*

As to the possession of child pornography charge in count three, Galletta contends that Attorney Sletvold acted unreasonably in not filing a motion to dismiss count three because it was defective in six ways. First, he contends that count three lacked an "adequate description" of when he committed the offense because the timeframe covers a period of approximately one year. Original Br. at ECF pp. 125–26. Second, he argues that count three "fails to describe the nature or type of 'sexually explicit conduct' the minors are allegedly engaged in." *Id.* at 126. Third, he asserts that count three lacks a "factual basis for the interstate or foreign commerce nexus." *Id.* Fourth, he claims that the use of the phrase "knowingly possessed" was insufficiently specific because the word "possessed" can have several different meanings. *Id.* Fifth, he argues that count three "failed to describe the form of the visual depiction and . . . also omits the 'by computer' language provided in the statute." *Id.* Sixth, he contends that count three was defective because it did "not identify the means or facility of interstate commerce used to ship, transport or produce child pornography." Am. Mem. at ECF p. 11.

As with his other challenges to the sufficiency of the superseding indictment, Galletta "contends that the government used language that was not specific enough to inform [him] what he would need to defend against." Original Br. at ECF p. 126 (citing *United States v. Hillie*, 227 F. Supp. 3d 57 (D.D.C. 2017)). Instead, "[t]he government simply follow[ed] the statutory language without supplementing the elements of the offense with specific facts and conduct." *Id.* He also points out that "an indictment that merely tracks the statutory language is insufficient unless the statute 'fully, directly, and expressly without any uncertainty or ambiguity set[s] forth all the elements necessary to constitute the offence intended to be punished.'" Am. Mem. at ECF p. 12 (quoting *Russell*, 369 U.S. at 763).

### iii.  *Resolution of Claim*

Preliminarily, the court must address Galletta's principal reliance on *United States v. Hillie*, 227 F. Supp. 3d 57 (D.D.C. 2017), in support of his argument that all counts in the superseding indictment, but especially count three, are deficient.[74] *See* Original Br. at ECF pp. 109, 126, 127, 129. As explained below, Galletta's reliance on *Hillie* is misplaced because it involved a review of a significantly different indictment than the superseding indictment here.

In *Hillie*, a grand jury indicted the defendant on six counts of production of child pornography in violation of 18 U.S.C. § 2251(a), one count of possession of child pornography in violation of section 2252(a)(4)(B), and other offenses irrelevant to Galletta's case. 227 F. Supp. 3d at 61–62. The defendant filed a motion to dismiss those charges, claiming that "the indictment merely quote[d] the broad language of the child pornography statutes without including any facts that specify the particular conduct of [the defendant] that is the basis of the government's charges." *Id.* The district court granted the motion, finding that the indictment failed to provide the defendant with sufficient notice of the production and possession of child pornography charges against him. *See id.* at 72. About this lack of notice, the district court explained:

> Based on the indictment, one knows only that [the defendant] did something involving visual depictions of sexually explicit conduct of a minor "in the District of Columbia" during periods of time that span two to three years, and that the government has chosen to charge this alleged criminal activity (whatever it is) in a series of separate counts that appear to differ based solely on the overlapping time frames that relate to each count. The indictment is barren of factual averments regarding the what, where, or how of [the defendant's] conduct, and thus, a non-clairvoyant reader cannot possibly ascertain the substance of the government's accusations from the face of the charging instrument.
>
> This lack of particularity or specificity regarding [the defendant's] actions also makes it impossible to discern—and therefore to distinguish between—the conduct underlying each separate count. For example, Count One charges that, "[b]etween on or about July 1, 2008, and on or about August 30, 2010, in the District of

---

[74] During oral argument, Galletta acknowledged principally relying on *Hillie* in support of his argument that count three failed to provide him with sufficient notice of the charge against him.

Columbia," [the defendant] "did knowingly and intentionally employ, use, persuade, induce, entire, and coerce J.A.A., an eleven-to-thirteen-year-old minor female, to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct[.]" (Indictment at 1.) Count Two repeats that same generic charge, relating it to a slightly larger timeframe. (*See id.* at 2 (charging that [the defendant] "did knowingly and intentionally employ, use, persuade, induce, entire, and coerce J.A.A., ... to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct" and that he did so "[b]etween on or about July 1, 2008, and on or about August 30, 2011").) Because nothing in these counts reveals the particular conduct that [the defendant] allegedly engaged in with respect to J.A.A. during this overlapping multi-year period, one cannot tell whether the charges relate to distinguishable or separate child-pornography-production offenses, and, indeed, it is not at all clear that these counts even reference different acts on the Defendant's part.

*Id.* at 72–73 (all alterations other than substitution of party name in original).

The district court also found that the indictment was of a type that required greater specificity: "[W]hen the government sought to charge [the defendant] with various violations of the broadly worded federal statutes that criminalize production and possession of child pornography, the government's accusations needed to be accompanied by *further* details about [the defendant's] actual conduct—i.e., an explanation of *how* he allegedly violated those statutes—in order to satisfy constitutional and pleading standards." *Id.* at 74–76. Thus, the court concluded that "it [was] especially evident here that any attempt on [the defendant's] part to mount a meaningful defense against the indictment's multiple, undifferentiated charges is impermissibly frustrated." *Id.* at 76.

As expressed above, the indictment in *Hillie* was significantly different than the superseding indictment here, namely "it related to seven overlapping counts charging identical crimes." *United States v. Boutros*, No. 17-CR-80150, 2018 WL 11000721, at *2 (S.D. Fla. Jan. 8, 2018); *see United States v. Mumma*, No. 20-cr-168, 2023 WL 346676, at *2 (E.D. Cal. Jan. 20, 2023) (indicating that *Hillie* involved "seven overlapping counts which charged identical crimes"); *see also United States v. Munchel*, No. 1:21-CR-118, 2023 WL 2992689, at *3 n.1 (D.D.C. Apr.

18, 2023) (explaining that defendant's "frequent reliance" on *Hillie* was "unpersuasive" because it "featured unique circumstances, including overlapping and broad time periods"). Thus, it is distinguishable from the superseding indictment here which charged Galletta with three distinct offenses occurring at different times, albeit recognizing that the period in count three covers the specific dates of the offenses in counts one and two. *See Mumma*, 2023 WL 346676, at *2 (determining *Hillie* was inapplicable to challenge to two-count indictment charging defendant with "sexual exploitation of a minor and attempt to do so in violation of 18 [U.S.C.] §§ 2251(a)(e) and receiving a visual depiction of a minor engaged in sexually explicit conduct in violation of 18 [U.S.C.] § 2252(a)(2) and (b)(1)").

Even though *Hillie* is inapplicable due to its unique circumstances, unlike his arguments relating to counts one and two, Galletta has identified a defect with count three of the superseding indictment because it does not set forth all the necessary elements of a possession of child pornography offense under section 2252(a)(4)(B). Regarding the elements of the offense, section 2252(a)(4)(B) states that

> **(a)** Any person who--
>
> . . .
>
> > **(4)** . . . **(B)** knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if--
> >
> > > (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
> > >
> > > (ii) such visual depiction is of such conduct[.]

18 U.S.C. § 2252(a)(4)(B).

Here, while the court rejects Galletta's claims about count three being defective because it (1) lacked a sufficient description of the time of the offense, (2) failed to describe the type of sexually explicit conduct the minors were engaged in, and (3) included an insufficiently specific phrase, "knowingly possessed," for reasons already articulated in addressing his contentions as to counts one and two, the court agrees with Galletta that count three contains a defect. More specifically, although count three indicates that Galletta knowingly possessed matter containing a visual depiction produced using materials which have been mailed, shipped, or transported in interstate and foreign commerce, it lacks any mention of the means. In other words, it does not include the element, "by any means including by computer." *Id.*

Based on this court's research, it is rare for a defendant to identify a defect in an indictment in a section 2255 proceeding. Yet, the court, even without the benefit of Attorney Sletvold's testimony on this issue, must conclude that his conduct was objectively unreasonable in failing to file a motion to dismiss count three as it had a defect. As such, the court will address whether Galletta has been prejudiced.

As to possible prejudice, Galletta has failed to show that he was prejudiced due to Attorney Sletvold not filing a motion to dismiss count three prior to trial or by challenging the language on count three for the first time on appeal. Concerning Attorney Sletvold not filing a motion to dismiss count three, Galletta cannot show prejudice because the government undoubtedly would have done the same thing it did regarding count one, i.e. return to the grand jury for a superseding indictment to fix any possible deficiency with the charge.[75] *See Myles v. United States*, Nos. 17-cv-61, 12-cr-

---

[75] This failure to establish prejudice is equally applicable to Galletta's misplaced reliance on *Hillie* because he ignored the ultimate result of the motion to dismiss in that case. Although the district court granted the defendant's motion to dismiss those seven counts, the court dismissed them without prejudice and held the dismissal order in abeyance for 14 days "to provide the government with an opportunity to consider the path forward and, if it so chooses, seek a superseding indictment that comports with the Constitution and the Federal Rules." 227 F. Supp. 3d at 62. As explained *infra*, the government clearly had the information and evidence at its disposal to give to the grand jury that would have corrected the purported deficiencies identified by Galletta in these section 2255 proceedings.

239, 2018 WL 4052241, at *8 (W.D.N.C. Aug. 24, 2018) (concluding that section 2255 movant failed to show counsel was ineffective for failing to challenge alleged deficiency indictment because, *inter alia*, movant "cannot demonstrate prejudice because any deficiency could have been addressed through a statement of particulars or a superseding indictment"); *Petersen v. United States*, Civ. A. No. 17-127, Crim. A. No. 13-117, 2018 WL 4677915, at *9 (S.D. Ala. May 16, 2018) ("[S]ince any deficiency could have been easily cured by obtaining a superseding indictment after a motion to dismiss was filed, there can be no prejudice from counsel's failure to challenge the sufficiency of the indictment."), *report and recommendation adopted*, Crim. A No. 13-117, 2018 WL 2981169 (S.D. Ala. June 14, 2018); *Kozak v. United States*, Nos. 15-cv-150, 11-cr-121, 2018 WL 691642, at *4 (M.D. Fla. Feb. 2, 2018) ("[S]ince any deficiency in Count One could have been easily cured by obtaining a superseding indictment after a motion to dismiss was filed, there can no prejudice from counsel's failure to challenge the sufficiency of Count One."); *see also United States v. Fisher*, 871 F.2d 444, 451 n.7 (3d Cir. 1989) ("A superseding indictment may be obtained by the government at any time prior to trial." (citation omitted)); *United States v. Edwards*, 777 F.2d 644, 649 (11th Cir. 1985) ("Clearly, a prosecutor may seek a superseding indictment at any time prior to trial on the merits, so long as the purpose is not to harass the defendant."), *cert. denied sub nom. Bolden v. United States*, 475 U.S. 1123 (1986); *United States v. Sam Goody, Inc.*, 506 F. Supp. 380, 384 (E.D.N.Y. 1981) ("Superseding indictments to cure pleading defects or inartfully drafted charges are not only commonplace but have been held to be perfectly proper, not abusive and not violative of due process."), *abrogated on other grounds by*, *Dowling v. United States*, 473 U.S. 207 (1985). Furthermore, Galletta has not articulated any reason why this court, if presented with a motion to dismiss count three, would have dismissed count three with prejudice even if the court granted the motion. To the contrary, considering that

the deficiency is easily curable, any dismissal would have been undoubtedly without prejudice, and there is no indication that the government would not have continued to pursue the possession charge as part of this case.[76] *See United States v. Fallon*, 61 F.4th 95, 125 (3d Cir. 2023) ("In order to have an indictment dismissed due to a course of prosecutorial misconduct, Appellants must demonstrate both prejudice from the misconduct and that there was no less severe means to remedy that prejudice."); *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019) ("[A] court may dismiss an indictment based upon its inherent authority only if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy was available to address the prejudice." (citations omitted)); *see also United States v. Fulmer*, 722 F.2d 1192, 1195 (5th Cir. 1983) ("A district court may dismiss an indictment with prejudice only where it has been shown that governmental misconduct or gross negligence in prosecuting the case has actually prejudiced the defendant.") Therefore, Galletta has failed to demonstrate that it was reasonably likely that the outcome of his proceedings would have been different if Attorney Sletvold filed a motion to dismiss count three prior to trial.

Concerning Attorney Sletvold failing to challenge count three on appeal, Galletta has not demonstrated that such a challenge would have been reasonably likely to result in the Third Circuit vacating his conviction on count three and dismissing count three of the superseding indictment. Even though it is unclear which standard of review the Third Circuit would have applied to Galletta's challenge to count three if Attorney Sletvold had raised it for the first time on direct appeal, it is not reasonably likely that the Third Circuit would have reached a favorable decision under either standard. Concerning plain error, count three of the superseding indictment contains

---

[76] The court recognizes that a "[d]ismissal without prejudice is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds." *United States v. Taylor*, 487 U.S 326, 342 (1988).

an error, which is plain, insofar as it omits an element from a section 2252(a)(4)(B) offense. Nevertheless, Galletta comes nowhere close to showing that the error affected the outcome of the trial or that the error affected the fairness, integrity, or public reputation of judicial proceedings. *See Marcus*, 560 U.S. at 262 (explaining requirements for plain error). While the court recognizes that Galletta asserts claims as part of these section 2255 proceedings about the government varying or constructively amending count one during the trial, the omission of the phrase "by any means including by computer," 18 U.S.C. § 2252(a)(4)(B), in count three did not affect the outcome of the trial in any respect.

Galletta contends that the omitted element in count three "permitted the government to constructively amend the [superseding] indictment to allow it to skirt around the requirement of having to prove that the materials us[ed] in the production of images of child pornography had to travel through interstate commerce." Am. Br. at ECF p. 12. Galletta is mistaken. The government did not "skirt around" the interstate commerce requirement; instead, it proved that the materials used in the production of the three images of child pornography traveled through interstate and foreign commerce.

As for this interstate commerce element, the definition statute applicable to section 2252(a)(4)(B) defines "producing" as "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. § 2256(3). Although the Third Circuit has yet to address the meaning of "produced" in section 2252(a)(4)(B), every other circuit court of appeals to address the meaning of "produced" has, by referring to the definition of "producing" in section 2256(3), concluded that it includes the copying or downloading of child pornography. *See United States v. Boles*, 914 F.3d 95, 108 (2d Cir. 2019) (agreeing with decisions by the First, Fifth, Seventh, and Ninth Circuits that "the word 'produced' [in section 2252(a)(4)(B)] encompasses mere copying or downloading of

child pornography" (citing *United States v. Burdulis*, 753 F.3d 255, 262 (1st Cir. 2014); *United States v. Dickson*, 632 F.3d 186, 189–90 (5th Cir. 2011); *United States v. Angle*, 234 F.3d 326, 341 (7th Cir. 2000); *Lacy*, 119 F.3d at 750; *United States v. Schene*, 543 F.3d 627, 639 (10th Cir. 2008) ("It is obvious that the government's evidence was sufficient . . . to show that each 'image of child pornography' had been copied or downloaded to Schene's hard drive in one capacity or another, and was therefore 'produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce.'" (citations omitted)); *see also United States v. Lively*, 852 F.3d 549, 559–60 (6th Cir. 2017) (explaining that sections 2251, 2252, and 2252A share section 2256's definition of "producing," and holding that "'producing' child pornography, as used in § 2251(a), encompasses copying images onto a hard drive"). This court cannot identify a reason why the Third Circuit would not follow those decisions, particularly given the rationale for the decision espoused by the Second Circuit in *Boles*:

> Those circuits that have interpreted "produced" to include copying or transferring rely on 18 U.S.C. § 2256(3), which defines the word "producing" in the child pornography and child exploitation statutes to mean "producing, directing, manufacturing, issuing, publishing, or advertising." 18 U.S.C. § 2256(3); *see also Angle*, 234 F.3d at 341. The plain meaning of the word "produced" would include producing or making a copy. Moreover, we agree that to interpret "produced" to exclude pulling up images on a computer monitor is "far too restrictive as it essentially renders meaningless the statutory definition of 'producing' [in § 2256(3) ] ... and focuses entirely on the circumstances surrounding the original or actual production of the visual depiction." *Angle*, 234 F.3d at 341. To read the statute this way would require the government to present evidence about the original materials used to create the child pornography in every case a defendant is charged under the "produced using materials" language. Boles fails to point to, and we are unable to find, any evidence that Congress intended these subsections to be applied so narrowly. Indeed, the nature of the industry is that these images are copied over and over again as collectors share them, and it would be difficult in many cases to prove the circumstances of the original "production."

914 F.3d at 108.

Applying this definition of "produced" to the evidence introduced against Galletta, there was sufficient evidence to show that he produced child pornography by using the Phone, which, as Galletta stipulated to, was shipped and transported through interstate and foreign commerce insofar as it was manufactured by Samsung in China and then shipped or transported to the United States, *see* Day One Tr. at 90–91, to save or download the three images of child pornography. *See id.* at 104–08 (testimony from Agent Leri about images being saved or downloaded to the Phone).[77] Thus, there is no question that the evidence presented at trial unequivocally and overwhelmingly supported the missing element, namely, that the three images of child pornography were produced using materials which had been mailed, shipped, or transported in interstate or foreign commerce, by any means including by computer. *See, e.g.*, *Dickson*, 632 F.3d at 190 (affirming defendant's conviction for violating section 2252(a)(4)(B) when evidence showed that defendant produced pornography when he copied it to compact disc made in China and possessed it in Texas). Therefore, Galletta has not shown that the Third Circuit was reasonably likely to find plan error, and his allegation of prejudice fails if the Third Circuit would have conducted a plain error review.

If the Third Circuit were to follow the reasonable/liberal-construction line of cases, the result would be the same. As already stated, there is an element missing from the charge in count three of the superseding indictment. Although count three states that the images were produced using materials mailed, shipped, or transported in interstate and foreign commerce, indicates that the images were on Galletta's mobile device, and identifies the time period of the offense and the statute Galletta allegedly violated, it does not state the means by which the materials were mailed, shipped, or transported. While Galletta would have known that the possession charge was based on images found on the Phone, he would not have been on notice of the means allegedly used to

---

[77] The government followed this interpretation of "produced" at trial. *See* Day Two Tr. at 120.

mail, ship, or transport the materials used to produce the child pornography.[78] As such, it is reasonably likely that the Third Circuit would determine that count three was deficient even giving it a liberal construction.

Although count three omitted an element of a section 2252(a)(4)(B) offense, Galletta cannot show that the outcome of his appeal would have been different because the Third Circuit would have found that the error was harmless. *See United States v. Pena*, 58 F.4th 613, 622 (2d Cir. 2023) ("[T]he mistaken omission of an element from an indictment is amenable to harmless-error analysis."); *United States v. Welborn*, No. 21-5425, 2022 WL 1276024, at *3–5 (6th Cir. Apr. 29, 2022) (concluding that appellant raising challenge to sufficiency of indictment for first time on appeal failed to show error under de novo review and even if certain language "should have been included in the indictment, any error was harmless"), *cert. denied*, 143 S. Ct. 261 (2022); *McCoy v. United States*, 266 F.3d 1245, 1250–51 (11th Cir. 2001) (concluding that harmless error review applies to claim that indictment omitted element of offense charged); *United States v. Thompson*, 356 F.2d 216, 226–27 (2d Cir. 1965) ("[T]he courts of the United States long ago withdrew their hospitality toward technical claims of invalidity of an indictment first raised after trial, absent a showing of substantial prejudice to the accused . . . ."); *see also Arizona v. Fulminate*, 499 U.S. 279, 306 (1991) (indicating that Supreme Court has "adopted the general rule that a constitutional error does not automatically require reversal of a conviction," and explaining that

---

[78] Out of the possible missing elements for a section 2252(a)(4)(B) offense, it is arguable that the government omitted the least consequential element. The jurisdictional hook in section 2252(a)(4)(B) "requires the government to establish that the pornography was produced using materials that had been in interstate commerce." *United States v. Looney*, 606 F. App'x 744, 746 (5th Cir. 2015) (per curiam); *see also United States v. Lewis*, 554 F.3d 208, 213 n.5 (1st Cir. 2009) (explaining that "§ 2252(a)(4)(B) allows the jurisdictional element to be satisfied in two ways: either the depiction has been 'mailed, or has been shipped or transported in interstate or foreign commerce' or else it has been 'produced using materials which have been mailed or so shipped or transported'" (quoting 18 U.S.C. § 2252(a)(4)(B))). Even if the government had included the missing statutory language, "by any means including by computer," 18 U.S.C. § 2252(a)(4)(B), which would seemingly have made count three sufficient, it would not have necessarily provided Galletta with any additional information that was not already in the superseding indictment. Especially, considering that the mailing, shipping, or transporting can be accomplished by "any means." *Id.*

"the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless"); *Stevenson*, 832 F.3d at 427–28 (applying harmless error review to challenge to indictment on appeal after challenge was made in district court); *United States v. Howard*, 947 F.3d 936, 955 (6th Cir. 2020) (Nalbandian, J., concurring in part and in the judgment) ("[W]hile I find that Howard's indictment, even liberally construed, contains error, I find that error harmless."); *United States v. Doe*, 572 F.3d 1162, 1173 n.9 (10th Cir. 2009) (explaining that "even if the information were insufficient, it resulted in only harmless error"). As to harmless error,

> [t]he test for harmless error is set forth in Rule 52(a) of the Federal Rules of Criminal Procedure: "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." This requires us to determine whether "beyond a reasonable doubt ... the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) ("An otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."). To do so we ask: "(1) whether the indictment provided [the defendant] sufficient notice of the crime with which he had been charged and (2) whether [the defendant] was harmed by losing the right to have the public determine whether there existed probable cause to charge the missing element." *United States v. Dentler*, 492 F.3d 306, 310–11 (5th Cir. 2007) (internal quotation marks omitted).

*Stevenson*, 832 F.3d at 427–28 (second and third alterations in original).

On the first element of the harmless error analysis, Galletta argues that count three of the superseding indictment failed to provide him with sufficient notice of the crime with which he had been charged. *See* Original Br. at ECF p. 126. The court disagrees. Count three notified Galletta of the period in which the offense occurred, the item he knowingly possessed which contained the images of child pornography,[79] that the images were produced using materials that were mailed,

---

[79] To the extent that Galletta could possibly show that the use of the term "mobile device" alone was deficient, the court notes that the grand jury also included a forfeiture notice with the superseding indictment, which sought forfeiture of a Samsung SCH-i545 Galaxy S IV because it was "property used or intended to be used, in any manner

shipped, and transported in interstate or foreign commerce, and identified the statute being charged. The missing element would not have provided Galletta with any additional information (especially if the statutory language was included) that was not already there. This was sufficient statutory and factual detail to provide Galletta with notice of the charge against which he was to defend. *See Stevenson*, 832 F.3d at 428 (concluding that "although the count at issue did not explicitly reference 'interstate commerce,' it nevertheless provided more than adequate statutory and factual detail to provide Stevenson notice of the charge against which he was to defend" (citing *United States v. Mallen*, 843 F.2d 1096, 1103 (8th Cir. 1988)).

As for the second element of harmless error review,

[t]o determine whether [the defendant] was harmed by losing the right to have the grand jury make a probable cause determination regarding [the missing element of the offense charged, the court] consider[s] 'whether, on the basis of the evidence that would have been available to the grand jury, any rational grand jury presented with a proper indictment would have charged that [the defendant] committed the offense in question.

*Id.* (quoting *Dentler*, 492 F.3d at 311). In this case, there is no indication that the grand jury would not have had the same evidence that was available to the petit jury, and the petit jury found Galletta guilty of violating section 2252(a)(4)(B) "after receiving explicit instructions as to the facts necessary to convict [him] on the [by any means including by computer] element *beyond a reasonable doubt*." *Id.*; *see also* Day Two Tr. at 159–62 (instructing jury on section 2252(a)(4)(B) offense). "This verdict strongly supports the conclusion that a rational grand jury would have probable cause to charge [Galletta] with each and every element of the [possession of child pornography] charge." *Id.* (citation omitted). Further, considering that the government was able to show that Galletta possessed child pornography that was produced using materials which had been

___

or part, to commit, or to facilitate the commission of, the violations of [18 U.S.C. § 2252(a)(1), (4)], as charged in this indictment." Superseding Indictment at 4.

mailed, shipped, or transported in interstate or foreign commerce *by any means*, "it is hard to fathom how *any* rational person" could conclude that a defendant who possessed a cell phone containing three images of child pornography that a forensic evaluation showed he had once saved or downloaded to the cell phone, which was manufactured in China and possessed in Pennsylvania, "had probably not done so" "by any means including by computer." *Id.*; 18 U.S.C. § 2252(a)(4)(B). Therefore, this court concludes that Galletta has failed to show that it was reasonably likely that the Third Circuit would have found that any error in count three was not harmless. Accordingly, whether the Third Circuit would have applied plain error or liberal construction review to a challenge to count three on direct appeal, Galletta has failed to show that he was prejudiced under *Strickland* when Attorney Sletvold did not challenge count three on direct appeal.

### 5. Ineffective Assistance of Counsel for Failure to File Motion to Suppress Search of the Phone

#### a. The Parties' Arguments

Galletta contends that Attorney Sletvold was ineffective for failing to file a motion to suppress the results of the search of the Phone. *See* Original Mot. at ECF p. 41; Original Br. at ECF pp. 170−84; Suppl. at ECF pp. 12–16; Am. Mot. at ECF p. 5; Am. Mem. at ECF pp. 18–29; Am. Mot. Suppl. at 11–16; 2255 Hrg. Tr. at 30–39. He asserts that his state-court counsel had prepared a motion to suppress,[80] provided a copy of that motion to Attorneys Henry, Meehan, and Sletvold, and recommended that they file it. *See* Original Br. at ECF p. 172. In addition, Galletta claims to have "begged, literally begged" Attorney Sletvold to file a motion to suppress. *Id.* at ECF p. 180; *see* 2255 Hrg. Tr. at 37 (stating that he "begged" Attorney Sletvold to file motion to

---

[80] At the hearing, Galletta testified that his state-court defense counsel filed the motion in the state court prior to the case being dismissed. *See* 2255 Hrg. Tr. at 31–32.

suppress results from search of Phone). Yet, his defense counsel did not file a motion to suppress the results of the search of the Phone.[81] *See* Original Br. at ECF p. 173; 2255 Hrg. Tr. at 32.

Galletta asserts that he suffered prejudice by his defense counsel not filing a motion to suppress because, if he did, the evidence from the Phone—the text messages and deleted child pornography images—would have been suppressed. *See* 2255 Hrg. Tr. at 31. In addition, he believes that he would not have been convicted for possessing child pornography and the Rule 404(b) evidence would not have been admissible as to the other two charges. *See id.* at 39.

Concerning the grounds for a motion to suppress, Galletta argues that Agent Leri lacked probable cause to believe he had child pornography on the Phone because their conversations did not involve discussions on creating, sharing, sending, or enjoying child pornography. *See* Original Br. at ECF pp. 173, 175. He also raises several challenges to the search warrant itself. First, Galletta points out that the warrant did not mention a cell phone or GPS systems among the items to be seized and searched. *See id.* at ECF p. 175. Second, Galletta asserts that the affidavit of probable cause stated that he was suspected of violating 18 Pa. C.S. § 6132, which relates to child pornography, despite he and Agent Leri having never discussed child pornography. *See id.* at ECF pp. 175–76. Third, Galletta claims that Agent Leri testified that there was no child pornography viewable through a plain view search of the Phone; as such, there was no probable cause to conduct a forensic analysis of the Phone for child pornography. *See id.* at ECF pp. 176–77. Fourth, he argues that the warrant is overbroad and "contains obvious 'cut and paste' statements from a template warrant." Suppl. at ECF pp. 12, 15–16. Fifth, Galletta contends that the search warrant did not incorporate the affidavit of probable cause for seizure of the Phone. *See id.* at ECF p. 14.

---

[81] Galletta testified that Attorneys Meehan and Henry told him that they would not file a motion to suppress the results of the search of the Phone because it would not be suppressed because of the inevitable discovery rule. *See* 2255 Hrg. Tr. at 32.

Sixth, Galletta alleges that the affidavit of probable cause does not contain statements "remotely suggesting" that he possessed child pornography.[82] *See* Am. Mem. at ECF p. 20. Galletta further argues that no exception to the warrant requirement would justify the forensic search of the Phone. *See* Original Br. at ECF pp. 177–79. As already noted, Galletta contends that a plain view search of the Phone did not find any images of child pornography. *See id.* at ECF pp. 177–78.

In response to Galletta's arguments, the government contends as follows:

> All evidence seizures were obtained through valid search warrants authorized by a Commonwealth of Pennsylvania Magistrate Judge or a United States Magistrate Judge. All search warrants contained ample probable cause for their issuance. Law enforcement had good faith to rely on the warrants issued. Any motion challenging the evidence seized as a result would have been frivolous. As such, Galletta has not demonstrated that his counsel erred in failing to challenge the warrants because he has not demonstrated such challenges would have been successful and changed the outcome of his prosecution. He has failed to demonstrate his counsel was ineffective and that he was prejudiced as a result. [sic] This [sic] claim must also fail.

Gov't's 2d Br. at 20.[83]

### b.    Applicable Law

The Fourth Amendment requires that search warrants be supported by probable cause.  U.S. Const. amend. IV.  When analyzing whether probable cause existed for the issuance of the search warrant, the court must consider "whether, given all the circumstances set forth in the affidavit before [the magistrate], including the 'veracity' and 'basis of knowledge' of persons supplying

---

[82] During the hearing, Galletta introduced a seventh criticism of the warrant, namely, that there were no facts in the affidavit of probable cause linking the cell phone to his communications with Agent Leri. *See* 2255 Hrg. Tr. at 33. Despite this criticism, Galletta recognized that the affidavit of probable cause indicated that he had told Agent Leri that he used a cell phone to communicate. *See id.* at 34. Galletta claims that he never made such a statement to Agent Leri, and he can prove it through his transcript of his interview with law enforcement after his arrest. *See id.* at 34–35. Galletta alleges that Agent Leri intentionally misled the magistrate by including the statement and did so to connect the cell phone to criminal activity. *See id.* at ECF p. 35.

[83] As illustrated by this quoted text from the government's brief, there was no analysis of the claim raised, just a series of recitations of conclusions of law. Simply stating, for example, that there was "ample probable cause," is entirely different than identifying for the court how the warrant contained probable cause.

hearsay information, there is a fair probability that contraband or evidence of a crime will be found

in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

> Additionally,
>
> [i]n evaluating the issuing judge's probable cause determination, the Court conducts a deferential review, *United States v. Stearn,* 597 F.3d 540, 554 (3d Cir. 2010) (citing *Gates,* 462 U.S. at 238–39), and considers only the facts that were before the issuing authority, *i.e.,* facts contained in the affidavit of probable cause. [*United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993).] Importantly, the Court does not decide probable cause *de novo,* but rather determines whether the affidavit provides a "substantial basis" to support the conclusion that probable cause existed. *Stearn,* 597 F.3d at 554; *see also Gates,* 462 U.S. at 238. If a substantial basis exists to support the probable cause finding, the Court must uphold that finding even if it or a "different magistrate judge might have found the affidavit insufficient to support a warrant." *United States v. Conley,* 4 F.3d 1200, 1205 (3d Cir. 1993). Although the district court should not simply "rubber stamp" the issuing judge's conclusions, [*United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000)] (citing *Jones,* 994 F.2d at 1055), the Supreme Court has directed that "doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Stearn,* 597 F.3d at 554 (citing *Gates,* 462 U.S. at 237 n.10). The defendant bears the burden of establishing that his Fourth Amendment rights were violated. *United States v. Acosta,* 965 F.2d 1248, 1257 n. 9 (3d Cir. 1992) (citing *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)).

*United States v. Herrera*, No. CRIM. A. 15-22, 2015 WL 3536616, at *4 (E.D. Pa. June 5, 2015),

*aff'd sub nom.*, *United States v. Suarez-Arzon*, 664 F. App'x 180 (3d Cir. 2016).

> c.      Information Provided in Search Warrant

The Application for Search Warrant and Authorization (the "Application") indicated that

Galletta was accused of violating 18 Pa. C.S. § 6312 (Sexual Abuse of Children)[84] and 18 Pa. C.S.

---

[84] Section 6312 criminalizes the following conduct:

> **(b) Photographing, videotaping, depicting on computer or filming sexual acts.--**
>
> (1) Any person who causes or knowingly permits a child under the age of 18 years to engage in a prohibited sexual act or in the simulation of such act commits an offense if such person knows, has reason to know or intends that such act may be photographed, videotaped, depicted on computer or filmed.
>
> (2) Any person who knowingly photographs, videotapes, depicts on computer or films a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such an act commits an offense.

§ 6318 (Unlawful Contact with a Minor).[85] *See* Am. Mot., Ex. A at ECF p. 33; 2255 Hrg. Tr.,

Pet'r's Ex. 1. Based on these offenses, the Application stated that law enforcement was requesting

to search a "2001 Grey SAAB vin: YS3ED48E913 with PA Registration JFF9949, currently in the

custody of the Pennsylvania Office of Attorney General," and then search and seize the following

items:

> All computer hardware, including, but not limited to, any equipment which can collect, create, display, convert, store, conceal, or transmit electronic, magnetic, optical or similar computer impulses or data. Any computer processing units, internal and peripheral storage devices, [sic] (such as fixed disks, external hard disks, discs, backup media, flash media, and optical storage devices), peripheral input / output devices (such as keyboards, printers, scanners, video displays,

---

**(c) Dissemination of photographs, videotapes, computer depictions and films.**--Any person who knowingly sells, distributes, delivers, disseminates, transfers, displays or exhibits to others, or who possesses for the purpose of sale, distribution, delivery, dissemination, transfer, display or exhibition to others, any book, magazine, pamphlet, slide, photograph, film, videotape, computer depiction or other material depicting a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such act commits an offense.

**(d) Child pornography.**--Any person who intentionally views or knowingly possesses or controls any book, magazine, pamphlet, slide, photograph, film, videotape, computer depiction or other material depicting a child under the age of 18 years engaging in a prohibited sexual act or in the simulation of such act commits an offense.

18 Pa. C.S. § 6312(b)–(d).

[85] Section 6318 criminalizes the following conduct:

**(a) Offense defined.**--A person commits an offense if he is intentionally in contact with a minor, or a law enforcement officer acting in the performance of his duties who has assumed the identity of a minor, for the purpose of engaging in an activity prohibited under any of the following, and either the person initiating the contact or the person being contacted is within this Commonwealth:

(1) Any of the offenses enumerated in Chapter 31 (relating to sexual offenses).

(2) Open lewdness as defined in section 5901 (relating to open lewdness).

(3) Prostitution as defined in section 5902 (relating to prostitution and related offenses).

(4) Obscene and other sexual materials and performances as defined in section 5903 (relating to obscene and other sexual materials and performances).

(5) Sexual abuse of children as defined in section 6312 (relating to sexual abuse of children).

(6) Sexual exploitation of children as defined in section 6320 (relating to sexual exploitation of children).

18 Pa. C.S. § 6318(a).

switches, . . . and disc/media readers), and related communication devices such as network/Internet devices, cables, and connections, recording equipment, as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware. Any mobile devices such as cellular phones, PDA's (personal digital assistants), and GPS (global positions systems), any cables or connections used to charge or connect devices to computers, and any storage cards contained in or that can be utilized in mobile devices. These items will be seized and then later searched for evidence relating to the possession and / or [sic] distribution of child pornography.

SOFTWARE: Software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, graphics, or spread sheet programs), utilities, compilers, and communications programs. These items will be seized in order to facilitate the search of the computer systems / computer system components / computer systems storage media named above. The reason for these items to be seized are outlined in the affidavit of this search warrant and incorporated hereto by reference.

DOCUMENTATION: Computer related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items. These items will be seized in order to facilitate the search of the computer systems / computer system components / computer systems storage media named above. The reason for these items to be seized are outlined in the affidavit of this search warrant and incorporated hereinto by reference.

PASSWORDS AND DATA SECURITY DEVICES: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software, or other programming code. A password (string of alpha-numeric characters) usually operates as a sort of digital key to unlock particular data security devices. These items will be seized in order to facilitate the search of the computer systems / computer system components / computer systems storage media named above. The reason for these items to be seized are outlined in the affidavit of this search warrant and incorporated hereto by reference.

Documents: Documents of any nature, printed, or hand written which may relate to passwords, accomplices or co-conspirators. Any documents that shows [sic] ownership or who resides at the place to be searched.

Child pornographic images and any other digital evidence to the possession and /or [sic] dissemination of child pornography or unlawful contact with a minor, contained on the electronic storage media seized as a result of this search warrant.

Bathing suit discussed in undercover communications.

*Id.* at ECF pp. 33–34.

Regarding probable cause to search, the Application contained the following information

in an affidavit:[86]

> Your Affiant, Kate Linehan, is a Special Agent with the Pennsylvania Office of Attorney General's Child Predator Section. Your affiant received the following information from Special Agent Justin M. Leri, Pennsylvania Office of Attorney General:
>
> Justin M. Leri, is a Special Agent with the Pennsylvania Office of Attorney General's Child Predator Section. Before being employed as a Special Agent with the Pennsylvania Office of Attorney General, your Affiant was a Computer Forensic Analyst with the New York State Police and a Detective with the Lackawanna County District Attorney's Office. Your affiant has been a member of the Pennsylvania State Police Northeast Computer Crime Task Force, Pennsylvania Internet Crimes against Children Task Force and Federal Bureau of Investigation, Scranton Resident Agency, as a Task Force Officer, with a Top Secret Clearance.
>
> Leri has received training from the Internet Crimes against Children's Task Force; Investigative Techniques, Undercover Investigations and Advanced training in Peer to Peer file sharing as it related to the online victimization of children. Leri has also received training from the Pennsylvania State Police, Federal Bureau of Investigation, and National White Collar Crime Center.
>
> Leri has conducted hundreds of investigations involving the sexual exploitation of children and computer related devices since 2008. Leri has provided expert testimony in computer forensics and child exploitation investigations in the Lackawanna County Court of Common Pleas and United States District Court for the Middle District of Pennsylvania.
>
> Leri has also received the following training as it related to computer operating systems and computer forensics:
> BDRA – Basic Data Recovery and Acquisition
> NSTISSI 4011 - National Training Standard for Information System Security Professionals certificate
> CNSS 4012 - National Assurance Standard for Senior System Managers certificate
> CNSSI – National Standard for System Certifiers certificate
> EnCe- Encase Certified Computer Forensic Examiner

---

[86] Due to the significant number of text abbreviations used in the affidavit the court has not used sic to refer to words seemingly misspelled or misconjugated. The quoted text is how it stands in the original except for where the court substituted the phrase "smiley face emoji" for actual smiley face emojis, corrected the spelling of Galletta's last name on one occasion, and used [sic] after one reference to an incorrect year.

CFCB - Computer Forensic Certified Examiner.

Part of your Affiant's and SA LERI's duties include investigating violations of state law, such as the online exploitation of children, in particular violations of Title 18, Section 6312, which criminalizes, among other things, the possession, receipt, and transmission of child pornography. Your Affiant and SA Leri have gained experience conducting such investigations through training in seminars, classes, and consistent work assignments. SA LERI has also been trained in the investigation of persons using peer to peer file sharing programs on the Gnutella, ARES and BitTorrent networks to obtain digital media files consisting of child pornography and undercover chat communications.

On July 22, 2014 I was conducting undercover operations through an online ads website relating to the sexual exploitation of minors. The title of the ad stated "Pervy Dads – m4m – 34 (Mall)." The poster of the ad stated "I am looking for another pervy dad to hangout with. One who is pervy and likes taboo stuff. I want to hangout and talk at the mall or pool. Better yet if you have a pool. I am 34, good looking and I know that there are other dads who are pervy like me."

On the same date, utilizing an undercover email account and an undercover identity of an adult male with children, I responded to the ad stating "i j saw ur ad. i have to admit that it got me interested ;p"

At 1637 hours an individual, later identified to be Brent GALLETTA, responded to the email, stating "Tell me more. Are you a dad? Do you appreciate pretty younger girls? Do you have a pool?

Chris"

At 1654 hours I responded, stating, "Hi thanks for the response. I am….and i do :)…and yes I have access to pool lol. What about u"

At 1718 hours GALLETTA responded, stating, "I love younger girls. I love their tight bodies and I love to hangout and befriend them. I love pools, but do not have one. I had a step daughter who is 9 now but her mother and I split and they moved to Texas and that is why I am having withdraw. I need to find someone who appreciates them as much as I do and will let me spend time with them and get pervy together.

Chris
chrisdouglas775@gmail.com"

At 1754 hours I responded to the email address chrisdouglas775@gmail.com, stating "I am so sorry to hear that! I tots get the withdraw …my ex is a really making my life a mess and for my two kids I have a 6 yo son N a 7yo daughter…. sound

exactly like me n know the importance of love. I'm in the area a few days w my kids trying to get some things straitened out. What type of things r u into"

At 1802 hours GALLETTA responded, stating, "I am sorry to hear about your situation also. I am into young. I am bi curious but I know that I like young girls. I have been dating woman with young daughters just to spend time with their daughters. I was at the park today with a woman and her daughter who is 9 and gorgeous. I just like flirting with her and playing with her. Tomorrow we are suppose to go to the movies and swim. I hope this doesnt offend you but I am being honest. I am attracted to younger. So if there is a dad who feels the same and is not threatened by it then I want to hangout. Do stuff together and be friends. What do you think? What are you looking for too?

Chris
txt me if you want 484-222-8487

I then began text message communicating with GALLETTA utilizing an undercover cellular device, and messages to the above listed number.

During the text message communication, GALLETTA stated, "I hope I didn't offend u in my email." I then responded, "not at all its hard to find others who think alike. U r very lucky to find a woman to date w such a young beautiful girl wow."

GALLETTA responded, stating "That's the easy part. Trying to get close and flirt and touch incidentally is the hard part. The last woman was not hot but after I fucked her long and hard she would go to sleep and I would go in and peek while her 7 year slept."

After some additional communications, I responded "it's fine as long as it's done w love and respect that's the most important part with my little ones."

GALLETTA then responded, stating "that's how I am. I am not a molester who hurts them. Just one who connects and encourages them to explore and learn about their bodies and enjoy it."

Additional communication continued to which GALLETTA asked for a picture of me and my two children. He then asked "when r u free to hangout?"

I then responded, stating "Im not looking for trouble I hope u know that and I want to b able to trust u….i've been burned b4." Additional communication continued to which GALLETTA responded, "Damn. I am not an asshole. Trust me. Once we meet u will know I am serious."

I then responded, stating "I may be able to get my little girl out of my parents tonight w out making a scene, if not, tomorrow. I don't want them thinking anything…they

r helping me so much right no. What would u b interested in doing. I would need the final say, obvi."

GALLETTA responded, "I am free later tonight. I would only do what u want me to. Nothing more. Whatever ur comfortable with."

After additional communication, GALLETTA responded "hopefully touching, Kisses and tickling and peeking upskirt. Oh. I love feet too [smiley face emoji]"

After additional communication, and again, identifying the female as a 7 year old, GAL[L]ETTA stated, "I am. I want to do more if u want that too," and "what do you want to happen?"

Communication again continued, to which GALLETTA stated "I want to go down on her amd taste her sweet pussy. That is what I want. But only if u r ok with it." Additionally GALLETTA stated, "I agree. I am 1000 percent honest. I want to play with ur daughter. I want to enjoy her body her lips her fert her laugh her everything."

GALLETTA then asked "U want me to come over tonight? And play at ur parents?," I probably cant tonight…. But tomorrow I am freee all day [smiley face emoji].

I then continued communicating with GALLETTA relating to a meet on July 23, 2014. Additionally GALLETTA sent a picture of an adult male, later identified to be him.

Only July 23, 2012 [sic] communication continued with GALLETTA and a meet location was established at a location in South Whitehall, PA. I then asked GALLETTA, "u planning on take any pics? My only rule is I don't want them all over the internet." GALLETTA responded, "sure and ok." In another text communication, GALLETTA stated "Ok. Who is home today? Do I need to be worried about your parents?" I then responded, "No they r gone it will b just us and the kids."

In additional communication, GALLETTA asked if he should bring a laptop computer and responded to my question, "sure do u want Stephanie in anything." by stating, "bikini [smiley face emoji]"

At approximately 1330 hours, a grey SAAB bearing PA registration JFF 9949 pulled into the predetermined meet location. I then identified the driver of the vehicle as GALLETTA from the undercover operation and pictures received. GALLETTA then parked the vehicle and was taken into custody by Special Agents from the Pennsylvania Office of Attorney General, South Whitehall Police Department and Lehigh County Detectives.

I then verbally mirandized GALLETTA and asked to speak with him. GALLETTA stated that he was at the location to "meet with a father and hang out." GALLETTA then requested to speak with a lawyer. No further questioning was conducted at this time. GALLETTA was then advised that he would be transported to the police department and paperwork would be completed, he was then asked if he had ever been arrested before, prior to explaining to him the arrest process. GALLETTA then stated "yes I have, for the same thing." Prior to entering the police station, GALLETTA blurted, "oh my god my fucking life is over."

GALLETTA was then transported to South Whitehall Township Police Department. While at the police department completing arrest paperwork, officers advised me that GALLETTA requested to speak with me. I then went to the holding cell to speak with GALLETTA, whom stated that he wanted to answer questions, regarding the investigation, and no longer wanted a lawyer." At approximately 14:25 hours I then re-mirandized GALLETTA and both myself and SSA Smith interviewed GALLETTA regarding the investigation.

A criminal history search on GALLETTA noted that he served 4-23 months in prison in 2001, relating to a violation of 6301, Corruption of Minors and 2.5-5 years in prison in 2002 for an additional violation of 6301, Corruption of Minors.

During the course of this interview, GALLETTA acknowledged that he used a cellular device to communicate. A cellular device was also noted on the front seat of his vehicle, at time of arrest.

**Search and Seizure of Computer Systems, Hardware, and Software**

Your Affiant knows that searching and seizing information from computers often requires investigators to seize all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

1) Computer storage devices (like hard drives, diskettes, tapes, DVD-ROMs, CD-ROMs, flash drives, and portable devices) can store the equivalent of hundreds of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence, store criminal evidence in a random order, or with deceptive file names or deceptive file extensions. This requires searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored and it is impractical to attempt a comprehensive data search on site.

2) Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a

search which expert is qualified to analyze the system and its data. Data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive codes imbedded in the system, such as "booby traps"), a controlled environment is essential to its complete and accurate analysis.

Based upon your affiant's experience in computer searches, data retrieval from computers and related media, and consultations with experts who have been involved in the search of computers and retrieval of data from computer systems, your affiant knows that searching computerized information for evidence or instrumentalities of crime commonly requires investigators to seize all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

3) Peripheral devices, which allow users to enter or retrieve data from the storage devices, vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. An example is a card reader for camera memory storage. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence contained therein. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

4) In order to fully retrieve the data from a computer system, the analyst also needs all magnetic storage devices, individual external storage devices, as well as computing systems sometimes referred to as central processing units (CPU).

In addition, there is probable cause to believe that the computer and its storage mediums, display devices, peripherals, and electronic components are all instrumentalities of the crimes of receipt and possession of child pornography, in violation of law, and shall all be seized.

*Id.* at ECF pp. 35–39.

d.      <u>Resolution of Claim</u>

Galletta has failed to show that Attorneys Meehan, Henry, and Sletvold were ineffective when they did not file a motion to suppress the results of the warrant to search the Phone. Galletta

has not satisfied the prejudice prong of *Strickland* because he has not shown that it was reasonably likely that the evidence from the Phone would have been suppressed if his defense counsel filed a motion to suppress because the warrant contained sufficient information to establish probable cause and, even if it did not, the officers acted in good faith in relying on the warrant to search the Phone. *See, e.g.*, *United States v. Cephas*, Crim. A. No. 08-163, Civ. A. No. 12-6625, 2014 WL 3035603, at *2–3 (E.D. Pa. July 3, 2014) (rejecting section 2255 movant's claim of ineffective assistance of counsel based on counsel's failure to challenge search warrant when movant could not show prejudice because affidavit in support of warrant contained sufficient basis for finding of probable cause).

Regarding probable cause, Galletta claims that the warrant lacked probable cause because the information contained in the warrant about his conversations with Agent Leri did not include discussions about creating, sharing, sending, or enjoying child pornography. The court disagrees. While Galletta attempts to downplay the information in the warrant about child pornography, *see* Am. Br. at 22, that information was sufficient for the magisterial district justice to find probable cause to issue the warrant to search the phone.

The affidavit of probable cause details the communications between Agent Leri and Galletta during which Galletta made several references to his sexual attraction to minors. He asked for a picture of Agent Leri and his two fictitious children. After Galletta agreed to meet with Agent Leri under the premise that Galletta was going to get access to interact with Agent Leri's seven-year-old daughter, he responded to Agent Leri's question about a desire to take pictures of the seven-year-old by indicating that he wanted to take pictures and agreed that he would not post them all over the Internet. There is no possible inference from this information that Galletta was interested in taking pictures of anything or anyone other than the seven-year-old girl. Moreover,

based on Agent Leri and Galletta's communications to that point, it is reasonably inferable from this information that was interested in taking pictures of the girl in a bikini (as he asked Agent Leri to put her in a bikini) or other pictures of her if he was able to entice, persuade, or induce her to engage in unlawful sexual activity with him. Almost all his sexual communications with Agent Leri to that point related to what Galletta wanted to do sexually with the girl, and he thought he was going to get access to interact with the girl.

Galletta also asked Agent Leri whether he should bring a laptop computer with him. While the question about the laptop computer could have been benign, it surely would not have been unreasonable for the magisterial district judge to infer, considering the context of the communications between Galletta and Agent Leri, that Galletta's question about the laptop meant that he was prepared to share child pornography, or much more likely, produce child pornography by using the laptop to record the activities with the seven-year-old girl. The affidavit also stated that Galletta acknowledged using a cellular device to communicate, and law enforcement noticed a cellular device on the front seat of Galletta's vehicle at the time of his arrest.

These facts, and the reasonable inferences from those facts, taken together, along with the deferential review that this court must give to a magistrate judge's probable cause determination, provides a substantial basis to support the magistrate judge's conclusion that probable cause existed to search the Phone for child pornography. At a minimum, Galletta acknowledged wanting to take pictures of the seven-year-old girl, and since law enforcement noticed the Phone in his car, it was reasonable for the magistrate to conclude that the Phone could contain images of child pornography. In addition, as Galletta mentioned bringing a laptop to potentially produce or show child pornography, it was also reasonable for the police to seek out other items of technology that could contain child pornography that were possibly located inside the Saab.

Galletta cites to two cases in support of his assertion that the warrant lacked probable cause, but neither of them is applicable in this case. The first case is *United States v. Pavulak*, 700 F.3d 651 (3d Cir. 2012). *See* Am. Mem. at ECF pp. 20–21. In *Pavulak*, law enforcement obtained search warrants to search the defendant's office and email account based on, *inter alia*, a witness reporting that they saw the defendant "'viewing child pornography' of females 'between 16 and 18 years old'" and another witness reporting that they saw "'images of females between the ages of 12 to 15 years on [the defendant's] computer' that had been sent to [the defendant] via email." 700 F.3d at 656–57. The affidavit, however, "neither defined what was meant by the label 'child pornography' nor provided any further details about the images' content." *Id.* at 657.

The searches of the defendant's office and email account yielded significant incriminating evidence. *See id.* at 657–59. Although the defendant filed a motion to have the district court suppress the evidence obtained during the searches, the district court denied the motion. *See id.* at 659–60. Ultimately, a jury convicted the defendant of several offenses, and the district court sentenced him to an aggregate sentence of life imprisonment. *See id.* at 660. The defendant then filed an appeal, and he asserted that, *inter alia*, the district court erred in denying his motion to suppress because "the affidavit submitted in search of the search-warrant applications did not establish probable cause because it lacked any details about what the alleged images of child pornography depicted." *Id.*

In addressing the defendant's contention, the Third Circuit explained that

[w]hen faced with a warrant application to search for child pornography, a magistrate must be able to independently evaluate whether the contents of the alleged images meet the legal definition of child pornography. *New York v. P.J. Video*, 475 U.S. 868, 874 n. 5, 106 S. Ct. 1610, 89 L. Ed. 2d 871 (1986). That can be accomplished in one of three ways: (1) the magistrate can personally view the images; (2) the search-warrant affidavit can provide a "sufficiently detailed description" of the images; or (3) the search-warrant application can provide some other facts that tie the images' contents to child pornography. *United States v.*

134

> *Miknevich*, 638 F.3d 178, 183 (3d Cir. 2011); *see also United States v. Vosburgh*,
> 602 F.3d 512, 527 (3d Cir. 2010) (holding that probable cause supported a warrant
> where the affidavit tied the images of child pornography to the defendant using his
> IP address, a "fairly unique identifier[ ]").

*Id.* at 660–61 (second alteration in original). The Third Circuit determined that the warrant lacked

sufficient probable cause because the supporting affidavit did not state sufficient information about

what was contained on the images. *See id.* at 661–63. The Third Circuit nonetheless upheld the

search because law enforcement relied upon the warrant in good faith. *See id.* at 663–65.

While this court recognizes that *Pavulak* articulates the applicable law for establishing

probable cause to search for child pornography in many situations, it is inapplicable here because

the facts of this case are so different. Even though there were no exchanges of child pornography

between Galletta and Agent Leri, Galletta clearly expressed his intent to create child pornography

staring Agent Leri's seven-year-old daughter. The affidavit of probable cause also stated that

Galletta admitted to having been arrested before "for the same thing," which, within the context

of the affidavit could have referred to any aspect of what transpired, including when he indicated

a desire to take pictures of the seven-year-old girl in a bikini. At bottom, the court does not interpret

*Pavulak* as providing the only standard for determining probable cause when seeking a warrant to

search for child pornography. In this instance, the affidavit of probable cause provided a substantial

basis for the magistrate's conclusion that there was a fair probability of evidence of child

pornography on Galletta's Phone at the time of the search.

The second case Galletta references, and the one he analogizes to this case, is *Virgin Islands

v. John*, 654 F.3d 412 (3d Cir. 2011). *See* Am. Mem. at ECF pp. 24–25. In *John*, the Virgin Islands

challenged a decision by the Virgin Islands Supreme Court in which the Court concluded that the

good faith exception did not save an otherwise unlawful search due to a lack of probable cause.

*See* 654 F.3d at 415, 417. The Third Circuit agreed with the Virgin Islands Supreme Court, finding

that "the catalogue of the affidavit's 'indicia of probable cause' with respect to child pornography [wa]s completely empty" and, as such, the good faith exclusion did not apply. *Id.* at 418. The Third Circuit explained that

> [t]he Virgin Islands Supreme Court was correct in describing the affidavit as "wholly lacking in probable cause," because "[e]ven a cursory reading of Officer Joseph's affidavit reveals that there is not a single assertion that John was in any way associated with child pornography." 52 V.I. at 263, 262. To be sure, the affidavit provides reason to believe that John had committed sex crimes against his students on school property, and that he kept two particular pieces of evidence of those crimes in his home. But those allegations are not sufficient to establish—or even to hint at—probable cause as to the wholly separate crime of possessing child pornography.
>
> A belief in the existence of probable cause in this case requires believing that a person who has sexually assaulted a child is also likely to collect child pornography. Putting aside for the moment the reasonableness of such an assumed connection, that latter belief is not stated anywhere in Joseph's affidavit. The closest the affidavit comes is the averment that "persons who commit sexual offense crimes involving children customarily hide evidence of such offenses, including notes, photographs, [and] computer files, in their homes and on their computer[s]." But all this statement can be read to allege is that John, who stands accused of sexually abusing children, "customarily hide[s]" evidence of that crime in his home and/or on his computer. It does not allege that an individual in John's position also "customarily hide[s]" evidence of other crimes, in his home or anywhere else. Without such an allegation, it was unreasonable to conclude that there was probable cause to believe that John possessed child pornography.

*Id.* at 419.

Contrary to Galletta's assertion, *John* is not analogous to this case. Although there were no assertions that the defendant was associated with child pornography in the affidavit in *John*, Galletta indicated that he wanted to **make** child pornography in the affidavit of probable cause here. Galletta did not intend to simply interact with and ultimately molest Agent Leri's seven-year-old daughter, he wanted to take pictures of it and of her. The affidavit can also be reasonably read as Galletta having been inclined to make videos of child pornography when he mentioned whether he should bring a laptop. Thus, the link that the Third Circuit found was not present in the affidavit

136

in *John*, namely, the defendant's association with child pornography, was clearly present here because Galletta indicated his intent not just to possess it, but to make it. Therefore, the affidavit contained a substantial basis to support the magistrate judge's conclusion that there was a fair probability of evidence of child pornography on the Phone, which again was in the vehicle he was driving, and it would be a reasonable inference that Galletta would use that cellular phone to take pictures.

Before turning to whether the good faith exception would apply in this case were the court to find that the warrant lacked probable cause, the court must address a few of Galletta's additional arguments.[87] First, Galletta asserts that the warrant did not mention a cell phone or GPS systems among the items to be seized and searched. *See* Original Br. at ECF p. 175. Galletta is incorrect as the warrant states that among the items to be searched for and seized were "[a]ny mobile devices such as cellular phones, PDA's (personal digital assistants), and GPS (global positioning systems), any cables or connections used to charge or connect devices to computers, and any storage cards contained in or that can be utilized in mobile devices." Am. Mem. at ECF p. 34. Second, Galletta claims that the warrant is overbroad and "contains obvious 'cut and paste' statements from a template warrant." Suppl. at ECF pp. 12, 15–16. On this latter assertion, while law enforcement may recite similar statements when preparing an affidavit of probable cause, Galletta has failed to identify what a "template warrant" is, that any information from a separate warrant was used in

---

[87] Because of the nature in which this case has been litigated, meaning Galletta having submitted a voluminous initial *pro se* section 2255 motion and brief, then a supplemental brief, then a counseled amended brief in which counsel essentially added some new claims but incorporated Galletta's *pro se* claims, then a counseled supplemental brief in which counsel did not add any new claims but incorporated all prior claims, then an evidentiary hearing which was mostly Galletta testifying about the nature of his claims, and finally oral argument in which Galletta proceeded *pro se* but with standby counsel, it has been difficult to identify all of Galletta's discrete arguments and claims despite this court endeavoring to do so. This claim of ineffectiveness is emblematic of the issue because Galletta's *pro se* arguments do not correspond with his counsel's arguments.

preparing the affidavit in his case, or even if such information was used, how it would invalidate the warrant.

As for the overbroad argument,

[t]he Fourth Amendment prohibits "[g]eneral warrants" that would allow "exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 479, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)). To guard against such general warrants, courts require "particularity," which "prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196, 48 S. Ct. 74, 72 L. Ed. 231 (1927). Particularity has three components: "First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (citations omitted).

*United States v. Perez*, 712 F. App'x 136, 138–39 (3d Cir. 2017) (alterations in original). Here, the warrant was not overbroad. It stated that, *inter alia*, (1) law enforcement was looking for evidence of child pornography on several devices, including any cellular devices, (2) Galletta had been texting with Agent Leri and law enforcement noticed a cellular device on the front seat of Galletta's vehicle at the time of his arrest, (3) Galletta was accused of violating 18 Pa. C.S. § 6312, which is Pennsylvania's criminal statute pertaining to child pornography. *See* Am. Mem. at ECF pp. 33, 34. Therefore, the warrant authorized the search and seizure of the Phone.

Third, Galletta argues that the search warrant did not incorporate the affidavit of probable cause for the seizure of the Phone. *See* Suppl. at ECF p. 14. While Galletta correctly notes that, unlike the other categories of items sought to be searched and seized, the paragraph mentioning the cell phone does not indicate that the reason for the items to be seized is outlined in the affidavit and incorporated therein by reference. *See* Am. Mem. at ECF p. 34. Nevertheless, the omission of that incorporation statement cannot mean that the affidavit did not provide the reason for searching the Phone and other items. The entire warrant, including the affidavit, is read together, with the

affidavit of probable cause being the only portion of the document where law enforcement will set forth the factual basis for the magistrate judge to determine if there is probable cause to issue the warrant to seize and search the items identified in the warrant. This court has not located a case in which law enforcement is required to explicitly state that the affidavit of probable cause is incorporated into the description of the items to be searched in the warrant.[88] As such, Galletta's argument lacks merit.

Fourth, and finally, Galletta asserts that the affidavit contained an intentional misrepresentation insofar as Agent Leri stated that Galletta acknowledged that he used a cell phone to communicate with him. *See* Suppl. at ECF p. 16; 2255 Hrg. Tr. at 34–35. There are several issues with this claim. First, it was not included as part of his original motion, supplemental brief, or amended motion. Galletta never filed a motion to add it to his amended motion. As such, this claim is waived and not properly before this court.[89] *See Hernandez Portillo v. United States*, No. 07-CR-81, 2014 WL 3615815, at *25 (E.D. Va. July 17, 2014) ("During the evidentiary hearing . . . Petitioner briefly raised a number of arguments that were not raised in the § 2255 Motion and

---

[88] The court recognizes that the principle of incorporating other documents has arisen in the context of the particularity requirement or the scope of the warrant. *See United States v. Hines*, Crim. A. No. 20-421-1, 2022 WL 2159267, at *4 (E.D. Pa. June 14, 2022) ("The particularity requirement—'the touchstone of [the] warrant,' *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir. 2004)—is expressly satisfied by listing items to be seized or expressly incorporating an affidavit that lists such items." (citing *Bartholomew v. Commonwealth of Pa.*, 221 F.3d 425, 428–29 (3d Cir. 2000)). In that context, it is understandable to require explicit language incorporating an additional document about the scope of the search. It is not understandable to impose such a requirement on an affidavit of probable cause, which should always accompany a warrant.

[89] The closest Galletta comes to making this argument, and it really is nowhere close to it, is when he argues in his supplemental brief that

> [t]he government never alleged in the affidavit that the seized cell phone was the cell phone that [he] used to communicate. They simply inserted a statement, 'Galletta acknowledged that he used A [emphasis added] cellular device to communicate. A cellular device was also noted on the front seat of his vehicle at the time of arrest[.]" This statement does not sufficiently connect the cell phone to the alleged criminal activity.

Suppl. at ECF p. 16. Although Galletta undoubtedly attached the transcript of his interview to his supplemental brief, he did not connect that interview to his ineffective assistance of counsel claim pertaining to the failure to file a motion to suppress the results of the search of phone. *See id.* at ECF pp. 12–16.

therefore are not properly before the Court."); *Arbuckle v. United States*, Civ. A. No. 4:10cv632, Crim. A. No. 4:06cr198, 2014 WL 1289418, at *3 (E.D. Tex. Mar. 28, 2014) ("Movant raised the 'forgery' issue for the first time at the evidentiary hearing. He did not raise this issue in his original § 2255 motion. He did not ask the court for leave to raise a new issue. Claims raised for the first time outside of the original motion or without leave of the court in an amended motion, need not be considered by the Court." (citation omitted)).

Second, while Galletta alleges that Agent Leri intentionally misled the magistrate judge, *see* Suppl. at ECF p. 16; 2255 Hrg. Tr. at 35, he has offered no proof in support of this statement.[90] Thus, the extent that Agent Leri's statement was inaccurate, it is equally as likely to have been inadvertence rather than an intentional act.

Third, it is unclear that Agent Leri's statement is inaccurate solely by viewing the transcript of Galletta's post-arrest interview as Galletta would have this court do. The portion of the interview Galletta references indicates as follows:

> [Agent Leri]: Ok. How about that phone number that you were texting me, was that your cell phone number or was that an app?
>
> [Galletta]: An app…
>
> [Agent Leri]: Ok. Do you remember what that number was off hand? Or what the app was?
>
> [Galletta]: Umm, no. I'm sorry.

Suppl. at ECF p. 94. As shown by this excerpt, Agent Leri only asks Galletta about whether he gave Agent Leri his cell phone number during their conversations or whether he had used an app. *See id.* Galletta's response that he used an app, surely cannot be interpreted as Galletta having told

---

[90] Pursuant to *Franks v. Delaware*, the Fourth Amendment entitles a defendant is entitled to an evidentiary hearing if they "make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." 438 U.S. 154, 155–56 (1978).

Agent Leri that he used another device to communicate as the Phone also had apps on it. *See, e.g.*, Day One Tr. at 92 (testimony by Agent Leri that Phone had Pinger app). Thus, it would not have been unreasonable for Agent Leri, who had been communicating with Galletta all the way up to the final meeting location, to have interpreted Galletta's statement, in conjunction with Galletta being arrested in a car with the Phone in it, as Galletta having stated that he used an app on the Phone to communicate with him, instead of the cell phone's actual phone number.

Finally, even if Agent Leri's statement was inaccurate, the removal of that statement from the affidavit does not negate the magistrate judge's finding of probable cause as the affidavit contained sufficient information linking the cellular device found in Galletta's car to his alleged criminal activity. *See Franks*, 438 U.S. at 156 (explaining that if defendant shows at evidentiary hearing that perjurious or recklessly false statement was included in affidavit, court will have to examine whether, without said statement, affidavit still established probable cause; if not, search warrant is invalid, and fruits of that search excluded). The affidavit explained about how Galletta had been texting with Agent Leri, Galletta expressed a desire to take pictures of the seven-year-old girl, and a cellular phone was observed on a seat in Galletta's vehicle. It was not a stretch for the magistrate judge to conclude that there was probable cause to believe that there was evidence of criminal activity on the Phone, even without the statement about Galletta using a cell phone to communicate with Agent Leri. Accordingly, this challenge to the warrant would have also been unsuccessful.

Thus far, Galletta has failed to show that he was prejudiced because his defense counsel did not file a motion to suppress the results of the search of the Phone because the affidavit established probable cause to search the Phone. He has also not raised any other meritorious specific challenge to the warrant. Nevertheless, the court will presume that Galletta could show

that there was not a substantial basis for the magistrate judge to conclude that probable cause existed to search the Phone. If this occurred, Galletta still has failed to show prejudice under *Strickland* because the officers relied on the warrant in good faith.

To "effectuate the Fourth Amendment right of all citizens to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" the Supreme Court adopted the exclusionary rule, which provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citations and internal quotation marks omitted). "This prohibition applies as well to the fruits of the illegally seized evidence." *Id.* (citations omitted). Courts apply the exclusionary rule

> "only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule" to ward against unreasonable searches and seizures by law enforcement. *United States v. Leon*, 468 U.S. 897, 918 (1984). Courts must perform a "rigorous" test to measure the "deterrence benefits of exclusion" against "substantial social costs." *Davis v. United States*, 564 U.S. 229, 237–38 (2011).
>
> The good faith exception buttresses this test. The good faith exception prevents suppression of evidence when the executing officers acted in "good faith" or "objectively reasonable reliance" on a "subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. Thus, in instances where an officer acted illegally but "in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment.... [the exclusionary rule] should not be applied[ ] to deter objectively reasonable law enforcement activity." *Id.* at 918-19. Further, the exclusionary rule is only implemented when law enforcement conduct is "deliberate, reckless, or grossly negligent." *Herring v. United States*, 555 U.S. 135, 144 (2009).
>
> Accordingly, the test to determine if the good faith exception applies is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23; *see also United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999). "[A]ny defects in the warrant" and "the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known" are both evaluated by courts. *United States v. Franz*, 772 F.3d 134, 147 (3d Cir. 2014). Courts must recognize that law enforcement officers do not have an expert grip on the law and are not "expected to question the magistrate's probable-cause determination." *Leon*, 468 U.S. at 921.

*See also Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986) ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable." (internal quotation marks and citation omitted)).

There are four instances, however, where the good faith exception does not apply:

(1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;

(3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010).

*United States v. Henry*, No. 21-3254, 2023 WL 2770817, at *2–3 (3d Cir. Apr. 4, 2023) (internal footnote omitted) (alterations in original).

While somewhat unclear, it appears that Galletta relies on the third instance/exception to the good faith rule, namely that "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Tracey*, 597 F.3d at 151; *see* Am. Mem. at ECF pp. 27–28 (arguing that case was "practically indistinguishable" to *John*, and pointing out that defendant in *John* had argued that third instance to good faith exception applied); Original Br. at ECF pp. 178–79 (referencing good faith exception and arguing that warrant was not supported by probable cause). Presuming that Galletta is relying on the third exception,

[t]he standard to establish th[is] exception to the good faith rule "is a high one." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012). The burden is on the

defendant to show that the magistrate judge made an error "so obvious that a law enforcement officer, without legal training, should have realized, upon reading the warrant, that it was invalid and should thus have declined to execute it." [*92,422.57*, 307 F.3d at 146.]

*Henry*, 2023 WL 2770817, at *3.

Here, Galletta falls far short of the high standard to satisfy this exception. The affidavit in support of the warrant to search the Phone "is not a 'bare bones' affidavit. It does not rely on an officer's unsupported belief that probable cause exists[,] . . . on a single piece of stale evidence[, or] . . . an uncorroborated or unreliable anonymous tip." *Pavulak*, 700 F.3d at 664 (internal citations omitted). Instead, the affiant reported information that was provided to them by Agent Leri, who had personally conducted the undercover investigation on Galletta, which included communicating with him, arresting him, and questioning him at the police station. *See* Am. Mem. at ECF pp. 33–39. The affidavit also included Galletta's criminal history, his statement about being previously arrested for "the same thing," and the connection of a cellular device to Galletta. *See id.* at ECF pp. 35–39. Further, law enforcement sought the warrant to search the Phone on the same day as Galletta's arrest. *See id.* at ECF p. 33. Overall, the affidavit contained a basis for believing that the Phone contained evidence of child pornography. Therefore, Galletta has failed to satisfy his burden to show that the magistrate judge made an error "so obvious" that the affiant would have known the warrant was invalid "without legal training." *92,422.57*, 307 F.3d at 146. Accordingly, as Galletta has not demonstrated that the warrant was not supported by probable cause, that any of his specific challenges to the warrant have merit, and that the good faith rule would not apply even if there was a concern about probable cause, he has not met his burden to show prejudice under *Strickland* and this ineffective assistance of counsel claim fails as well.

**6.      Ineffective Assistance of Counsel for Failing to File a Motion to Suppress the Search Warrant for Galletta's Email**

a.      The Parties' Arguments

Galletta asserts that his defense counsel were ineffective for failing to file a motion to suppress the search warrant for his email at chrisdouglas775@gmail.com for four reasons.[91] *See* Original Mot. at ECF p. 42; Original Br. at ECF pp. 185–210; Suppl. at ECF pp. 16–20, 46–70; 2255 Hrg. Tr. at 39–46, 71–72. First, Galletta believes that counsel should have filed a motion to suppress because there was a lack of probable cause to search his email. *See* Original Br. at ECF pp. 186–95. Galletta states that the affidavit of probable cause contained a "third[-]party description" of an image discovered from an email he allegedly sent to "RK" on March 17, 2014. *See id.* at ECF pp. 186–87. This description indicated that the image "depict[ed] a girl around 10 years old, provocatively laying on her side on a bed wearing panties, her legs slightly spread exposing part of her genital area." *Id.* Galletta contends that the image was not illegal and not child pornography; as such, it would not have provided probable cause to search his email for evidence of child pornography. *See id.* at ECF p. 187. Galletta claims that "[t]his particular image was obtained using a standard Google image search" and "could only be obtained by Google if the image did not possess a NCMEC hash value identifying it as an illegal image." *Id.* (citing to 18 U.S.C. § 2258A and purportedly referencing "Google reporting requirements circa 2008"). He also claims that Google would have reported the image if it believed it was child pornography. *See id.* Based on his assessment of this image, he argues that "the government used a deliberately misleading description of a presumptively First Amendment protected image as probable cause to generally rummage through the entirety of [his] email account." *Id.* He also claims that Detective

---

[91] The government's response in opposition to this claim is joined with its response to Galletta's ineffective assistance of counsel claim regarding the failure to move to suppress the results of the search of the Phone. *See* Gov't's 1st Br. at 23–25.

Joseph Walsh of the Delaware County Police Department had been investigating the "RK" case for months and "did NOT feel that the 'provocative' image justified probable cause to obtain a search warrant to search [Galletta's] email account." *Id.* at ECF p. 188.

Galletta goes on to allege that neither the affiant for the warrant, Agent Smith, nor the magistrate judge viewed the image alleged to be child pornography. *See id.* at ECF p. 189. He also points out that Agent Smith indicated in the affidavit that Galletta violated sections 2422(b) and 2252(a)(4)(B), neither of which Galletta believes would apply to the March 17, 2014 image. *See id.* at ECF p. 190. Galletta also questions why the magistrate judge did not question Agent Smith's placement of a third statute, section 2251 (relating to the production of child pornography), despite alleging that only two statutes were violated. *See id.* Galletta also believes that the affidavit did not allege probable cause to believe he violated section 2251. *See id.*

Galletta asserts that Agent's Smith showed "reckless disregard for the truth" and included "deliberate falsehoods" in the affidavit when "he copied and pasted investigative information from other agencies or third parties without confirming their truths." *Id.* Galletta claims that the March 17, 2014 image is actually "of a girl fully clothed wearing a T-shirt and shorts and is presumptively a First Amendment protected image." *Id.* at ECF p. 191. He also claims that Agent Smith falsely stated in the affidavit that "several [images] depicting child pornography were found on the [Phone.]" *Id.* at ECF pp. 193. Galletta asserts that Agent Leri testified at trial that no images of child pornography existed on the Phone because they had all been deleted. *See id.* at ECF pp. 193–94 (citing Day One Tr. at 136).[92] Due to Agent Smith's purportedly deliberate misrepresentations in the affidavit, Galletta believes that defense counsel should have filed a motion requesting a

---

[92] Galletta appears to be deliberately misrepresenting the evidence introduced at trial here because even though Agent Leri did testify that the images of child pornography had been deleted, thumbnails of the images remained on the Phone due to Galletta having previously downloaded or saved them to the Phone. *See* Day One Tr. at 103–09; Gov't's Exs. 9–11.

*Franks* hearing. *See id.* at ECF pp. 188, 190. He also argues that defense counsel should have challenged Agent Smith's references to the images found on the Phone as being child pornography without fully describing or viewing those images. *See id.* at ECF p. 194. He further denies that the affidavit connected those images to his email account. *See id.* at ECF pp. 194–95.

Second, Galletta argues that his counsel should have challenged the warrant because it was overbroad. *See id.* at ECF pp. 195–200; Suppl. at ECF pp. 16–20. Galletta contends that the search should have been limited to searching for emails during the period Galletta's offenses occurred, namely, July 22–23, 2014. *See* Original Br. at ECF pp. 195–97; Suppl. at ECF p. 19. Instead of being limited to that range, Galletta indicates that the warrant sought to search the entire contents of his email. *See id.* Galletta also contends that even if the court were to consider the search of his entire email sufficiently particular, there was no probable cause to search for child pornography because the emails related to his alleged violations of section 2422(b). *See id.* at ECF p. 197.

Third, Galletta claims that if defense counsel had challenged the warrant, the court would not have found that the good faith exception to the exclusionary rule applied and would have suppressed the results of the search of his email. *See* Original Br. at ECF pp. 220–21. In particular, he believes that Agent Smith, as a well-trained FBI agent, should have known that the warrant was illegal. *See id.* He also appears to assert that the good faith exception would not apply because (1) the magistrate judge abdicated their impartial role by "failing to read the affidavit and question the sufficiency of the probable cause before signing it" and (2) there was a complete lack of probable cause. *See id.* at ECF pp. 204, 208–09.

Finally, Galletta argues that Attorney Sletvold should have challenged the warrant because out-of-district warrants violate the United States Constitution. *See* Suppl. at ECF pp. 46–70. He appears to contend that, *inter alia*, Congress exceeded its authority when it passed the Patriot Act

and changed the definition of a court of competent jurisdiction to include a state judge because it "permit[s] a State to invade the sovereignty of another state by serving process, such as a search warrant for an email account in northern California." *Id.* at ECF pp. 46, 56.

b.    <u>Resolution of Claim</u>

Having identified Galletta's numerous challenges to the warrant to search his email address, he has completely failed to support his challenges with any evidence. On the less-significant evidence front, Galletta has provided no evidentiary support for his representations that (1) the March 17, 2014 image was obtained through a Google search, (2) Google's reporting requirements "circa 2008," (3) Detective Walsh conducted a multi-month investigation into "RK" and did not believe that the image was of child pornography and, as such, did not seek a search warrant for Galletta's email address, (4) the image was "of a girl fully clothed wearing a T-shirt and shorts and is presumptively a First Amendment protected image,"[93] and (5) "[n]either the governor of California nor a Magistrate in the Northern District of California consented to a search in their district." *Id.* at ECF pp. 187–88, 191; Suppl. at ECF p. 68. On the highly-significant evidence front, Galletta has not submitted the warrant itself. He did not attach it (despite attaching other documents) to his 367-page original motion and brief, his 136-page supplement, his first counsel's amended section 2255 motion and supporting brief, and his second counsel's supplemental brief.[94] He neither introduced it into evidence at the evidentiary hearing, nor attempted to do so at the oral argument in which he argued on his own behalf.[95] Without that

---

[93] Galletta appears to forget that the jury determined that this image constituted child pornography, and he has never argued that Attorney Sletvold should have challenged the jury's determination that it was on direct appeal. So, even if the minor was fully clothed as Galletta asserts, the jury still found it to be child pornography for reasons he is not mentioning here. *See* Day Two Tr. at 115–16 (describing image for jury as part of government's closing argument).

[94] In the government's first brief in response to the original *pro se* section 2255 motion and other motions Galletta had filed, it stated that it had attached "all pertinent search warrants" as Attachment A. Gov't's 1st Br. at 25. There is no Attachment A to the brief.

[95] During that same argument, he asked if the court wanted a copy of the warrant to search the Phone and provided the court with a copy of it. He did not ask the same question to the court when moving on to his argument in support

warrant or even testimony from Galletta's former defense counsel, this court cannot assess whether counsel were ineffective for failing to file a motion to suppress the results of the search of his email. Galletta's allegations about the information contained in the warrant are merely hearsay statements with no indicia of reliability, as are his statements about who issued the warrant and where it was served. At bottom, it was Galletta's burden to prove that his defense counsel was ineffective, and he has failed to do so. *See United States v. Fritz*, 643 F. App'x 192, 194 (3d Cir. 2016) ("To establish a constitutional violation for ineffective assistance of counsel, a defendant has the burden to show that his counsel's representation both 'fell below an objective standard of reasonableness' and 'prejudice the defense.'" (quoting *Strickland*, 466 U.S. at 687–88)); *see also Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 (3d Cir. 1991) ("Zettlemoyer cannot meet his burden to show that counsel made errors so serious that his representation fell below an objective standard of reasonableness based on vague and conclusory allegations that some unspecified and speculative testimony might have established his defense. Rather, he must set forth facts to support his contention." (citations omitted)).

### 7.    Ineffective Assistance of Counsel for Failing to Notify Galletta that Under *Anders v. California*, 386 U.S. 738 (1967), He Had a Right to File His Own Supplemental Appellate Brief to Raise Any Nonfrivolous Claims

#### a.    The Parties' Arguments

Galletta asserts that Attorney Sletvold was ineffective for failing to inform him that he had a right to file his own supplemental appellate brief to raise any nonfrivolous claims pursuant to *Anders v. California*, 386 U.S. 738 (1967). *See* Original Mot. at ECF pp. 42–43; Original Br. at ECF pp. 211–17; 2255 Hrg. Tr. at 46–47. Galletta claims that he had informed Attorney Sletvold

---

of his ineffective assistance of counsel claim pertaining to the search of his email address. Even if he did, without an oral or written motion to supplement the record, the court would not have been able to consider the warrant as evidence, although it would have allowed the court to possibly address Galletta's arguments hypothetically as if he had submitted the warrant as evidence.

that he should not file any direct appeal until he conferred with Galletta, which would have allowed Galletta to confirm that all claims that he wanted to raise on appeal were included. *See* Original Br. at ECF p. 211. Once Galletta found out that Attorney Sletvold had not raised all the claims Galletta wanted to raise on appeal, he filed a *pro se* motion with the Third Circuit in which he wanted to amend his appeal or compel Attorney Sletvold to file an *Anders* brief.[96] *See id.* As for the claims Galletta wanted to include as part of his appeal, he alleges that he wanted to: (1) challenge the imposition of the $10,000 fine; (2) argue that the government had constructively amended count one of the superseding indictment through its arguments, evidence presented, and proposed jury instructions; (3) raise a claim of plain error regarding "the variance of the elements required to be proven under count one"; (4) this court's refusal to recuse under 28 U.S.C. §§ 144, 455(a), (b)(1); and (5) this court's "refus[al] to conduct a proper voir dire to consider the ex parte letter from [Galletta] seeking recusal" as the letter "qualifies as an affidavit."[97] *Id.* at ECF pp. 212– 13.

---

[96] The court reviewed the Third Circuit docket relating to Galletta's direct appeal, and it appears that after Attorney Sletvold filed an appellate brief, Galletta filed a *pro se* motion for the appointment of new counsel. *See* Docket, *United States v. Galletta*, No. 15-4018 (3d Cir.). The Third Circuit denied the motion on August 25, 2016, because

> [i]t is the Court's practice that trial counsel whether retained or appointed continue on appeal absent extraordinary circumstances. 3rd Cir. LAR Misc. 109.1. It is noted that "extraordinary" circumstances require more than a conflict as to strategy or tactics and may not be based on allegations that counsel has been ineffective unless the District Court has made a determination concerning ineffective assistance. Moreover, claims of ineffective assistance of counsel are generally not reviewable on direct appeal. *U.S. v. Thornton*, 327 F.3d 268 (3d Cir. 2003).

Order, *United States v. Galletta*, No. 15-4018 (3d Cir. Aug. 25, 2016).
    It appears that the clerk of court for the Third Circuit docketed a *pro se* "Motion to Supplement Appeal" from Galletta on November 7, 2016. Docket, *United States v. Galletta*, No. 15-4018 (3d Cir.). The Third Circuit entered an order on November 8, 2016, in which it stated that "[n]o action w[ould] be taken on the . . . pro se motion as [Galletta] is represented by counsel in the appeal. Pro se motions and pro se briefs are prohibited. *See* 3d Cir. LAR 27.8, 3d Cir. LAR 31.3. In accordance with the Court's rules, the motion will be forwarded to counsel for whatever action counsel deems appropriate." Order, *United States v. Galletta*, No. 15-4018 (3d Cir. Nov. 8, 2016).
[97] The court notes that other than the recusal claim, Galletta did not identify the other claims he purportedly wanted to raise in his *pro se* submissions to the Third Circuit. *See* Mot. for Appointment of New Counsel, *United States v. Galletta*, No. 15-4018 (3d Cir.); Mot. to Suppl. Appeal and Correct Sentence, *United States v. Galletta*, No. 15-4018 (3d Cir.).

As for prejudice, Galletta alleges that he was prejudiced because he did not have all the claims he wanted to raise addressed by the Third Circuit. *See id.* at ECF p. 213. Also, if Attorney Sletvold had informed Galletta about his ability to file an *Anders* brief, Galletta states that he "would have absolutely argued for [the aforementioned] claims and would have submitted a pro se appellate brief." *Id.*; *see id.* at ECF p. 216. He believes that

> plain error review by the Third Circuit Court of Appeals would have agreed with [his] claims and permitted them to be considered under direct review. Plain error review by the appeals court would have ruled that the constructive amendment to count one of the indictment was unconstitutional and violated [his] right to due process and vacated the conviction. Plain error review by the appeals court would have ruled that the variance to count one of the indictment was fatal and violated [his] constitutional right to Due Process and the guaranteed protection against double jeopardy. Plain error review by the appeals court would have ruled that [this court's] refusing to recuse was a structural error that would have required automatic reversal of the conviction. Any one of these claims would have prevailed under direct review and would have vacated the conviction requiring the case to be remanded back to the district course for further consideration.

*Id.* at ECF pp. 216–17.

In response to Galletta's claim, the government argues that Attorney Sletvold was not ineffective because he was not obligated to "present *pro se* issues when presenting the issues [he] deem[ed] worthy." Gov't's 1st Br. at 25. The government also points out that the Third Circuit will not accept *pro se* submissions when the litigant is represented by counsel. *See id.* (citing *United States v. Turner*, 677 F.3d 570 (3d Cir. 2012)).

### b.    Resolution of Claim

Galletta has not demonstrated that Attorney Sletvold was ineffective because Galletta has misinterpreted *Anders*. "In *Anders*, the Supreme Court clarified what counsel must do in order to withdraw from representing a criminal defendant while still satisfying '[t]he constitutional requirement of substantial equality and fair process.'" *United States v. Langley*, 52 F.4th 564, 569 (3d Cir. 2022) (alteration in original) (quoting *Anders*, 386 U.S. at 744). The Court determined

that "for counsel to withdraw from representation while still comporting with the constitutional requirement that an indigent defendant be provided representation, counsel must satisfy the court that [they have] conducted a 'conscientious investigation' and '[have] diligently investigated the possible grounds of appeal.'" *Id.* at 569–70 (quoting *Anders*, 386 U.S. at 741–42). To do so, counsel must file "a brief referring to anything in the record that might arguably support the appeal." *Id.* at 570 (quoting *Anders*, 386 U.S. at 744).[98]

*Anders* only comes into play if counsel, after a "conscientious examination" of the case finds it "to be **wholly** frivolous." 386 U.S. at 744. At that point, counsel

> should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court—not counsel—then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if [the] law so requires. On the other hand, if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal.

*Id.*

Here, Galletta ignores the requirement that counsel find an appeal to be "wholly frivolous," *id.*, before *Anders* comes into play. At no point in *Anders* does the Court indicate that a litigant can file a *pro se* supplemental brief simply because the litigant is unhappy with the issues counsel raised on appeal. To the contrary, as the Third Circuit explained to Galletta in its denial of one of his *pro se* motions, a litigant represented by counsel on appeal has no right to file a *pro se*

---

[98] After *Anders*, the Court "provided additional guidance of what is expected of counsel to demonstrate a 'conscientious examination' of the record." *Langley*, 52 F.4th at 170. For instance, counsel is obligated under *Anders* to "provide 'a thorough review of the record and a discussion of the strongest arguments revealed by that review.'" *Id.* (quoting *McCoy v. Ct. of Appeals of Wisc., Dist. 1*, 486 U.S. 429, 444 (1988)). Also, "the Court emphasized that counsel's *Anders* brief 'serves the valuable purpose of assisting the court in determining both that counsel in fact conducted the required detailed review of the case and that the appeal is indeed so frivolous that it may be decided without an adversary presentation.'" *Id.* (quoting *Penson v. Ohio*, 488 U.S. 75, 81–82 (1988)).

supplemental brief even if they are unhappy with their counsel's representation of them on appeal. *See* Order, *United States v. Galletta*, No. 15-4018 (3d Cir. Nov. 8, 2016).[99]

In addition, as the Third Circuit explained in *Turner*, *Anders* does not permit counsel to file a supplemental brief raising issues that the client wants to raise, but counsel deem to be frivolous, when counsel has not sought leave to withdraw and has asserted claims that counsel believed were potentially meritorious. 677 F.3d at 576–79. In *Turner*, a criminal defendant's appellate counsel filed a "quasi-*Anders*" brief raising several arguments that the defendant wanted counsel to raise on appeal, but also explaining why counsel believed the additional arguments were frivolous. *Id.* at 576. The Third Circuit concluded that "[a]lthough we have no doubt that [the quasi-*Anders* brief] was well-intentioned and counsel were no doubt perplexed as to what to do, the brief was improper." *Id.*

---

[99] The Third Circuit fully addressed this issue in *United States v. Turner*, 677 F.3d 570 (3d Cir. 2012). In *Turner*, the Third Circuit rejected the "invitation" to consider an appellant's *pro se* filings when the appellant was represented by counsel because *pro se* litigants do not have a right to hybrid representation and the Third Circuit's Local Rules prohibit parties represented by counsel to file *pro se* briefs. 677 F.3d at 578. The Third Circuit explained that

> [b]y requiring that briefs be filed only by counsel, we ensure that counsel and client speak with one voice. When a client seeks to raise additional issues, counsel must evaluate them and present only the meritorious ones, rather than simply seeking leave for the client to file a supplemental brief. This promotes effective advocacy because it prevents counsel from allowing frivolous arguments to be made by the client.

*Id.* at 579 (citing *Jones v. Barnes*, 463 U.S. 745, 751–53 (1983)). The Third Circuit also pointed out that allowing represented parties to file *pro se* briefs would require their adversaries "to respond on two distinct fronts," and even "[a]part from the procedural morass that would follow such 'hybrid' advocacy (as occurred in this case), our attention would be diverted from potentially meritorious arguments." *Id.*

Based on this rationale, the Third Circuit held that

> except in cases governed by *Anders*, parties represented by counsel may not file pro se briefs. When such briefs are filed nonetheless, the Clerk will refer them to the putative pro se litigant's counsel. At that point, counsel may (1) include the client's pro se arguments in their own briefs or (2) in the appropriate and unusual case, seek leave to file a separate, supplemental brief drafted by counsel that advances arguments raised by the client. Of course, such briefs should make only those arguments counsel believe, consistent with their ethical duty, to be meritorious.

*Id.*

While discussing why the quasi-*Anders* brief was improper, the Third Circuit explained

that the Pennsylvania Rules of Professional Conduct provide that a client disagreeing with their

counsel can seek to resolve the disagreement by discharging counsel. *See id.* (citing Pennsylvania

Rule of Processional Conduct 1.2 cmt. 2). The Third Circuit also explained that

> [t]he Rules do not require anything like a "quasi-Anders brief." *Id.* To the contrary,
> they state that a "lawyer is not bound ... to press for every advantage that might be
> realized for a client. For example, a lawyer may have authority to exercise
> professional discretion in determining the means by which a matter should be
> pursued." *Id.* at 1.3 cmt. 1. Moreover, the lawyer "shall not ... assert or controvert
> an issue ... unless there is a basis in law and fact for doing so that is not frivolous."
> *Id.* at 3.1. This basic rule accords with the Supreme Court's admonition that "[a]n
> attorney, whether appointed or paid, is ... under an ethical obligation to refuse to
> prosecute a frivolous appeal." *McCoy v. Court of Appeals of Wis., Dist. 1*, 486 U.S.
> 429, 436, 108 S. Ct. 1895, 100 L. Ed. 2d 440 (1988). Stated simply, counsel need
> not, and should not, present frivolous arguments merely because a client instructs
> them to do so.

*Turner*, 677 F.3d at 577 (all alterations other than first alteration in original).

The Third Circuit then pointed out that "*Anders* briefs ensure that constitutional rights are

protected; they are not an opportunity to brief issues that would otherwise be unacceptable. By

filing an *Anders* brief without seeking to withdraw, counsel have presented issues to the Court that

need not have been raised." *Id.* (citations omitted). Further, the Third Circuit noted the important

function that counsel provide by using their professional judgment in choosing the claims that are

most likely to succeed on appeal. *See id.* at 577–78. Therefore, counsel are under no obligation to

raise or identify for the circuit court the arguments the defendant wants to raise, even if they are

not frivolous, when counsel use their professional judgment to identify potentially meritorious

issues. *See id.* at 578.

As shown above, *Turner* forecloses any argument that Galletta had a right to file a

supplemental brief pursuant to *Anders* or that Attorney Sletvold was somehow obligated to raise

issues on appeal simply because Galletta wanted to raise them. Thus, Attorney Sletvold's conduct

could not be objectively unreasonable in purportedly failing to inform Galletta of a right he did not have. Moreover, Galletta cannot show that he was prejudiced because the Third Circuit would have never accepted Galletta's *pro se* supplemental brief, as he learned when trying to submit *pro se* motions. Accordingly, Galletta is not entitled to relief on this claim.

**8.    Ineffective Assistance of Counsel for Failing to Challenge Imposition of $10,000 Fine**

a.    Galletta's Arguments

Galletta asserts that Attorney Sletvold was ineffective for failing to challenge the court's imposition of a $10,000 fine at the time of sentencing.[100] *See* Original Mot. at ECF p. 43; Original Br. at ECF pp. 218–21. He contends that he told Attorney Sletvold that he wanted to present "mitigating evidence to the court to show that [he] was unable to pay the fine." Original Br. at ECF p. 219. He claims Attorney Sletvold should have informed the court that he could not pay the $10,000 fine because he did not have "any expected earnings" and was receiving a 50-year sentence, "which equates to the balance of [his] natural life." *Id.* at ECF pp. 218, 219.

Regarding prejudice, Galletta alleges that if Attorney Sletvold presented evidence concerning his inability to pay the fine, "the court would have removed or modified the amount of the fine." *Id.* at 221. Also, because Attorney Sletvold failed to present any mitigating evidence of Galletta's inability to pay, Galletta believes that he "continues to [be] hamper[ed] . . . in his ability to adequately press his case for pro se post conviction proceedings." *Id.*

Interestingly, Galletta acknowledges that such a challenge is usually not cognizable as part of a section 2255 motion. *See id.* Nevertheless, he contends that it "might be an abuse of judicial discretion for the district court not to consider this claim and construe an avenue of relief." *Id.* (citing *United States v. McNeil*, 561 F. App'x 162 (3d Cir. 2014)). If this court does not consider

---

[100] The government did not address this claim in either of its responses to Galletta's motions.

the claim, Galletta asserts that he would have "no other option than to present this claim to the Supreme [C]ourt for a gap in the law as there would never be an avenue to relief." *Id.*

b.    Resolution of Claim

As Galletta recognizes, challenging the imposition of a fine is generally not a proper ground for relief in a section 2255 motion because "the monetary component of a sentence is not capable of satisfying the 'in custody' requirement of federal habeas statutes." *United States v. Ross*, 801 F.3d 374, 380 (3d Cir. 2015); *see Obado v. New Jersey*, 328 F.3d 716, 718 (3d Cir. 2003) (per curiam) ("The payment of restitution or a fine, absent more, is not the sort of 'significant restraint on liberty' contemplated in the 'custody' requirement of the federal habeas corpus statutes."); *see also Ryan v. United States*, 688 F.3d 845, 849 (7th Cir. 2012) ("A collateral attack under § 2241, § 2254, or § 2255 contests only custody . . . and not fines or special assessments."); *United States v. Chacon-Vega*, 262 F. App'x 730, 731 (8th Cir. 2008) (per curiam) ("[A] challenge to the imposition of a fine is not cognizable in a 28 U.S.C. § 2255 proceeding."); *United States v. Watroba*, 56 F.3d 28, 29 (6th Cir. 1995) (concluding that section 2255 movant could not challenge imposition of fine and supervised release in section 2255 motion); *United States v. Segler*, 37 F.3d 1131, 1135–36 (5th Cir. 1994) ("The 'propriety of a fine is a matter relative to sentencing and should have been raised on direct appeal and not for the first time in a § 2255 proceeding.'" (quoting *United States v. Davis*, 8 F.3d 23 (5th Cir. 1993) (unpublished table decision))). In addition, a section 2255 movant seeking a challenge to a fine through an ineffective assistance of counsel claim would not save the claim. *See Kolasinac v. United States*, Civ. A. No. 13-1397, 2016 WL 1382145, at *5 (D.N.J. Apr. 7, 2016) (explaining that even if a section 2255 "claim challenging the fine or restitution order is presented as an ineffective assistance of counsel claim[] does not change th[e] result" that it is not cognizable as part of section 2255 motion); *see also United States*

*v. Tonagbanua*, 706 F. App'x 744, 756 (3d Cir. 2017) (per curiam) ("[A] restitution order cannot be challenged in a § 2255 motion, either directly or indirectly through a claim of ineffective assistance of counsel."). Moreover, "[a] claim challenging a fine or restitution order likewise does not become cognizable simply because it is included within a petition which does present cognizable claims challenging an inmate's physical custody." *Kolasinac*, 2016 WL 1382145, at *4 (citations omitted); *see also Kaminski v. United States*, 339 F.3d 84, 89 (2d Cir. 2003) ("Habeas lies to allow attacks on wrongful custodies. There is therefore no reason why the presence of a plausible claim against a custodial punishment should make a noncustodial punishment more amenable to collateral review than it otherwise might be. . . . Collateral relief from noncustodial punishments is not made more readily available to a petitioner just because that petitioner happens at the time to be subject also to custodial penalties. And the mere fact that the sentencing court chose to impose incarceration on a defendant in addition to restitution does not, as to the restitution order, distinguish that defendant from someone who, having been convicted, received a punishment that did not include any custodial element."). Therefore, Galletta's claim that Attorney Sletvold was ineffective for failing to challenge the imposition of a $10,000 fine is not cognizable as part of the instant motion. *See Kolasinac*, 2016 WL 1382145, at *5 ("As Petitioner's claim that his counsel failed to argue his inability to pay a fine addresses only the fine imposed and does not challenge Petitioner's custody, that claim is not cognizable under § 2255, and as such must be denied, regardless of the fact that it is couched as an ineffective assistance of counsel claim and despite the presence of cognizable challenges to Petitioner's physical custody presented in his § 2255 motion." (citations omitted)).

Even if Galletta's ineffectiveness claim was cognizable as part of his amended section 2255 motion, he has not shown that Attorney Sletvold was ineffective because he has not demonstrated

prejudice.[101] Regarding the imposition of a fine generally, "[a] defendant who has been found guilty of an offense may be sentenced to pay a fine." 18 U.S.C. § 3571(a). For an individual like Galletta, who was convicted of three felonies, the maximum fine the court could impose for each offense was $250,000.[102] *See id.* § 3571(b)(3) ("Except as provided in subsection (e) of this section, an individual who has been found guilty of an offense may be fined not more than the greatest of . . . (3) for a felony, not more than $250,000 . . . ."). Further, when

> determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine, the court shall consider, in addition to the factors set forth in section 3553(a)--
>
> **(1)** the defendant's income, earning capacity, and financial resources;
>
> **(2)** the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose;
>
> **(3)** any pecuniary loss inflicted upon others as a result of the offense;
>
> **(4)** whether restitution is ordered or made and the amount of such restitution;
>
> **(5)** the need to deprive the defendant of illegally obtained gains from the offense;
>
> **(6)** the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence; [and]
>
> **(7)** whether the defendant can pass on to consumers or other persons the expense of the fine . . . .

18 U.S.C. § 3572(a)(1)–(7).[103]

---

[101] Once again, the court is faced with a situation where Attorney Sletvold did not testify about the fine. As such, the court cannot assess the reasonableness of Attorney Sletvold's conduct during sentencing and on appeal by considering his reasoning for proceeding in the manner he did. The court also lacked any testimony from Galletta or Attorney Sletvold about whether Galletta ever informed Attorney Sletvold that he wanted to challenge the $10,000 fine.

[102] Although Galletta's presentence report was not admitted into the record as evidence in this case, the court notes that it stated that the guideline range for Galletta's fine as to each offense was $25,000 to $250,000, by referencing U.S.S.G. § 5E1.2(c)(3).

[103] There is an eighth factor only applicable to organizations, which the court has omitted here. *See* 18 U.S.C. § 3572(a)(8) (requiring court to consider, "if the defendant is an organization, the size of the organization and any

Here, Galletta's entire claim is premised on his purported inability to pay any fine. The court recognizes that the Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). As evident from this language, "[t]he defendant has the burden of proving [their] inability to pay." *United States v. Torres*, 209 F.3d 308, 312 (3d Cir. 2000). To do so, the defendant must "com[e] forward with evidence from which the [district court] could find it more likely than not that any fine would remain unpaid." *United States v. Kadonsky*, 242 F.3d 516, 520 (3d Cir. 2001). "The defendant may meet that burden by an independent showing or by reference to the [presentence report]. If the defendant comes forward with such evidence, the Court may not impose a fine without making findings concerning the defendant's ability to pay it." *Id.* (internal citations and quotation marks omitted).

Galletta has failed to demonstrate that he could have shown the court that he was unable to pay any fine at the time of sentencing or as part of these section 2255 proceedings. Prior to sentencing, the United States Probation Officer recommended in the presentence report that the court impose a $10,000 fine. During the sentencing hearing, Attorney Sletvold indicated that he had sufficient time to review the report with Galletta. *See* Tr. of Dec. 4, 2015 Sentencing Hrg. ("Sentencing Tr.") at 4, Doc. No. 91. Neither Attorney Sletvold nor Galletta raised any objection to the recommendation of a $10,000 fine, despite objecting to other aspects of the presentence report. *See id.* at 6–35. Galletta also had the opportunity to address the fine or anything else in his case at the time of sentencing and chose not to speak on his own behalf. *See id.* at 42.

In these section 2255 proceedings, Galletta's only quasi-factual support of this claim of ineffectiveness is a self-serving assertion of an inability to pay in his supporting brief. *See* Original

---

measure taken by the organization to discipline any officer, director, employee, or agent of the organization responsible for the offense and to prevent a recurrence of such an offense").

Br. at ECF pp. 218–21. However, even this self-serving assertion is somewhat limited as it appears to be premised on Galletta's inability to pay due to his lengthy period of incarceration. *See id.* at ECF pp. 218–19.

In addition to the lack of support for this claim, Galletta has failed to show that a challenge to the $10,000 fine at the time of sentencing or on appeal would have been likely to result in the vacating of the fine. During the sentencing hearing, the court determined that Galletta lacked the ability to pay a fine within the $25,000 to $250,000 guideline range. *See* Sentencing Tr. at 49. The court also considered Galletta's ability to pay when concluding that the interest requirement would be waived. *See id.* The court further considered that Galletta would be able to make payments toward the fine, as restitution was not at issue in the case, by participating in the Bureau of Prisons' Inmate Financial Responsibility Program ("IFRP"), where he would provide a minimum payment of $25 per quarter toward the fine. *See id.* at 49–50. If Galletta were to serve out the entirety of his 50-year sentence and remain in the IFRP, he would have paid, at a minimum, $5,000 toward the $10,000 fine.

At bottom, Galletta did not object to either the guideline range for the fine or the recommended fine in the presentence report upon which this court relied in making findings relating to the imposition of a $10,000 fine, and he did not raise his inability to pay at sentencing despite having ample opportunity to do so (even if Attorney Sletvold did not). Additionally, he has not shown as part of these section 2255 proceedings that he could not make payments toward the fine while participating in the IFRP, he does not assert as part of his motion that Attorney Sletvold was ineffective in failing to object to the guideline range or facts in the presentence report pertaining to his employment history and assets, which were cited in support of the probation officer's recommendation, and he does not contend that the court failed to consider his ability to

pay a fine. Even if he did assert that the court failed to consider his ability to pay a fine, it is belied by the record. *See id.* at 49–50. If Attorney Sletvold had challenged the fine on direct appeal, the Third Circuit would have reviewed the decision for plain error, and there is no such error on this record. *See Torres*, 209 F.3d at 313 ("Where, as here, a defendant did not at sentencing raise the issue of his or her inability to pay, a sentencing court's decision to impose a fine and the amount of the fine is reviewed for plain error. *See* Fed. R. Crim. P. 52(b). And where, again as here, a defendant, whose burden it was to prove his or her inability to pay by a preponderance of the evidence, made utterly no showing in that regard and took no issue with facts of record showing an ability to pay, error sufficient to warrant relief must be very plain, indeed."). Accordingly, even if the court could consider Galletta's ineffectiveness claim relating to the failure to challenge the imposition of the $10,000 fine at sentencing or on appeal, such a challenge lacks merit because he has failed to show by a preponderance of the evidence that there was a reasonable probability that this court would have declined to impose a fine[104] or that the Third Circuit would have concluded that this court erred, even if he had preserved such a challenge, by imposing the fine. As such, the court will deny this claim for relief.

### 9.    Ineffective Assistance of Counsel for Failing to Object to the Court Abusing its Discretion When Informing Galletta About Hybrid Representation

#### a.    The Parties' Arguments

Galletta argues that he is entitled to section 2255 relief because defense counsel were ineffective by never informing this court that the Third Circuit permits hybrid representation, which was contrary to what this court told him. *See* Original Mot. at ECF pp. 43–44; Original Br. at ECF pp. 222–30; 2255 Hrg. Tr. at 47–48. Concerning the availability of hybrid representation,

---

[104] Even treating Galletta's unsupported allegations in his motion and supporting brief as true, he has not explained how this court would have found it more likely than not that any fine would remain unpaid considering he would be making payments toward the fine as part of his participation in the IFRP.

Galletta contends that courts in the Third Circuit and elsewhere have acknowledged that a court may permit hybrid representation. *See* Original Br. at ECF pp. 223–24 (citing *United States v. Jenkins*, 540 F. App'x 893 (10th Cir. 2014); *United States v. Bennett*, 539 F.2d 45 (10th Cir. 1976); *United States v. Treff*, 924 F.2d 975 (10th Cir. 1991); *In re Trinsey*, 115 B.R. 828 (Bankr. E.D. Pa. 1990);[105] *O'Reilly v. New York Times Co.*, 692 F.2d 863 (2d Cir. 1982); *United States v. Swinton*, 400 F. Supp. 805, 806 (S.D.N.Y. 1975); *United States v. Hill*, 526 F.2d 1019, 1023–24 (10th Cir. 1975); *Banks v. Horn*, 939 F. Supp. 1165 (M.D. Pa. 1996), *vacated*, 126 F.3d 206 (3d Cir. 1997); *Banks v. Horn*, 63 F. Supp. 2d 525 (M.D. Pa. 1999), *rev'd*, 271 F.3d 527 (3d Cir. 2001), *cert. granted, opinion rev'd*, 536 U.S. 266 (2002)).[106] Since courts may permit hybrid representation, Galletta claims that this court committed an abuse of discretion by "deliberately misinform[ing] him about the law and the "rules" of the Third Circuit insofar as the court informed him that hybrid representation was not permitted. *Id.* at ECF p. 222. He asserts that if the court had accurately relayed to him about the availability of hybrid representation, "he may have formerly [sic] requested hybrid representation." *Id.* In addition, if defense counsel had brought up the issue of the court's misinformation, "they would have preserved the right to appeal the decision." *Id.* at 223.

In response to Galletta's arguments, the government reiterates that Galletta is incorrect insofar as he is asserting that he had a right to hybrid representation. *See* Gov't's 1st Br. at 26 (citing *United States v. Turner*, 677 F.3d 570, 578 (3d Cir. 2012)). Since Galletta's argument is

---

[105] In several instances in his *pro se* submissions, Galletta misidentifies court decisions as being attributed to circuit courts of appeals when they were decisions of district or bankruptcy courts. For example, Galletta identified this decision as a Third Circuit decision instead of as a decision by the United States Bankruptcy Court for the Eastern District of Pennsylvania. *See* Original Br. at ECF p. 224. While the court recognizes that Galletta did this in a *pro se* capacity, he should exercise greater care in accurately representing the court rendering the decision to which he is citing.

[106] This is another instance of Galletta misidentifying a district court decision as a circuit court decision. *See* Original Br. at ECF p. 224.

based on a mistaken premise, the government contends that his counsel could not have been ineffective. *See id.*

b.      Resolution of Claim

The court agrees with the government that Galletta has failed to show that his counsel was ineffective in any aspect regarding hybrid representation, albeit for different reasons. Before identifying those reasons, a preliminary matter warrants discussion.[107] Galletta, in his misguided attempt to show that this court intentionally misled him about hybrid representation, attributes statements to the court without indicating where in the record he located the statements. For example, Galletta alleges that this court "clearly informed [him] that there were only two options. 'You either allow your defense counselors to represent you and conduct your case or you may represent yourself pro-se and conduct your own case without the assistance of counsel.'" *Id.* at ECF pp. 224–25. He also claims that this court told him that his "lawyers do not work for you" and his "lawyers do not have to do what you tell them." *Id.* at ECF p. 225. At no point does Galletta, despite using quotation marks to attribute those statements as coming directly from the court, identify the proceeding in which the court made such statements to him.

Despite Galletta's failure to cite to the record, the court attempted to verify whether any such statements were made to him while he was represented by Attorneys Meehan and Henry. The

---

[107] In addition to Galletta's misrepresentations about this court's statements to him, the court must also point out Galletta's misrepresentation of supporting case law in his brief in support of this claim. In particular, Galletta attributes the quote, "[L]imiting hybrid representation (in which litigant proceeds simultaneously by counsel and pro-se) are constitutionally acceptable in both the appellate and trial contexts," to *United States v. Turner*, 677 F.3d 570, 578 (3d Cir. 2012). The court has thoroughly reviewed *Turner*, and Galletta's quoted text is nowhere to be found in that decision, whether at Galletta's pinpoint cite or elsewhere.

    Upon further research, it appears that Galletta was attempting to quote text from another Third Circuit decision, *Castillo v. All Jane/John Does Staff/Supervisors from PA Ct. of Common Pleas Clerk of Cts.*, where the Third Circuit stated: "And rules limiting hybrid representation (in which a litigant proceeds simultaneously by counsel and pro se) are constitutionally acceptable in both the appellate and trial contexts." 672 F. App'x 178, 180 (3d Cir. 2016) (per curiam) (citing *Turner*, 677 F.3d at 578–79). Nevertheless, Galletta's *pro se* status does not excuse him from accurately attributing quoted text from a court decision to the correct court decision.

court's research showed that there were only two proceeding where the statements could have been made: (1) an April 10, 2015 status conference; and (2) the May 6, 2015 hearing during which the court permitted Attorneys Meehan and Henry to withdraw as counsel. Fortunately, both proceedings have been transcribed. *See* Doc. Nos. 86, 87. Unfortunately for Galletta, the court thoroughly reviewed the transcripts of those two proceedings and none of the statements Galletta is attempting to attribute to the court are included in those transcripts.

Instead, the court points out that the following discussion occurred between the court, Attorneys Henry and Meehan, and Galletta during the on-the-record status conference on April 10, 2015:

> MS. HENRY: . . . [O]ne of the conversations that we've had with Mr. Galletta and I think he just wanted Your Honor to confirm that what we're representing to be the law is the law. So specifically, . . . we've explained to him that as a defendant he is entitled to make the decision on whether to . . . enter a guilty plea or go to trial and he's allowed to make the decision of whether to testify or not. And that all the other strategy decisions in this case there are what the defense attorneys can make and that he is not entitled -- we've investigated, we've done a lot of the things that he's wanted us to do, but we're having conversations about the fact that he's not entitled to make the strategy decisions we get to make those and I think he would want to hear that from Your Honor that we're not just making that up.

> THE COURT: . . . Mr. Galletta, the issue that's being raised by counsel is referred to as hybrid representation. . . . [H]ybrid representations are not permitted. You have an absolute right to make the decision whether to plead guilty or go to trial and that is absolutely yours and cannot be made by your counsel, although you should consider their advice in that regard.

> You have the absolute right to decide whether you're going to testify or remain silent and you have an absolute[] right to do either. And that is not a decision counsel can make, that's a decision that has to be made by you. And of course, if you decide to remain silent that cannot be held against you and if you requested in fact that jury would be so instructed that they could not draw any adverse inference from your decision to remain silent.

> But when it comes to trial strategy while counsel will obviously consult with you and listen to your -- what you believe is important in this case, they're trained in the law, this is a very important case to you, you're the one with the most

at stake, but they're the ones trained to defend your rights and to protect your interest. So the law recognizes that. While you have a right to proceed without counsel that's generally a very bad idea and the reason you have counsel is so they can develop and craft a trial strategy that has the best chance of protecting your rights whether that is damage control, acquittal, whatever it means is to protect your rights. Do you understand that?

[GALLETTA:] Yeah, can I ask a question?

THE COURT: Absolutely, sir.

[GALLETTA:] Is it different -- is it different because it's federal? When I was arrested it was state. It only became federal in November, I think. When I had a private lawyer . . . he was letting me make the decisions what witnesses I would call, you know, everything. All kinds of strategy. He said you tell me what you meant [sic] to do, . . . and so when it went to federal and I have new counsel and they're telling me everything is different and --

. . .

So, I'm just trying to transfer the strategy that I had for the state defense to the federal defense that's all.

THE COURT: Understood.

[GALLETTA:] And they -- . . . I'm not saying it's wrong, they might be right, but all I know is what my previous lawyer who say [sic] paid recommended to me to do. He said call witnesses, get an expert, get a forensic -- so that's what we were lined up to do once the state dropped the case and they have it they through [sic] that out and said no, we have a different strategy. And . . . I've asked them well, can't we use some of the strategy? Let's do this, let's do that and they're -- they told me yesterday that I don't get to make any of the decisions. I can only determine if I want to testify, take the stand or plead guilty that the strategy is theirs and if I don't like their strategy I should ask for a court-appointed.

THE COURT: The answer to your question first and foremost is no, the state system and federal system are the same. Inasmuch as neither permits hybrid representation, because hybrid representation is recognized as not being in the interest of the defendant. That's the reason you have counsel.

Now, can a lawyer consult with you? Not only can a lawyer consult with you, a lawyer must consult with you and will consult with you and will listen to your ideas and will listen to who you believe might have evidence that might be brought to bear in your defense or attack the government's case, but when it gets right down to who determines what the strategy is that is counsel's responsibility and counsel's job.

So yes, they can listen to you. And they can consider what you have to say and they can explain to you why . . . in their opinion will or won't work, but the ultimate trial strategy decision rests with counsel.

[GALLETTA:] Okay.

THE COURT: Does that answer your question?

[GALLETTA:] Yeah, so if . . . I'm making it difficult for them, but I don't need [sic] to.

THE COURT: Well, they're used to difficult, don't worry about that.

[GALLETTA:] But if I didn't like their strategy, she had recommended that I would ask for court-appointed, meaning I don't know if the term is fire and . . . I don't think their strategy is wrong, I don't, I don't, I just didn't know that everything that I was working towards doesn't count, doesn't, you know, I really trusted my other lawyer, you understand and so I've just met them and, you know, we didn't hit it off and so my impression was that they were just giving me a different strategy for a different reason.

THE COURT: And that's not unusual. You know, what you're explaining is not at all unusual and it takes a while to get comfortable with counsel and to appreciate why their strategy is what their strategy is, but it's all done on your behalf, because everybody recognizes you're the one with the most at stake in this matter.

[GALLETTA:] Yes, Your Honor. I don't want to ask for court-appointed[.] I trust them.

Tr. of Apr. 10, 2015 Status Hrg. at 24–29, Doc. No. 87.[108]

As for the May 6, 2015 hearing on Attorneys Meehan and Henry's request to withdraw as Galletta's counsel, the following pertinent exchanges occurred after Attorney Henry indicated her and Attorney Meehan's reasons for seeking to withdraw, Galletta stated that he did not agree with their reasons to withdraw, and Galletta attempted to explain certain issues he was having with them:

THE COURT: . . . Mr. Galletta, I don't want you to get into the specifics of your conversations with counsel. . . . I know you presume you know the law or

---

[108] This was the only portion of the proceeding where the court, Galletta, and Attorneys Meehan and Henry discussed the attorneys' representation of Galletta.

you're talking to people other than your counsel in accepting what their [sic] representing to you is the law and that's always a problem. But the bottom line here [is] I wasn't asking you about whether they've done a good job or whether you're dissatisfied with the job they've done or what your complaints have been directly to them[.] . . . I need to know whether your relationship with them, your professional relationship with them has broken down to such a point where it's no longer prudent for them to represent you and that they should be allowed to withdraw from further representation and new counsel appointed.

Obviously, it's the rare case when that happens, you don't have to like your lawyers or you could like your lawyers, but just not at all be able to work with them. There could be a lot of reasons. You're the one who has all the pressure on you because this is a very important case to you, obviously, as it's a very important case to the government.

You've got two of the finest attorneys there are, but at the same time there could be a case and this may be it where just because of your personality or your position on what should be done or whatever they would not be the appropriate counsel to represent you in this matter. And so I need to know from you do you believe that they should be allowed to withdraw because your relationship with them has just deteriorated to a point where they can no longer effectively represent you?

[GALLETTA:] Yes. I just think it's not fair that . . . I don't get to tell you []

THE COURT: I'm not judging you and I'm not judging them. This is the sole issue is whether I'm going to allow --

[GALLETTA:] Yeah, They should be able to withdraw, Your Honor.

THE COURT: Okay.

[GALLETTA:] They didn't like me from the beginning.

THE COURT: So you're requesting that they be removed from your counsel and be allowed to withdraw?

[GALLETTA:] Yes, Your Honor.

THE COURT: And then new counsel then be appointed to represent you?

[GALLETTA:] Yes, Your Honor.

THE COURT: Do you also understand that any delay that is occasioned by this delay that counts against you does not count against the government for purposes of speedy trial?

[GALLETTA:] Yes, Your Honor.

THE COURT: And notwithstanding that it may in fact delay your trial date you're requesting that they be allowed to withdraw and that I appoint new counsel?

[GALLETTA:] I didn't come here today knowing that they even asked to withdraw, literally I found out a second ago.

THE COURT: Do you want more time to discuss this with them?

[GALLETTA:] No. They should be able to withdraw.

THE COURT: And do you want new counsel?

[GALLETTA:] Yes. Yes, Your Honor.

THE COURT: So you do not want them to represent you any further?

[GALLETTA:] No.

THE COURT: So your position is in accord with their position that the relationship between you and your counsel has deteriorated to a point where they can no longer effectively represent you?

[GALLETTA:] Yes, Your Honor.

THE COURT: And counsel do you both agree with that?

[ATTORNEY HENRY:] Yes, Your Honor.

Withdrawal Hrg. Tr. at 7–12.

After providing the government with an opportunity to set forth its position on whether Attorneys Henry and Meehan should be permitted to withdraw as counsel, Galletta expressed concerns about the fairness of allowing counsel to withdraw and his lack of awareness of counsel's intent to seek to withdraw until he learned it at the time of the hearing. *See id.* at 12. In response

to these expressions by Galletta, the following discussion occurred between the court, Galletta, and Attorney Henry:

> THE COURT: Well, again, I asked you if you wanted to have an opportunity to discuss this with your counsel, if you have any doubts about that you're not satisfied with their performance.

> [GALLETTA:] Well, the –

> THE COURT: They're under the impression that you're not satisfied with their performance. That you have been complaining about their performance, challenging legal decisions they have made based on their legal knowledge, their legal experience and their legal ability. And that accordingly that you don't believe it's fair to have them represent you that you want somebody else representing you who you believe will proceed in a different manner and more effectively represent your interest.

> This is all about ensuring that you have a fair trial in this matter that the government has a fair trial and that you have a fair trial. So when you say that's not fair, this is all about fairness is if you're not satisfied with your counsel while it is somewhat rare that this court will permit counsel to withdraw or allow a defendant to just pick and choose counsel that are appointed to represent him in this particular case given what I've heard today I am inclined to grant your request which I understand this is a request of yours now as well as a request of your counsel that they be replaced with new counsel for all further proceedings.

> So when you say it's not- fair, it's not a matter of me having to know why you're not satisfied with them, I'm -- if you say you're not satisfied with them and that your relationship with them is deteriorated to a point that you do not believe they can effectively represent you, I'm satisfied with that. So what do you mean when you say it's not fair, sir?

> [GALLETTA:] Well, I don't know what triggered them to file this other than the last letter that I wrote you. I mean –

> THE COURT: Well, I thought it had become clear to you that I -- hybrid representation is not permitted. It's not a rule that I have.

> [GALLETTA:] Yeah.

> THE COURT: It is the law that when you have counsel represent you you should not be forwarding anything to the judge. Beyond the point that it's ex parte it is also an improper filing. The filings are made by your counsel. They are made in the form of a motion. There's a motions procedure the United States has an opportunity to respond et cetera.

169

Sending a letter to me was wholly inappropriate, but I understand why you did it, but it's wholly inappropriate. And it appears to me --

[GALLETTA:] Yes.

THE COURT: -- and this is some speculation that it was the last straw. That it wasn't just you doing that going around your counsel, you should never go around your own counsel.

[GALLETTA:] Right.

THE COURT: They are the people who represent you. They're the people that you're supposed to trust and believe in and be assured that their representing your interest. So it's always an issue if someone goes around their counsel as an ex parte communication with the judge which is why that ex parte communication was immediately just forwarded onto your counsel. Because they represent you. They responded to that by saying that it appears that you're not satisfied with their representation and that your communication has broken down and that the only real way to proceed forward in a fair proceeding is to have now counsel appointed that you do feel comfortable with.

Now, I do note the United States Attorney has represented a concern that I think is a legitimate concern that you won't be happy with the new lawyer that would be appointed to represent you, but sometimes it is hard to hear the facts and it is hard to hear the reality of the situation. And I'm quite certain counsel have not in painting a rosy picture in this case, because it would be foolish for them to do so. And I'm quite certain it's very difficult for you to hear that. But then it's got to get down to strategy and it's got to get down to how you proceed in this case to either establish your innocence and get acquitted to defeat the government's case to control damage. There might be a variety of strategies that counsel would undoubtedly employ in this case or any other case. And none of that is of concern to me. What is of concern is that you're satisfied your counsel are employing the best strategy by employing their legal knowledge, their wisdom, their abilities, their view of the whole case and how they think it can best resolve in your favor, but that's just a lot of words, but I do share the U.S. Attorney's concern that with your new counsel you're going to again be dissatisfied and it will become a revolving door of counsel after counsel and that of course I will not permit. Yes, sir.

[GALLETTA:] I -- I didn't ask them to be replaced. So –

THE COURT: But you're asking me now.

[GALLETTA:] Only because you asked me. What I'm saying is I didn't know -- I never asked to have them replaced. Even with my frustration I wasn't

asking them to replace [sic], so her argument that I'm just doing this to get other counsel and would do it again, I never asked for my counsel to be replaced.

So that's not -- that's -- that wasn't my purpose of coming today. So I'm only going along with what they requested which is to be removed. I never asked them to even with the frustration that we experience in the communication and the -- I never asked for it. I'm going along with it now because I don't see how two lawyers who come to court and say we don't want to represent you, I can put trust in them.

It's -- it's not because they disagreed with me or anything like that. I heard they were good lawyers. I was fine with it; do you understand? They made a phone call to my family and it was great. My family told me they're fighting for you, this was just Friday, so I came here excited. I got blind-sided when they said we're here to –

[ATTORNEY HENRY:] Your Honor, . . . I mean, he just, [Galletta] just said on the record before that we lied to him twice, so that -- that I lied to him about confidentiality. That I lied to him about the recusal and so for -- he's talking out both sides of his mouth to say now, well no, I have -- I didn't -- I didn't want this. I didn't criticize, you know, I never -- I trust them. That he just told you that -- that in his opinion we are liars and that we did not give him bad advice, but we lied to him, so that just -- so no matter what he's going to say to you right now, Your Honor about, you know, and that he's -- it's really hard for him, whatever, I mean he's -- that -- that puts us in a -- that puts us in a place that, you know, it's not that we're -- don't like the case, we do these cases all the time. I have a staff [indiscernible] office of enticement case, it has nothing to do with the charges, but there is a breakdown in communication when a defendant is not accepting advice, but then telling the Court in letters and on the record that he believes counsel is lying to him.

So it's not -- and it's not just an issue of him reaching out to Your Honor around us, he's done other things around counsel [indiscernible] I don't want to get into too much detail, but that have shown that he's not willing to accept our advice.

And I think thing [sic] that the penalty be so severe that whether or not he'll be looking for new counsel, I don't know down the road, but I know -- one thing I know for sure based on my experience in the past several months is that we'll be back here criticizing saying he's not accepting our advice, saying that we're lying to him and, you know, complaining about our performance I know that for sure based on the track record so far.

THE COURT: Mr. Galletta, yes, sir.

[GALLETTA:] I can't -- I can't argue better than she can and I'm not trying to, but I'm not lying. I didn't just say that I trusted them, I didn't even say that. I

said my family just had a conversation with them and when I talked to them said we think they're doing really good for you we trust him. My family said that; okay.

And she mentions me saying that they lied to me on two -- she's saying on two different times. All I'm saying is I don't -- we have a computer at the -- at the prison that you could look stuff up. That's all I have access to. When they tell me something and I go to the computer and it says something different and I come back to them and say the computer says something different they dismiss it. So when I challenge it I don't -- they don't resolve it and so they're very good lawyers I know they're good lawyers. I just don't know how to resolve something that I had mentioned in the letter, because -- [indiscernible] support and I am requesting that they be removed. I don't -- I don't have choice, but I didn't come here –

THE COURT: You do have a choice, sir.

[GALLETTA:] Well, they don't want to represent me.

THE COURT: Yeah, but you understand the reasons why they don't want to represent you. The issue here is whether you want them to withdraw and have me appoint new counsel to represent you. They've indicated that they believe that the relationship, the professional relationship you have with them has deteriorated to a point where they can no longer effectively represent you. Do you agree?

[GALLETTA:] I do agree, Your Honor.

*Id.* at 13–19.

Despite Galletta again agreeing that Attorneys Henry and Meehan should be permitted to withdraw as his counsel, he later responded to one of the court's questions by expressing a belief that he had been "bullied" by his counsel, and "it just [did not] seem ethical." *Id.* at 22. At that point, the court for a third time asked Galletta whether he wanted to speak to Attorneys Meehan and Henry in private. *See id.* On this occasion, Galletta indicated that he wanted to speak in private with Attorneys Henry and Meehan, so the court took a recess to allow him to do so. *See id.* at 23. Following that private conference, the court resumed the hearing where both Galletta and his counsel agreed that counsel should be permitted to withdraw. *See id.* at 23–24.

As illustrated by these transcribed portions of two proceedings, the court never made the statements Galletta claims were made. To the contrary, the court patiently and accurately explained

to Galletta certain aspects of the attorney-client relationship and pointed out that his attempts to act as co-counsel, such as by submitting *pro se* documents to the court, while being represented by experienced, competent counsel was wholly improper. The court admonishes Galletta for his attempt to attribute statements from the court that were clearly never stated in this case, simply to, yet again, show that the court was biased against him.

Now turning to the merits of Galletta's claims, he has not demonstrated that Attorneys Meehan and Henry were ineffective in failing to "correct" this court's misrepresentation about his ability to pursue hybrid representation because the court did not misrepresent his ability to potentially pursue hybrid representation. As illustrated by Galletta's comments during the hearings referenced above, Galletta is contemplating hybrid representation as a situation where he is fully represented by counsel and yet they do whatever he asks. He might also be contemplating a situation where he has the same ability as his counsel to submit documents in the case. In either situation, Galletta is wrong.

As this court and the Third Circuit have repeatedly informed Galletta, he has no right to hybrid representation. *See Turner*, 677 F.3d at 578 ("Pro se litigants have no right to 'hybrid representation' because '[a] defendant does not have a constitutional right to choreography special appearances by counsel.' *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984). 'Once a pro se defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously ... request[s] that ... counsel be silenced.' *Id.*" (alterations in original)). As such, litigants generally have two choices: they can decide to proceed *pro se* or they can proceed with counsel. The only other situation is where a litigant proceeds *pro se*, but the court appoints standby counsel to assist the litigant. *See Banks v. Horn*,

271 F.3d 527, 539 (3d Cir. 2001) ("In the typical hybrid representation, a trial court acts in its discretion to appoint standby counsel[.]"), *rev'd on other grounds sub nom. by Horn v. Banks*, 536 U.S. 266 (2002). The appointment of standby counsel is discretionary with the trial court. *See Thomas v. Carroll*, 581 F.3d 118, 125 (3d Cir. 2009) (pointing out that once defendant chose to represent himself, trial court "could have appointed standby counsel"). Nevertheless, even if a defendant has standby counsel, the defendant still lacks a right to hybrid representation. *See McKaskle*, 465 U.S. at 184 (indicating that "defendant does not have a constitutional right to choreograph special appearances by counsel" while proceeding *pro se*). Accordingly, there is no scenario in which Galletta would have been able to obtain the sort of hybrid representation he appears to claim he could have sought.

Galletta has failed to show that this court misled him about hybrid representation in any matter and, as such, has not shown that Attorneys Meehan and Henry's conduct was objectively unreasonable in advising him that the court was incorrect or by confronting the court about the court's statements concerning hybrid representation. In addition, Galletta has not shown that he was prejudiced by counsel's representation because he has not demonstrated that there was a reasonable likelihood that the outcome of any aspect of his case would have been different. Moreover, he does not even assert in his submissions that he would have taken action to change the nature of his representation if the court had provided him with the information that he believes he should have received, and there is no indication that he would have sought to proceed *pro se* and asked for standby counsel even if counsel or the court identified it for him as an option. Therefore, this claim of ineffective assistance of counsel wholly lacks merit and will be denied.

**10.     Ineffective Assistance of Counsel for Failing to Seek the Undersigned's Recusal**

Galletta asserts that his defense counsel were ineffective for failing to seek the undersigned's recusal based on the undersigned having sentenced Galletta in 2004 after presiding over his criminal trial. *See* Original Mot. at ECF p. 44; Original Br. at ECF pp. 231–37; 2255 Hrg. Tr. at 48–51. The court will deny this claim because Galletta has not submitted any evidence in support of it. Although his arguments on recusal relate to a proceeding in the Court of Common Pleas of Northampton County in 2004, he has not introduced any transcripts, records, or decisions from those proceedings. He has not even identified any proceedings in this matter where the recusal issue was discussed. Instead, Galletta makes only general allegations of bias and prejudice by the undersigned based on what purportedly occurred during those proceedings. *See* Original Br. at ECF pp. 231–37; 2255 Hrg. Tr. at 48–51. At bottom, his failure to offer any evidence in support of the claim is fatal to the claim, and this court will deny it on that basis alone.

Even if the court were to consider Galletta's arguments concerning counsel's ineffectiveness, he has failed to prove by a preponderance of the evidence that they were ineffective in not seeking the undersigned's recusal. In resolving this claim, the court will first set forth what occurred in the state-court proceedings, the law applicable to recusal of district judges, the parties' arguments, and what transpired in an on-the-record April 10, 2015 status conference where the issue of recusal was discussed.

a.     State-Court Proceedings

As indicated during the trial, Galletta pleaded guilty before the Honorable F.P. Kimberly McFadden, now retired, in the Court of Common Pleas of Northampton County in December 2001 to two counts of corruption of minors (18 Pa. C.S. § 6301(a)), relating to unlawful communications with a 14-year-old girl in June 2001. *See* Day Two Tr. at 76–82; Gov't's Exs. 24, 25; *see also*

Docket, *Commonwealth v. Galletta*, No. CP-48-CR-2253-2001 (Northampton Cnty. Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-48-CR-0002253-2001&dnh=b5QsdETmQmtCg7EofCnqRg%3D%3D ("2253-2001 Dkt."). Judge McFadden sentenced Galletta to serve an aggregate term of confinement of a minimum of four months to a maximum of 23 months. *See* 2253-2001 Dkt. at 2.

While Galletta was on parole on these charges, the Nazareth Borough Police Department arrested him on August 31, 2002, charging him with (1) indecent assault (18 Pa. C.S. § 3126(a)(8)), (2) interference with custody of children (18 Pa. C.S. § 2904(a)), and (3) corruption of minors (18 Pa. C.S. § 6301(a)), relating to Galletta's allegedly unlawful actions involving a 13-year-old girl. *See Commonwealth v. Galletta*, 864 A.2d 532, 533 (Pa. Super. 2004); *see also* Docket, *Commonwealth v. Galletta*, No. CP-48-CR-3297-2002 (Northampton Cnty. Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-48-CR-0003297-2002&dnh=BNV2wzwSIYgWSh2LzX%2F9XQ%3D%3D. The same police department also charged Galletta with (1) involuntary deviate sexual intercourse (18 Pa. C.S. § 3123(a)(7)), (2) aggravated indecent assault (18 Pa. C.S. § 3125(a)(8)), (3) indecent assault (18 Pa. C.S. § 3126(a)(8)), and (4) corruption of minors (18 Pa. C.S. § 6301(a)), relating to Galletta's alleged activity with the 13-year-old girl's 15-year-old sister. *See Galletta*, 864 A.2d at 533; *see also* Docket, *Commonwealth v. Galletta*, No. CP-48-CR-3296-2002 (Northampton Cnty. Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-48-CR-0003296-2002&dnh=8R%2BnSSDkqxwYvtIziBW7Bw%3D%3D. Galletta later proceeded to a consolidated jury trial on all charges other than the interference with custody of children charge (which had already been dismissed) before the undersigned, who at the time was sitting as a Judge of the Court of Common Pleas of Northampton County. The jury ultimately found Galletta guilty

one count of corruption of minors, graded as a first-degree misdemeanor, relating to the 15-year-old girl and not guilty on the other charges. *See Galletta*, 864 A.2d at 533.

The undersigned held a sentencing hearing on February 27, 2004, during which Galletta was sentenced to a minimum of two-and-a-half years to a maximum of five years of state confinement. *See id.* This sentence exceeded the guideline standard range and was the statutory maximum allowed. *See id.* at 534; *see also* 18 Pa. C.S. § 6301(a)(1)(i) (defining corruption of minors offense as including when "whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, ***commits a misdemeanor of the first degree***" (emphasis added)); 18 Pa. C.S. § 106(b)(6) ("A crime is a misdemeanor of the first degree if it is so designated in this title or if a person convicted thereof may be sentenced to a term of imprisonment, the maximum of which is not more than five years.").

In imposing this sentence, the undersigned explained the reasoning for the sentence as follows:

> THE COURT: . . . Mr. Galletta, I have considered carefully the entire presentence report. I have also considered carefully the report prepared by Reading Specialists and signed by Robert W. Gil, also the very brief report from Carol Herzon-Loney who had done some sex offender therapy from July 1st, 2002 through September 9th, 2002, and of course the report from Doctor Wisser dated February 16th, 2004 who performed a psychological evaluation on you.
>
> I have also carefully considered the sentencing guidelines which as I indicated to you call for a mitigated range of restorative sanctions, a standard range of one to 12 months, and aggravated range of 15 months.
>
> I note that you are 31 years of age. At the time this offense occurred you were 29-years-old.
>
> I also note that the victim was 15-years-old at the time of this event. You do have a high school diploma. Your prior record has already been factored into

the prior record score, so I cannot consider the prior record separate from the sentencing guidelines; it's already part of the sentencing guidelines, but I do note and am considering that you were on parole for this violation and that prior offense of particular concern in this case, sir, is the prior offense was a corruption of minors. The prior offense still dealt with a teenage girl.

The current offense which you've been found guilty by the jury, and I do respect the jury's verdict, and I am sentencing you solely on the offense which you were found guilty.

The current offense involves corruption of minors, and again, a teenage girl. By your own admission you did have involvement with both teenage girls, although you deny and were not found guilty of having any sexual contact with the 13-year-old.

By your own admission you arranged to meet these two girls at a movie theater, where they were being dropped off by their mother. She certainly could have had no idea even in her wildest dreams that there was a 29-year-old man waiting inside that theater for her young daughters to meet when she thought they were going to see a movie. I can only imagine every parent in hearing the details of this crime wondering if they can ever just drop their teenage daughters off at the local theater to go in and see a movie without first checking to see who they're with or otherwise supervise them.

By the end of that movie, you were already sitting in the back of the theater kissing the 15-year-old girl despite your age of 29 years.

I note that the age of the victim, I note the disparity in age between you and the victim. And of course as I indicated before, you were on parole for a similar offense and that there have already been attempts to give you the necessary treatment to insure that you would not further victimize young girls and it failed.

I am bound to consider the sentencing guidelines, and it is only in extraordinary cases that the Court should have deviate [sic] from the sentencing guidelines. It is not appropriate for this Court to substitute its own sense of justice for that of the Legislature or of the Sentencing Commission. And I do not intend to substitute my own judgment.

But I do find that this is the extraordinary case where the Court appropriately must deviate from the guidelines. And that is because there are extraordinary circumstances involved here. To victimize the teenage victims in this case in particular a 15-year-old when you're already on parole for victimizing another teenage girl, the disparity in ages, the way you went about preying on the girl, and I must refer to the 13-year old only because of your admitted conduct that you had contact with her and she was in your apartment only briefly and you gave her your phone number, and this is how you arranged to meet the 15-year-old girl.

It's not just that you should have known better, it's that you still do not appreciate the wrongfulness of your conduct. And I have great fear that the moment you're not isolated from our community you'll begin again to plan your next victimization; that you will continue to prey on children, and that the only thing this Court can do in the exercise of its discretion is to keep you isolated from the community every possible day that I can while we attempt to get you whatever treatment is necessary such that when you are released we don't have more victims.

Accordingly, sir, and I'll note the factual basis is not in contention. It's not simply what the jury found, it's what you admitted to. And it's that conduct that forms the factual basis upon which I'm entering this sentence.

On the offense of corruption of minors, I am sentencing you to a minimum of two and a half years to a maximum of five years in the state correctional institution. I am ordering you to pay a fine of $2500. I'm ordering to you [sic] pay the cost of prosecution.

At this point, sir, I must recommend to the State Parole Board that they not even consider paroling you until the expiration of your maximum sentence unless and until they can be convinced, in light of the repeat nature of this offense, that you are able to; number one, be supervised in such a way that you're not able to victimize another child because I believe you will victimize another child if you're given that opportunity, or that you have such treatment that somehow you are a changed person.

My sentence reflects the fact that I believe you continue to pose a danger to the public. This amount of confinement I have imposed, while I recognize it is two and a half times the recommended maximum standard range sentence, I believe it is the absolute minimum amount of confinement consistent with the protection of the public, the gravity of the offense, and your rehabilitative needs.

In imposing this sentence I fully considered your character, which I had ample opportunity to both observe during the trial, including while you testified, and here today, as well as considering everything within the pre-sentence report and accompanying evaluations. I am very much concerned with what I see as a lack of remorse, although I do note that today for the first time it appears as though there was some remorse but still I am convinced that you do not appreciate the wrongfulness of what you did which further convinces me that you will re-offend if you are not isolated from the community.

I also have to consider the overall effect and the nature of the crime that you have committed . . . .

*Galletta*, 864 A.2d at 534–36 (quoting Notes of Sentencing, 2/27/04, at 29–36).

After his sentencing, Galletta filed post-sentence motions which the undersigned denied. *See id.* at 533. Galletta then filed an appeal to the Superior Court of Pennsylvania, where he challenged the sentence imposed.[109] *See id.* In addressing Galletta's challenge to his sentence, the Superior Court recognized that "[t]here is no doubt the sentence imposed not only exceeded the guideline range, but was the statutory maximum allowed." *Id.* at 534. Then, after setting forth the applicable law and reciting the undersigned's reasons for imposing the sentence, the Superior Court concluded that "the sentence imposed was not unreasonable" and the undersigned "did not manifestly abuse it [sic] discretion." *Id.* at 536–38. The Superior Court also noted that

> [a]lthough we may not have chosen to impose the statutory maximum in this case, we find that the sentencing court balanced the relevant factors as required and, therefore, did not manifestly abuse its discretion by imposing the sentence it did. The sentencing court's oral explanation at the time of sentencing along with its written statement of reasons for deviating from the guidelines shows consideration for and an understanding of the relevant factors that a sentencing court must balance in order to fashion an appropriate sentence.

*Id.* at 538.

### b.   Applicable Law – Recusal

There are two federal statutes pertaining to recusal, 28 U.S.C. § 144 and 28 U.S.C. § 455. As it appears that Galletta mentions both statutes in his original brief, the court will discuss them both here.

---

[109] The undersigned also presided over a *Gagnon II* proceeding relating to Galletta's violation of his parole in No. CP-48-CR-2253-2001. *See* 2253-2001 Dkt. at 10. The undersigned found that Galletta had violated the terms of his parole when he committed a new offense while on parole. *See Galleta* Op. at 1–2. The court then directed Galletta to serve the balance of that sentence, which would run consecutive to the two-and-a-half to five-year sentence imposed for his other conviction. *See id.* at 1, 12.

Galletta also contested this sentence on appeal to the Superior Court, which rejected his claim that the undersigned committed an abuse of discretion by revoking his parole and recommitting him to serve the balance of his original sentence. *See id.* at 13. The Superior Court also explained that Galletta's argument that the sentence was harsh and excessive was not reviewable because he "was not re-sentenced; rather, he was recommitted solely to serve the remainder of his original sentence and may at some point again be granted parole." *Id.* at 13–14.

i.     *28 U.S.C. § 144*

Section 144 states that

> [w]henever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 144. As evidenced by the language in section 144, it is initiated upon a party filing of

an affidavit. *See id.* Nonetheless,

> [t]he mere filing of an affidavit, however, will not automatically disqualify a judge; rather, the Court must determine whether the affidavit (1) alleges legally sufficient facts to warrant recusal and (2) was timely filed. *United States v. Townsend*, 478 F.2d 1072, 1073 (3d Cir. 1973).
>
> It falls to the judge implicated in a § 144 affidavit to determine whether legally sufficient facts have been alleged. Id. "It is equally [the judge's] duty to deny the affidavit on insufficient grounds as to allow it on sufficient allegations." *Simmons v. United States*, 302 F.2d 71, 75 (3d Cir. 1962); *see also Simonson v. Gen. Motors Corp.*, 425 F. Supp. 574, 578 (E.D. Pa. 1976) ("While, in proper cases, we have a duty to recuse ourselves, in [other cases], we have [a] concomitant obligation not to recuse ourselves; absent a valid reason for recusal, there remains what has sometimes been termed a 'duty to sit.'").
>
> When a party files a motion and supporting affidavit pursuant to § 144, the district judge will accept the allegations of the movant as true. *United States v. Furst*, 886 F.2d 558, 582 (3d Cir. 1989). "Neither the truth of the allegations nor the good faith of the pleader may be questioned, regardless of the judge's personal knowledge to the contrary." *Mims v. Shapp*, 541 F.2d 415, 417 (3d Cir. 1976). The movant must set forth "[f]acts, including time, place, persons, and circumstances." *Townsend*, 478 F.2d at 1074. Generalized statements which fail to cite to specific acts will not suffice to substantiate "a successful attack upon the qualifications of the Judge to sit in the proceedings." *Simmons*, 302 F.2d at 76; *see also United States v. Enigwe*, 155 F. Supp. 2d 365, 370 (E.D. Pa. 2001) ("[T]he affidavit on which a

motion for recusal is based must state particularized facts and reasons showing why recusal is required.").

However, the Court is not required to credit "[c]onclusory statements and opinions." *United States v. Vespe*, 868 F.2d 1328, 1340 (3d Cir. 1989); *see also Cooney v. Booth*, 262 F. Supp. 2d 494, 502 (E.D. Pa. 2003) ("[T]he court may disregard personal opinions and conclusions when determining whether the allegations within the affidavit are sufficient to establish the existence of personal bias on the part of the presiding judge."); *Bumpus v. Uniroyal Tire Co. Div. of Uniroyal Inc.*, 385 F. Supp. 711, 715 (E.D. Pa. 1974) ("Subjective conclusions or opinions that bias or the appearance of impropriety may exist are insufficient to require a Judge's disqualification."). The judge against whom the § 144 affidavit is filed has a duty to withdraw when "the reasons and facts, regardless of their truth or falsity, fairly support 'the charge of a bent of mind that may prevent or impede impartiality of judgment.'" *Simmons*, 302 F.2d at 75 (quoting *Berger v. United States*, 255 U.S. 22, 33–34 (1921)).

*United States v. Gedeon*, Crim. A. No. 21-210, 2023 WL 3097651, at *1–2 (E.D. Pa. Apr. 26, 2023) (all alterations except first alteration in original).

ii.     *28 U.S.C. § 455*

As for section 455, it

governs disqualification based on the appearance of impropriety or actual bias. Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The test for disqualification under this provision is "whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Intern. Ltd.*, 368 F.3d 289, 301 (3d Cir. 2004). The standard is objective; "[t]he judge does not have to be subjectively biased or prejudiced, so long as he appears to be so." *United States v. Ciavarella*, 716 F.3d 705, 718 (3d Cir. 2013) (quoting *Liteky v. United States*, 510 U.S. 540, 553 n.2 (1994)); *see also Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997) ("The standard for recusal is whether an objective observer reasonably might question the judge's impartiality."). Under 28 U.S.C. § 455(b)(1), recusal is required where a judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1).

Unlike the analysis under 28 U.S.C. § 144, "when deciding a motion for recusal under Section 455(a) [or Section 455(b)], the court need not accept the Movant's allegations as true." *Cooney* [*v. Booth*, 262 F. Supp. 2d 494, 504 (E.D. Pa. 2003)] (collecting cases); *see also United States v. Sciarra*, 851 F.2d 621, 625 n.12 (3d Cir. 1988) (noting the "considerable authority for the proposition that the

factual accuracy of affidavits submitted pursuant to 28 U.S.C. § 455 may be scrutinized by the court deciding the motion for recusal"); 13D Charles Alan Wright et al., Federal Practice & Procedure § 3550 (3d ed. 2023 update) ("If a party does move for disqualification under § 455, and the motion is supported by an affidavit, ... the court is not required to accept the factual statements as true."). Rather, the judge is permitted to contradict the factual allegations made in the movant's affidavit based on her own knowledge and the record. *Cooney*, 262 F. Supp. 2d at 504 (citing *Mass. Sch. of Law at Andover, Inc.*, 872 F. Supp. at 1349).

*Gedeon*, 2023 WL 3097651, at *2 (all alterations except last alteration in original).

### c.      The Parties' Arguments

Galletta contends that his defense counsel did not seek the undersigned's recusal despite (1) Attorneys Meehan and Henry purportedly told him that the undersigned would "more than likely . . . recuse himself" after "realiz[ing] that he had presided over your earlier case" and (2) Attorney Sletvold "express[ing] his surprise when he took over the case and found out that [the undersigned] had refused to consider his recusal." Original Br. at ECF p. 231. As for the grounds for recusal, Galletta contends that the undersigned should have recused himself from presiding over this case because he "had clearly developed an unfavorable disposition against [him] and had openly expressed this disposition in court in 2004." *Id.* He also claims that the undersigned (1) "displayed extrajudicial bias during his extrajudicial comments from an unrelated proceeding," (2) "should as a judge, always mean what he says and say when he means," and (3) made comments about him that "deserve[] to be characterized as" biased or prejudiced. *Id.* at ECF p. 232. He further asserts that "the 5[-]year maximum sentence imposed which was deemed 'excessive' by the Pennsylvania Superior Court was in itself a display of personal bias," and shows that the undersigned "became personally involved and abandoned his neutral and impartial role." *Id.* at ECF pp. 232–33.

Galletta alleges that he was prejudiced because he

> would have been able to appeal the denial by [the undersigned] of the motion
> seeking his recusal. An impartial judge would have permitted a hearing to be
> conducted regarding the ex parte letter seeking recusal and would have permitted
> introduction of evidence in support of [his] motion seeking recusal. An impartial
> judge would have reviewed the sufficiency of the indictment and concluded that it
> lacked the constitutionally required elements and conduct to fairly inform [him] of
> the alleged conduct. A truly impartial judge would have not permitted the
> government to constructively amend count one of the indictment nor create a
> variance on count of the indictment. An impartial and detached judge would have
> prevented the government from being able to present a theory to the jury that was
> not presented to the grand jury in violation of [his] constitutional right to due
> process. [He] has presented more than enough evidence that the partiality of [the
> undersigned] did infect the proceeding and the fairness of the tribunal.

*Id.* at ECF pp. 235–36.

In opposition to this claim, the government argues that Galletta's "argument is disingenuous" because the court held a hearing to discuss recusal. *See* Gov't's 1st Br. at 26 (citing Apr. 10, 2015 Status Hrg. Tr., Doc. No. 87). In addition, the government asserts that "[i]t was clear after the hearing [that] there was no basis for a recusal[]" because (1) there was no bias or appearance of bias by the undersigned and (2) nothing that the undersigned learned about Galletta was obtained from an extrajudicial source. *See id.* at 14–15.

### d.  The April 10, 2015 Hearing

The government correctly points out that the court held a hearing on April 10, 2015, to discuss the undersigned's involvement in Galletta's prior state-court trial. *See* Apr. 10, 2015 Status Hr. Tr. at 5 ("I just wanted to put both [parties] . . . on notice that I had presided over the prior trial and that was a trial before a jury where the jury found . . . Galletta guilty of corruption of minors and not guilty of the remaining offenses."). At this hearing, although the undersigned expressed that "I don't believe my impartiality might reasonably be questioned," counsel for the parties were provided with the opportunity to ask questions about the undersigned's involvement in Galletta's

prior trial "to address whether there is even an appearance that I would have a personal bias or prejudice concerning . . . Galletta." *See id.*

Attorney Henry, who along with Attorney Meehan, was representing Galletta at the time, took advantage of the opportunity to ask the undersigned questions about the prior case. *See id.* at 5–13. During Attorney Henry's questioning, the undersigned, *inter alia* (1) acknowledged recognizing Galletta's name upon the case being assigned here, (2) indicated that the undersigned did not "really remember anything independently about the case," and any current knowledge was based on reading the Pennsylvania Superior Court's opinion resolving Galletta's direct appeal from his sentence, (3) did not recall Galletta testifying in the trial, (4) could not recall any impressions of Galletta's conduct or testimony during the trial, (5) did not recall the reasons for imposing Galletta's sentence other than what was contained in the Superior Court's opinion, and (6) understood that the government may be seeking to introduce Galletta's conviction in the prior trial as Rule 404(b) evidence, but stated that any prior involvement would not influence a decision with respect to any such motion. *See id.*

Following Attorney Henry's questioning, counsel for the government asked a couple of questions. *See id.* at 13–14. In responding to the government's questions, the undersigned stated that any knowledge about Galletta was gained only through the undersigned's role as a judge, and that the undersigned had no deep seeded favoritism or antagonism toward him. *See id.*

Upon the conclusion of counsel's questioning, the court asked whether the defense wanted to move for the undersigned's recusal. *See id.* at 15. Instead of orally moving for recusal, Attorney Henry made a statement "for the record":

> Your Honor the -- and this is the first time I've met Your Honor, so I don't have anything to go on other than but, you know, seeing you today and reading a transcript. However, the defense's concern is what Your Honor alluded to at the beginning of this is the appearance of any personal bias certainly I understand that

Your Honor is saying you don't remember I can under in light of a number of cases and the number of years that that is totally reasonable to not remember the details.

However, there was a lot of things said on the record in this case about Mr. Galletta's history about the fact that the Court was very concerned about the fact that he was on supervised release and then here he gets arrested for the same kind of conduct, but the Court expressed concern about particularly is the fact that he would -- while the Court stated it [indiscernible] the statutory maximum and then was concerned about any kind of parole was the Court was worried about protecting society and the fact that if he was released he would do the same thing again if he had not been treated since he had that prior.

And so exactly what the Court was concerned about here we are again and it's the same person and then he was recognizable to the Court understandably and so what our concern is is [sic] that when looking at the record in this case and the fact that he -- Your Honor sat through a trial where two young girls had to testify in a case where he was convicted and sentenced to the statutory maximum in a case where Your Honor also sentenced him to a sentence that ended up being a consecutive sentence for his parole violation the fact that Your Honor is now going to have to rule on whether that trial that not just is listed as a conviction then the Court would have to decide under the law that's admissible and weigh the probative factors, but also it would appear that it could have been that after having sat through that trial and being so concerned and impacted by what you read in those reports which you must have been very concerned and the high sentence was upheld so it was not unreason amount under the circumstances, but it could appear that Your Honor could not be fair and impartial in deciding that this -- after sitting through this . . . trial and seeing what happened and then opposing at sentence it could appear that if and admitting if that case ended up being admitted under 404(b) that there could be some sort of bias, so that's our only concern and that's what we'd like to put on the record, Your Honor.

*Id.* at 15–17.[110]

In response to Attorney Henry's concerns that were placed on the record, the court stated

the following:

I have looked at this from two different aspects. One is of course Mr. Galletta's presumed to be innocent. And he is entitled to a fair trial. The other is if he should be convicted either by virtue of going to trial and being convicted of one or more of the counts or if he should plead guilty to one or more of the counts that then I would be the sentencing judge. And the issue there is number one, can I be fair which I represented that I don't think I have any personal bias or prejudice against Mr. Galletta and I don't even remember anything beyond what is in this opinion.

---

[110] The government did not introduce any information pertaining to Galletta's trial before the undersigned as Rule 404(b) evidence during his trial. *See* Day One Tr. at 4–5.

So I am not all concerned about my ability to be fair both during the trial and to make the right decisions with respect to evidentiary calls and during sentencing, I have no doubt about my ability to consider all the evidence that is presented through the presentence report, through whatever evaluations were done, I mean that's assuming he was convicted and tailor an appropriate sentence in accordance with the factors and the guidelines in the federal system.

What I was most concerned about is that the defense be satisfied that I can be fair and impartial, but also that Mr. Galletta himself, he's the one that if he should plead guilty that he knows I would be the sentencing judge if he should be convicted he knows I'm the sentencing judge. If he's acquitted then there's not an issue. If the government should withdraw the charges there's not an issue.

And I wanted to make sure that he heard on the record that I have no personal bias or personal animosity against him. At the same time I wanted the government to be satisfied that I am not going to bend over backwards against the government to prove my impartiality and my fairness. That there's nothing special about this particular case that would interfere with my ability to preside as I preside over every other case and to impose an appropriate sentence if the sentence should even be required in accordance with the law. Because I can see that the government's saying well, wait a minute, now you're going to bend over backwards to prove your fairness and we're going to be somehow impacted by that. This case just doesn't -- it does not stand out to me as a case that I would have a feeling one way or the other towards the defendant, Mr. Galletta or towards the government and I see no reason why I couldn't be fair and impartial notwithstanding that I previously imposed the sentence.

*Id.* at 17–18.

After the court's statement, Galletta informed his counsel that he wanted to put on the record that although the Superior Court upheld the sentence imposed on him, the Superior Court indicated that it was excessive. *See id.* at 19. Not long thereafter, Galletta sought and received permission to ask his own question, which he stated (as it was more of a statement than a question) as follows:

[W]hen you had my previous case[,] . . . you had me brought over to the Courthouse in Easton a couple of days before Christmas and begged me on -- in [sic] with everyone there you begged me to take the guilty plea to a felony charge with my lawyer you -- and I said no and you got angry at me and you yelled at my lawyer and told my lawyer to take me aside and tell him to take this deal. And I -- and he did and he came back and you said if you take this deal you'll be home for

Christmas. It was like two or three days before Christmas and I didn't take the -- I didn't accept it and I had said to you I wanted to just tell you what I did and then let you sentence me on that and you said it doesn't work that way, you know there's a -- but you were very angry with me and you had stated on the record that I would be -- I would get time served if I just accepted the guilty plea which was to a felony.

When I got convicted on a misdemeanor and acquitted on all the felonies you stated on record which the law requires you to state why you're going to go excessive and you did and the Superior Court published their opinion that they said it was excessive legal, legal, because you stated on record why, but that they thought it was excessive and I -- I personally just felt that that kind of demonstrated punishment for not having accepted a guilty plea. Because I could've just -- I had 19 months in and you were offering me a one to two or one to three and I would've been immediately, you know, available for parole and anyway, hindsight is 20/20, you know, I'm not saying anything like that, but I just felt like maybe you were angry with me for not taking the guilty plea.

*Id.* at 29–30.

In response to Galletta's question/statement, the court stated:

Well, I will tell you, sir your memory, either you're not talking about me and talking about another judge, because first of all I never get angry. Second of all, I prefer trials over guilty pleas, so I would've preferred the trial as opposed to you pleading guilty just because I enjoy trials so much. I believe they're the most important way that our justice system works properly. And I don't get involved in plea negotiations. So there is no way that it would've happened the way you described it. I don't get involved with trying to tell defendants to take a guilty plea or not taking guilty plea. I never try to force a defendant to take any guilty plea, like I said, I prefer trials. And there's no way I would've been angry with you because I truly do not get angry.

To me this is not personal with any defendant. This is just making sure our system functions properly that the interest of the defendant are properly protected as they must be, because God forbid an innocent person should ever be convicted and sentenced.

So I don't know what happened, but I never would've gotten angry at you. I never would have gotten angry with at [sic] your defense counsel. I never would have wanted to avoid a trial. I would've embraced the idea of a trial. There might have been times where the suggestion would've been brought to me that judge, by your defense counsel I think my client doesn't understand and could you put on the record so it's clear so if there's a PCRA that he understood what the deal was and what the potential consequences are. And then I would go into the courtroom with all parties present and I would explain for the record what the plea deal was and

what the potential consequences were under the law. Not I'm going to give you a harsher sentence because you didn't accept the plea deal.

So that may have happened in your case, I don't know, because I don't recall it at all, but it certainly wouldn't have been out of any anger or any animosity towards you or your defense counsel and I certainly would not have considered that at all even if I had gone into the court to explain that to avoid a PCRA against the defense counsel I never would've factored that into sentence that I ultimately imposed. . . . I don't want you to believe in any way that I hold any animosity towards you or any personal bias, because I do not, sir.

*Id.* at 30–32.

e.     Resolution of Claim

i.     *Section 144*

As best this court can discern, Galletta appears to argue that Attorney Sletvold was ineffective for failing to argue on direct appeal that the court erred in not considering an ex parte letter he sent to chambers regarding recusal as an affidavit under section 144.[111] *See* Original Br.

---

[111] Galletta's letter stated:

Honorable Judge Smith
    I am writing you directly because I need my voice heard. Once I had received notice that my federal case would be assigned to you I had expressed concern. I do not feel that you can be impartial because you demonstrated partiality while presiding and sentencing in my state case. I understand the standard to be used by a judge when deciding whether he should or should not recuse himself is "when it is reasonable for either party in the case to believe that the presiding judge may not be impartial." So it is not whether you feel you can be or are in fact actually impartial as you stated at our last hearing. I expressed both orally and written [sic] to my lawyers prior to 4/10/15 to formally request that you recuse yourself and allow this case to be presided over by another judge. They did not ask you to recuse yourself. I do not want to waive this argument. I absolutely requested them to ask you to rule on our argument that a judge who presided over a previous trial should not then be able to preside over another trial by the same defendant. Several other lawyers said it is unheard of and I would be able to appeal on this argument. Please understand, I am not trying to offend you, however, I am trying to exercise my legal rights and options. I asked [Attorney Meehan] immediately after our hearing why they never asked you? She stated I could still use this argument on appeal if I lose. I do not believe this. The law library computer clearly says that any argument not raised and ruled on during trial process is considered waived. I am not waiving this argument. I am asking you to rule on our objection to you presiding over this trial. Whatever your decision, I am sure that you would consider it reasonable for a defendant to believe a judge who presided over a previous trial and then sentenced him to the maximum sentence possible after agreeing to a time served sentence would be partial. Even the Superior Court published their opinion that your sentence though legal was excessive. If you choose to keep this case, I would like to raise this issue on appeal.

. . .

at ECF p. 236–37. At the time the court received it, the court deemed the letter to be a nullity because Attorneys Meehan and Henry were representing him at the time he improperly sent the ex parte letter to the undersigned chambers, and Galletta had no right to hybrid representation. The court then forwarded the letter to Attorneys Meehan and Henry, who later moved to withdraw as his counsel.

Galletta is correct insofar as he asserts that the court did not consider the letter to be an affidavit under section 144, but he is incorrect that this was an error. The letter is not a sworn affidavit, *see Gedeon*, 2023 WL 3097651, at 3 n.1 ("Because Mr. Gedeon did not file a sworn affidavit along with his motion, as required by 28 U.S.C. § 144, technically that statute is inapplicable to this motion [to recuse]." (citing *United States v. Berger*, 375 F.3d 1223, 1227 (11th Cir. 2004))), and it also was not accompanied by a certificate from "a counsel of record stating that it is made in good faith." 28 U.S.C. § 144. Therefore, Galletta's ex parte letter would not have invoked section 144 and, as such, Attorney Sletvold could not have been ineffective for failing to raise a claim that this court should have considered it as a section 144 affidavit for the first time on direct appeal.

### ii.      *Section 455*

Galletta has failed to show that his counsel were ineffective in failing to move for the undersigned's recusal because (1) the undersigned's impartiality could not be reasonably be questioned and (2) the undersigned did not have "a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 18 U.S.C. § 455(a), (b)(1). The initial fundamental flaw in Galletta's argument is his belief that presiding over

---

P.S. I objected from the beginning. I never waived my objection.

Apr. 23, 2015 Ltr. at 1–2, attached to this memorandum opinion as Attachment 1.

his 2004 trial and sentencing him outside the applicable guideline ranges but not beyond the maximum allowable sentence warrants recusal. A judge presiding over a prior case involving a party is not the type of "extrajudicial source" from which bias or prejudice can be discerned.[112]

> Instead,
>
> opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky*, 510 U.S. at 555 (emphasis added); *see also Johnson v. Trueblood*, 629 F.2d 287, 291 (3d Cir. 1980) ("Extrajudicial bias refers to a bias that is not derived from the evidence or conduct of the parties that the judge observes in the course of proceedings." (internal quotation marks omitted)). Thus, a judge presiding over a second case involving the same party does not automatically warrant recusal. *See Liteky*, 510 U.S. at 551 ("It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant."); *see also Dinsio v. App. Div., Third Dep't*, No. 16-CV-324, 2016 WL 11807212, at *2 (N.D.N.Y. Aug. 31, 2016) ("[E]ven if the undersigned had presided over plaintiff's prior trial, or any related proceedings, this fact, alone, would not serve as a sufficient basis for recusal." (citation omitted)).

Galletta has also failed to show that the undersigned's actions while presiding over his prior trial and sentencing "display[ed] a deep-seated . . . antagonism that would make fair judgment

---

[112] For this same reason, even if Galletta's ex parte letter could somehow constitute a proper section 144 affidavit, it would not have warranted the undersigned's recusal as his entire argument is based on the mistaken premise that a judge cannot preside over a second criminal case involving the same defendant.

impossible." *Liteky*, 510 U.S. at 555; *see also Gedeon*, 2023 WL 3097561, at 3 ("If the moving party does not rely on an extrajudicial source as evidence of bias and instead relies on 'facts introduced or events occurring in the course of the proceedings, or of prior proceedings,' then it has the heavy burden of showing that the judge to be recused harbors 'deep-seated favoritism or antagonism [that] would make fair judgment impossible.'" (alteration in original) (quoting *Liteky*, 510 U.S. at 555)). To the extent that Galletta, perhaps understandably, did not like the sentence imposed in that case, the undersigned's imposition of a lawful, yet lengthy sentence also would not be a basis for recusal. *See Liteky*, 510 U.S. at 555 ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal." (internal citation omitted)); *Ex Parte Am. Steel Barrel Co.*, 230 U.S. 35, 44 (1913) (explaining that recusal "was never intended to enable a discontented litigant to oust a judge because of adverse rulings made, for such rulings are reviewable otherwise, but to prevent his future action in the pending cause. Neither was it intended to paralyze the action of a judge who has heard the case, or a question in it, by the interposition of a motion to disqualify him between a hearing and a determination of the matter heard"); *Martinez v. Comm'r Soc. Sec.*, No. 22-2411, 2023 WL 3597380, at *1 (3d Cir. May 23, 2023) (rejecting claim that recusal of district judge was warranted where claimant "relied on his belief that the [d]istrict [j]udge was biased against him because he made rulings unfavorable to [claimant] in a previous case"). Galletta has also failed to demonstrate that the imposition of that sentence was based on anything other than the undersigned's observations during the trial and at

sentencing, the evidence presented during the sentencing hearing, and the information provided in the reports of any evaluations conducted prior to sentencing. In other words, he has not identified an extrajudicial source played any role in the court's sentence in the state-court case.

Additionally, while the court recognizes that Galletta claims that the Superior Court determined that the sentence was "excessive," he is mistaken. At no point in the Superior Court's opinion did the court state that the sentence was "excessive," *see Galletta*, 864 A.2d at 533–39,[113] instead, the closest the Superior Court came to stating anything similar was when the court stated, "There is no doubt the sentence imposed not only ***exceeded*** the guideline range, but was the statutory maximum allowed."[114] *Id.* at 534 (emphasis added). Simply because the Superior Court accurately pointed out that the sentence exceeded the guideline range does not mean that the court found the sentence to be excessive, because if it did, it would have vacated the sentence because excessive sentences are unlawful under Pennsylvania law. *See, e.g.*, *Commonwealth v. Sarvey*, 199 A.3d 436, 444, 455–56 (Pa. Super. 2018) (vacating consecutive sentences for being excessive); *Commonwealth v. Coulverson*, 34 A.3d 135, 150 (Pa. Super. 2011) (vacating sentence found to be manifestly excessive).

In addition to the length of the sentence and the Superior Court's purported finding of excessive, Galletta identifies two other aspects of the case that he believes warranted the undersigned's recusal. The first aspect is his representation that the undersigned also stated during the sentencing hearing that "I would give you more time if I could." 2255 Hrg. Tr. at 52. As Galletta acknowledges, he has not been able to acquire (personally or through counsel) a copy of

---

[113] The Superior Court's only references to "excessive" in the opinion related to Galletta's arguments that his sentence was excessive.

[114] The Superior Court also stated, "Although we may not have chosen to impose the statutory maximum in this case, we find that the sentencing court balanced the relevant factors as required and, therefore did not manifestly abuse its discretion by imposing the sentence that it did." *Galletta*, 864 A.2d at 538. In the context of sentencing, where the term "excessive" carries a very specific meaning, the Superior Court was not stating that the sentence was excessive.

the sentencing hearing transcript. *See id.* at 52–54. Thus, he has failed to substantiate that the undersigned made this statement during the sentencing hearing, and it is not included in the portion of the sentencing transcript quoted by the Superior Court. *See Galletta*, 864 A.2d at 534–36. Even if he did prove that the statement was made, it still would not qualify as extrajudicial information or show that a reasonable person would find that the undersigned has a deep-seated antagonism towards him that "would make fair judgment impossible." *Liteky*, 510 U.S. at 555. It surely would not demonstrate that the undersigned had an opinion of Galletta that was "so extreme as to display clear inability to render judgment." *Id.* at 551; *see also In re Shusterman*, 394 F. App'x 888, 890 (3d Cir. 2010) (per curiam) (concluding that district judge's comment during plea hearing that defendant was "one of the most specially-talented liars that I've ever met in my life" and was "genius in his ability to shape events to present things in a certain way" did not require judge to recuse from considering defendant's section 2255 motion); *United States v. Pearson*, 203 F.3d 1243, 1252, 1277–78 (10th Cir. 2000) (determining that sentencing judge's comments about defendant's character, based on information learned during trial, including comments that defendant was, *inter alia*, "a predator, a manipulator who preys on women," someone who "has [n]ever done anything decent in his life," "repulsive," and a "poster boy for a life sentence in a federal penitentiary," did not require recusal under section 455 because "[a]ll of the comments made by the judge were based on information he learned during the course of the proceedings and did not display a deep-seated antagonism that would make fair judgment impossible").

The second aspect is a purported prior on-the-record conference where the undersigned, *inter alia*, purportedly (1) "begged" Galletta to plead guilty prior to the trial, (2) got angry at him and yelled at his attorney when he refused to plead guilty, (3) proposed a plea offer, (4) directed his attorney to take Galletta aside and tell him to take the deal, and (5) was overall very angry with

him. *See* April 10, 2015 Status Hrg. Tr. at 29–30. This also would not provide a basis for demonstrating counsel's ineffectiveness because Galletta has never introduced any evidence that this occurred. Moreover, as the undersigned explained during the April 10, 2015 status conference, Galletta's representation as to what occurred is completely contradictory to how the undersigned has presided over cases for the past approximately 22 years in state, federal, and military tribunals. At no point during that period has the undersigned ever (1) gotten angry at a litigant, much less a criminal defendant, in a case, (2) made any remarks, positive or negative, about a criminal defendant's decision to not plead guilty and go to trial, (3) told a criminal defendant's counsel to compel their client to take a plea deal, or (4) penalized a defendant who chose to go to trial rather than plead guilty.[115] *See id.* at 30–32. Nevertheless, even if the undersigned had gotten "angry" with Galletta as he indicated, it still would not have warranted the undersigned's recusal under section 455. *See Liteky*, 510 U.S. at 555–56 (explaining that actions "[n]ot establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal

---

[115] In a separate section of his original brief, Galletta claims that the undersigned "made several plea offers to [him] during the plea negotiations in 2003 prior to the trial," with each of those offers "includ[ing] a time served sentence." Original Br. at ECF p. 244. He mentions this in support of his assertion that the undersigned punished him more harshly because he went to trial. *See id.*

Once again, Galletta is either lying or completely mistaken. The undersigned has never been involved in plea discussions in a criminal case during his time as a Judge of the Court of Common Pleas of Northampton County or as a federal district judge, as to do so is wholly improper. *See* Fed. R. Crim. P. 11(c)(1) (stating that district court "must not participate in [plea] discussions"); *Commonwealth v. Siers*, 464 A.3d 1307, 1311 (Pa. Super. 1983) ("[D]eliberate participation by the judiciary in the plea bargaining process has been held to be improper in Pennsylvania."). While the undersigned has no recollection as to what occurred in Galletta's state-court case, both federal and Pennsylvania state judges always have discretion to accept a plea agreement/bargain. *See* Fed. R. Crim. P. 11(c)(3) ("To the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report."); *Commonwealth v. Wissler*, 469 A.2d 686, 687 (Pa. Super. 1983) ("The decision whether to accept a plea bargain is in the exclusive discretion of the trial judge . . . 'There is no absolute right to have a guilty plea accepted.'" (quoting *Commonwealth v. Wilson*, 335 A.2d 777, 778 (Pa. Super. 1975))). Of course, this discretion is inapplicable in this case because Galletta is not alleging that the undersigned refused to accept a plea that would have allowed him to serve a time-served sentence; instead, he is alleging that the undersigned wanted him to plead guilty to receive that sentence and then punished him when he refused to do so. Which again, is wholly at odds with the undersigned's conduct while serving as a trial judge in state, federal, and military courts.

judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune"); *see also Rhoades v. Henry*, 598 F.3d 511, 519 (9th Cir. 2010) (statements of sentencing judge in earlier case opining that defendant was "morally vacant and totally devoid of conscience" and characterizing crime as "extremely wicked and vile, shockingly evil, and designed to inflict a high degree of physical and mental pain with utter indifference to and with the apparent enjoyment of the suffering" did not show that judge was biased at sentencing in subsequent case).

At bottom, even if Galletta satisfied his obligation to compile the record as the court has done here, he still would have failed to show that his defense counsel acted objectively unreasonably by not filing a motion to have the undersigned recused prior to trial. Galletta has failed to point to anything showing that the undersigned had a "personal bias or prejudice concerning [him], or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). To the contrary, the record shows that the undersigned did not recall anything about Galletta's case, other than his name, and acquired any information about it from reviewing the Superior Court's opinion prior to the April 10, 2015 status conference. In addition, Galletta has not shown that recusal was warranted under section 455(a) because "a reasonable person, with knowledge of all the facts, would conclude that the [undersigned's] impartiality might reasonably be questioned," *In re Kensington Int'l Ltd.*, 368 F.3d at 301, based on the undersigned's participation as the presiding judge in Galletta's criminal trial approximately ten years prior to the assignment of this case. *See United States v. Larsen*, 427 F.3d 1091, 1095 (8th Cir. 2005) (concluding that district court's denial of motion to recuse was not abuse of discretion, where "[t]he district judge's statements in the prior proceeding against Mr. Larsen dealt with the matter before the court at that time, and there was no evidence that the district judge would have been

unable to adjudicate Mr. Larsen's current case fairly due to opinions that he formed and expressed ten years before"); *see also United States v. Giorgi*, 840 F.2d 1022, 1035 (1st Cir. 1988) (concluding that district court did not have to recuse under section 455(b)(1) where "the opinion of Giorgi voiced by [the district judge] rest[ed] solely on facts learned in judicial proceedings," and did not have to recuse under 455(a)'s objective test because "[a]lthough the knowledge of a defendant gained during a judicial proceeding *may* present grounds for a reasonable person to question a judge's impartiality, mere exposure to prejudicial information does not, in itself, establish the requisite factual basis: [T]he judicial system could not function if judges could deal but once in their lifetime with a given defendant, or had to withdraw from a case whenever they had presided in a related or companion case or in a separate trial in the same case." (second alteration in original) (internal citations and quotation marks omitted)). Furthermore, Galletta has failed to demonstrate prejudice insofar as the filing of any motion to recuse would have been futile, and he has also not shown how the outcome of any aspect of his trial would have been different.[116]

---

[116] Galletta appears to identify the prejudice he suffered by having this court preside over his case in a separate section of his original brief. *See* Original Br. at ECF p. 247. In that section, he claims that

> [a] truly impartial judge would have been able to determine that the government was attempting to put forth an alternate theory of the criminal conduct. The government was permitted to amend count one of the indictment to charge an attempt to persuade an adult instead of a minor. An impartial judge would have held the government to exactly the conduct as charged in the indictment to protect the Petitioner's right to due process. A truly unbiased judge would have not allowed the government to ADD a second mens rea of seeking unlawful sexual contact to the indictment and then seek conviction upon the second non requisite mens rea. The Petitioner was never charged with having the mens rea of seeking unlawful sexual contact with a minor, however, Judge Smith used this additional mens rea to explain his reasoning behind letting in 404(b) evidence that was to show the 'intent' of the Petitioner. However, letting in 404(b) evidence to corroborate the intent to have unlawful sexual contact with a minor for a charge of § 2422(b) is an error. An impartial judge would have not allowed the erroneous 404(b) evidence in as it was irrelevant and highly prejudicial. A truly unbiased judge would have ruled on the Rule 29 motion by the defense in favor of the defense. When the government concluded their case and summed up the conduct of the Petitioner as attempting to have unlawful sexual contact with a minor and attempting to induce a parent to cause or bring about an act, an impartial judge would have found the evidence insufficient. The government's own explanation of the evidence IS [sic] that it proves the Petitioner attempted to gain access to a minor. This is not the charge of the indictment and the evidence was insufficient.

*Id.*

*See Hale v. Lockhart*, 903 F.2d 545, 549–50 (8th Cir. 1990) (concluding that section 2255 movant cannot be prejudiced by counsel's failure to file futile motion). Accordingly, Galletta is not entitled to relief based on his counsel's failure to file a motion to recuse.

### 11.     Due Process Violation for the Undersigned Refusing to Consider Recusal

#### a.     Galletta's Arguments

Galletta argues that his due process rights were violated when the undersigned purportedly failed to consider recusal under section 455 prior to trial. *See* Original Mot. at ECF pp. 44–45; Original Br. at ECF pp. 237–48. In this argument, he focuses on his claim that the undersigned purportedly commented that "I would give you more time if I could" during his prior sentencing. *See* Original Br. at ECF pp. 237–48. Galletta asserts that the undersigned's purported statement shows that the undersigned had a "'goal' during the trial." Original Br. at ECF pp. 237–38; *see also id.* at ECF p. 239 (arguing that undersigned's "comments were stark, plain and unambiguous and demonstrated his 'goal' in 2004"). He also asserts that the statement "[did] not have an expiration date," and showed the undersigned's "intent . . . to impose a lengthier sentence on [him]." *Id.* at ECF p. 238. Galletta believes that the way the undersigned effected this intent was "to ensure the government got as free a road as possible towards a conviction, which . . . would [then] give the [undersigned] . . . the opportunity to 'give more time' to [him]." *Id.* at ECF p. 241; *see id.* at ECF p. 243 ("[I]t is objectively reasonable for the every day man to believe that [the undersigned's] intent could be to ensure that [Galletta] would be convicted so that he can 'give more time' to him.").

---

All these arguments are frivolous. As will be explained later in this opinion, Galletta's arguments about constructive amendments, variances, and purported insufficient evidence are wholly off-base. Concerning the Rule 404(b) evidence, Galletta appears to forget that he raised a claim that this court should not have admitted said evidence on direct appeal only to have the Third Circuit reject his argument and conclude that it was properly admitted. *See Galletta*, 662 F. App'x at 193–95. In addition, Galletta is purely speculating that any other judge would have decided any aspect of this case differently than this court did considering the facts and circumstances presented, along with the applicable law.

Galletta further argues that the undersigned had a personal interest in his conviction and sentence. For example, Galletta claims that the undersigned's indication of a desire to impose a lengthier sentence, "clearly demonstrates that he had a personal interest outside of the law and justice to see that [Galletta] spend more time in prison." *Id.* at ECF p. 240. Galletta claims that it was "frustrating to [the undersigned] personally" that Pennsylvania law prevented the imposition of a lengthier sentence in the state court case. *Id.* at ECF p. 239.

Galletta also appears to assert that the court denied him his due process rights when the court told him that any motion to recuse would have been frivolous. *See id.* at ECF p. 240. Galletta interpreted this as the court indicating that it was effectively ruling on a motion without first hearing the evidence and any arguments. *See id.* at ECF p. 240. He also criticizes the court for stating that any motion would be frivolous without taking Galletta up on his "invit[ation]" to review the entire record of the 2004 case. *See id.* at ECF pp. 240–41. The court also allegedly "refus[ed] to consider the ex parte letter to recuse [Galletta sent]." *Id.* at ECF p. 239.

b.     <u>Applicable Law – Due Process and Recusals</u>

Parties have a due process right to an impartial judge. *See In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); *see also Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016) ("Due process guarantees an absence of actual bias on the part of a judge."). "[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (internal citations and quotation marks omitted). In general,

> [c]ourts presume that judges are honest, upright individuals who rise above biasing influences. *Franklin v. McCaughtry*, 398 F.3d 955, 959 (7th Cir. 2005). But that presumption is rebuttable. *Id.* at 960. Whether a judge should be recused is an objective inquiry; courts do not ask "whether the judge is actually, subjectively

199

biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009).

This does not require proof of actual bias, "though actual bias, if disclosed, no doubt would be grounds for appropriate relief." *Id.* at 883, 129 S. Ct. 2252. "[B]ad appearances alone do not require disqualification." *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc); *see also Suh v. Pierce*, 630 F.3d 685, 691–92 (7th Cir. 2011) (rejecting the argument that recusal is required "in the absence of any possibility of actual bias—that is, based solely on how the situation might have 'appeared' to an outside observer."). To prove a disqualifying bias, there must be evidence of "either actual bias, or a possible temptation so severe that we might presume an actual, substantial incentive to be biased." *Del Vecchio*, 31 F.3d at 1380. For the latter, courts must determine whether "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Rippo v. Baker*, [580 U.S. 285], 137 S. Ct. 905, 907, 197 L. Ed. 2d 167 (2017) (per curiam) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975)).

Courts have identified a limited set of circumstances that meet this standard. First, actual bias is disqualifying. *See, e.g., Franklin*, 398 F.3d at 961–62 (finding actual bias where there was evidence that the judge determined that defendant was guilty before trial). Second, "there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Williams v. Pennsylvania*, [579 U.S. 1], 136 S. Ct. 1899, 1905, 195 L.Ed.2d 132 (2016). Third, a judge is disqualified when the judge has a financial incentive in the case's outcome. *See, e.g., Rippo*, 137 S. Ct. at 906; *Caperton*, 556 U.S. at 877–78, 129 S. Ct. 2252; *Bracy*, 520 U.S. at 906, 909, 117 S. Ct. 1793; *Bracy v. Schomig*, 286 F.3d 406, 413, 419 (7th Cir. 2002) (en banc). Lastly, a judge should recuse himself when the judge becomes "personally embroiled" with a litigant. *Mayberry v. Pennsylvania*, 400 U.S. 455, 465–66, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971); *see also Del Vecchio*, 31 F.3d at 1373–75.

*United States v. Williams*, 949 F.3d 1056, 1061 (7th Cir. 2020).

c.   Resolution of Claim

Presuming that Galletta may permissibly bring this due process claim for the first time in a section 2255 proceeding, he is nonetheless not entitled to relief for several reasons. First, as already stated as part of Galletta's ineffective assistance of counsel claim on the recusal issue, he has not substantiated his assertion that the undersigned stated on the record a desire to impose a lengthier sentence in the 2004 case.

Second, in Galletta's attempt to construct a narrative where the court was biased against him, he conflates what occurred in two separate proceedings and then misrepresents portions of those proceedings. More specifically, the court initiated, and then held, an on-the-record conference on April 10, 2015 to discuss the recusal issue. Although Galletta claims that the court did not consider recusal under section 455(a), he ignores that among the court's opening remarks, the undersigned stated: "[Although,] I don't believe that my impartiality might reasonably be questioned, . . . I certainly wanted to give counsel for both sides the opportunity to address whether there is even an appearance that I would have a personal bias or prejudice concerning Mr. Galletta."[117] Tr. of Apr. 10, 2015 Status Conf. at 5. As already stated, the court then allowed counsel to ask questions, allowed Galletta to ask questions (which turned into him making a statement), openly discussed the prior proceedings and answered questions if possible, asked if defense counsel wanted to orally move for the undersigned's recusal, allowed Attorney Henry to state on the record what she wanted to include, and essentially explained why the court did not believe that recusal was warranted in this case. *See id.* at 5–19, 29–34. As such, Galletta's notion that he was somehow deprived of due process through the court not considering evidence and argument is utterly wrong.

In addition, Galletta makes multiple references to the court informing him that a motion to recuse would have been frivolous, but he does not cite to when that occurred. If he had done so, he would have pointed out that the word "frivolous" came up during the May 6, 2015 hearing on Attorneys Henry and Meehan's motion to withdraw as his counsel. It came up because Galletta had improperly sent that ex parte letter to the undersigned's chambers where he complained about Attorney Henry and Meehan not moving for the undersigned's recusal. Attorneys Henry and

---

[117] This alone contradicts Galletta's argument that the court "did not even for a moment consider the 'appearance of bias.'" Original Br. at ECF p. 240.

Meehan then sought to withdraw, and during the hearing on their request, Galletta brought up again that he wanted them to move for the undersigned's recusal. *See* Withdrawal Hrg. Tr. at 8. In response to his statements about counsel not moving to have the undersigned recused, the court stated: "I can't help but think did you ever think that they knew the law of recusal and that's why they did not file what otherwise would have been a frivolous motion, but I asked that rhetorically, because I'm not asking you for an answer to that." *Id.* at 9. By this point, the court had already held an on-the-record proceeding and provided counsel and Galletta the opportunity to ask the undersigned questions or put on any evidence they wanted to introduce. Therefore, contrary to Galleta's misrepresentation, it was not a situation where the court determined the recusal issue without having already heard evidence or argument. Although no motion to recuse was filed, the court did not determine that recusal was warranted.

Third, Galletta continues to demonstrate a propensity for making things up. In this regard, Galletta references a purported quote by the court, in which the court stated, "I am known to be impartial and therefore I will not recuse."[118] Original Br. at ECF p. 239. The court made no such statement. Galletta also claims that the court stated, "I do not remember the defendant." *Id.* at ECF p. 240. Once again, the court made no such statement during any proceeding.[119] Galletta's propensity to fabricate quotations out of whole cloth makes it especially problematic for the court

---

[118] The court admonishes Galletta that he should exercise caution when using quotation marks. In general, the use of quotation marks around one or more words, along with an indication that those words were spoken or written by someone, indicates that the person identified spoke those exact words. *See* Purdue Online Writing Lab, https://owl.purdue.edu/owl/general_writing/punctuation/quotation_marks/index.html ("The primary function of quotation marks is to set off and represent *exact* language (either spoken or written) that has come from somebody else."). In addition, any quotations, especially in legal documents, should always contain a citation to the source of the quotation. No court should have to try and search for the source of quoted text from any litigant, even *pro se* litigants.

[119] The court acknowledged not remembering (1) the two minor victims testifying during the trial, (2) anything about the prior case other than what the court acquired by reading the Superior Court's opinion, (3) the reports that were provided to the court prior to sentencing in the prior trial, (4) whether Galletta testified in the prior trial, (5) any impressions of Galletta from the prior trial, (6) Galletta's prior trial, (7) any plea offer that the government made to Galletta. *See* Tr. of Apr. 10, 2015 Status Conf. at 7–8, 15, 17. In addition, the court stated at the outset that the hearing was scheduled because the court remembered Galletta's name.

when addressing Galletta's representation that the court stated that it would have given him a lengthier sentence if it could, when Galletta has never provided any evidentiary support for this statement.

Finally, even if the court indicated a desire to be able to sentence Galletta to a longer period of incarceration in the prior trial, this does not support a conclusion that "the probability of actual bias on the part of the judge or decisionmaker [wa]s too high to be constitutionally tolerable." *Rippo*, 137 S. Ct. at 907. The unsubstantiated statement does not meet one of the "limited set of circumstances that meet this standard." *Williams*, 949 F.3d at 1061. In this regard, (1) there is no proof of actual bias, (2) the undersigned was not formerly employed "as a prosecutor in a critical decision regarding [Galletta's] case," *Williams*, 579 U.S. at 8, (3) the undersigned had no financial incentive in the outcome of Galletta's case, and (4) the undersigned did not become "personally embroiled" with Galletta. *Mayberry*, 400 U.S. at 465–66.

The court also notes that Galletta attempts to support his due process argument by comparing the court's purported statement about imposing more time in the 2004 case with the district judge's comments referenced in *United States v. Antar*, 53 F.3d 568 (3d Cir. 1995). *See* Original Br. at ECF pp. 237, 239. His comparison is inapt.

In *Antar*, the district judge indicated during a discussion at sentencing about the potential restitution award that "[m]y object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others." 53 F.3d at 573 (emphasis removed). The Third Circuit determined that this statement warranted the district judge's recusal, explaining that

> [t]his case is different . . . from nearly all the reported recusal cases we have come across. This is not a case where the district judge is accused of being biased in a personal way against a litigant. Nor is this a case where a judge's rulings are so indefensible that combined with particular comments they arguably demonstrate

203

partiality towards or against a party. It is not even a case where, as in [*In the Matter of Huntingdon Commons Assocs.*, 21 F.3d 157 (7th Cir. 1994)], it is argued that the judge's previous experience with the case may have left him disdainful of one party's position. Rather, this is a case where the district judge, in stark, plain and unambiguous language, told the parties that his goal in the criminal case, from the beginning, was something other than what it should have been and, indeed, was improper. Of course, a trial judge in a criminal proceeding should ensure that a fair and orderly trial takes place in the courtroom. Here, however, the district court told the parties that his goal from the beginning of the criminal proceeding was to enforce a repatriation order and final judgment issued during a concurrent civil proceeding and give back the proceeds recovered to the public. It is difficult to imagine a starker example of when opinions formed during the course of judicial proceedings display a high degree of antagonism against a criminal defendant. After all, the best way to effectuate the district judge's goal would have been to ensure that the government got as free a road as possible towards a conviction, which then would give the judge the requisite leverage to order a large amount of restitution. And it goes without saying that this is an improper role for a district judge during a criminal trial.

*Id.* at 575–76.

Galletta's attempt to analogize this court's purported statement to the district judge's statement in *Antar*, while creative, is unavailing. First, *Antar* did not involve a claim that the defendant's due process rights were violated (as Galletta is alleging here); rather, it involved whether the district judge should have *sua sponte* disqualified himself under section 455. Second, in *Antar*, the district judge expressly stated during the case over which the judge was presiding, that the judge had a goal to have a certain result occur, and the judge had that goal from the beginning of the case. For Galletta, no such statement occurred, and no action or word spoken by this court demonstrated that the court had a goal of ensuring Galletta would be convicted so that he would be imprisoned. Finally, merely stating that, based on the facts and circumstances of the 2004 case that the court would have imposed a lengthier sentence at that time, does not express a goal that the court would continue to follow a decade later, after presiding over hundreds of other trials, thousands of guilty pleas, thousands of sentencings, and interacting thousands of attorneys and litigants, both civil and criminal. The notion that this court would recall Galletta's case, much

less that statement, and then maintain a purported goal of ensuring that Galletta be incarcerated, would not be tenable to a reasonable person. It surely would not constitute a due process violation. *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948) ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level.").[120]

In conclusion, Galletta has not shown that his due process rights were violated when this court did not *sua sponte* recuse itself from his case. Nor has he, as already explained, demonstrated that *sua sponte* recusal was warranted under section 455. Once again, Galletta's claim for relief under section 2255 fails.

## 12.   Ineffective Assistance for Failing to Object to the Constructive Amendment and Variance of Count One of the Superseding Indictment at Trial or on Direct Appeal

Galletta argues that Attorney Sletvold was ineffective when he failed to object to a constructive amendment and prejudicial variance of count one of the superseding indictment during the trial and on appeal.[121] *See* Original Mot. at ECF pp. 45–47; Original Br. at ECF pp. 249–89; Suppl. at ECF pp. 21–41; Am. Mot. Suppl. at 17–20; 2255 Hrg. Tr. at 54–68. Galletta uses approximately 60 pages to articulate his arguments in support of these claims. Because those arguments are presented in a disorganized, rambling, and repetitive fashion, the court will first identify the law applicable to constructive amendments and variances to give context to his

---

[120] Although this is in a different context, other courts have concluded that a judge's prior statements that further criminal conduct by a defendant would result in a longer or certain sentence did not warrant recusal from a subsequent criminal proceeding involving the same defendant. *See, e.g.*, *United States v. Martin*, 757 F.3d 776, 778–79 (8th Cir. 2014) (concluding that recusal was not warranted where judge warned defendant about getting certain period of incarceration for future violations because judge's statement "does not display a 'deep-seated antagonism that would make fair judgment impossible.'" (quoting *Liteky*, 510 U.S. at 555)); *United States v. Mitchell*, 348 F. App'x 430, 430–31 (11th Cir. 2009) (concluding that district court did not abuse discretion in denying recusal "based on her comments in an earlier revocation hearing that she would 'sentence [the defendant] to the full and maximum term that is allowed by law' if the government moved to revoke [the defendant's] probation a second time").

[121] Galletta had set out separate ineffective assistance claims pertaining to constructive amendment, variance, and the failing to raise either on appeal. *See* Original Mot. at ECF pp. 45–47. Since all three claims are based on many of the same arguments, the court has addressed them together here.

arguments, then attempt to identify Galletta's precise arguments, and finally resolve these ineffective assistance claims.

a.    <u>Applicable Law</u>

i.    *Constructive Amendments*

"The Fifth Amendment requires that a defendant be tried only for crimes for which [they have] been indicted. Accordingly, a court cannot later amend an indictment – either formally or constructively – to include new charges." *United States v. Scarfo*, 41 F.4th 136, 193 (3d Cir. 2022) (internal citations omitted), *cert. denied sub nom.*, *Pelullo v. United States*, 143 S. Ct. 1044 (2023); *see also Stirone v. United States*, 361 U.S. 212, 215–16 (1960) ("[A]fter an indictment has been returned[,] its charges may not be broadened through amendment except by the grand jury itself."). Concerning constructive amendments, "[a] constructive amendment occurs when the court 'broaden[s] the possible bases for conviction from th[ose] which appeared in the indictment." *Id.* (alterations in original) (quoting *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007)). Stated differently,

> [a] constructive amendment occurs where the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged. Trial evidence, arguments, or the district court's own instructions can all form the basis of constructive amendments. A constructive amendment is *per se* reversible error because it deprives a defendant of his Fifth Amendment right to be tried on charges presented to the grand jury. The key inquiry in a constructive amendment claim is whether the defendant was convicted of the same conduct for which he was indicted.

*Fallon*, 61 F.4th at 111 (internal citations and quotation marks omitted).

An example of a constructive amendment is when "the jury instructions 'modify essential terms of the charged offense' such that 'the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged.'" *Scarfo*, 41

206

F.4th at 193 (quoting *United States v. Daraio*, 445 F.3d 253, 259–60 (3d Cir. 2006)); *see also*

*United States v. Feldman*, 931 F.3d 1245, 1260 (11th Cir. 2019) ("The constructive amendment of

an indictment occurs when the essential elements of the offense contained in the indictment are

altered—for instance, by a faulty jury instruction—to broaden the possible bases for conviction

beyond what is contained in the indictment." (citation and internal quotation marks omitted)).

Another example occurs when evidence is introduced that "broaden[s] the possible bases for

conviction from that which appeared in the indictment." *United States v. Miller*, 471 U.S. 130, 138

(1985); *see also United States v. Dove*, 884 F.3d 138, 146 (2d Cir. 2018) (explaining that "[t]he

archetypal example of a constructive amendment created by adding an additional element

sufficient for conviction is *Stirone v. United States*, 361 U.S. 212, 80 S. Ct. 270, 4 L. Ed. 2d 252

(1960). In *Stirone*, the indictment alleged a violation of the Hobbs Act based on the obstruction of

interstate importation of sand to be used in construction of a steel mill. 361 U.S. at 213–14, 80 S.

Ct. 270. At trial, the prosecutor additionally argued that the defendant had obstructed the interstate

exportation of steel to be manufactured at the mill once it was constructed. *Id.* at 214, 80 S. Ct.

270. This addition, the Court held, constructively amended the indictment because it provided an

additional basis, one not considered by the grand jury, upon which the petit jury may have

convicted the defendant. *Id.* at 215, 217–19, 80 S. Ct. 270.").

ii.     *Variances*

When considering claims of a constructive amendment and a variance,

"[t]he line between a constructive amendment and a variance is at times difficult to
draw." *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002). There is a
variance "where the charging terms [of the indictment] are unchanged, but the
evidence at trial proves facts materially different from those alleged in the
indictment." [*United States v. Castro*, 776 F.2d 1118, 1121 (3d Cir. 1985)]. When
there has not been a constructive amendment of the indictment but rather there only
has been a variance between the facts alleged in the indictment and the evidence
offered at trial, the proceedings at the trial will not have usurped the constitutionally

guaranteed role of the grand jury. Instead, the concerns raised by a variance argument are the fairness of the trial and the protection of the defendant's right to notice of the charges against her and her opportunity to be heard. *See, e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 757–58, 66 S. Ct. 1239, 1244, 90 L. Ed. 1557 (1946); *Berger v. United States*, 295 U.S. 78, 81–82, 55 S. Ct. 629, 630, 79 L. Ed. 1314 (1935). Accordingly, we have recognized that "[t]he variance rule, to the extent that it is constitutionally required, is more of a due process rule than is the flat fifth amendment prohibition against being tried on an indictment which a grand jury never returned." *United States v. Crocker*, 568 F.2d 1049, 1059 (3d Cir. 1977).

Unlike a constructive amendment, a variance can result in a reversible error only if it is likely to have surprised or otherwise has prejudiced the defense. *United States v. Schurr*, 775 F.2d 549, 553–54 (3d Cir. 1985). To demonstrate prejudice from a variance, a defendant "must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right." *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996). "A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." *United States v. Schoenhut*, 576 F.2d 1010, 1021–22 (3d Cir. 1978).

*Daraio*, 445 F.3d at 261–62 (all alterations except second alteration in original).

### b.  Galletta's Arguments

The court understands Galletta's arguments to be as follows:

First, Galletta contends that the government constructively amended count one by alleging that he "attempt[ed] to persuade, entice, or induce an adult intermediary instead of a minor as charged." Original Br. at ECF p. 249. In support of this contention, Galletta indicates that the government stated during its opening statement that the evidence would show that it was Galletta's "intent[,] . . . plan, . . . [and] motive to find a father to allow him to have access to his young daughter so he could sexually abuse her." *Id.* at ECF p. 250 (quoting Day One Tr. at 21:20-22–22:1). Galletta asserts that this shows that the government, which he believes could have only proven his attempt via his "actual communications" with Agent Leri, "constructively amend[ed]

208

the terms of count one of the [superseding] indictment from an intent to attempt to persuade a 'minor' to an intent to attempt to persuade an adult," which is not a violation of section 2422(b). *See id.* at ECF p. 251.

Galletta also points to the government's appellate brief, which he has not introduced as evidence in this case, as demonstrating that the government constructively amended count one. *See id.* at ECF p. 252. He claims that the government asserted on appeal that Galletta efforted to "induce a parent to permit the abuse of his daughter," and that his "communications with the officer provide an ample basis for a rational jury to find that Galletta attempted to persuade the undercover officer – the adult intermediary who had control over the child – to make the child available to him for sexual activity." *Id.* at ECF p. 253 (purportedly quoting Gov't's App. Br. at 29).

Second, Galletta argues that the evidence presented at trial was insufficient to prove that he attempted to persuade a minor through an intermediary. *See id.* at ECF p. 255. Galletta notes that there was no proof that he attempted to communicate with the minor using a means of interstate commerce because none of his texts or emails to Agent Leri contained an expression of an intent to communicate with the minor child. *See id.* Instead, the evidence showed that his communications were aimed entirely at Agent Leri, which he argues is not a violation of section 2422(b). *See id.*

Third, Galletta argues that the government also constructively amended count one by telling the jury that he had the intent to violate the two Pennsylvania criminal statutes identified as part of count one. *See id.* at ECF p. 256. He asserts that "this . . . is not what [he] was charged with and also is not a violation of § 2422(b)." *Id.* He also asserts that the government did not have to prove he had the intent to commit those two Pennsylvania crimes. *See id.* at ECF p. 260 ("The

Pennsylvania statutes are not the substantive elements of § 2422(b) that need to be proven. Circuits that have held that they need to be proven are incorrect.").

Fourth, he argues that the government introduced a constructive amendment or prejudicial variance when it purportedly predicated its entire case on proving that he intended to have unlawful sexual activity with a minor, instead of attempting to persuade, entice, or induce a minor to engage in sexual activity. *See id.* at ECF pp. 249, 256, 259–60. In support this argument, Galletta points to the government's opening statement where it purportedly stated that Galletta's specific intent was to gain access to the minor or have sexual contact with the minor. *See id.* at ECF p. 260 (referencing Day One Tr. at 6, 7); *id.* at ECF pp. 261–62 (referencing Day One Tr. at 31:23–32:4); *id.* at ECF p. 262 (referencing Day One Tr. at 32:10-14, 36:7). He contends that "each time the government tells the jury that they are permitted to consider that the required mens rea is the intent to have sexual contact either through their evidence or arguments, they are creating a fatal and prejudicial variance upon which the jury may convict." *Id.* at ECF p. 261.

Fifth, Galletta appears to challenge the government's evidence insofar as it would show that he attempted to violate section 2422(b). *See id.* at ECF p. 264. He again asserts that only the email and text communications are relevant to show his specific intent. *See id.* He contends that his Craigslist posting is not relevant to his intent and does not qualify as a substantial step because it was "not aimed or targeted at minors" and "was located in an adults only area of the website." *Id.* He also argues that his plans to meet Agent Leri and his traveling to the meeting spot were irrelevant to the attempted persuasion, which had to be through the text and email communications. *See id.* at ECF p. 265; *see also id.* at ECF pp. 266–67 ("[T]he act of travel or even the act or setting up a meeting is not a substantial step of intending to use interstate commerce to persuade a minor."); *see also* Suppl. at ECF p. 26 ("To be perfectly clear, any plans to meet or actual travel

cannot be considered a substantial step towards doing something that has been completed before the substantial step is undertaken.").

Sixth, he argues that the jury instruction on the offense was improper, as it permitted the government "to alter the substantial step requirement from some action towards using the means of interstate commerce to persuade a minor to some action towards the unlawful sexual activity." *See id.* at ECF p. 272. In particular, he challenges the use of the word "it" in this portion of the government's proposed instruction (which he claims the court adopted):

> It is also not necessary for the government to prove that the individual was actually persuaded, induced, enticed or coerced into engaging in the described sexual activity, as long as it proves the defendant intended to persuade, induce, entice or coerce the individual to engage in some form of unlawful sexual activity with the defendant and knowingly took some action that was a substantial step toward bringing 'IT' [sic] about. A substantial step is conduct that strongly corroborates the firmness of the defendant's criminal 'attempt'. Mere preparation is not enough.

*Id.* at ECF pp. 271–72 (quoting Gov't's Proposed Jury Instrs. at p. 29). Galletta believes that "[t]he 'it' at the end of the sentence refers to the unlawful sexual activity and NOT the charged persuasion of the minor by means of interstate commerce to engage in unlawful sexual activity."[122] *Id.* at ECF p. 272.

Galletta also challenges another sentence in the government's proposed instruction, where it states that "[a] substantial step is conduct that strongly corroborates the firmness of the defendant's criminal attempt." *Id.* at ECF p. 275 (quoting Gov't's Proposed Jury Instrs. at p. 29). He points out that the instruction is improper because it uses the word "attempt" instead of "intent." *Id.*

---

[122] As part of this argument, Galletta indicates that "[t]he Third Circuit has adopted the jury instructions for § 2422(b) from the Fifth Circuit Pattern Criminal Instruction 2.85 (2012)," and then proceeds to argue that the Third Circuit "intentionally created ambiguity" by slightly differing its instruction from the Fifth Circuit's instruction. *See* Original Br. at ECF pp. 272–74. Once again, Galletta is misrepresenting something. The Third Circuit does **not** have a standard jury instruction for section 2422 offenses.

Seventh, and finally, Galletta appears to challenge the Third Circuit's resolution of his direct appeal, calling it "weak," Suppl. at ECF p. 30, and even the Third Circuit's opinion in *United States v. Nestor*, 574 F.3d 159 (3d Cir. 2009). He contends that on his direct appeal the Third Circuit "completely ignored" his argument that although "using an intermediary does violate § 2422(b), the alleged conduct must still be communications consisting of enticement, coercion or inducement on the minor THROUGH the intermediary and NOT upon the adult intermediary." Suppl. at ECF p. 31. He asserts that the Third Circuit "punted the football by citing a wholly different argument to support their affirmation of the conviction, thereby ignoring [his] actual argument." *Id.* at ECF p. 32.

As for *Nestor*, Galletta argues that the Third Circuit misrepresented what the defendant was charged with in that case. *See id.* He disagrees with the Third Circuit's determination that the defendant wanted to meet and have sex with the minor because that would not have qualified as an offense under section 2422(b). *See id.* at ECF p. 33. He further disagrees with the Third Circuit's conclusion that traveling to meet with the adult intermediary who had access to the minor qualifies as a substantial step because it does involve means of interstate commerce. *See id.* Instead, the substantial step "must corroborate ONLY the mens rea of using means of interstate commerce to persuade a minor to engage in unlawful activity and NOT towards meeting to have sex." *Id.* at ECF p. 34. Galletta "ask[s] that the Third Circuit please weigh in an [sic] address the argument that was raised on direct appeal, can someone be guilty of attempting to violate § 2422(b) by attempting to persuade an adult to then arrange the unlawful sexual activity with a minor." *Id.* at ECF p. 35.

In response to Galletta's arguments, the government points out that he had already raised constructive amendment arguments during trial and on appeal. *See* Gov't's 1st Br. at 29. The

government notes that the Third Circuit already rejected his argument that contact with an adult intermediary is all that is required to be convicted of an attempt under section 2422(b). *See id.* Overall, the government asserts that "upon consideration of the elements of his charged offense and the evidence adduced at trial, Galletta cannot meet his burden to establish either a constructive amendment or a variance" and, as such, Attorney Sletvold cannot be ineffective for failing to raise a frivolous argument on appeal. *Id.*

c.     <u>Resolution of Claim</u>

i.     *Constructive Amendment*

Galletta has failed to show that count one was constructively amended at trial; therefore, he has not shown by a preponderance of the evidence that Attorney Sletvold was ineffective for failing to raise a constructive amendment claim either at trial or on direct appeal. The essence of Galletta's failure comes down to his continued misunderstanding of the requirements for an indictment to be sufficient. As already explained, count one only needed to inform Galletta of what he did and did not need to explain in detail how he did it. *See United States v. Williams*, 591 F. App'x 78, 90–91 (3d Cir. 2014) ("The government is not required to include in the indictment all of the information at its command so as to present 'a fully integrated theory for the benefit of the defendant.'" (quoting *Addonizio*, 451 F.2d at 64)); *see also United States v. D'Amelio*, 683 F.3d 412, 418 (2d Cir. 2012) (explaining that indictment must allege "core of criminality" for offense, which "involves the essence of the crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview"). Galletta's entire constructive amendment challenge pertains to how the government proved that he attempted to "knowingly persuade[], induce[], entice[], or coerce[]" a minor "to engage in . . . any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2422(b). The government did not need to specify

213

how Galletta committed the crime in count one, and it was not limited to a particular "how" insofar as it did not specify the way he committed the offense in count one. Instead, it alleged that Galletta (1) "knowingly used a facility and means of interstate commerce, that is, the Internet and a mobile device," (2) "to attempt to knowingly persuade, induce, and entice an individual whom he believed was 7-years-old," (3) "to engage in sexual activity for which a person can be criminally charged under" Pennsylvania law, namely aggravated indecent assault (18 Pa. C.S. § 3125(a)(7)) and indecent assault (18 Pa. C.S. § 3126(a)(7)). Superseding Indictment at 1. Since the government's arguments and the evidence presented at trial followed the elements set forth in count one, and count one sufficiently alleges the elements of a charge under section 2422(b), Galletta's ineffective assistance of counsel claim based on the failure to object to a constructive amendment of count one at trial or on appeal fails. *Daraio*, 445 F.3d at 260 ("The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted." (quoting *United States v. Robles–Vertiz*, 155 F.3d 725, 729 (5th Cir. 1998)); *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010) ("If a defendant is convicted of the same offense that was charged in the indictment, there is no constructive amendment.").

In addition, even if the purported differences in the government's opening statement could qualify as leaning towards a constructive amendment, the court's instructions "limited the jury" to the elements presented in count one anyway.[123] *Fallon*, 61 F.4th at 113; *see Daraio*, 445 F.3d at

---

[123] Galletta argues that the government also constructively amended count one by telling the jury that he had the intent to violate the two Pennsylvania criminal statutes identified as part of count one. *See id.* at ECF p. 256. To the extent that the government misspoke and stated that it needed to prove that Galletta intended to commit the offenses of aggravated indecent assault and indecent assault under Pennsylvania law, rather than needing to prove that the sexual acts that Galletta wanted to persuade, induce or entice the minor to do constituted criminal offenses under Pennsylvania law, it would not have constituted a constructive amendment because it would have, at best, narrowed the basis for which Galletta could be convicted. *See United States v. Heinrich*, 57 F.4th 154, 160 (3d Cir. 2023) (concluding that "the ordinary reading of [section 2422(b)] requires that the defendant intend the act that are objectively sexually explicit. But [they] need not appreciate their sexual character or legal consequence"); *see also United States v. Miller*, 471 U.S. 130, 144 (1985) (rejecting proposition "that a narrowing of the indictment constitutes an amendment that renders the indictment void"). Even if it somehow could have broadened the basis by which he

261 ("[T]he district court obviated the possibility of the indictment being constructively amended by issuing accurate and thorough jury instructions precluding the jury from convicting [the appellant] for any conduct other than that which the indictment charged."). In this regard, the court's instructions on the attempted enticing or coercing a minor charge in count one were as follows:

> [THE COURT:]The first is attempted enticement of a minor to engage in illicit sexual activity. The defendant is charged in count one of the superseding indictment with attempting to commit the crime of coercing or enticing a minor to engage in unlawful sexual activity. For you to find the defendant guilty of this crime you must be convince [sic] that the government is [sic] proven both of the following elements beyond a reasonable doubt. Now these are the elements for intent [sic].

> First, that the defendant intended to commit the crime of coercing or enticing a minor to engage in unlawful sexual activity and second, that the defendant did some overt act that was a substantial step towards committing the crime of coercing or enticing a minor to engage in unlawful sexual activity.

> Now, already you must be starting to think this is getting a little confusing and we're just beginning. You will not have a copy of the written charge when you go back to the jury deliberation room, but if you have any questions about the law when you're in there all you have to do is write that down in a written communication, have the floor [sic] person that you will select sign that written communication, I'll take that up with counsel. If you need to be instructed on part of the law we'll bring you back into the courtroom and instruct you on that law. You will not have to listen to this court charge again, but we can focus on just those areas where you might have any question.

> But again, the two elements for attempting to commit the crime of coercing or enticing a minor to engage in unlawful sexual activity are as follows. First if the defendant intended to commit the crime of coercing or enticing a minor to engage in unlawful sexual activity. Now, I'm soon going to explain to you what the elements of that officer [sic] are.

> Second, that the defendant did some overt act that was a substantial step toward committing the crime of coercing or enticing a minor to engage in unlawful sexual activity. Now, I will define for you the elements of the crime of coercing or

---

could be convicted, the court's instructions to the jury, recited *infra*, accurately and thoroughly instructed the jury that to find Galletta guilty the jury would have to determine beyond a reasonable doubt that the type of sexual activity that Galletta wanted to entice, induce, persuade, or coerce the minor to engage in would have constituted the crimes of aggravated indecent assault or indecent assault under Pennsylvania law. *See* Day Two Tr. at 148:13–16, 148:18–20, 149:9–13, 150:23–151:23, 152:25–153:20, 154:5–18.

enticing a minor to engage in unlawful sexual activity, because you need to know the elements of that crime to know whether the government has proven that the defendant attempted to commit this crime.

The elements of that crime are as follows. That the defendant knowingly, now you notice I emphasized the word intended before and here the word knowingly, because we're going to get into that instruction I gave you about that evidence that was being introduced for the limited purpose of the state of mind of the defendant. That evidence that you could only use for trying to determine whether the government had proven this state of mind beyond a reasonable doubt.

So the elements of the crime of coercing or enticing a minor to engage in unlawful sexual activity are first, that the defendant knowingly persuaded, induced, enticed or coerced a minor to engage in any sexual activity. It's not necessary for the government to prove that the defendant communicated directly with a minor. Dealing with an adult intermediary for the purpose of enticing or coercing the minor is sufficient. So that is the first element.

The second element is that the defendant used the Internet or a cell phone, okay, so the second element is the defendant used the Internet or a cell phone to do so. And that is a facility or means of interstate or foreign commerce.

Third, that the defendant believed that such individual would less than 18 years of age. And fourth, that had the sexual activity actually occurred the defendant could be charged with the criminal offense -- with criminal offenses under the laws of the Commonwealth of Pennsylvania. And I'm going to give you more detailed instruction on this.

The alleged criminal defenses [sic] under the indictment are aggravated indecent assault and indecent assault. So let me give you those four elements again. First, you know the two elements for attempting, you intended to commit the crime. And second, that you did some overt act that was a substantial step towards committing the crime. The crime here is as alleged is the crime of coercing or enticing a minor to engage in unlawful sexual activity. The elements that offense are that the defendant knowingly persuaded, induced, enticed or coerced a minor to engage in any sexual activity. It's not necessary for the government to prove that the defendant communicated directly with a minor dealing with an adult intermediary for the purpose of enticing or coercing the minor is sufficient.

Second, that the defendant used the Internet or a cell phone to do so. Third, that the defendant believed that such individual was less than 18 years of age. And fourth, that the sexual activity had it actually occurred, the defendant could be charged with criminal offenses under the laws of the Commonwealth of Pennsylvania that being aggravated indecent assault and indecent assault.

216

Now, here's some more detailed instructions on these terms. Using a means or facility of interstate commerce which is an element includes using the Internet or a mobile telephone, a cellular telephone. Hence, why I instructed you that in order to find the defendant guilty under the facts of this case you have to find that the defendant used the Internet or a cell phone to do the persuading inducing, enticing or coercing.

Is it is not necessary for the government to prove the individual is real. Now, this is the individual who is being enticed. It is not necessary for the government to prove the individual is real or was in fact less than 18 years of age, but it is necessary for the government to prove that the defendant believed such individual to be under that age.

The government need only prove that the defendant believed the victim to be a real minor. It is not a defense to this crime that no minor was actually involved in the communications with the defendant. It is also not necessary for the government to prove that the individual was actually persuaded, induced, enticed or coerced into engaging in the described sexual activity as long as it proved that the defendant intended to persuade, induce, entice or coerce the individual to engage in some form of unlawful sexual activity with the defendant and knowingly took some action that was a substantial step toward bringing it[124] about.

A substantial step is conduct that strongly corroborates the firmness of the defendant's criminal intent. Mere preparation is not enough. What do I mean by that? This is an attempt that the defendant's been charged with. When does an

---

[124] As indicated above, although Galletta challenges the government's proposed instruction which he believes that the court read verbatim, and even though he failed to reference any of the court's actual instructions from the transcript of the trial, he argues that the use of the word "it" here referred to unlawful sexual activity, instead of to his intent to persuade, induce, entice or coerce the minor to engage in unlawful sexual activity. *See* Original Br. at ECF pp. 271–72. The court disagrees with this contention because a reasonable juror would have believed "it" to refer to the entire previously stated phrase, "to persuade, induce, entice or coerce the individual to engage in some form of unlawful sexual activity." Even if the use of the word "it" there was ambiguous, the remainder of the court's instruction accurately informed the jury that the substantial step had to relate to Galletta's attempt to persuade, induce, entice, or coerce the minor to engage in unlawful sexual activity. *See, e.g.*, Day Two Tr. at 146:12–15 (instructing that to prove attempt, government must prove that "the defendant did some overt act that was a substantial step towards committing the crime of coercing or enticing a minor to engage in unlawful sexual activity"); *id.* at 147:9–12 (instructing that to prove attempt to commit crime of coercing or enticing a minor to engage in unlawful sexual activity government must prove that "the defendant did some overt act that was a substantial step toward committing the crime of coercing or enticing a minor to engage in unlawful sexual activity"); *id.* at 148:21–25 (instructing jury that two elements for attempt are "you intended to commit the crime. And second, that you did some overt act that was a substantial step towards committing the crime. The crime here is as alleged the crime of coercing or enticing a minor to engage in unlawful sexual activity"); *id.* at 152:5–8 (instructing jury that second element of attempt required jury to find that "the defendant did some overt act that was a substantial step towards committing the crime of coercing or enticing a minor to engage in unlawful sexual activity"). Accordingly, the instructions as a whole limited the jury's consideration of a substantial step to the crime of attempt to persuade, induce, entice, or coerce a minor to engage in unlawful sexual activity. *See Daraio*, 445 F.3d at 261 ("Overall we are satisfied from our examination of the jury instructions as a whole that the district court properly focused the jury on Daraio's conduct as charged in the indictment by repeatedly instructing the jury to confine its consideration of the Rule 404(b) evidence to its proper purpose. Accordingly, we hold that the government's proofs coupled with the district court's instructions did not constructively amend the indictment.").

attempt become a criminal attempt? Well, mere preparation to commit a crime is not enough. A substantial step has to occur, an overt act. And a substantial step is construct [sic] that strongly corroborates the firmness of the defendant's criminal attempt.[125]

As a matter of law, the following are crimes under the law of the Commonwealth of Pennsylvania. These are the two offenses under the information where if and I got to make this is clear here, because it can be confusing even to lawyers who practice in this field. Remember I said the fourth element of the enticement offense, the fourth element is that had the sexual activity actually occurred the defendant could be charged with criminal offense under the laws of the Commonwealth of Pennsylvania that being aggravated indecent assault and indecent assault. We need to know what are those offenses? What does it take to commit those?

For aggravated indecent assault, a person who engages in penetration however slight of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith, medical, hygienic or law enforcement procedures commits aggravated indecent assault if the complainant is less than 13 years of age.

For indecent assault under Pennsylvania law, it provides that a person is guilty of indecent assault if the person has indecent contact with the complainant or causes the complainant to have indecent contact with the person for the purposes of arousing the sexual desire in the person or the complainant and the complainant is less than 13 years of age.

Now, indecent contact is any touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire in either person.

So I don't want to belabor this, but I'm going to go over this just one more time. Remember this is attempted enticement of a minor to engage in illicit sexual activity. To attempt that crime the government would have to prove beyond a reasonable doubt the following two elements, that the defendant intended to commit the crime of coercing or enticing a minor to engage in unlawful sexual activity. And second, that the defendant did some overt act that was a substantial step towards committing the crime of coercing or enticing a minor to engage in unlawful sexual activity.

---

[125] Galletta, although once again focusing his challenge on only the government's proposed instructions instead of the court's actual instructions, asserts that the use of the word "attempt" here demonstrates an error that proves there was a constructive amendment. *See* Original Br. at ECF p. 275. Here, Galletta's focus on the government's proposed instruction is particularly problematic because he ignores the government having amended its count one instruction prior to the court charging the jury, to which Attorney Sletvold did not object. *See* Day Two Tr. at 96–97. Regardless, the totality of the court's instructions, which included, *inter alia*, an instruction just prior to that informing the jury that a "substantial step is conduct that strongly corroborates the firmness of the defendant's criminal intent," Day Two Tr. at ECF p. 150:14–15, show that there was no constructive amendment.

Now, the elements of the crime of coercing or enticing a minor to engage in unlawful sexual activity are first, that the defendant knowingly persuaded, induced, enticed or coerced a minor to engage in any sexual activity. It's not necessary for the government to prove that the defendant communicated directly with a minor, dealing with an adult intermediary for the purpose of enticing or coercing the minor is sufficient.

The second element is that the defendant used the Internet or a cell phone to do so, because to be a federal crime there has to be any facility or means of interstate or foreign commerce and I've already instructed you that interstate or foreign commerce includes using the Internet or a cell phone or a mobile phone.

The third element is that the defendant believed, that is the individual that he was alleged to be enticing was less than 18 years of age and the fourth element is that had the sexual activity actually occurred the defendant could be charged with a criminal offense under the laws of the Commonwealth of Pennsylvania. And I've already explained to you what the elements of aggravated indecent assault are and indecent assault. The aggravated indecent assault is a person who engages in penetration however slight of the genitals or anus of a complainant with a part of that person's body for any purpose other than good faith, medical, hygienic or law enforcement procedures commits aggravated indecent assault if the complainant is less than 13 years of age.

Indecent assault states a person is guilty of indecent assault if the person has indecent contact with the complainant or causes the complainant to have indecent contact with the person for the purposes of arousing the sexual desire in the person or the complainant and the complainant is less than 13 years of age. And indecent contact as is referenced there is any touching of the sexual or other intimate parts of the person for the purpose of arousing or gratifying sexual desire in either person.

. . .

Just so that last explanation of aggravated indecent assault and indecent assault does not confuse you, just remember this all ties into the fourth element of the offense of enticing. The fourth element is that had the sexual activity actually occurred, in other words the person is enticing someone to commit sexual activity, illicit sexual activity, had the sexually activity actually occurred the defendant could be charged with the criminal offense under the laws of the Commonwealth of Pennsylvania. The indictment charges that it could have been aggravated indecent assault and indecent assault. It doesn't have to be both, but all 12 of you have to agree on which one it is. All 12 of you have to agree that element four has been met if -- in order to find that element four has been met all 12 of you have to agree that had the sexual activity occurred it would've been either aggravated indecent assault or indecent assault or both.

Day Two Tr. at 146:2–154:18.

As evidenced by the court's instructions, the court instructed the jury that to find Galletta guilty of attempting to persuade, induce, entice, or coerce a minor under section 2422(b), they had to find: (1) Galletta intended to persuade, induce, entice, or coerce a minor to engage in unlawful sexual activity; and (2) Galletta took a substantial step toward persuading, inducing, enticing, or coercing a minor to engage in unlawful sexual activity. Since the court's instructions accurately and thoroughly explained the elements of count one to the jury, the jury was precluded from convicting Galletta for any conduct other than that charged in count one of the superseding indictment. Accordingly, there was no constructive amendment, and Attorney Sletvold was not ineffective for failing to raise it during trial or on appeal.

ii.   *Variance*

As with his ineffective assistance of counsel claim relating to a purported constructive amendment, Galletta has failed to show that there was a prejudicial variance of count one and, as such, Attorney Sletvold was not ineffective under *Strickland* for failing to raise such a claim during trial or on appeal. Galletta has not identified a single piece of evidence offered by the government that was unrelated to showing that he committed the offense of attempt to persuade, entice, or induce a minor to engage in unlawful sexual activity in violation of section 2422(b).[126] In addition, Galletta challenged the sufficiency of the evidence as to count one on appeal and the Third Circuit concluded that the evidence was sufficient to convict him. *See Galletta*, 662 F. App'x at 192–93. Moreover, as explained above, the court accurately and thoroughly instructed the jury on the elements to convict Galletta for attempting to persuade, induce, or entice a minor to engage

---

[126] To the extent that Galletta somehow argues that this court should not have admitted the Rule 404(b) evidence, he again ignores that this issue was raised on appeal and the Third Circuit rejected it. *See Galletta*, 662 F. App'x at 193–95. Further, the Rule 404(b) evidence could not have been considered a variance because Galletta cannot claim that he was surprised by its admission insofar as the government filed motions seeking the admission of this evidence. Also, the court, as the Third Circuit pointed out, gave proper instructions to the jury about limiting its consideration of the Rule 404(b) evidence. *See id.* at 195.

in unlawful sexual activity. *See Daraio*, 445 F.3d at 262–63 (concluding that there was no prejudicial variance because (1) "the indictment sufficiently informed [the defendant] of the charges against her so as to put her on notice to prepare her defense"; (2) "the government's proofs . . . did not vary from the terms of the indictment"; (3) the admission of Rule 404(b) evidence "did not deprive [the defendant] of the opportunity to prepare her defense" insofar as "[t]he prosecutor filed a pre-trial notice to justify the admission of [the Rule 404(b)] evidence"; (4) "the district court repeatedly admonished the jury to limit its consideration of the Rule 404(b) evidence to its appropriate role"; and (5) "the government proved the material facts of the indictment at trial and [the defendant] does not challenge the sufficiency of the evidence"). Accordingly, this ineffectiveness claim under *Strickland* also lacks merit.

### iii.    *Three of Galletta's Specific Arguments*

As Galletta is reasonably likely to appeal from this decision, the court addresses three of Galletta's specific arguments should they somehow be construed as colorable claims regarding a constructive amendment or variance. The three claims are (1) the government shifted the focus from him attempting to persuade, induce, or entice the seven-year-old girl to him attempting to persuade, induce, or entice the adult intermediary, Agent Leri; (2) the evidence could not have been sufficient to convict him under count one because there was no evidence that he attempted to communicate with the seven-year-old girl through Agent Leri; and (3) that his attempt to persuade, induce, or entice the seven-year-old girl could only relate to his communications with Agent Leri and not his Craigslist advertisement or his traveling to the meet location. The court will address each claim in turn.

Galletta's first argument that the government shifted the focus from him attempting to persuade, induce, or entice the seven-year-old girl to him attempting to persuade, induce, or entice

the adult intermediary is incorrect. Although the government introduced evidence and argument showing that Galletta **also** attempted to persuade the adult intermediary, Agent Leri, to allow him the opportunity to persuade, induce, or entice the seven-year-old girl to engage in unlawful sexual activity with him, it did not shift the jury's focus away from Galletta's attempt to persuade, induce, or entice the seven-year-old girl; instead, it was just part of the proof to show Galletta's attempt to violate section 2422(b). At bottom, despite his numerous references to the law of criminal attempt, Galletta continues to apparently not comprehend his attempt conviction in this case.

To convict Galletta of attempting to persuade, induce, or entice a minor into engaging in unlawful sexual activity, in a case involving an adult intermediary, the government could show that he persuaded, induced, enticed, or coerced the adult intermediary as part of the attempt to persuade, induce, or entice the minor. The evidence in this case showed that Galletta did persuade, induce, or entice the adult intermediary to allow him access to interact with the minor child, which constituted a substantial step toward committing the offense of persuading, inducing, or enticing a minor to engage in unlawful sexual activity. To get the opportunity to persuade the minor, Galletta first had to persuade the adult with custody over the minor. Simply because the government made statements in its opening statement or appellate brief about Galletta seeking out an adult with a child does not mean that the government's focus shifted away from showing that he attempted to entice a minor to engage in unlawful sexual activity. Rather, it was proof of Galletta's attempt, a substantial step, to commit the offense of enticing a minor to engage in unlawful sexual activity. *See United States v. Nestor*, 574 F.3d 159, 161 (3d Cir. 2009) (determining that government proved defendant's substantial step to violate section 2422(b) by, *inter alia*, "interact[ing] repeatedly with a man who responded to his [Craigslist] ad and, by e-mail and telephone, discussed having sexual contact with children").

Galletta's second claim, namely, that there was insufficient evidence to convict him of count one because there was no evidence that he attempted to communicate with the seven-year-old girl through Agent Leri, is also unavailing. An attempt under section 2422(b) does not require the government to introduce evidence of a defendant's attempt to persuade, induce, entice, or coerce a minor by evidence showing that the defendant asked the intermediary to communicate (via any form of communication) with the minor on the defendant's behalf. Neither the Third Circuit nor most of the other circuits require such a showing.

In the Third Circuit, a defendant may be found guilty of an attempt under section 2422(b) without directly communicating with a minor or indirectly communicating with a minor through an adult intermediary, so long as that communication with the adult intermediary showed that the defendant was attempting to persuade, induce, entice, or coerce a minor to engage in unlawful sexual activity with them. *See Nestor*, 574 F.3d at 162. In *Nestor*, the defendant posted an advertisement on "Craigslist asking, 'anybody into family fun?'" 574 F.3d at 160. An undercover Pennsylvania police officer, "recognizing that 'family fun' was code for sexual contact with minor children," responded to the ad, and identified himself as an individual with an underage stepson. *See id.* The defendant and undercover law enforcement,[127] over a five-day period, engaged in numerous communications. *See id.* In these communications, "[the defendant] proposed to engage in sexual activity with [the undercover officer] and [the undercover officer's] stepson and arranged for a meeting at [the defendant's] home. [The defendant] also discussed precautions that should be taken to avoid police detection and asked [the undercover officer] to bring him child pornography."

---

[127] After initiating contact with the defendant, the Pennsylvania police officer contacted an agent with the FBI, who also spoke to the defendant on the phone, using the same undercover identity as the Pennsylvania officer. *See Nestor*, 574 F.3d at 160.

*Id.* On the day of the arranged meeting at the defendant's home, law enforcement officers arrested him. *See id.*

The grand jury indicted the defendant for, among other offenses, violating section 2422(b). *See id.* The defendant proceeded to a jury trial, and at the end of the government's case he "moved for a judgment of acquittal, arguing that, because he had never e-mailed or spoken to a child or someone posing as a child, he could not be convicted of attempting to entice a child to engage in sexual activity under § 2422(b)." *Id.* The trial court denied the motion, the jury ultimately found the defendant guilty, and the trial court sentenced him. *See id.*

The defendant then appealed to the Third Circuit, where the court framed the issue as "whether a defendant who uses an adult intermediary, rather than direct contact with a child, to attempt to persuade, induce, entice, or coerce the child to engage in sexual activity can be held to violate 18 U.S.C. § 2422(b)." *Id.* at 160–61. The Third Circuit concluded that a defendant could violate section 2422(b) by using an adult intermediary. *See id.* at 161 ("Because, by its very terms, the crime at issue is one of attempt, logic and precedent compel us to answer yes.").

In reaching this conclusion, the Third Circuit pointed out that the defendant (like Galletta), "was not charged with actual enticement but with attempting to persuade, induce, entice, or coerce a child to engage in sexual activity." *Id.* The Third Circuit explained that "a defendant attempts to commit a crime when [they] demonstrate [their] intent to commit the crime and take[] a substantial step toward doing so." *Id.* (citing *United States v. Tykarsky*, 446 F.3d 458, 469 (3d Cir. 2006)).

The Third Circuit determined that the evidence showed the defendant was guilty of attempt because he

> evinced his intent to violate § 2422(b) in his e-mails and phone conversations. We will not burden readers with the details of [the defendant's] interactions with [the undercover officers] in their role as stepfather to the young victim [the defendant] sought, but it is abundantly clear from the record that [the defendant] was

224

determined to meet and have sex with a child. The question then becomes whether [the defendant] took a substantial step toward that end, using means of interstate commerce. The answer again is clear. He posted an advertisement on Craigslist seeking sexual contact with children. He interacted repeatedly with a man who responded to his ad and, by e-mail and telephone, discussed having sexual contact with children. He arranged a rendezvous for the sexual encounter and discussed ways to avoid police detection. Individually, each of these actions could constitute a substantial step toward the violation of § 2422(b); when examined together, there is no question that [the defendant] used means of interstate commerce, namely the internet and telephone services, to take a substantial step towards persuading, inducing, enticing, or coercing a child to engage in sexual activity. Thus, under *Tykarsky*, it is of no moment that [the defendant] never dealt directly with his intended child victim. 446 F.3d 458, 468–69 ("[W]e hold that the lack of an actual minor is not a defense to a charge of attempted persuasion, inducement, enticement or coercion of a minor in violation of § 2422(b).")[.]

*Id.* at 161–62.

The Third Circuit then rejected the defendant's contention that he could not be convicted for violating section 2422(b) because "the terms 'persuade,' 'induce,' 'entice,' or 'coerce' all contemplate direct communication between the actor and the person being acted upon." *Id.* at 162. The Third Circuit explained that

[e]ven if we were to accept that limitation on the terms in § 2422(b), and it is by no means clear we would, [the defendant] would still be guilty because, again, he was convicted of a crime of attempt. He took substantial steps calculated to put him into direct contact with a child so that he could carry out his clear intent to persuade, induce, entice, or coerce the child to engage in sexual activity. Thus, though he never communicated directly with a child, he took substantial steps he believed would allow him to do so, and he is therefore guilty of an attempt under § 2422(b).

While not necessary to our analysis, we note that the legislative history of the statute, policy considerations, and common sense support our reading of § 2422(b). Subsection (b) was originally added to § 2422 by the Telecommunications Act of 1996. Pub. L. No. 104–104, § 508, 110 Stat. 56 (1996). Two years later, that subsection was amended as part of the Child Protection and Sexual Predator Punishment Act of 1998, a bill that was described as "a comprehensive response to the horrifying menace of sex crimes against children, particularly assaults facilitated by computers." H.R. Rep. No. 105–557, at 10 (1998). That statute sought to address computer-related crimes against children "by providing law enforcement with the tools it needs to investigate and bring to justice those individuals who prey on our nation's children." *Id.* The amendment to § 2422(b) was thus part of an overall policy to aggressively combat computer-related sex crimes against children.

It would be wholly inconsistent with the purpose and policy of the statute to allow sexual predators to use adult intermediaries to shield themselves from prosecution.

In addition, it is a matter of common sense to recognize that there are children too young to use computers or understand how to communicate over the internet but who are nevertheless targeted by pedophiles. Because a sexual predator like [the defendant] cannot reach those victims directly, he will of necessity go through older intermediaries, and those intermediaries will often be, as in this case, adults. To accept [the defendant's] reasoning and say that contact through an adult intermediary rather than directly with a child means there has been no crime would be to place beyond the reach of § 2422(b) those who prey on the particularly young. Hindering law enforcement efforts to protect an especially vulnerable class of children is, given the language and history of the statute, an obviously illogical result.

*Id.* (internal footnote omitted).

The facts of Galletta's case are strikingly like those in *Nestor*. Galletta started the events in his case by posting an advertisement on Craigslist,[128] an undercover officer responded to the advertisement, the undercover officer and Galletta exchanged numerous communications during which Galletta expressed his desire to engage in unlawful sexual activity with the undercover officer's minor child, and Galletta was arrested after arranging a meeting between themselves, the undercover officer, and the minor child, and then traveling to that meeting location. The *Nestor* court did not reference any attempt by the defendant to direct a communication to the minor through the intermediary as being necessary for a conviction under section 2422(b), and the evidence here did not show that Galletta expressly attempted to pass along any messages to the minor child through the intermediary.[129]

---

[128] Galletta's attempt to distinguish his Craigslist advertisement from the one in *Nestor*, namely, by pointing out that his advertisement was not aimed or targeted at minors, *see* Original Br. at ECF p. 264, falls flat. Galletta posted the advertisement in an adults only area because he wanted to find an adult who had access to a minor. Thus, contrary to Galletta's belief, the Craigslist posting was also a substantial step toward committing the crime of coercing or enticing a minor to engage in unlawful sexual activity, as it was in *Nestor*. 574 F.3d at 161.

[129] Even though Galletta did not ask Agent Leri to pass along any messages to his daughter, it is abundantly clear from Galletta's communications with him that he was prepared to persuade, induce, or entice the daughter to engage in unlawful sexual activity. For example, while Galletta was discussing his current relationship with his girlfriend, he acknowledged that persuading, inducing, or enticing was difficult. *See* Day One Tr. at 64–65 (replying to Agent Leri's communication about Galletta being "lucky to find a woman to date with such a young beautiful girl" by stating,

Several other circuit courts of appeals have equally concluded that a defendant need not direct any communication to the minor through the intermediary to be found guilty of attempt under section 2422(b). *See United States v. Perez-Rodriguez*, 13 F.4th 1, 14–15 (1st Cir. 2021) (concluding sufficient evidence existed to convict defendant of attempt under section 2422(b) where none of defendant's communications with undercover officer posing as adult with 11-year-old boyfriend was directed to minor); *United States v. Hensley*, 982 F.3d 1147, 1154–55 (8th Cir. 2020) (determining sufficient evidence was presented to convict defendant of attempt under section 2422(b) even though defendant never directly contacted minor or asked intermediary to relay message to minor); *United States v. Vinton*, 946 F.3d 847, 853 (6th Cir. 2020) ("The gravamen of the attempt offense under § 2422(b) is the intention to achieve the minor's assent. Whether the defendant aims to achieve a minor's assent by contacting the minor directly, by sending the minor enticing messages through an adult intermediary, or by enlisting an adult intermediary to persuade the minor, the defendant has the same intent to gain the minor's assent. And that intent is criminalized under § 2422(b)." (internal quotation marks and citation omitted)); *United States v. Caudill*, 709 F.3d 444, 446–47 (5th Cir. 2013) (rejecting defendant's argument that he could not be convicted for violating section 2422(b) because "he did not seek to have any of his communications with the adult passed on directly to a child"); *United States v. Olvera*, 687 F.3d 645, 647–48 (5th Cir. 2012) (concluding that defendant convicted for attempt under § 2422(b) did not have to "seek to have any of his communications with the adult passed on directly to a child"); *United States v. Douglas*, 626 F.3d 161, 164–65 (2d Cir. 2010) (per curiam) (concluding

---

"That's the easy part[,] trying to get close and flirt and touch . . . incidentally is the hard part"). Galletta also described himself as "one who connects and encourages [the minor] to explore and learn about their bodies and enjoy it." *Id.* at 65. Furthermore, when expressing what he wanted to do with the seven-year-old girl, Galletta said that he wanted to "play with [her]" and "enjoy her body, her lips, her [feet], her laugh, her everything," which a jury surely could have reasonably concluded showed his intent to persuade, induce, or entice the girl into engaging in unlawful sexual activity with her.

that defendant could be convicted of violating section 2422(b) even where no communications were directed to minor and communications were only to adult intermediary; rejecting defendant's argument that "the defendant's speech must be directed to a minor in all cases in order for persuasion, inducement, enticement, or coercion to occur," and explaining that defendant can attempt to obtain minor's assent to unlawful sexual activity "by persuading a minor's adult guardian to lead a child to participate in sexual activity"); *United States v. Murrell*, 368 F.3d 1283, 1284–85, 1287–88 (11th Cir. 2004) (finding that "direct communication with a minor or supposed minor is unnecessary under the text of § 2422(b)" and affirming section 2422(b) attempt conviction even though defendant never directly communicated with minor or indirectly through intermediary). In *Vinton*, the Sixth Circuit addressed a defendant's argument that, to be convicted under § 2422(b), "he must use the adult intermediary as a messenger to convey the defendant's own enticing messages to the minor. In other words, the specific means of inducing or enticing the child must come from the defendant himself." 946 F.3d at 852–53. The Sixth Circuit rejected this argument, explaining that

> accepting [the defendant's] argument would have illogical results. . . . [I]t would mean that § 2422(b) would reach the defendant who promises to bring cake for the child but not the defendant who promises an adult intermediary $10,000 if the intermediary convinces the child to have sex with him. Both defendants intend to persuade or entice the minor. Both defendants work through an adult intermediary. But only the first defendant sends a persuasive message arguably directed at the child. The second defendant relies on the expertise of the parent in determining how best to entice the child. We don't think Congress . . . meant to make this distinction and exempt defendants like the second one from conviction under § 2422(b).

*Id.* at 853.

Despite these decisions (which are not mentioned in Galletta's submissions) and *Nestor*, which is binding authority on this court (although Galletta argues *Nestor* was wrongly decided),[130]

---

[130] The court declines Galletta's request (as he specifically stated during oral argument) to pontificate as to whether *Nestor* was wrongly decided, as it is binding precedent on this court. The court nevertheless notes that Galletta's

Galletta appears to ask this court to follow the D.C. Circuit's decision in *United States v. Hite*, 769 F.3d 1154 (D.C. Cir. 2014). *See* Original Br. at ECF p. 252. In *Hite*, the D.C. Circuit, after holding that "§ 2422(b) criminalizes situations in which a defendant transforms or overcomes the will of a minor by way of an adult intermediary," also concluded that "where an adult intermediary is involved, the defendant's interaction with the intermediary must be aimed at transforming or overcoming the child's will to violate § 2422(b)." 769 F.3d at 1163, 1164.

*Hite* is inapplicable here for multiple reasons.[131] First, *Hite* is not binding on this court, whereas *Nestor* is. Second, the Third Circuit did not interpret the phrase, "persuades, induces, entices, or coerces" so narrowly in *Nestor*, or in any other decision this court could locate. *See, e.g.*, *United States v. Chip*, 762 F. App'x 86, 88 (3d Cir. 2019) ("While "§ 2422(b) does not define the terms persuade, induce, entice and coerce, they have a plain and ordinary meaning that does not need further technical explanation. Three of the terms—persuade, induce, and entice—are effectively synonymous, conveying the idea of one person leading or moving another by

---

reliance on the dissenting opinion in *Laureys* in support of his argument is completely misguided as no circuit has adopted it. In addition, although Galletta stated during oral argument that the D.C. Circuit has criticized the decision in *Nestor*, he is wrong. As far as this court's research could uncover, neither the D.C. Circuit nor any other federal court has criticized *Nestor*. Moreover, in *Laureys*, the majority referenced *Nestor* and determined that the *Nestor* court's "view of the law is not plainly erroneous." 653 F.3d at 33.

[131] The court recognizes that Galletta also cites to *Hite* in support of his argument that the government constructively amended count one or caused a prejudicial variance when it purportedly focused the jury's attention on his desire to engage in sexual activity with the seven-year-old girl instead of on his attempt to persuade, induce, entice, or coerce the girl to engage in unlawful sexual activity. In *Hite*, the D.C. Circuit, applied its new interpretation of section 2422(b)—that an attempt conviction under section 2422(b) can be sustained if evidence showed that defendant only communicated with an adult intermediary—to the prosecutor's closing arguments and the trial court's instructions and determined that the trial court's instructions were deficient and highly prejudicial because "the jury could have convicted the defendant without necessarily finding that he intended to transform or overcome the will of either fictitious minor, so long as they found that he sought to arrange for sexual activity with them." 769 F.3d at 1167.

To the extent that this was part of Galletta's constructive amendment argument, any statements by the government inconsistent with Galletta's intent to persuade, induce, entice, or coerce was negated by the court's instructions to the jury, which correctly and thoroughly instructed the jury on the elements to find Galletta guilty of violating section 2422(b). To the extent that this was part of Galletta's prejudicial variance argument, the court again points out that the Third Circuit concluded that there was sufficient evidence to convict Galletta for violating section 2422(b). *See Galletta*, 662 F. App'x at 192–93. As the Third Circuit noted in that opinion, "it is inconceivable that a 7-year-old girl would engage in sexual activity with a 34-year-old stranger without being persuaded, induced, enticed, or coerced into doing so." *Id.* at 193.

persuasion or influence, as to some action [or] state of mind." (internal citations and quotation marks omitted)). Third, at least two other circuit courts of appeals have criticized *Hite*'s interpretation because it does not take into account that a person can violate section 2422(b) even if the minor is a willing participant, *see United States v. Waqar*, 997 F.3d 481, 483 (2d Cir. 2021) (indicating that the verbs, persuade, induce, entice, and coerce "do not include, as a necessary element, the overbearing or transformation of another's will"); *United States v. Cramer*, 789 F. App'x 153, 156 (11th Cir. 2019) (explaining that *Murrell* "forecloses a reading of [section 2422(b)] that would make interactions with an adult intermediary punishable only if such interactions were aimed at transforming or overcoming the minor's will in favor of sexual activity"), which is also a position that has been recognized by the Third Circuit and other circuit courts of appeals. *See Chip*, 762 F. App'x at 90 ("It was not necessary to prove that Chip initially kindled a desire for sex in an otherwise-disinterested [minor]; it was sufficient to prove that Chip knowingly persuaded (or attempted to persuade) [the minor] to engage in sexual activity."); *United States v. York*, 48 F.4th 494, 500 (7th Cir. 2022) ("Under § 2422(b), a minor's willingness or unwillingness to engage in sexual activity is irrelevant." (citation omitted)), *cert. denied*, 143 S. Ct. 1772 (2023); *United States v. Dhingra*, 371 F.3d 557, 561 (9th Cir. 2004) ("The plain language of the statute makes clear that the relevant inquiry is the conduct of the defendant, not the minor. The conduct that the statute criminalizes is persuading, inducing, enticing, or coercing illegal sexual activity—actions of the defendant alone. An individual of ordinary intelligence would have no doubt that criminal liability does not depend on whether the minor actually engaged in criminal sexual activity, but rather whether the defendant sought such sexual activity from a minor."), *as amended on denial of reh'g* (July 23, 2004). Therefore, Galletta's second argument also lacks merit.

The third, and last of Galletta's arguments this court will address is his argument that the only relevant substantial steps for an attempt conviction under section 2422(b) must involve a facility or means of interstate commerce. *See* Original Br. at ECF pp. 255, 264–67. The Third Circuit has already addressed this precise question and rejected such a narrow interpretation of a substantial step in an attempt charge. In *United States v. Davis*, the defendant had communicated with an undercover officer posing as a 14-year-old girl. 985 F.3d at 301. Law enforcement ultimately arrested the defendant after he had traveled to a meeting place where he was to meet the 14-year-old. *See id.* At the time of his arrest, the defendant had three condoms in his pocket. *See id.* He was charged with attempting to entice a minor to engage in sexual conduct and another offense, and a jury ultimately convicted him of both offenses. *See id.* at 301–02.

The defendant appealed, and on appeal he argued that his traveling to the meeting location and the possession of condoms could not qualify as substantial steps because they were unnecessary to violate section 2422(b). *See id.* at 304. The Third Circuit disagreed with this "interpretation of the law of attempt," explaining that

> [the defendant] misapprehends the relationship of a substantial step to a criminal offense. The central purpose of the substantial step inquiry is to corroborate criminal intent and to establish that a defendant went beyond mere planning. The substantial step does not need to be the exact conduct that the statute criminalizes. It would be absurd to require the substantial step, a single element of attempt, to be identical to the consummated crime but for the fictitious minor. However, important to a substantial-step assessment is an understanding of the underlying conduct proscribed by the crime being attempted. The substantial step must, in some way, relate to the conduct criminalized by the statute. Here, that conduct requires the use of interstate facilities to entice a minor to engage in sexual conduct.
>
> A post-enticement act like travel can constitute a substantial step in violating § 2422(b). To do so, however, the travel must relate to the defendant's enticing communications. This reasoning is implicit in most decisions involving travel because, generally speaking, the travel relates to a plan established by the interstate communication. In these circumstances, traveling to an agreed upon location may demonstrate that a defendant's communications were not innocent but harbored criminal intent and that the defendant was willing to go beyond mere

planning. In other words, traveling demonstrates that the communications were not all hot air.

       Every other court of appeals that has addressed this issue has held that travel can constitute a substantial step. This determination is consistent with our decision in *Tykarsky*. Although in that case we identified the defendant's instant messages as a substantial step, we also indicated that his travel to the Holiday Inn according to the plan established over the instant messages provide[d] the requisite measure of objective evidence corroborating his intent. That is the precise purpose of the substantial step inquiry.

       Requiring the substantial step to relate to the enticing communications prevents criminalizing otherwise lawful behavior and permitting improper inferences against a criminal defendant.

*Id.* at 305–06 (final alteration in original). The Third Circuit went on to conclude that the defendant's travel to the meeting location and his possession of condoms constituted substantial steps. *See id.* at 306.

Here, Galletta's Craigslist advertisement, his communications with Agent Leri, and his travel to the proposed meet location were all substantial steps in support of his intent to violate section 2422(b). *See id.*; *Nestor*, 574 F.3d at 161 (determining that defendant's emails and phone conversations with adult intermediary, Craigslist advertisement, arrangement of a "rendezvous for the sexual encounter," and discussion of ways to avoid police detection "could [each] constitute a substantial step toward the violation of § 2422(b)"). Therefore, Galletta's third argument also lacks merit and does not alter this court's conclusion that Galletta has failed to show that Attorney Sletvold was ineffective under *Strickland* for failing to raise the issue of a constructive amendment or variance as to count one during trial or on appeal.

13.     **Ineffective Assistance of Counsel for Failing to File a Motion to Dismiss for Lack of Subject-Matter Jurisdiction Because the Government Lacked "Criminal Standing" to Bring Case into Federal Court**

a.     Galletta's Arguments[132]

Galletta contends that this court lacked subject-matter jurisdiction over his case because the government lacked "criminal standing" to bring the claim into federal court. *See* Original Mot. at ECF p. 48; Original Br. at ECF pp. 293–328; 2255 Hrg. Tr. at 69. As best this court can discern through Galletta's lengthy argument, he believes that the government cannot satisfy the injury-in-fact requirement for standing requirements in **civil** cases.[133] *See* Original Br. at ECF pp. 300–01, 304. Galletta asserts that charging a defendant with violating sections 2422 and 2252 implicate three "legally cognizable rights under which a government may claim injury . . .[:] injury to their commerce, injury to their monopoly on child pornography, and injury to their commercial police power to stop moral corruption."[134] *Id.* at ECF p. 297. Of the three rights implicated, Galletta argues that only one is potentially applicable, namely, the government's "right to protect children and society from moral corruption." *Id.* at ECF p. 300.

This right, according to Galletta, falls under the auspices of a government's police power, meaning that only the state (in this case, the Commonwealth of Pennsylvania) can claim any injury. *See id.* He asserts that "[t]he proper sovereign party by right is the Commonwealth of Pennsylvania, as they have general police power to protect children and society from moral corruption." *Id.* at ECF p. 301. He goes on to argue that claiming that an individual violated a law

---

[132] The government did not address this claim in either of its submissions.

[133] Galletta consistently uses the word "plaintiff" when referring to the government in this portion of his argument. The court points out for Galletta that a "plaintiff" is "[t]he party who brings a **civil suit** in a court of law." Plaintiff, Black's Law Dictionary (11th ed. 2019). The government is not a "plaintiff" in a criminal case.

[134] The government does not have a monopoly on child pornography.

of the United States does not confer standing on the government; instead, it "merely makes the United States a nominal party." *Id.* at ECF p. 304.

Although Galletta mostly focuses on the government's lack of a traceable injury, he also contends that the government could not satisfy the second requirement for the standing of a plaintiff in a civil case, which is "a causal relationship between the injury complained of and the challenged conduct." *Id.* at ECF p. 306 (citations omitted). In support of his argument that there was no causal relationship, Galletta states:

> Petitioner in the instant case was convicted on a three count indictment for enticing a minor, transporting and possessing child pornography. The reasoning behind the enticement statute is to protect minors from communicating with adults absent parental supervision. The reasoning behind the child pornography statutes is that harm results from contributing to the "national market" which the law prohibits for the purpose of guarding children and society from moral corruption. However, Petitioner's alleged conduct had no identifiable victim, was not monetized, but was required by the statute to "affect commerce" at the time of the indictment, there is no possibility that Petitioner's alleged enticement injured the Plaintiff. For the transportation count the government claimed only an alleged interaction with one party in Pennsylvania. The single image used to allege transportation of child pornography was not considered by Google or the Delaware County police department to be child pornography. Google was not only the conduit for which the image was transported, they did not report it as required by law, and third they were also the party that provided the very image to the Petitioner on March 17th, 2014. As such Google is a third party not before the court.

*Id.* at ECF pp. 307–08. He then suggests that Congress could properly exercise its Commerce Clause authority by forcing every electronic service provider and electronic communication service, such as Google, Verizon, and Microsoft, to prevent child pornography. *See id.* at ECF pp. 310–11.

### b.    Resolution of Claim

Galletta's claim that the government lacks criminal standing is completely frivolous. Although it does not appear that many federal courts have address such a claim, the Third Circuit has, and has rejected it. *See United States v. Daniels*, 48 F. App'x 409, 417–18 (3d Cir. 2002) (per

curiam) ("Appellant finally argues that the United States lacks standing to bring a criminal action against him in federal court because the indictment fails to present a 'cas[e]' or 'controvers[y]' as required by Article III, Section 2 of the Constitution. U.S. Const. Art. III, sec. 2. Presumably, this is because, in Appellant's view, his crimes did not inflict the 'concrete' and 'imminent' [']injury in fact' on the United States that Article III requires civil litigants to demonstrate to have their claims adjudicated in federal court[.] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). This contention is frivolous. As sovereign, the United States has standing to prosecute violations of valid criminal statutes.").

Even if the Third Circuit had not flatly rejected such a claim, this court would still not find that Galletta's defense counsel was ineffective for failing to file a motion challenging the government's standing to bring the three charges against Galletta. In this regard, the court would follow the path set by the United States District Court for the Southern District of New York, and find persuasive and adopt the following analyses of other courts addressing similar claims:

> As the court thoughtfully explained in *United States v. Ellis*, No. 06 Cr. 390, 2007 WL 2028908, at *1 W.D. Pa. July 12, 2007:
>
>> [T]o the extent *pro se* defendant has requested and intends to request [the] services [of a paralegal or investigator] to aid him in presenting a motion to dismiss based on this court's Article III jurisdiction to hear the case and the United States Attorney for the Western District's "standing" to conduct the prosecution, the motion must be denied because it is based on indisputably meritless legal theory. Although *pro se* defendant has latched on to the notion that to have standing in an Article III civil controversy, the party bringing the action must have a concrete stake in the litigation and have suffered an injury-in-fact, he fails to appreciate the distinctions to be drawn between a criminal case and a civil controversy. And while the broad language appearing in some of the more recent Supreme Court opinions expounding on the limitations of Article III standing would appear at first brush to be irreconcilable with the traditional mechanics employed in conducting criminal prosecutions, dogmatically drawing a corollary conclusion that federal criminal prosecution is outside the jurisdictional reach of Article III is

tantamount to the "absurd." *See* Edward Hartnett, *The Standing of the United States: How Criminal Prosecutions Show that Standing Doctrine is Looking for Answers in all the Wrong Places*, 97 Mich. L. Rev. 2239 (1999) (to reason and conclude from the current status of the Court's Article III standing doctrine that "the vast majority of federal criminal prosecutions are not 'cases' or 'controversies' and the United States lacks standing to initiate them [would,] ... [o]f course, [amount to] an absurd result."). Furthermore, while there are several approaches that might be employed to harmonize the seemingly inconsistent principles present in federal criminal prosecutions with the Court's current approach to defining the outer scope of private causes of action challenging the actions of government officials under Article III, we need not delve into that foray to discard the notion that defendant may not be prosecuted by the Justice Department for violation of federal law on the junk pile of needless intellectual exercises in futility. *See id.* (noting that "Article III cannot sensibly be read to prohibit the United States from vindicating its sovereign interests in its own courts" and summarizing the various scholarly approaches that have been used to reconcile federal criminal prosecutions with the Court's current standing jurisprudence).

And in *Rice v. Farley*, No. 14 Civ. 31 (ART), 2014 WL 2441260 (E.D. Ky. May 30, 2014), the court resolved an argument identical to Sessum's and Thomas's as follows:

> [I]t is the United States' interest — the people's injury at large — that supports criminal standing. But that just begs a most interesting question: after all, why *does* the United States have standing to bring a criminal action when the same generalized interest in enforcing the law does not support standing for private parties, *see, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)?

> As it turns out, Rice has touched on a well-known (seemingly apparent) tension between criminal prosecution and standing doctrine. Indeed, legal academics attacking that doctrine have actually posed the exact same question about criminal standing as that raised by Rice. *See, e.g.*, Edward A. Hartnett, *The Standing of the United States: How Criminal Prosecutions Show That Standing Doctrine Is Looking for Answers in All the Wrong Places*, 97 Mich. L. Rev. 2239, 2246 (1999) ("What is the 'concrete and particularized' injury in fact suffered by the United States that gives it standing to bring a criminal prosecution?"). Unlike Rice, however, these scholars mean not to question the United States' standing in criminal cases, but to rely on that standing to disprove Rice's

assumption: precisely because the government unquestionably has criminal standing, they say, particularized injury cannot possibly be required by Article III. Since criminal actions only involve the public's generalized interest in enforcing the law, the argument goes, individualized injury must not be constitutionally required to create a "case or controversy." *Id.* at 2246-51.

This attack on standing doctrine and Rice's challenge to his sentencing court's jurisdiction both fail for the same reason: the constitutional requirements of standing are "party-specific." Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 Mich. L. Rev. 689, 695 (2004). While individualized injury is necessary for private plaintiffs to have standing in private litigation, "diffuse injuries to the general public" are enough to create standing between the public (the government) and criminal defendants. *Id.*; *see also* Thomas R. Lee, *The Standing of Qui Tam Relators Under the False Claims Act*, 57 U. Chi. L. Rev. 543, 570 (1990) ("The government enjoys ... a special constitutional status as plaintiff — it sues, for example, to enforce the criminal laws, and it need not show a particularized injury as a predicate to sue."). The Supreme Court put the point quite clearly over a century ago, disavowing that the government needed a concrete interest to establish its standing to sue on behalf of the public:

> Every government, [e]ntrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.

*In re Debs*, 158 U.S. 564, 584, 15 S. Ct. 900, 39 L. Ed. 1092 (1895) (emphasis added) *disapproved of on other grounds by Bloom v. State of Ill.*, 391 U.S. 194, 195-96, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601, 102 S. Ct. 3260, 73 L. Ed. 2d 995 (1982) (recognizing the sovereign's interest in "creat[ing] and enforce[ing] a legal code, both civil and criminal"). It thus made perfect sense for Chief Justice John Marshall in *Cohens v. Virginia* to refer to an action by a state to enforce its penal laws as a "case." 19 U.S. (6 Wheat.) 264, 399, 5 L. Ed. 257 (1821); *see also* John Harrison, *The*

> *Power of Congress to Limit the Jurisdiction of Federal Courts and the Text of Article III*, 64 U. Chi. L. Rev. 203, 210 (1997) ("Cases include all legal actions, criminal and civil, while controversies include only civil proceedings."). The key to understanding standing doctrine thus lies in the oft-forgotten distinction between public and private rights.
>
> So while there is no doubt whatsoever that the United States had standing to pursue a criminal action against Rice — and therefore, that the district court had jurisdiction in his case — that universally accepted conclusion is hardly inconsistent with the constitutional requirement of a concrete, individualized interest in private litigation. Standing is no more than the litigable interest necessary to create a case, and when it comes to the government, wrongs to the public at large — generalized grievances — will do. And that makes perfect sense, since the government represents us all. It is thus entirely natural that the United States, but no one individually, can vindicate the people's general interest in respect for the law. *Cf.* Lillian BeVier & John Harrison, *The State Action Principle and Its Critics*, 96 Va. L. Rev. 1767, 1785 (2010) ("[P]rivate individuals are principals, entitled to act to pursue their own interests, whereas government decisionmakers are agents, whose function is to further the interests of the citizens.").

    *Id.* at *2-3.

*Sessum v. United States*, Nos. 18 Civ. 6222, 15 Cr. 667-6, 2020 WL 1243783, at *8–10 (S.D.N.Y. Mar. 16, 2020). Accordingly, Galletta has failed to show that his defense counsel were ineffective under *Strickland* for failing to raise a frivolous claim regarding the government's purported lack of standing to prosecute him in this case.

### 14.   Ineffective Assistance of Counsel for Failing to Object to a Constructive Amendment to Count Three of the Superseding Indictment

#### a.   Galletta's Arguments[135]

Galletta argues that Attorney Sletvold was ineffective for failing to object to a constructive amendment to count three, the possession of child pornography charge, in the superseding indictment. *See* Original Mot. at ECF pp. 48–49; Original Br. at ECF pp. 329–37; Am. Mot. at

---

[135] The government did not address this claim in either of its submissions.

ECF p. 4; Am. Mem. at ECF pp. 14–18; 2255 Hrg. Tr. at 69–70. Galletta appears to have two arguments, one relating to the "matter" identified in count three, *see* Original Br. at ECF pp. 329–37, and the other relating to the "materials produced." Am. Mem. at ECF pp. 14–18.

For Galletta's first argument, he points out that count three states that the "matter" he possessed which contained the child pornography was a mobile device. *See* Original Br. at ECF p. 329. However, he claims that the government instead substituted a computer file for the mobile device in its proposed jury instructions, which he believes broadened the basis for his conviction. *See id.* at ECF p. 330. He also claims that he was unable to defend against the computer files being the "matter" containing child pornography and asserts that he "is . . . now exposed to double jeopardy as the government may in the future allege either knowing possession of the phone and or the computer files as the matter that contained child pornography." *Id.* at ECF p. 331. He further argues, yet again, that a computer file does not constitute "matter" under section 2252(a)(4)(B). *See id.* at ECF pp. 331–35.

Regarding his second argument, Galletta contends that a plain reading of count three indicates that the Phone (or mobile device) "had nothing to do with the interstate commerce element. Rather, the *materials* which were used to produce the visual depictions are what are alleged in the indictment to have come through interstate commerce." Am. Mem. at ECF p. 16. He points out that (1) the government argued in its closing that the Phone, "rather than the materials used to produce the visual depictions contained in it, was the item that had to traverse in interstate commerce" and (2) the government entered into evidence a stipulation stating that the Phone was made in China and not Pennsylvania. *Id.* at ECF pp. 16–17 (citing Day Two Tr. at 120). Despite introducing this evidence about the Phone, Galletta asserts that the government failed to introduce

any evidence that the materials used in producing the child pornography passed through interstate commerce. *See id.* at ECF p. 17.

### b.      Resolution of Claim

Galletta has failed to show that Attorney Sletvold was ineffective for failing to object to a purported constructive amendment to count three because, as with count one, there was no constructive amendment to count three. As to Galletta's first argument, it is based on a mistaken premise because at no point did the government shift the "matter" containing the child pornography from the Phone to anything else. *See, e.g.*, Day Two Tr. at 107 ("[W]e also showed you three images that we are submitted are child pornography . . . . One of them showing a young girl performing oral sex on an adult male. These are the things we know were on his cell phone."). Regarding the court's instructions, the court instructed the jury that section 2252(a)(4)(B) "makes it a  crime for anyone to knowingly possess one or more books, magazines, periodicals, films, videotapes or other matter which contain any visual depiction which was produced using material which have been mailed or shipped or transported by any means including by computer." *See* Day Two Tr. at 159. Thereafter, in instructing the jury on the elements of section 2252(a)(4)(B), the court also instructed the jury that they had to determine whether Galletta "possessed matter, such as a computer file, which [Galletta] knew contained a visual depiction of a minor engaged in sexually explicit conduct." *Id.* at 160. Through this additional instruction (which was repeated three times), the court was merely restating the law and not instructing the jury that they had to consider only a computer file as the "matter." Even if the additional instruction did somehow alter the jury's focus from the Phone to a computer file as potentially constituting the "matter," the instruction did not broaden the basis for a conviction under section 2252(a)(4)(B) because the computer files at issue were in the Phone, so the jury could not have concluded that Galletta

possessed the computer files without also determining that he possessed the Phone. Furthermore, Galletta's purported double jeopardy argument is meritless because the government could never prosecute him again by simply alleging that the computer file (or the Phone) constitutes "matter" because it would involve the same law and the same set of facts. *See United States v. Finley*, 726 F.3d 483, 495 (3d Cir. 2013) (explaining that, to violate Double Jeopardy Clause, charged offenses must be same in law and in fact).

Concerning Galletta's second argument, it also lacks merit because it misinterprets the word "produced." Count three of the superseding indictment charged Galletta with having knowingly possessed a mobile device containing visual depictions, which had been produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce, involving minors engaging in sexually explicit conduct. The evidence presented at trial showed that Galletta possessed a mobile device, the Phone, which had three images of child pornography, and which was produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce. As the court already explained, Galletta misconstrues the word "producing" in section 2252(a)(4)(B), because, as every other circuit court of appeals has determined, it included the copying and downloading of child pornography. *See supra* at 114–15.

Applying this definition of "produced" to the evidence introduced against Galletta, there was sufficient evidence to show that he produced child pornography by using the Phone, which, as Galletta stipulated to, was shipped and transported through interstate and foreign commerce insofar as it was manufactured by Samsung in China and then shipped or transported to the United States, *see* Day One Tr. at 90–91, to obtain three images of child pornography. Contrary to Galletta's assertion, a reasonable reading of count three would not have precluded the government from proving that the Phone produced the child pornography. Accordingly, there was no

constructive amendment to count three, and Galletta has not demonstrated that Attorney Sletvold was ineffective for failing to raise such a claim.

### 15. Ineffective Assistance of Counsel for Failing to Challenge Sufficiency of the Evidence as to Count Three

Following his constructive amendment claim as to count three, Galletta also argues that Attorney Sletvold was ineffective for failing to raise a claim prior to trial, during trial, posttrial, or on appeal that the evidence was insufficient to convict him of possessing child pornography in count three of the superseding indictment.[136] *See* Am. Mot. at ECF p. 4; Am. Mem. at ECF pp. 11–14. He contends that the evidence was insufficient because the government did not present any evidence that the materials used to produce the depiction were shipped, mailed, or transported through interstate commerce. *See* Am. Mem. at ECF p. 14. Galletta is mistaken. As already explained above, the government introduced sufficient evidence to show that Galletta possessed a visual depiction that was "produced using materials which have been mailed or . . . shipped or transported, by any means including by computer," when he saved or downloaded the images of child pornography to the Phone, which was manufactured in China. Accordingly, Attorney Sletvold was not ineffective for failing to challenge the sufficiency of the evidence on count three at any point prior to trial, during the trial, after the trial, or on appeal.

### 16. Claim that the Trial was Fundamentally Unfair Due to Cumulative Error

#### a. Galletta's Arguments[137]

Galletta asserts that his trial was fundamentally unfair due to the cumulative effect of the numerous errors in it. *See* Original Mot. at ECF pp. 47–48; Original Br. at ECF pp. 290–92; Suppl. at ECF pp. 41–45; 2255 Hrg. Tr. at 68–69. It appears that Galletta believes the numerous errors

---

[136] The government did not respond to this argument in either of its submissions.
[137] The government did not respond to this argument in either of its submissions.

include: (1) his defense counsel's ineffectiveness in failing to file a motion to recuse the undersigned based on the appearance of bias and actual bias; (2) Attorney Sletvold's failure to file motions to suppress warrants that lacked probable cause and were insufficiently particular; (3) Attorney Sletvold's failure to procure expert medical testimony to support his "only reasonable defense strategy"; (4) Attorney Sletvold's ineffectiveness in allowing Galletta to go to trial "without being fairly informed of the allegations against him"; (5) Attorney Sletvold's ineffectiveness in failing to protect Galletta from double jeopardy insofar as "he permitted the constitutionally insufficient superseding indictment to go unchallenged"; (6) Attorney Sletvold's ineffectiveness by refusing to assert an affirmative defense to the possession of child pornography charge; (7) Attorneys Meehan and Henry's ineffectiveness in failing to properly inform Galletta that "hybrid representation was available and exactly what it provides," which prevented him from "formerly [sic] requesting it"; and (8) Attorney Sletvold's ineffectiveness in failing to object to the constructive amendment and prejudicial variance of count one of the superseding indictment. *See* Original Br. at ECF pp. 291–92.

b.   <u>Applicable Law</u>

Regarding a claim of cumulative trial error,

[w]here there are multiple trial errors, a defendant can ask us to consider them together. Under this cumulative-error analysis, we grant a new trial only if "the[ ] errors, when combined, so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)).

Like our sister circuits, we do not "simply count[ ] up the number of errors discovered." *Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013). There are two ways that errors that are not individually reversible can become so cumulatively. First, related errors can have "an inherent synergistic effect," in which "they amplify each other in relation to a key contested issue in the case." *Cargle v. Mullin*, 317 F.3d 1196, 1221 (10th Cir. 2003); *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011). Second, even if there is no synergy, "accumulating

*unrelated* errors" can still warrant reversal "if their probabilistic sum sufficiently undermines confidence in the outcome of the trial." *Grant*, 727 F.3d at 1026 (emphasis added). In other words, even if the errors do not multiply, they can still add up to prejudice. We have not found that cumulative errors warranted reversal, however, where the remaining evidence of guilt was "overwhelming." *See United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994) (finding harmless the admission of prejudicial victim-impact testimony on top of six other alleged trial errors).

*United States v. Greenspan*, 923 F.3d 138, 154 (3d Cir. 2019).

### 3.     Resolution of Claim

The resolution of this claim is quite easy. Galletta has failed to identify any trial error or meritorious ineffectiveness claim. Accordingly, this claim also fails.

### B.     Galletta's Additional Motions

Galletta has filed motions for transcripts, to compel release of his case file, to take judicial notice and supplement section 2255 motion, and to take judicial notice. *See* Doc. Nos. 158–60, 163. The court will address each in turn.

### 1.     Motion for Transcripts

Galletta seeks to have the court direct that he receive a free transcript of the November 6, 2019 oral argument in which he argued on his own behalf. *See* Mot. for Transcripts at ECF p. 1, Doc. No. 158. He requests the free transcript so he can prepare his appeal if the court denies the instant section 2255 motion. *See id.* Galletta believes that the transcript is "necessary to document and support all of his claims that were raised during the oral arguments [sic]." *Id.* He also points out that he never received a transcript from the evidentiary hearing. *See id.*

In a limited set of circumstances, 28 U.S.C. § 753(f) provides the court with authority to provide an indigent defendant with transcripts at the government's expense.  Specifically, the court may do so in a section 2255 proceeding if "the trial judge or a circuit judge certifies that the suit or appeal is not frivolous and that the transcript is needed to decide the issue presented by the suit

or appeal." 28 U.S.C. § 753(f). Similarly, in a case involving an application for a writ of habeas corpus, "the clerk of any court of the United States shall furnish to the petitioner without cost certified copies of such documents or parts of the record on file in his office as may be required by order of the judge before whom the application is proceeding." 28 U.S.C. § 2250.

Here, while Galletta has not articulated a strong argument as to why the transcript of the oral argument is necessary for his appeal, because the court has referenced that oral argument in this opinion, the court will grant the motion, direct that a transcript be prepared from the November 6, 2019 oral argument, and direct the clerk of court to provide Galletta with that transcript and a transcript of the evidentiary hearing held on September 18, 2018.

## 2.    Motion to Compel Release of Case File

Galletta seeks a court order directing Attorney Holihan to release to Galletta his entire case file. *See* Mot. to Compel Release of Case File ("Mot. to Compel") at 1, Doc. No. 159. Galletta alleges that he sent a letter to Attorney Holihan on March 12, 2020, requesting that Attorney Holihan send him his entire case file. *See id.* at 2. Galletta even detailed the specific items that he "expected to be in the case file and to be returned." *Id.*

In support for this motion, Galletta focuses on Rule 1.16(d) of the Pennsylvania Rules of Professional Conduct, which he claims states, "[U]pon written request by the client, the lawyer shall promptly release to the client . . . the entire file relating to the matter."[138] *Id.* Galletta also

---

[138] Although it has no bearing on the outcome of this motion, Galletta has misquoted Rule 1.16(d). Rule 1.16(d) provides that

> (d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, ***surrendering papers and property to which the client is entitled*** and refunding any advance payment of fee or expense that has not been earned or incurred. ***The lawyer may retain papers relating to the client to the extent permitted by other law.***

Pa. R.P.C. 1.16(d) (emphasis added).

points out that (1) this district has adopted the Pennsylvania Rules of Professional Conduct in Rule 83.6 of the Local Civil Rules and (2) Rule 1.2 of this court's Local Criminal Rules has adopted Local Civil Rule 83.6. *See id.*[139] Galletta argues that Rule 1.16(d) requires Attorney Holihan to turn over the entire case file upon request, even if the file or certain portions of it are unnecessary or useless. *See id.* at 3–4. Nevertheless, Galletta claims that the entire case file is necessary and useful to an anticipated appeal. *See id.* at 4.

The court will deny this motion without prejudice because, contrary to Galletta's assertion, Attorney Holihan remains his counsel of record in this case (although there is a pending motion to withdraw, which the court will be granting via a separate order to be filed at the same time as this memorandum opinion and its accompanying order). Rule 1.16(d) only comes into effect "[u]pon termination of representation," Pa. R.P.C. 1.16(d), and Galletta's request to Attorney Holihan was premature as no court order had been entered to allow Attorney Holihan to withdraw as Galletta's counsel. *See* E.D. Pa. Loc. Civ. R. 5.1(b) ("An attorney's appearance may not be withdrawn except by leave of court, unless another attorney admitted to practice in this court shall at the same time enter an appearance for the same party, or another attorney admitted to practice in this court had previously entered an appearance for the same party and continues to represent that party in the

---

[139] In support of this statement, Galletta identifies the correct Local Civil Rule as Rule 86(IV)(B), but references the wrong passage in the Rule. Galletta focuses on the portion of the Rule stating that "[a]cts or omissions by an attorney admitted to practice before this court, . . . which violate the Rules of Professional Conduct adopted by this Court shall constitute misconduct and shall be grounds for discipline . . . ." Mot. to Compel at 2 (quoting E.D. Pa. Loc. Civ. R. 83.6(IV)(B)). This is not the portion of the Rule where this district court adopts the Pennsylvania Rules of Professional Conduct as the "Rules of Professional Conduct" referenced there is this district's rules. Galletta should have focused on the following sentence where the Rule states:

> The Rules of Professional Conduct adopted by this court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania, as amended from time to time by that state court, except as otherwise provided by specific rule of this Court after consideration of comments by representatives of bar associations within the state . . . .

*Id.*

matter.").[140] Nevertheless, Galletta does state that Attorney Holihan recognized that Galletta wanted his file insofar as he reached out to the BOP to inquire about the documents Galletta desired. *See* Mot. to Compel at 5. The court is confident that Attorney Holihan will comply with his ethical obligations concerning Galletta's case file if he has not already done so. If he does not, Galletta may refile this motion.[141]

### 3.    Motion to Take Judicial Notice and Supplement Amended Section 2255 Motion

Galletta has filed a motion to have the court take judicial notice of an aspect of his judgment and allow him to supplement his amended section 2255 motion to include a claim relating to his sentencing. *See* Doc. No. 160. Regarding the request for the court to take judicial notice, Galletta requests that the court take judicial notice that his judgment of conviction indicates that he was sentenced under section 2252(b)(1) and (2) without presenting the qualifying predicate offenses to a jury. *See* Mot. to Take Judicial Notice and to Suppl. 2255 Habeas Pet. at 1–2. He points out that the court sentenced him to (1) 240 months' imprisonment for transportation of child pornography, which would be within the 15-to-40-year guideline range under section 2252(b)(1); and (2) 120 months' imprisonment for possession of child pornography, which would meet the mandatory minimum of ten years under section 2252(b)(2). *See id.* at 2. Galletta argues that this sentence

---

[140] Local Criminal Rule 1.2 applies Local Civil Rule 5.1 to all criminal proceedings. *See* E.D. Pa. Loc. Crim. R. 1.2 ("The following Local Civil Rules shall be fully applicable in all criminal proceedings: Rule 5.1, Appearances . . . .").

[141] If Galletta refiles the motion, Galletta must address how this court has authority to compel Attorney Holihan, a private attorney, to produce client files to him pursuant to an ethical rule. Although Galletta identifies two cases in his motion in which courts ordered former attorneys to turn over client files to their clients pursuant to the jurisdiction-specific Rule 1.16(d), neither case explains **how** a federal court has authority to do so. In other words, while this court recognizes Attorney Holihan's ethical obligation under Rule 1.16(d) to turn over papers to which Galletta is entitled, Attorney Holihan is not a party to these proceedings, and there are cases in which courts have concluded they lack the authority to compel an attorney to turn over a client's file. *See Browning v. Cardwell*, Civ. A. No. 22cv74, 2023 WL 3069756, at *2 (E.D. Tex. Jan. 17, 2023) (declining request by plaintiff to use mandamus under 28 U.S.C. § 1361 to compel attorney to turn over client file), *report and recommendation adopted*, Civ. A. No. 22cv74, 2023 WL 3060780 (E.D. Tex. Apr. 24, 2023); *Chagoya v. United States*, No. 22-CV-356, 2022 WL 17403632, at *11–12 (E.D. Wisc. Dec. 2, 2022) (denying request by *pro se* section 2255 movant for order compelling former attorney to turn over case file); *United States v. Davis*, No. 17-cr-264, 2019 WL 7987814, at *1 (N.D. Tex. Nov. 27, 2019) (collecting cases and concluding that "the issue of a client's request for attorney's case file is a matter that should be resolved between the attorney and client, not in federal court").

violates that Fifth Amendment's Grand Jury Clause and the Sixth Amendment's fair notice requirement. *See id.* He also references his counsel being ineffective for failing to address this at the time of the sentencing hearing or on direct appeal. *See id.*

Concerning the motion to supplement, Galletta requests that the court allow him to supplement his amended section 2255 motion with a claim that the court erred in applying the U.S.S.G. § 2G2.2(b)(5) five-level sentencing enhancement for a pattern of activity involving the sexual abuse or exploitation of a minor. *See id.* Galletta claims that the court failed to apply the categorical approach when considering whether his previous convictions for corruption of minors under 18 Pa. C.S. § 6301(a) qualified. *See id.* at 2–3. He asserts that this court improperly considered the conduct giving rise to the convictions instead of the criminal statute itself. *See id.* at 3. He also notes that the Third Circuit has already indicated that a corruption of minors conviction under 18 Pa. C.S. § 6301 is not by default a conviction relating to an exploitation of a child in a sexual way. *See id.* (citing *United States v. Galo*, 239 F.3d 572 (3d Cir. 2001)).

Preliminarily, the court has construed Galletta's request for judicial notice as a motion to amend his amended section 2255 motion because he is clearly attempting to raise a new claim that he believes entitles him to relief under section 2255. If the court simply takes judicial notice of the judgment (which the court would not need to do anyway because it is already part of the record), it will not provide Galletta with any relief. In addition, the court construes the request to supplement as seeking leave to amend because Rule 15 of the Federal Rules of Civil Procedure applies to section 2255 motions, *see United States v. Duffus*, 174 F.3 333, 336 (3d Cir. 1999) ("The Federal Rules of Civil Procedure apply to motions to amend habeas corpus motions." (citation omitted)), and Rule 15(d), which applies to supplements, would not benefit Galletta here because it only pertains to "transaction[s], occurrence[s], or event[s] that happened ***after*** the date of the

pleading to be supplemented." Fed. R. Civ. P. 15(d) (emphasis added). Accordingly, the court will consider Galletta as moving to amend his amended section 2255 motions to add two new claims.

Rule 15(a) "allows pleading amendments 'with leave of court' any time during a proceeding." *Mayle v. Felix*, 545 U.S. 644, 655 (2005). Here, since Galletta filed the instant motion years beyond the limitations period in section 2255(f), this court can only grant him leave to amend if the new claims "relate back to the date of the original pleading." *Id.* Claims "relate back" to the original section 2255 motion if they "arose out of the conduct, transaction, or occurrence set out" in the original motion. *See* Fed. R. Civ. P. 15(c); *Mayle*, 545 U.S. at 655. "[C]ourts should not interpret 'conduct, transaction, or occurrence' in such a broad manner so as to construe essentially all amendments as permissible under the relation-back doctrine." *United States v. Santarelli*, 929 F.3d 95, 101 (3d Cir. 2019). Thus, "an amendment relates back to a habeas petition under Rule 15(c) '[s]o long as the original and amended petitions state claims that are tied to a *common core of operative facts*.'" *Id.* (alteration in original) (quoting *Mayle*, 545 U.S. at 664).

When analyzing whether there is a common core of operative facts between the original motion and the proposed amendment,

> courts should remain aware that "the touchstone for relation back is fair notice, because Rule 15(c) is premised on the theory that 'a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide,'" *Glover v. FDIC*, 698 F.3d 139, 146 (3d Cir. 2012). "Thus, only where the opposing party is given 'fair notice of the general fact situation and the legal theory upon which the amending party proceeds' will relation back be allowed." *Glover*, 698 F.3d at 146 (quoting *Bensel*, 387 F.3d at 310). For example, we have held that "amendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction[,] or occurrence in the preceding pleading fall within Rule 15(c)" because the opposing party will have had sufficient notice of the circumstances surrounding the allegations contained in the amendment. *Bensel*, 387 F.3d at 310.

*Id.* (alteration in original).

Here, Galletta falls far short in demonstrating that his new claims are tied to a "common core of operative facts" from either his original or his amended section 2255 motions. *Mayle*, 545 U.S. at 664. None of Galletta's numerous claims in his original and amended section 2255 motions would have provided the government with any notice that he was going to assert what is essentially an *Apprendi v. New Jersey*, 530 U.S. 466 (2000) challenge to his sentence and argue that the court wrongly imposed the U.S.S.G. § 2G2.2.(b)(5) five-level enhancement, whether as direct claims or under the guise of ineffective assistance of counsel claims. Accordingly, the court will deny Galletta's request for leave to amend.[142]

---

[142] Although the court will deny the motion because the new claims do not relate back, the court also notes that Galletta's two new claims are frivolous. Concerning his first proposed amendment, namely, the inclusion of section 2252(b)(1) and (2) on the judgment, Galletta has fabricated a narrative of what occurred during sentencing to fit his argument. For example, Galletta ignores that for his conviction for transporting child pornography, section 2252(b)(1) provides that he would be "fined under this title and imprisoned not less than 5 years and not more than 20 years." 18 U.S.C. § 2252(b)(1). Galletta was sentenced to the maximum allowable sentence of 20 years under section 2252(b)(1). In addition, the presentence report indicated that the maximum sentence the court could impose for this offense was 20 years (and not 40 years as would have been allowable under the second part of section 2252(b)(1). *See* 28 U.S.C. § 2252(b)(1) (stating that if person convicted of violating section 2252(a)(1) "has a prior conviction under this chapter, section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, or sex trafficking of children, such person shall be fined under this title and ***imprisoned for not less than 15 years nor more than 40 years***" (emphasis added)).

Similarly, for Galletta's conviction for possessing child pornography under section 2252(a)(4)(B), the reference to section 2252(b)(2) in the judgment of conviction does not refer to anything else other than the sentence directed by the first portion of the statute. A person convicted for violating section 2252(a)(4)(B) "shall be fined under this title and imprisoned not more than 10 years, or both." 18 U.S.C. § 2252(b)(2). The court imposed a sentence of ten-years' imprisonment for Galletta's conviction, which was the maximum the court could impose under the statute. *See id.* Once again, Galletta's contention is contradicted by the presentence report indicating that the maximum sentence the court could impose for this offense was ten years' incarceration (and not 20 years as would have been allowable under the second part of section 2252(b)(2). *See* 28 U.S.C. § 2252(b)(2) (providing that if person convicted of violating section 2252(a)(4) possessed "any visual depiction involved in the offense [that] involved a prepubescent minor or a minor who had not attained 12 years of age, such person shall be fined under this title and imprisoned for not more than 20 years, or if such person has a prior conviction under this chapter, chapter 71, chapter 109A, or chapter 117, or under section 920 of Title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 10 years nor more than 20 years").

As for Galletta's second proposed claim, U.S.S.G. § 2G2.2(b)(5) provides for a five-level increase "[i]f the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2(b)(5). The commentary to this section defines a "pattern of activity involving the sexual abuse or exploitation of a minor" as "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant, whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." U.S.S.G. § 2G2.2, cmt. n.1.

**4.      Motion for the Court to Take Judicial Notice of Portion of Grand Jury Transcript**

Galletta has filed a motion seeking to have the court take judicial notice of one page of the transcript from the grand jury proceedings held before the grand jury returned the original indictment. *See* Doc. No. 163. The court denies this motion.

As indicated above, Galletta claims that his defense counsel were ineffective for failing to challenge the sufficiency of the superseding indictment. The transcript page Galletta attaches to his motion could never support his claim that his counsel were ineffective because "the law is clear that an indictment cannot be challenged based on inadequacy or insufficiency of the evidence presented to the grand jury." *United States v. Teva Pharms. USA, Inc.*, Crim. A. No. 20-200, 2022 WL 7528898, at *2 (E.D. Pa. Oct. 13, 2022) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)); *United States v. Doe*, 429 F.3d 450, 453 (3d Cir. 2005); *United States v. Katzin*, 707 F. App'x 116, 120 (3d Cir. 2017); *United States v. Totoro*, Crim. A. No. 15-291, 2017 WL 3189216 at *4, 2017 U.S. Dist. LEXIS 117371 at *10 (E.D. Pa. July 27, 2017)).[143] Therefore, even if the court took judicial notice of this single page, which the court will not do, Galletta cannot show that defense counsel's conduct was objectively unreasonable or that he suffered prejudice under

---

Galletta's argument fails because U.S.S.G. § 2G2.2(b)(5) is not limited to the elements of the offenses for the prior convictions. In other words, courts do not apply a categorical approach when determining whether the enhancement applies. Instead, it is "an offense-specific enhancement that 'punish[es] a defendant for ***the specific characteristics*** of the offenses of conviction.'" *United States v. Seibert*, 971 F.3d 396, 400 (3d Cir. 2020) (quoting *United States v. Dowell*, 771 F.3d 162, 171 (4th Cir. 2014)), *opinion clarified*, 991 F.3d 1313 (3d Cir. 2021). Galletta does not, and cannot, argue that the facts underlying his prior convictions for corruption of minors do not qualify as two "separate instances of the sexual abuse or sexual exploitation of a minor." U.S.S.G. § 2G2.2, cmt. n.1. Therefore, this claim is also frivolous.

[143] In *Costello*, the Supreme Court explained why such challenges are improper:

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

350 U.S. at 363 (internal footnote omitted).

*Strickland* when any motion counsel would have filed based on that page would have been frivolous.[144]

### III.    CONCLUSION

For the reasons set forth above, Galletta has not shown that he is entitled to relief on any claim raised in his amended section 2255 motion and, as such, the court will deny the motion. The court will grant Galletta's motion for transcripts of the evidentiary hearing and oral argument on the amended section 2255 motion. The court will deny Galletta's motions (1) for judicial notice and to supplement his amended section 2255 motion (which the court construed as motions to amend the amended section 2255 motion), (2) to compel release of his case file, and (3) to take judicial notice of one page of a transcript prepared from the grand jury proceedings prior to the returning of the original indictment. Further, the court will not issue a certificate of appealability.[145]

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.

---

[144] Although he has not articulated this claim, he also cannot show that his counsel were ineffective for failing to file a motion under Rule 6(e)(3)(E)(ii) for the disclosure of grand jury materials for similar reasons. There is no indication whatsoever, much less a reasonable likelihood, that this court would have granted any request for a transcription of the grand jury proceedings.

In addition, as stated earlier in this opinion, Agent Smith did not misrepresent the nature of the image and, moreover, and most importantly, the jury found that this image constituted child pornography. Further, while Galletta appears to forget that his challenge to the superseding indictment is through the vehicle of ineffective assistance of counsel and not a direct challenge to the superseding indictment, he surely has not demonstrated that count two was obtained through reckless or intentional deceit, a deliberate misrepresentation, or other corrupt means.

[145] To be entitled to a certificate of appealability, Galletta must show, *inter alia*, reasonable jurists would debate whether this court was correct in its ruling. *See Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) ("To obtain a COA under § 2253, a habeas petitioner must make a substantial showing of the denial of a constitutional right, a demonstration that . . . includes a showing that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement further." (internal quotation marks and citation omitted)). The court does not find that a reasonable jurist would disagree with the court's assessment and resolution of Galletta's claims.

# Attachment 1

4/23/15

HONORABLE  JUDGE  SMITH

I AM WRITING YOU DIRECTLY BECAUSE I NEED MY VOICE HEARD. ONCE I HAD RECEIVED NOTICE THAT MY FEDERAL CASE WOULD BE ASSIGNED TO YOU I HAD EXPRESSED CONCERN. I DO NOT FEEL THAT YOU CAN BE IMPARTIAL BECAUSE YOU DEMONSTRATED PARTIALITY WHILE PRESIDING AND SENTENCING IN MY STATE CASE.  I UNDERSTAND THE STANDARD TO BE USED BY A JUDGE WHEN DECIDING WHETHER HE SHOULD OR SHOULD NOT RECUSE HIMSELF IS "WHEN IT IS REASONABLE FOR EITHER PARTY IN THE CASE TO BELIEVE THAT THE PRESIDING JUDGE MAY NOT BE IMPARTIAL." SO IT IS NOT WHETHER YOU FEEL YOU CAN BE OR ARE INFACT ACTUALLY IMPARTIAL AS YOU STATED AT OUR LAST HEARING. I EXPRESSED BOTH ORALLY AND WRITTEN TO MY LAWYERS [prior to 4/10/15] TO FORMALLY REQUEST THAT YOU RECUSE YOURSELF AND ALLOW THIS CASE TO BE PRESIDED OVER BY ANOTHER JUDGE. THEY DID NOT ASK YOU TO RECUSE YOURSELF. I DO NOT WANT TO WAIVE THIS ARGUMENT. I ABSOLUTELY REQUESTED THEM TO ASK YOU TO RULE ON OUR ARGUMENT THAT A JUDGE WHO PRESIDED OVER A PREVIOUS TRIAL SHOULD NOT THEN BE ABLE TO PRESIDE OVER ANOTHER TRIAL BY SAME DEFENDANT. SEVERAL OTHER LAWYERS SAID IT IS UNHEARD OF AND I WOULD BE ABLE TO APPEAL ON THIS ARGUMENT. PLEASE UNDERSTAND, I AM NOT TRYING TO OFFEND YOU, HOWEVER, I AM TRYING TO EXERCISE MY LEGAL RIGHTS AND OPTIONS. I ASKED CATHY MEEHAN IMMEDIATELY AFTER OUR HEARING WHY THEY NEVER ASKED YOU? SHE STATED I COULD STILL USE THIS ARGUMENT ON APPEAL IF I LOSE. I DO NOT BELIEVE THIS. THE LAW LIBRARY COMPUTER CLEARLY SAYS THAT ANY ARGUMENT NOT RAISED AND RULED ON DURING TRIAL PROCESS IS CONSIDERED WAIVED. I

Am not waiving this argument. I am asking you to rule on our objection to you presiding over this trial. Whatever your decision, I am sure that you would consider it reasonable for a defendant to believe a judge who presided over a previous trial and then sentenced him to the maximum sentence possible after agreeing to a time served sentence would be partial. Even the superior court published their opinion that your sentence though legal was excessive. If you choose to keep this case, I would like to raise this issue on appeal.

Thank you,

Brent Galletta.

P.S. I objected from the beginning. I never waived my objection.